**No. 26-1898**

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

AFRICAN COMMUNITIES TOGETHER; DAVID DOE, individually and on behalf of all others similarly situated; JACOB DOE, individually and on behalf of all others similarly situated; MARY DOE, individually and on behalf of all others similarly situated; PETER DOE, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security; UNITED STATES DEPT. OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UNITED STATES,

*Defendants-Appellees*

On Appeal from the United States District Court for the District of Massachusetts

## APPELLANTS' OPENING BRIEF

Melissa Keaney
Nargis Aslami
Abbey Rutherford
MUSLIM ADVOCATES
1763 Columbia Rd. N.W.
#14324
Washington, D.C. 20009
(202) 897-2622

Erik Matthew Crew
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Rd
Ste H1
San Diego, CA 92120
(949) 603-7411

Daniel G. Randolph
Mark H. Lynch
Kathleen Choi
Yevgeniy Pilipovskiy
Kristin M. Oakley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-6000

Sarah Leadem
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000

*Counsel for Plaintiffs-Appellants*

## DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants submit the following statement:

African Communities Together has no parent corporation and does not issue stock.

*/s/ Daniel G. Randolph*
Daniel G. Randolph

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**


DISCLOSURE STATEMENT ........ ii

TABLE OF AUTHORITIES ........ v

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........ xv

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 4

STATEMENT OF THE ISSUES ........ 5

STATEMENT OF THE CASE ........ 5

A. The TPS Statutory Framework ........ 5

B. The Homeland Security Act of 2002 ........ 7

C. South Sudan's TPS Designation, Repeated Extensions and Redesignations, and Termination ........ 9

D. Plaintiffs' Initial Challenge to the Termination ........ 10

E. The Supreme Court's Decision in *Mullin v. Doe* ........ 11

F. Plaintiffs' New Claims, Which *Mullin* Did Not Consider ........ 13

STANDARD OF REVIEW ........ 15

SUMMARY OF ARGUMENT ........ 15

ARGUMENT ........ 20

I. The Secretary's Action Was *Ultra Vires* Because the Attorney General Alone Has the Statutory Authority to Terminate a TPS Designation ........ 20

A. Congress Unambiguously Vested TPS Termination Authority Exclusively in the Attorney General ........ 20

B. The District Court's Contrary Theory—Abandoned by Defendants—Disregards the Text and the Statutory Scheme ............ 24

1. The District Court Rewrote the Statute and Created Surplusage ........................................................................ 25

2. The District Court Ignored Evidence in the Same Statute that the EOIR-Only Theory Is Wrong .................................... 29

3. The District Court Selectively Read the Drafting History....... 34

4. The District Court Deferred to an Unexplained and Irrelevant Agency "Practice" ................................................ 36

C. Plaintiffs' *Ultra Vires* Claim Is Not "Self-Defeating"....................... 38

D. Nothing Forecloses the Review of Plaintiffs' *Ultra Vires* Claim ...... 40

II. The DHS Secretary's Deprivation of Plaintiffs' Liberty and Property Interests Violated Procedural Due Process.................................................. 42

A. TPS Recipients Have Constitutionally Protected Liberty and Property Interests in Their TPS Benefits ......................................... 43

B. Plaintiffs Were Deprived of Protected Interests Without Constitutionally Adequate Process ................................................. 46

1. The Secretary Was Required to Provide Adequate Notice of the Basis for Termination, But Failed to Do So .................. 46

2. The Secretary Was Required to Engage in Consultation, But Failed to Do So................................................................ 48

C. The District Court Mischaracterized Plaintiffs' Interests and the Nature of Their Challenge............................................................. 50

III. The Remaining Factors Overwhelmingly Favor Plaintiffs, as the District Court Previously Found................................................................ 54

CONCLUSION ............................................................................................. 55

CERTIFICATE OF COMPLIANCE.............................................................. 57

CERTIFICATE OF SERVICE ....................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases


*Acosta v. Loc. Union 26, UNITE HERE*,
895 F.3d 141 (1st Cir. 2018)....................27

*Adame v. Holder*,
762 F.3d 667 (7th Cir. 2014)....................53

*Afr. Cmtys. Together v. Mullin*,
2026 WL 2364398 (D. Mass. Aug. 14, 2026)....................15, 41

*Afr. Cmtys. Together v. Mullin*,
840 F. Supp. 3d 86 (D. Mass. 2026)....................14, 37, 41

*Aponte-Torres v. Univ. of P.R.*,
445 F.3d 50 (1st Cir. 2006)....................43

*Batalla Vidal v. Nielsen*,
291 F. Supp. 3d 260 (E.D.N.Y. 2018)....................51

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972)....................44

*BedRoc Ltd., LLC v. United States*,
541 U.S. 176 (2004)....................25

*Beitzell v. Jeffrey*,
643 F.2d 870 (1st Cir. 1981)....................45

*Bell v. Burson*,
402 U.S. 535 (1971)....................44

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020)....................36

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)....................20

*Bridges v. Wixon*,
326 U.S. 135 (1945)....................44

*Brown v. Gardner*,
513 U.S. 115 (1994) ............ 36

*CASA, Inc. v. Noem*,
792 F. Supp. 3d 576 (D. Md. 2025) ............ 9

*Castillo-Villagra v. INS*,
972 F.2d 1017 (9th Cir. 1992) ............ 47

*Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*,
144 F.4th 9 (1st Cir. 2025) ............ 15

*Ching v. Mayorkas*,
725 F.3d 1149 (9th Cir. 2013) ............ 44

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ............ 20

*Club Misty, Inc. v. Laski*,
208 F.3d 615 (7th Cir. 2000) ............ 52

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004) ............ 42

*In re Coughlin*,
33 F.4th 600 (1st Cir. 2022) ............ 28

*Cousins v. Sec'y of U.S. Dep't of Transp.*,
880 F.2d 603 (1st Cir. 1989) ............ 42

*David v. Heckler*,
591 F. Supp. 1033 (E.D.N.Y. 1984) ............ 47

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ............ 39

*Dia v. Ashcroft*,
353 F.3d 228 (3d Cir. 2003) (en banc) ............ 53

*Doe v. Mullin*,
2026 WL 2279577 (N.D. Ill. Aug. 7, 2026) ............ 41

*Duarte v. Mayorkas*,
27 F.4th 1044 (5th Cir. 2022) ....................9

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....................29

*Febus v. Gallant*,
866 F. Supp. 45 (D. Mass. 1994)....................47

*Fleet Nat'l Bank v. H&D Ent., Inc.*,
96 F.3d 532 (1st Cir. 1996)....................5

*FTC v. Mandel Bros., Inc.*,
359 U.S. 385 (1959)....................33

*Garcia-Rubiera v. Fortuno*,
665 F.3d 261 (1st Cir. 2011)....................52

*Gen. Dynamics Land Sys., Inc. v. Cline*,
540 U.S. 581 (2004)....................36

*Glassman v. Computervision Corp.*,
90 F.3d 617 (1st Cir. 1996)....................15

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
559 U.S. 280 (2010)....................29

*Guerrero Orellana v. Moniz*,
802 F. Supp. 3d 297 (D. Mass. 2025)....................54

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995)....................33

*Hampton v. Mow Sun Wong*,
426 U.S. 88 (1976)....................49

*Household Credit Servs., Inc. v. Pfennig*,
541 U.S. 232 (2004)....................33

*Hunt v. Massi*,
773 F.3d 361 (1st Cir. 2014)....................4

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)....27

*Ky. Dep't of Corr. v. Thompson*,
490 U.S. 454 (1989)....45

*Lackey v. Stinnie*,
604 U.S. 192 (2025)....25

*Lamie v. U.S. Tr.*,
540 U.S. 526 (2004)....26

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....50

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....1, 36

*Make the Rd. N.Y. v. Mullin*,
179 F.4th 16 (D.C. Cir. 2026)....51

*Mansor v. USCIS*,
685 F. Supp. 3d 1000 (W.D. Wash. 2023)....45

*Marbury v. Madison*,
5 U.S. 137 (1803)....1

*Marincas v. Lewis*,
92 F.3d 195 (3d Cir. 1996)....53

*Marx v. Gen. Revenue Corp.*,
568 U.S. 371 (2013)....27

*Mathews v. Eldridge*,
424 U.S. 319 (1976)....42, 46, 47, 48, 49

*Mayburg v. Sec'y of Health & Hum. Servs.*,
740 F.2d 100 (1st Cir. 1984)....37

*Mejia Rodriguez v. DHS*,
562 F.3d 1137 (11th Cir. 2009)....9

*Morrissey v. Brewer*,
408 U.S. 471 (1972)....................48

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950)....................46, 47

*Mullin v. Al Otro Lado*,
609 U.S. 258 (2026)....................28

*Mullin v. Doe*,
609 U.S. 324 (2026)....................11, 12, 17, 39

*Nat'l Park Conservation Ass'n v. U.S. Dep't of the Interior*,
178 F.4th 805 (1st Cir. 2026)....................4

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)....................37

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)....................38

*Nozzi v. Hous. Auth. of L.A.*,
806 F.3d 1178 (9th Cir. 2015)....................51

*O'Connell v. Marrero-Recio*,
724 F.3d 117 (1st Cir. 2013)....................40

*Perry v. Sindermann*,
408 U.S. 593 (1972)....................45

*Perttu v. Richards*,
605 U.S. 460 (2025)....................41

*Portillo-Rendon v. Holder*,
662 F.3d 815 (7th Cir. 2011)....................53

*R.J.S.V. v. Hernandez*,
2026 WL 2085854 (W.D. Wash. July 20, 2026)....................47

*Sackett v. EPA*,
598 U.S. 651 (2023)....................36

*Saget v. Trump*,
375 F. Supp. 3d 280 (E.D.N.Y. 2019) ....................................................... 9, 45

*Sanchez v. Mayorkas*,
593 U.S. 409 (2021) ....................................................................................... 44

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ....................................................................................... 37

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001) ....................................................................................... 36

*Somerville Pub. Schs. v. McMahon*,
139 F.4th 63 (1st Cir. 2025) .......................................................................... 55

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ....................................................................................... 39

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................................................................................... 39

*Truax v. Raich*,
239 U.S. 33 (1915) ......................................................................................... 44

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ......................................................................................... 27

*United States v. 1.04 Acres of Land, More or Less, Situate in Cameron Cnty., Tex.*,
538 F. Supp. 2d 995 (S.D. Tex. 2008) ........................................................... 32

*United States v. Charles*,
456 F. Supp. 3d 268 (D. Mass. 2020) ............................................................. 33

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) ....................................................................... 51

*Webster v. Fall*,
266 U.S. 507 (1925) ....................................................................................... 41

*Whitman v. United States*,
574 U.S. 1003 (2014) ..................................................................................... 42

*Wilkinson v. Austin*,
545 U.S. 209 (2005)....................................................................................48

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
186 F.4th 25 (1st Cir. 2026).........................................................................15

*Zadvydas v. Davis*,
533 U.S. 678 (2001)....................................................................................42

**Statutes**

5 U.S.C. § 706(2) ...........................................................................................2, 38

6 U.S.C.
§ 251.........................................................................................8, 23, 28
§ 271.........................................................................................8, 23, 28
§ 542..................................................................................................8
§ 542 note...................................................................................8, 23, 28
§ 552................................................................................................22
§ 557................................................................................................22

8 U.S.C.
§ 1103..............................................................................................21
§ 1103(a) ..................................................................2, 8, 16, 21, 25, 33
§ 1103(b)...........................................................................................32
§ 1103(g).......................................................................................24, 28
§ 1105..............................................................................................31
§ 1105(b)...........................................................................................31
§ 1189..............................................................................................30
§ 1231(*i*)...........................................................................................32
§ 1254a.......................................................................9, 22, 25, 34
§ 1254a(a) ...................................................................5, 6, 43, 44, 45
§ 1254a(b)(1) ..................................................................................6, 21
§ 1254a(b)(2) .......................................................................................6
§ 1254a(b)(3) ....................................2, 3, 6, 7, 15, 16, 20, 24, 45, 46, 48, 49, 52
§ 1254a(b)(5)(A)...........................................................................12, 17, 41
§ 1254a(c)(1).........................................................................................6
§ 1254a(d)(3) .......................................................................................2
§ 1254a(d)(4) .......................................................................................5
§ 1451(f)............................................................................................33

8 U.S.C.
§ 1531 .......... 30
§ 1532 .......... 29, 30
§ 1533 .......... 30
§ 1534 .......... 30
§ 1535 .......... 30
§ 1536 .......... 30
§ 1537 .......... 30

28 U.S.C. § 2401(a) .......... 39

Act to Amend Immigration and Nationality Act,
Pub. L. No. 112-58, 125 Stat. 747 (Nov. 23, 2011) .......... 35

Antiterrorism and Effective Death Penalty Act of 1996,
Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) .......... 30

Homeland Security Act of 2002,
Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) .......... 7

Homeland Security Act Amendments of 2003,
Pub. L. No. 108-7, 117 Stat. 11 (Feb. 20, 2003) .......... 21

Immigration Act of 1990,
Pub. L. No. 101-649, 104 Stat. 4978 (Nov. 29, 1990) .......... 5

Immigration and Nationality Act of 1952,
Pub. L. No. 82-414, 66 Stat. 163 (June 27, 1952) .......... 32, 33

Omnibus Consolidated Appropriations Act of 1997,
Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996) .......... 32

REAL ID Act of 2005,
Pub. L. No. 109-13, 119 Stat. 231 (May 11, 2005) .......... 35

USA PATRIOT Act,
Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001) .......... 31

Violence Against Women and DOJ Reauthorization Act of 2005,
Pub. L. No. 109-162, 119 Stat. 2960 (Jan. 5, 2006) .......... 35

Violent Crime Control and Law Enforcement Act of 1994,
Pub. L. No. 103-322, 108 Stat. 1796 (Sept. 13, 1994) .......... 32

**Legislative Materials**

H.R. 750, 110th Cong (2007)....................35

H.R. 1415, 108th Cong. (2003)....................35

S. 2454, 109th Cong. (2006)....................35

S. Amend. 4471 to H.R. 5005, 107th Cong. (2002)....................26

S. Amend. 4738 to S. Amend. 4471, 107th Cong. (2002)....................26

S. Amend. 4901 to H.R. 5005, 107th Cong. (2002)....................27

**Regulatory Materials**

8 C.F.R. § 244.19....................50

56 Fed. Reg. 618 (Jan. 7, 1991)....................7

57 Fed. Reg. 2,930 (Jan. 24, 1992)....................7

58 Fed. Reg. 7,582 (Feb. 8, 1993)....................7

63 Fed. Reg. 15,437 (Mar. 31, 1998)....................7

65 Fed. Reg. 52,789 (Aug. 30, 2000)....................7

67 Fed. Reg. 12,633 (Mar. 19, 2002)....................31

68 Fed. Reg. 23,744 (May 5, 2003)....................9, 21

76 Fed. Reg. 63,629 (Oct. 13, 2011)....................9

82 Fed. Reg. 47,228 (Oct. 11, 2017)....................22

88 Fed. Reg. 60,971 (Sept. 6, 2023)....................10

90 Fed. Reg. 10,511 (Feb. 24, 2025)....................21

90 Fed. Reg. 19,217 (May 6, 2025)....................10

91 Fed. Reg. 10,402 (Mar. 3, 2026)....................10

91 Fed. Reg. 57,675 (Sept. 10, 2026)....................31

**Other Authorities**

Brief for Appellants, *Ramos v. Nielsen*, No. 18-16981 (9th Cir. Nov. 29, 2018), 2018 WL 6420267 ........ 21

Brief for the Respondents, *Miot v. Trump*, No. 25-1077 (U.S. May 22, 2026) ........ 22

Bureau of Just. Assistance, U.S. Dep't of Just., *State Criminal Alien Assistance Program (SCAAP)*, https://bja.ojp.gov/program/scaap/overview (last visited Oct. 21, 2026) ........ 32

Fed. Bureau of Investigation, *National Crime Information Center (NCIC)*, https://le.fbi.gov/informational-tools/ncic (last visited Oct. 21, 2026) ........ 31

Press Release, DOJ, Off. of Pub. Affs., Department of Justice Files First Case in U.S. Alien Terrorist Removal Court to Deport Afghan Alien Who Supported Her Family's Plans for Election-Day Shooting (July 30, 2026) ........ 30

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument. This appeal presents novel and important questions concerning the allocation of immigration-related authorities within the Executive Branch and the scope of procedural due process protections applicable to certain immigration-related decisions that impact large but defined groups of individuals. These issues arise in the context of the Temporary Protected Status ("TPS") program, which for decades has granted work authorization and protection from removal to thousands of noncitizens from nations undergoing armed conflict, natural disasters, and other extraordinary circumstances. Given the novelty, complexity, and stakes of this appeal, Plaintiffs-Appellants submit that oral argument would be of assistance to the Court.

## INTRODUCTION

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). And judges may not "disregard[] that responsibility just because an Executive Branch agency views a statute differently." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). As a result, it is common for an agency to apply a statute incorrectly for decades—until a lawsuit brings the error to light.

This is such a case. In light of extraordinary conditions in the nation of South Sudan—including widespread armed conflict, torture, severe flooding, and disease outbreaks—South Sudanese nationals living in the United States were eligible since 2011 for Temporary Protected Status ("TPS"), which provides beneficiaries with protection from removal and authorization to work in the United States. In November 2025, following a practice that had been unquestioningly followed for years, the Secretary of Homeland Security purported to terminate the nation's TPS designation (the "Termination"). But the Secretary had no authority to issue that decision. Congress vested TPS termination authority exclusively in the Attorney General, *not* the Secretary.

The statutory text is crystal clear. When Congress established TPS in 1990, it repeatedly and unambiguously provided that the "Attorney General"—and only the "Attorney General"—possesses the authority to terminate a TPS designation.

*See* 8 U.S.C. § 1254a(b)(3)(B), (d)(3). For more than a decade, the TPS statute was administered consistently with that statutory delegation, with the Attorney General alone terminating TPS designations. But in 2003, that changed. The Department of Homeland Security ("DHS") for the first time claimed that when Congress passed the Homeland Security Act the prior year, it had transferred *all* TPS-related authority from the Attorney General to the DHS Secretary. And from that point onward, the DHS Secretary—not the Attorney General—purported to make TPS designation and termination decisions. That shift was based on a fundamental misreading of the statutory scheme, which expressly *reserved* to the Attorney General immigration-related "powers, functions, and duties conferred upon the … Attorney General" prior to the Act's passage. *Id.* § 1103(a)(1). Because the power to terminate a TPS designation is among those reserved powers, the DHS Secretary's purported Termination is *ultra vires* and must be "set aside." 5 U.S.C. § 706(2).

The district court reached the opposite conclusion only by adopting a theory that Defendants unveiled for the first time in response to Plaintiffs' suit, and then quickly *abandoned* before the district court even rendered its decision. It is obvious why Defendants discarded the theory: It requires rewriting the statutory provisions at issue and is at war with the broader scheme. The theory posits that the only immigration-related powers reserved to the Attorney General following the Homeland Security Act's reorganization were those related to the Executive Office

for Immigration Review ("EOIR"), but the statutory scheme is replete with examples of *non*-EOIR immigration powers that the Attorney General exercised before 2002 and continues to exercise to this day. The district court dodged that evidence in a footnote asserting that these contrary examples were simply "not before" it. Instead, the district court relied on the Secretary's "practice" in terminating TPS designations—a rationale that is indefensible, particularly in the *Loper Bright* era, and would allow agencies to seize statutory authority by adverse possession.

The Termination is also invalid for a separate and independent reason: It deprived Plaintiffs and other TPS beneficiaries of constitutionally protected liberty and property interests without due process. TPS status conveys protection from removal and work authorization, and the Termination automatically deprived South Sudanese TPS beneficiaries of those liberty and property interests. That triggers mandatory procedural safeguards under the Constitution. And because Congress understood this, at least two of those constitutionally required safeguards are *also* codified in the TPS statute, which requires "consultation with appropriate agencies" and "notice" of the actual "basis for the determination." 8 U.S.C. § 1254a(b)(3)(A). In a previous order, the district court recognized that the Secretary flouted those statutory safeguards when issuing the Termination. But when presented with the question of whether those same safeguards are independently required under the Constitution, the district court concluded that due process applies only to individual

adjudications. That ruling is not only contrary to precedent; it would mean that due process disappears whenever a deprivation affects a large number of people at once.

Plaintiffs have been unlawfully deprived of constitutionally protected interests by an official with no authority to take the challenged action. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*, and the Fifth Amendment to the United States Constitution. JA208, 269-278.

On August 7, 2026, the district court denied Plaintiffs' motion to amend the complaint to add new claims and a renewed request for postponement under 5 U.S.C. § 705 pending final resolution of the new claims. Add.15. Plaintiffs timely filed a notice of appeal on August 7, 2026. JA281. This Court has jurisdiction to review the denial of the postponement motion under 28 U.S.C. § 1292(a)(1). *See Nat'l Park Conservation Ass'n v. U.S. Dep't of the Interior*, 178 F.4th 805, 806 (1st Cir. 2026). The Court has jurisdiction to address the denial of the motion for leave to amend because it is both "inextricably intertwined" with the postponement motion and "necessary to ensure meaningful review" of the latter. *Hunt v. Massi*, 773 F.3d 361,

371 (1st Cir. 2014); *see also Fleet Nat'l Bank v. H&D Ent., Inc.*, 96 F.3d 532, 537 (1st Cir. 1996).

## STATEMENT OF THE ISSUES

1. Whether the Secretary of Homeland Security's termination of South Sudan's TPS designation was *ultra vires*, where Congress expressly vested the relevant authority in the "Attorney General" and expressly reserved that authority to the "Attorney General" when transferring other powers to the Secretary.

2. Whether the Secretary of Homeland Security violated procedural due process, where the termination of South Sudan's TPS designation deprived Plaintiffs of liberty and property interests without adherence to mandatory notice and consultation requirements.

## STATEMENT OF THE CASE

### A. The TPS Statutory Framework

Congress created the TPS program in 1990 to provide humanitarian relief to nationals of designated countries facing armed conflict, natural disasters, or other extraordinary conditions. Immigration Act of 1990, Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5030-38 (Nov. 29, 1990) (codified as amended at 8 U.S.C. § 1254a). During the period of time a country is designated under TPS, eligible nationals present in the United States may apply to receive protection from removal and work authorization. 8 U.S.C. § 1254a(a)(1), (a)(4), (d)(4).

Congress vested authority over the TPS program in the "Attorney General," who alone may designate countries for TPS, 8 U.S.C. § 1254a(b)(1); extend designations, *id.* § 1254a(b)(3)(C); and terminate designations, *id.* § 1254a(b)(3)(B). A designation lasts for six to eighteen months. *Id.* § 1254a(b)(2). Before it expires, the Attorney General must "consult[] with appropriate agencies of the Government," "review the conditions in the foreign state," and determine whether the conditions for designation "continue to be met." *Id.* § 1254a(b)(3)(A). If the Attorney General determines that a country no longer meets the statutory conditions for TPS, she must terminate the designation. *Id.* § 1254a(b)(3)(B). Otherwise, the designation is extended automatically by operation of law. *Id.* § 1254a(b)(3)(C). The Attorney General must publish the determination and "the basis for the determination" in the Federal Register. *Id.* § 1254a(b)(3)(A), (B). A termination may not take effect sooner than 60 days after publication. *Id.* § 1254a(b)(3)(B), (d)(3).

Once a country is designated for TPS, its nationals may apply for TPS by meeting statutory eligibility requirements, such as continuous physical presence and registration. *Id.* § 1254a(c)(1)(A)(i)-(iv). Applicants who establish *prima facie* eligibility "shall be provided" TPS benefits pending a final determination on their applications. *Id.* § 1254a(a)(4)(B). Those benefits include protection from removal and work authorization. *Id.* § 1254a(a)(1)(A)-(B). Although a TPS designation is

discretionary, terminations may be effectuated only in accordance with defined statutory criteria. *Id.* § 1254a(b)(3).

For more than a decade, the Attorney General exercised the principal TPS authorities, including termination. In 1991, the Department of Justice ("DOJ") delegated certain operational TPS functions to the Immigration and Naturalization Service ("INS") (at the time, a subagency in DOJ), including authority to find individual noncitizens eligible for TPS and process applications. *See* 56 Fed. Reg. 618, 618-20 (Jan. 7, 1991) (codified as amended at 8 C.F.R. pt. 244). But no delegation authorized any subordinate official to exercise the Attorney General's power to designate or terminate a foreign state's designation under 8 U.S.C. § 1254a. Accordingly, the Attorney General herself issued all TPS country designations and terminations.[1]

### B. The Homeland Security Act of 2002

In 2002, Congress passed the Homeland Security Act, which created DHS and transferred many immigration-related powers from DOJ to DHS. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002). For example, the Act transferred INS's border patrol, inspections, and investigations

[1] *See, e.g.*, 65 Fed. Reg. 52,789, 52,791 (Aug. 30, 2000) (Bosnia-Herzegovina TPS termination); 63 Fed. Reg. 15,437, 15,438 (Mar. 31, 1998) (Liberia TPS termination); 58 Fed. Reg. 7,582 (Feb. 8, 1993) (Lebanon TPS termination); 57 Fed. Reg. 2,930, 2,931 (Jan. 24, 1992) (Kuwait TPS termination).

functions, *see* 6 U.S.C. § 251, along with INS's adjudication functions—including authority to adjudicate *individual* TPS status—to the United States Citizenship and Immigration Services ("USCIS"), a DHS subagency created by the Act, *id.* § 271. But in part because the Attorney General, not INS, made *country-level* TPS designations and terminations, those authorities were not transferred under these provisions.

The Act also required the President to submit a Reorganization Plan, detailing "[t]he transfer of agencies, personnel, assets, and obligations to" DHS. 6 U.S.C. § 542(a). The President did so, issuing a detailed Reorganization Plan that—among many other provisions—transferred "the … functions of the [INS]" to DHS. *Id.* § 542 note (DHS Reorganization Plan). But the Plan made no mention of TPS, nor did it address the immigration-related powers vested specifically in the Attorney General, even though it expressly transferred *other* Attorney General functions. *Id.* The Act also provided that the DHS Secretary would generally be responsible for "the administration and enforcement of this chapter [*i.e.*, the Immigration and Nationality Act, codified in chapter 12 of title 8 of the U.S. Code] and all other laws relating to the immigration and naturalization of aliens, *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon* the President, *Attorney General*, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers." 8 U.S.C. § 1103(a)(1) (emphases added). Because

the power to terminate a TPS designation was expressly vested in the "Attorney General" through an immigration-related law housed in "chapter" 12 of title 8 of the U.S. Code, *see* 8 U.S.C. § 1254a, it fell within the category of powers that Congress reserved to the Attorney General through section 1103(a)(1).

The DHS Secretary nevertheless began issuing TPS designations, extensions, and terminations beginning in May 2003, claiming that *all* "responsibilities for administering the TPS program were transferred" to DHS. 68 Fed. Reg. 23,744, 23,744 (May 5, 2003). For decades, no plaintiff challenged the statutory basis for DHS's authority to terminate a TPS designation, and courts accordingly accepted—as an unquestioned, background assumption—that the DHS Secretary possessed such authority.[2]

### C. South Sudan's TPS Designation, Repeated Extensions and Redesignations, and Termination

DHS initially designated South Sudan for TPS in 2011, shortly after South Sudan gained independence from Sudan following more than two decades of civil war. *See* 76 Fed. Reg. 63,629, 63,630 (Oct. 13, 2011). South Sudan's initial designation cited escalating armed conflict, attacks on civilians, mass displacement, food insecurity, and lack of access to drinking water. *Id.* at 63,630-31.

[2] *See, e.g.*, *Duarte v. Mayorkas*, 27 F.4th 1044, 1048 n.1 (5th Cir. 2022); *Mejia Rodriguez v. DHS*, 562 F.3d 1137, 1140 n.3 (11th Cir. 2009); *CASA, Inc. v. Noem*, 792 F. Supp. 3d 576, 582 (D. Md. 2025); *Saget v. Trump*, 375 F. Supp. 3d 280, 297-300, 327 (E.D.N.Y. 2019).

From 2011 to 2025, DHS extended or redesignated South Sudan nine times, including during and after South Sudan's 2013 to 2018 civil war. Each time, DHS determined that armed conflict, human rights abuses, and humanitarian conditions prevented the safe return of South Sudanese nationals. For example, the 2023 notice found widespread armed conflict, arbitrary arrests and detention, torture, civilian killings, acute food insecurity, severe flooding, disease outbreaks, and barriers to humanitarian aid. *See* 88 Fed. Reg. 60,971, 60,975 (Sept. 6, 2023). On May 6, 2025, DHS announced that South Sudan's TPS designation had been automatically extended for six months. *See* 90 Fed. Reg. 19,217 (May 6, 2025).

On November 6, 2025, DHS published notice in the Federal Register purporting to terminate South Sudan's TPS designation, effective January 5, 2026. Add.16-19 (the "Termination"). South Sudan's termination was one of thirteen TPS terminations announced in 2025 and 2026.[3]

Before the Termination went into effect, approximately 232 South Sudanese nationals were TPS beneficiaries and roughly 73 had pending applications. Add.18.

**D. Plaintiffs' Initial Challenge to the Termination**

On December 22, 2025, Plaintiffs—African Communities Together (the nation's largest member-led organization of African immigrants) and four South

[3] *See* JA157 (listing twelve countries terminated prior to February 2026); *see also* 91 Fed. Reg. 10,402 (Mar. 3, 2026) (Yemen TPS Termination).

Sudanese TPS beneficiaries—filed a complaint challenging the Termination, and the next day sought emergency postponement of the Termination's effective date under 5 U.S.C. § 705. JA14-85; ECF 7. They argued that the Termination violated the APA and the equal protection guarantee of the Fifth Amendment. JA76-82.

The district court granted postponement. *See* JA194. It found Plaintiffs likely to prevail on their claim that the DHS Secretary failed to satisfy the TPS statute's consultation requirement because the administrative record contained "no communications between DHS and State Department officials about country conditions" beyond a single, "plainly … inadequate" email chain. JA185-188. The court also found the termination pretextual and preordained, and concluded that the Secretary failed to disclose the "true basis … for her termination determination." JA180. The court further concluded that Plaintiffs "easily" established irreparable harm, JA190-192, and that the balance of the equities and the public interest "favor[ed] Plaintiffs," JA192-193.

### E. The Supreme Court's Decision in *Mullin v. Doe*

Several months later, the Supreme Court decided *Mullin v. Doe*, 609 U.S. 324 (2026), which reviewed preliminary orders postponing the TPS terminations for Syria and Haiti on procedural APA grounds (for both sets of plaintiffs) and equal protection grounds (for the Haiti plaintiffs). *Id.* at 335-38.

The Court's ruling focused on the scope of the TPS statute's jurisdictional bar, 8 U.S.C. § 1254a(b)(5)(A), which precludes review of "any determination" "with respect to the designation, or termination or extension of a designation." *Mullin*, 609 U.S. at 338-39. The Court concluded that the review bar applied to plaintiffs' process-based APA claims whether "determination" is construed as the TPS termination decision itself or the process leading to that decision. *Id.* at 338-40. But the Court did not resolve whether the review bar applied to constitutional claims, instead concluding that the Haiti plaintiffs were unlikely to succeed on the merits of their equal protection claim. *Id.* at 345-50.

No party in *Mullin* raised the *ultra vires* or due process claims at issue in this appeal. The Court also never considered or addressed whether the review bar—which by its plain terms applies only to "determination[s] of the Attorney General," 8 U.S.C. § 1254a(b)(5)(A)—reaches actions taken by the DHS Secretary. And because the *Mullin* cases arose in a preliminary posture, the Court did "not make a final decision on any matter necessary to the ultimate judgment." 609 U.S. at 346. It instead made "only a predictive—not a final—decision about the outcome[s]," assessing the "likelihood" that the plaintiffs would succeed. *Id.*

Following *Mullin*, this Court summarily reversed the order postponing South Sudan's TPS termination and remanded "for further proceedings in light of and consistent with *Mullin*." ECF 111 at 2.

### F. Plaintiffs' New Claims, Which *Mullin* Did Not Consider

In response to *Mullin*, Plaintiffs moved for leave to amend their complaint, ECF 94, and renewed their postponement motion based on two new claims, ECF 96.[4] First, Plaintiffs alleged that the termination of South Sudan's TPS was *ultra vires* under the APA because Congress assigned TPS termination authority exclusively to the Attorney General and never transferred that authority to the DHS Secretary or any other official. *See* JA204, 273-278. Second, Plaintiffs asserted that the termination violated procedural due process by depriving Plaintiffs of protected interests in protection from removal and work authorization without constitutionally adequate procedures. *See* JA269-273. Other similarly situated TPS plaintiffs raised the same claims.[5]

In response to Plaintiffs' *ultra vires* claim, Defendants introduced a brand-new theory that DHS had never before articulated as the basis for its TPS termination authority, arguing that 8 U.S.C. § 1103(a) reserves to the Attorney General only EOIR-related functions as described in 8 U.S.C. § 1103(g). ECF 107 at 11-12. But within a few weeks—following adversarial briefing—Defendants abandoned the

---

[4] The district court initially denied the postponement motion without prejudice for lack of jurisdiction, citing the pending First Circuit appeal. Following summary reversal and remand, Plaintiffs refiled their postponement motion. *See* ECF 116; ECF 117.

[5] *See, e.g.*, *Afr. Cmtys. Together v. Mullin*, No. 1:26-cv-10278 (D. Mass.) (Ethiopia); *Afr. Cmtys. Together v. Mullin*, No. 1:26-cv-11201 (D. Mass.) (Somalia).

theory in favor of a reading that section 1103(g) is just an "example" of the reserved powers. ECF 118 at 8. The district court nevertheless adopted the government's since-discarded theory that section 1103(g) defined the universe of the reserved powers and on that basis concluded that Plaintiffs were unlikely to succeed on the merits of their *ultra vires* claim and that amending would be futile. *See* Add.2, 15. The district court's ruling relied on the DHS Secretary's "practice" of terminating TPS without asking whether any persuasive or longstanding *explanation* supported that practice. Add.9. And the court declined to address provisions within the Immigration and Nationality Act that are irreconcilable with the EOIR-only theory, asserting that such provisions were simply "not before" it. Add.10 n.3.

The district court also rejected Plaintiffs' due process claim. The court recognized that *Mullin* did not address the claim and preserved review of constitutional claims. Add.11-12. But on the merits, the court ignored Plaintiffs' contention that protection from removal and work authorization are liberty and property interests that trigger due process. Instead, the court ruled that Plaintiffs "have no invocable individual liberty or property interests in the TPS designation itself." Add.13. The district court relatedly considered Plaintiffs' claim as "a programmatic challenge" that did not trigger due process protections. Add.13.

Other district courts have rejected similar *ultra vires* and procedural due process claims, adopting similar rationales. *See, e.g.*, *Afr. Cmtys. Together v. Mullin*,

840 F. Supp. 3d 86 (D. Mass. 2026) ("*Ethiopia Op.*"); *Afr. Cmtys. Together v. Mullin*, 2026 WL 2364398 (D. Mass. Aug. 14, 2026) ("*Somalia Op.*").

## STANDARD OF REVIEW

This Court reviews the denial of preliminary relief under 5 U.S.C. § 705 for abuse of discretion. *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 144 F.4th 9, 19 (1st Cir. 2025). Under that standard, legal conclusions are reviewed *de novo* and factual findings for clear error. *Id.*; *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 39 (1st Cir. 2026). The Court reviews a denial of a motion to amend based on futility *de novo*. *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996).

## SUMMARY OF ARGUMENT

**I.** The DHS Secretary's termination of South Sudan's TPS designation was *ultra vires* because Congress vested termination authority in the Attorney General, not the DHS Secretary.

**A.** The statutory text resolves this case. Congress expressly vested authority to terminate a TPS designation in the "Attorney General," 8 U.S.C. § 1254a(b)(3)(B), and nothing in the Homeland Security Act (nor any other law) transferred that authority to the DHS Secretary. To the contrary, when Congress transferred other immigration-related responsibilities to DHS, it expressly reserved to the Attorney General the "powers, functions, and duties" expressly "conferred

upon" the "Attorney General," including specifically those housed in "chapter" 12 of title 8 of the U.S. Code. *Id.* § 1103(a)(1). TPS termination authority falls squarely within that reservation because it is immigration-related, housed within "chapter" 12 of title 8, and expressly "conferred upon" the "Attorney General." *Id.* § 1254a(b)(3)(B).

**B.** The district court's contrary theory—that 8 U.S.C. § 1103(g), which describes EOIR-related authorities, defines the universe of powers reserved to the Attorney General under 8 U.S.C. § 1103(a)—cannot be squared with the statute's text, structure, and history.

1. The court's interpretation requires adding words to the statute that Congress never enacted. For example, the court improperly reads a cross-reference into section 1103(a)(1) and the word "only" into section 1103(g). The court's reading also makes surplusage of the reservation in section 1103(a)(1).

2. Worse, the district court's interpretation cannot be reconciled with the broader statutory scheme—which includes prominent examples of non-EOIR authorities that were vested in the Attorney General before the Homeland Security Act's passage and that the Attorney General continues to exercise to this day. To highlight one example: The Attorney General initiated Alien Terrorist Removal Court proceedings this summer that under the district court's reading of section 1103(a)(1) *should* have been initiated by the DHS Secretary.

3. The district court applied a similarly myopic approach to the applicable drafting history, focusing narrowly on the amendments to section 1103 and ignoring the many other relevant provisions and amendments that were enacted at the same time. The court also overlooked how post-enactment amendments undermined its EOIR-only theory.

4. Finally, the district court erred by heavily relying on DHS's "practice" in administering the TPS program. But agency "practice" counts for nothing when it is not backed by a reasonable or consistent explanation, which is absent here.

**C.** Plaintiffs' position is not "self-defeating" simply because it may raise questions about earlier TPS designations. This case challenges one agency action: the Termination. The APA authorizes a court to set aside that action, and Article III confines this Court to remedying Plaintiffs' injury from it. These jurisdictional principles are central to our constitutional structure. Further, if the Executive Branch were to attempt to rescind Plaintiffs' TPS benefits on the theory that the underlying designation was unlawful, that would constitute separate agency action subject to independent judicial review.

**D.** Nothing forecloses review of the *ultra vires* claim. The TPS statute's judicial review bar applies to actions taken by "the Attorney General"—not the DHS Secretary—and is thus inapplicable here. 8 U.S.C. § 1254a(b)(5)(A). And *Mullin*

*v. Doe*, 609 U.S. 324 (2026), does not preclude the *ultra vires* claim because no party there raised the claim, and the Court never considered it.

**II.** The Termination independently violated the Fifth Amendment's Due Process Clause by depriving Plaintiffs of liberty and property interests without constitutionally guaranteed procedural safeguards. Plaintiffs were deprived of their non-discretionary benefits without adequate process because the Secretary terminated the relevant TPS designation without adhering to basic notice and consultation requirements that are mandated by the TPS statute *and*—independently—the Constitution.

**A.** Plaintiffs have protected liberty and property interests in the mandatory benefits conferred by their TPS status: protection from removal and work authorization. The Termination automatically strips beneficiaries of those benefits, without any further individualized proceeding. Due process therefore applies to the action that deprives Plaintiffs of them.

**B.** Because the Termination implicates protected interests, it triggers due process protections. Plaintiffs focus their claim on two procedural safeguards that are required by the TPS statute *and* the Due Process Clause: (1) notice of the actual basis for termination and (2) meaningful consultation. As the district court previously found, the Secretary violated both requirements when issuing the Termination.

**C.** The district court's conclusion that Plaintiffs were owed no process rested on at least three critical errors.

*First*, the court mischaracterized the protected interests at stake. The relevant liberty and property interests are not the TPS designation itself (as the district court posited), but the concrete benefits that TPS status confers: protection from removal and work authorization.

*Second*, the district court determined that due process did not apply because Plaintiffs challenged a generally applicable action rather than an "individual adjudication." But courts have often recognized that due process protections apply when a broadly applicable government action functions to revoke individuals' liberty or property interests—even when it affects many individuals at once.

*Third*, the court erred in dismissing Plaintiffs' due process claim as a "repackaged" statutory claim. Plaintiffs' due process claim is narrower and grounded in a distinct source of law: the Fifth Amendment.

**III.** The remaining factors overwhelmingly favor relief, as the district court previously found. Plaintiffs face irreparable harm given the dire conditions in South Sudan and the threatened loss of work authorization, detention, and removal. And the equities and public interest favor Plaintiffs for similar reasons.

## ARGUMENT

### I. The Secretary's Action Was *Ultra Vires* Because the Attorney General Alone Has the Statutory Authority to Terminate a TPS Designation

"It is axiomatic that an administrative agency's power … is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). And when agencies "act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

The DHS Secretary acted *ultra vires* here. When Congress established TPS in 1990, it unambiguously assigned the authority to terminate TPS designations to the Attorney General. Congress never transferred that authority to the DHS Secretary or any other official. The DHS Secretary therefore acted "beyond [her] jurisdiction" in purporting to terminate South Sudan's TPS designation. *City of Arlington*, 569 U.S. at 297. The district court's order rested on a contrary—and ultimately indefensible—conclusion, and it must be reversed.

#### A. Congress Unambiguously Vested TPS Termination Authority Exclusively in the Attorney General

Congress expressly authorized one—and only one—executive official to terminate TPS designations: the Attorney General. The TPS statute provides: "If the *Attorney General* determines … that a foreign state … no longer continues to meet the conditions for [TPS] designation … the *Attorney General* shall terminate the designation …." 8 U.S.C. § 1254a(b)(3)(B) (emphases added). The DHS Secretary is not mentioned; nor is any other government official. Consistent with the statute,

the Attorney General, and not any subordinate DOJ agency or official, exercised TPS termination authority for more than a decade. *See supra* p. 7 & note 1.

After the Homeland Security Act was enacted, DHS began asserting authority over TPS designations and terminations. DHS initially cited the Act as a whole, *see* 68 Fed. Reg. at 23,744-45 (citing "section 244 of the Immigration and Nationality Act (the Act), 8 U.S.C. [§] 1254"), but later claimed more specifically that the Act's revisions to 8 U.S.C. § 1103(a)(1) transferred all TPS authority from the Attorney General to DHS.[6] That provision does no such thing. As revised by the Homeland Security Act and a subsequent appropriations bill,[7] the statute provides that:

> The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter [*i.e.*, chapter 12 of title 8, the Immigration and Nationality Act] and all other laws relating to the immigration and naturalization of aliens, *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon* the President, *Attorney General*, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers[.]

8 U.S.C. § 1103(a)(1) (emphases added).

In other words, the revisions to section 1103(a)(1) made clear that immigration-related "powers, functions, and duties" expressly "conferred upon" the

---

[6] *See, e.g.*, Brief for Appellants at 5 n.1, *Ramos v. Nielsen*, No. 18-16981 (9th Cir. Nov. 29, 2018), 2018 WL 6420267, at *5 n.1 (citing 8 U.S.C. § 1103); Partial Vacatur of 2024 TPS Decision for Haiti, 90 Fed. Reg. 10,511, 10,511 n.1 (Feb. 24, 2025) (citing 8 U.S.C. §§ 1254a(b)(1), 1103(a)).

[7] *See* Homeland Security Act Amendments of 2003, Pub. L. No. 108-7, § 105, 117 Stat. 11 (Feb. 20, 2003).

"Attorney General"—including specifically those housed in "chapter" 12 of title 8 of the U.S. Code—would *remain* vested in the Attorney General. TPS termination authority clearly falls within those "powers, functions, and duties" reserved to the Attorney General because it is expressly vested in the Attorney General and is housed within "chapter" 12 of title 8 (in addition to being immigration-related). *See* 8 U.S.C. § 1254a. So on its face, far from transferring TPS termination authority to the DHS Secretary, section 1103(a)(1) *confirms* that the authority *remained* with the Attorney General following DHS's creation.

In the past, DHS has also cited 6 U.S.C. §§ 552(d) and 557 as the basis for its TPS termination authority.[8] But those provisions did not independently transfer any authority; they merely streamlined the process of amending the code by providing that certain "references" would be "deemed to refer" to the Secretary to the extent that they relate to functions that were actually transferred to the Secretary. For example, 6 U.S.C. § 557 provides: "*With respect to any function transferred by or under this chapter* … and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office *the functions of which are so transferred* shall be deemed to refer to the Secretary, other official, or component of the Department to which such function

---

[8] *See, e.g.*, Termination of the Designation of Sudan for TPS, 82 Fed. Reg. 47,228, 47,229-30 (Oct. 11, 2017) (citing 6 U.S.C. § 557); Brief for the Respondents at 3, *Miot v. Trump*, No. 25-1077 (U.S. May 22, 2026) (citing 6 U.S.C. §§ 552(d), 557).

is so transferred." (emphases added). And 6 U.S.C. § 552(d) similarly only applies to "[r]eferences *relating to an agency that is transferred* to [DHS]." (emphasis added). As the district court rightly recognized, these are just "housekeeping provisions" that apply after "a substantive transfer of authority has occurred." Add.7 n.2.

To be clear, Congress *did* transfer *most* immigration-related authorities—and even some limited TPS-related authorities—from DOJ to DHS. *See supra* pp. 7-8. But Congress primarily did so through other provisions that plainly did *not* cover TPS termination authority. *See* 6 U.S.C. § 251 (transferring border patrol, inspection, and investigation functions from INS to DHS); *id.* § 271 (transferring INS adjudication functions to DHS's USCIS). While INS's authority to adjudicate an *individual's* TPS status was transferred, *see supra* p. 8, TPS country designations and terminations were not transferred because those functions were performed by the Attorney General, *not* INS.

Nor did the President's Reorganization Plan transfer that authority. It made no mention of TPS or the Attorney General's immigration-related powers, even as it expressly transferred all INS functions to DHS and *other* Attorney General functions. *See, e.g.*, DHS Reorganization Plan, 6 U.S.C. § 542 note (transferring "the National Domestic Preparedness Office of the FBI, *including the functions of the Attorney General relating thereto*" (emphasis added)); *see also supra* p. 8.

### B. The District Court's Contrary Theory—Abandoned by Defendants—Disregards the Text and the Statutory Scheme

As noted above, in response to Plaintiffs' *ultra vires* claim, Defendants advanced a brand-new theory: that section 1103(g)—a provision they had never before cited or relied upon as the basis for the Secretary's TPS authority—defines the universe of the powers reserved to the Attorney General under section 1103(a)(1). Section 1103(g) provides that "[t]he Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by [EOIR], or by the Attorney General with respect to [EOIR]." 8 U.S.C. § 1103(g). Defendants' initial theory was that the Attorney General retained *only* the immigration-related powers exercised by EOIR when DHS was created. *See supra* pp. 13-14.

Defendants later abandoned that EOIR-only theory in favor of a different one,[9] but the district court viewed the EOIR-only theory as the "best" reading of the statute. Add.9. It is not. The relevant statutory terms have an obvious, plain meaning. Only the "Attorney General" has the statutory authority to terminate a

[9] Defendants subsequently argued that section 1103(a) transferred immigration functions to the DHS Secretary "except [as] otherwise provided elsewhere," and that section 1103(g) is merely an "example" of where Congress preserved authority for the Attorney General. ECF 118 at 8. Plaintiffs actually *agree* with that view. If adopted, it would confirm Plaintiffs' entitlement to relief, because Congress did "provide elsewhere" that the "Attorney General" has authority to terminate a TPS designation. *See* 8 U.S.C. § 1254a(b)(3)(B).

TPS designation, 8 U.S.C. § 1254a, and that authority indisputably falls within the set of "powers, functions, and duties" that Congress expressly reserved to the "Attorney General" when it transferred *other* immigration-related powers to the DHS Secretary, *see id.* § 1103(a)(1); *see also supra* Section I.A. The analysis should have ended there. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous"). Instead, the district court bent over backwards to justify an agency "practice" that simply has no grounding in the statutory text. To adopt the EOIR-only theory, the district court was forced to add words to the statute, ignore a host of other provisions in the same statutory scheme that plainly vest non-EOIR powers in the Attorney General, and misconstrue an isolated snapshot of the Homeland Security Act's "drafting history." The result is an interpretation that flouts some of the most basic rules of statutory interpretation.

### 1. *The District Court Rewrote the Statute and Created Surplusage*

Statutory interpretation "begin[s] with the text," *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025), as it is *actually* written. But the district court's interpretation requires adding words to the statute that Congress never enacted. For example, the court reads section 1103(g) as exhaustive—*i.e.*, providing the *only* immigration-related powers that were reserved to the Attorney General—but section 1103(g) does not include the word "only" or any comparable limiting language. Similarly, the

court reads section 1103(a)'s "except" clause as including a cross-reference to section 1103(g). But no such cross-reference exists. A theory that requires rewriting the statute it interprets is surely wrong. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) (declining to "read an absent word into the statute").

Cross-references and adverbs like "only" are not complicated linguistic devices. They are so commonplace in statutes that Congress surely would have used such language if it had intended for section 1103(g) to define the full scope of powers reserved to the Attorney General in section 1103(a). Indeed, this is not a case where one must speculate as to whether "Congress knew how" to draft particular language. Before Congress enacted the Homeland Security Act, it considered *but rejected* proposed legislation that would have enacted the district court's EOIR-only statutory reading. Two competing Homeland Security Act bills in the Senate would have transferred "[a]ll functions under the immigration laws of the United States vested by statute in, or exercised by, the Attorney General" to the DHS Secretary, with the sole exception of EOIR-related authorities.[10] Both bills were tabled and replaced by

[10] S. Amend. 4471 to H.R. 5005, 107th Cong. § 1111(a)(1) (2002) ("S. Amend. 4471") (as submitted, Sept. 3, 2002); S. Amend. 4738 to S. Amend. 4471, 107th Cong. § 1111(a)(1) (2002) ("S. Amend. 4738") (as submitted, Sept. 25, 2002). One bill kept EOIR-related authorities with DOJ by specifying that "[n]othing in this title, or any amendment made by this title, may be construed to authorize or require the transfer or delegation of any function vested in, or exercised by the [EOIR] of the [DOJ]." S. Amend. 4471 § 1118. The other bill expressly excluded EOIR from the transfer of authority to the DHS Secretary. S. Amend. 4738 § 1111(a)(1) ("*Except*

a substitute bill that became the Homeland Security Act, which did *not* limit the Attorney General's reserved powers to those that were EOIR-related. S. Amend. 4901 to H.R. 5005, 107th Cong. (2002) (as submitted, Nov. 13, 2002). That history is "compelling" evidence that the district court's theory is wrong. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442 (1987) (internal quotation marks omitted); *see also id.* at 442-43 ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."); *see also Acosta v. Loc. Union 26, UNITE HERE*, 895 F.3d 141, 144 (1st Cir. 2018) (same).

The district court's reading also creates surplusage out of sections 1103(a)(1) and 1103(g). *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (courts should avoid rendering statutory language "superfluous, void, or insignificant"). Under the court's EOIR-only theory, section 1103(a)'s reservation of powers for the Attorney General is the *exact same* reservation of powers contained in section 1103(g). *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme"). Plaintiffs' reading of the statute gives independent meaning to both of those provisions: section 1103(a) is a broad reservation of immigration-

---

*as provided in … title XIII* [*i.e.*, EOIR], all functions under the immigration laws of the United States vested by statute in, or exercised by, the Attorney General … are transferred to the Secretary …." (emphasis added)).

related powers vested in the Attorney General specifically, while section 1103(g) is a narrower provision focused on ensuring that powers exercised by EOIR remain with DOJ.

There is at most one minor redundancy under that reading because section 1103(g)—as an aside, in a short clause—also reserves powers exercised "by the Attorney General with respect to" EOIR. But small redundancies are common in statutes, particularly where a "specific" example is provided alongside a "general" category, *Mullin v. Al Otro Lado*, 609 U.S. 258, 273 (2026), or as a "belt-and-suspenders" approach, *In re Coughlin*, 33 F.4th 600, 608-09 (1st Cir. 2022). The Homeland Security Act in particular is full of belts and suspenders, with multiple overlapping transfer provisions aimed at ensuring that particular authorities were transferred from one department to another. *Compare, e.g.*, 6 U.S.C. §§ 251, 271 (transferring particular INS authorities to DHS), *with, e.g.*, DHS Reorganization Plan, 6 U.S.C. § 542 note (transferring all INS authorities to DHS). In that context, an overlapping dependent clause is unremarkable.[11]

[11] Indeed, as a technical matter, section 1103(g) cannot create any redundancy because it is arguably inoperative. Section 1103(g) hinges on certain powers that existed "on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002." 8 U.S.C. § 1103(g). But no such Act was ever passed, so the referenced powers are a null set. The fact that section 1103(g) arguably reserves nothing to the Attorney General illustrates the wisdom of Congress's belt-and-suspenders approach when designing the Homeland Security Act.

### 2. *The District Court Ignored Evidence in the Same Statute that the EOIR-Only Theory Is Wrong*

The errors multiplied as the district court shifted from text to structure. Perhaps the most glaring defect with the district court's EOIR-only theory is that it cannot be squared with the broader statutory scheme—which includes prominent examples of *non*-EOIR authorities that were vested in the Attorney General before the Homeland Security Act's passage and that the Attorney General continues to exercise to this day. Those examples prove that the district court's theory is incorrect, but the district court ignored them on the conclusory basis that they were simply "not before the Court." Add.10 n.3. That approach violated one of the cardinal rules of statutory interpretation: the "duty to construe statutes, not isolated provisions." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010). Rather than reading "the words of a statute … in their context and with a view to their place in the overall statutory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), the district court did the opposite, turning a blind eye to provisions that clearly contradicted the court's flawed, EOIR-only interpretation.

The examples speak for themselves:

**Alien Terrorist Removal Court (8 U.S.C. § 1532):** In 1996, Congress established an alien terrorist removal court that is entirely separate from EOIR and is comprised of Article III district court judges selected by the Chief Justice. *See*

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 401(a), 110 Stat. 1214, 1258 (Apr. 24, 1996) (codified at 8 U.S.C. §§ 1531-1537). Under this statute, only the "Attorney General" may initiate removal proceedings of an "alien terrorist" "by filing an application with the removal court." 8 U.S.C. § 1533(a)(1). Recently, the Attorney General exercised this authority, filing a high-profile "application to remove" an "alien terrorist" in order to commence removal proceedings in the specialized court.[12] But under the district court's theory, the Homeland Security Act transferred this non-EOIR authority from the Attorney General to the DHS Secretary—meaning only the Secretary had the authority to initiate "alien terrorist" removal proceedings earlier this year.

**Designating Foreign Terrorist Organizations (8 U.S.C. § 1189):** In 1996, Congress established a formal process by which the Secretary of State, "in consultation … with the Attorney General," can designate an organization as a "foreign terrorist organization," triggering various legal consequences. *See* AEDPA, § 302(a), 110 Stat. at 1548-50 (codified at 8 U.S.C. § 1189). In compliance with the plain terms of that provision, the Secretary of State has consistently consulted with the *Attorney General*—not the DHS Secretary—when issuing Foreign Terrorist

[12] *See* Press Release, DOJ, Off. of Pub. Affs., Department of Justice Files First Case in U.S. Alien Terrorist Removal Court to Deport Afghan Alien Who Supported Her Family's Plans for Election-Day Shooting (July 30, 2026), https://perma.cc/2CXR-BXFN.

Organization designations. *See, e.g.*, Foreign Terrorist Organization Designation of Los Tiguerones, 91 Fed. Reg. 57,675, 57,675 (Sept. 10, 2026) (issuing designation after "consultation with the Attorney General"); Designation of Terrorists and Terrorist Organizations Pursuant to Executive Order 13224 of September 23, 2001, 67 Fed. Reg. 12,633, 12,633 (Mar. 19, 2002) (same). Under the district court's theory, the Secretary of State has been consulting with the wrong Executive Branch official for decades.

**National Crime Information Center (8 U.S.C. § 1105):** The National Crime Information Center ("NCIC") database is a centralized criminal records database managed by the Federal Bureau of Investigation ("FBI"), a DOJ subagency.[13] The USA PATRIOT Act amended the Immigration and Nationality Act in 2001 to expand immigration-related access to this database. Pub. L. No. 107-56, § 403(a), 115 Stat. 272, 343 (Oct. 26, 2001) (codified at 8 U.S.C. § 1105). Under section 1105(b), "[t]he Attorney General and the Director of the [FBI] shall provide the Department of State … access to the criminal history record information contained in" the NCIC database "for the purpose of determining whether or not a visa applicant or applicant for admission has a criminal history record." 8 U.S.C. § 1105(b). Under the district court's theory, the DHS Secretary would bizarrely

[13] Fed. Bureau of Investigation, *National Crime Information Center (NCIC)*, https://le.fbi.gov/informational-tools/ncic (last visited Oct. 21, 2026).

have the authority to provide "access" to the NCIC database even though it has long been operated by the FBI, an agency located within DOJ and overseen by the Attorney General.

**Other Examples:** Similar examples abound. For instance, the Violent Crime Control and Law Enforcement Act of 1994 established the State Criminal Alien Assistance Program to provide federal payments to states and localities that incur correctional costs for incarcerating undocumented criminal noncitizens, *see* Pub. L. No. 103-322, § 20301, 108 Stat. 1796, 1823 (Sept. 13, 1994) (now codified at 8 U.S.C. § 1231(*i*)), and the Attorney General has administered that program since its inception.[14] Similarly, since the enactment of the Omnibus Consolidated Appropriations Act of 1997, the Attorney General has possessed the authority to "contract for or buy any interest in land" "adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States." Pub. L. No. 104-208, § 102(d), 110 Stat. 3009, 3009-555 (Sept. 30, 1996) (codified at 8 U.S.C. § 1103(b)); *see United States v. 1.04 Acres of Land, Tex.*, 538 F. Supp. 2d 995, 1003 (S.D. Tex. 2008) (recognizing Attorney General's land acquisition authority under this provision). And since the enactment of the Immigration and Nationality Act of

[14] Bureau of Just. Assistance, U.S. Dep't of Just., *State Criminal Alien Assistance Program (SCAAP)*, https://bja.ojp.gov/program/scaap/overview (last visited Oct. 21, 2026).

1952, holders of canceled naturalization certificates have been required to "surrender the same to the Attorney General," Pub. L. No. 82-414, § 340(h), 66 Stat. 163, 262 (June 27, 1952) (codified at 8 U.S.C. § 1451(f)), and courts have enforced this requirement even after the Homeland Security Act's passage, *see, e.g.*, *United States v. Charles*, 456 F. Supp. 3d 268, 288 (D. Mass. 2020).

The district court's failure to harmonize section 1103(a)(1) with the broader scheme—or even to attempt to do so—was a foundational error. Courts have a duty to interpret statutory provisions as part of a "symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995), and to "fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959). Reading provisions in a vacuum, as the district court did here, is never an option. *See, e.g.*, *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004) (lower court erred in "fail[ing] to examine [the statute's] other provisions … before reaching its conclusion"). The district court's narrow approach was particularly egregious here because section 1103(a)(1)—the provision whose meaning is most directly in dispute—expressly *cross-references* the Immigration and Nationality Act, which houses all the preceding examples of non-EOIR authorities vested in the Attorney General. *See* 8 U.S.C. § 1103(a) (twice referring to "chapter" 12 of title 8, *i.e.*, the Immigration and Nationality Act). And Plaintiffs' *ultra vires* claim does not rest exclusively on section 1103: It is premised first and foremost on the TPS statute,

which vests termination authority in the "Attorney General" and is codified in a separate section of the same chapter. *See id.* § 1254a. There was no justification for the district court's tunnel vision.

### 3. *The District Court Selectively Read the Drafting History*

The district court's myopic approach also infected its consideration of the Homeland Security Act's "drafting history." Add.10. The district court found it significant that the amendments to section 1103(a)(1) and the addition of section 1103(g) were the "only two amendments *to [section] 1103*" enacted as part of the Homeland Security Act. Add.10 (emphasis added). But the district court ignored the many other relevant provisions and amendments that were enacted at the same time, including provisions that transferred large categories of immigration-related authorities from the Attorney General to the DHS Secretary. *See supra* pp. 7-8, 14. The district court's narrow focus on section 1103—to the exclusion of the rest of the Immigration and Nationality Act and the Homeland Security Act itself—caused it to overread the relationship between sections 1103(a) and 1103(g). The fact that those provisions were enacted at the same time suggests that the provisions are related, and indeed, they are: the authorities reserved to the Attorney General in section 1103(g) are *examples* of the broader set of authorities reserved to the Attorney General under section 1103(a). But nothing about the contemporaneous enactment of those provisions suggests that they are related *in the specific manner*

that the district court posited—*i.e.*, that section 1103(g) defines the full scope of the reservation in section 1103(a)(1).

The district court's narrow focus also left no room for considering the Homeland Security Act's post-enactment history, which similarly refutes the EOIR-only theory. Since the Act's passage, Congress has repeatedly amended the Immigration and Nationality Act to replace references to the "Attorney General" with references to the DHS "Secretary." *See, e.g.*, Violence Against Women and DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, § 803, 119 Stat. 2960, 3054 (Jan. 5, 2006) (amending 8 U.S.C. § 1255(l) and (m) and specifying allocation of responsibilities with respect to adjustment of status for victims of trafficking); Act to Amend Immigration and Nationality Act, Pub. L. No. 112-58, § 1, 125 Stat. 747, 747 (Nov. 23, 2011) (amending 8 U.S.C. § 1186a).[15] Congress has also considered but *not* enacted bills that would have made similar changes to the TPS statute and other parts of the Immigration and Nationality Act.[16] If section 1103(a)(1) had reserved only EOIR-related powers to the Attorney General in 2002, *all* of those

---

[15] In at least one instance, Congress replaced references to "the Attorney General" with references to "the Secretary of Homeland Security or the Attorney General." *See* REAL ID Act of 2005, Pub. L. No. 109-13, § 101, 119 Stat. 231, 302 (May 11, 2005) (amending 8 U.S.C. § 1158(b)(1) to permit either the Attorney General or the DHS Secretary to make certain asylum-related determinations).

[16] *See, e.g.*, S. 2454, 109th Cong. § 205(a)(3) (2006) (proposing to amend 8 U.S.C. § 1254a); H.R. 750, 110th Cong. § 1302 (2007) (proposing to amend 8 U.S.C. § 1254a(b)(1)(C)); *see also* H.R. 1415, 108th Cong. § 7 (2003) (as engrossed in House) (proposing to amend 8 U.S.C. §§ 1103 and 1357(g)).

subsequent amendments and proposed amendments transferring specific non-EOIR powers from the Attorney General to the DHS Secretary would have been unnecessary.[17]

#### 4. *The District Court Deferred to an Unexplained and Irrelevant Agency "Practice"*

The district court's final, fundamental error was its heavy reliance on DHS's "practice" of administering the TPS program. Add.9.

The Supreme Court has made clear that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 603 U.S. at 412. For that reason, courts rightly reject agencies' long-held statutory interpretations when they cannot be squared with the relevant statute.[18] The DHS Secretary's "practice" of administering the TPS statute

---

[17] The district court also relied on Congress's failure to amend section 1103 despite DHS's longstanding assertion of TPS authority. Add.9. But the Supreme Court has repeatedly cautioned against drawing interpretive conclusions from legislative inaction. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 670 (2020) (cautioning that "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis" for interpreting a statute enacted by an earlier Congress).

[18] *See, e.g.*, *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (rejecting EPA's decades-old interpretation as "inconsistent with the [statute's] text and structure"); *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 599-600 (2004) (rejecting agency's over 20-year-old interpretation as "clearly wrong"); *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 167 (2001) (rejecting the Corps' 15-year-old interpretation as "not fairly supported"); *Brown v. Gardner*, 513 U.S. 115, 122 (1994) (rejecting Department of Veterans Affairs' 60-year-old interpretation since "[a]ge is no antidote to clear inconsistency with a statute");

is entitled to zero weight because—following *Loper Bright*—whether an *interpretation* may be afforded "respect" depends "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to *persuade*." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (emphasis added). There is no such thing as a persuasive "practice."[19] Defendants have offered no explanation for their claimed authority to terminate TPS designations that is "consisten[t] with earlier … pronouncements" or otherwise persuasive. *See id.* Indeed, in response to Plaintiffs' *ultra vires* claim, Defendants unveiled a new EOIR-only theory—only to abandon that theory within weeks when it was exposed to adversarial briefing. *See supra* p. 24 & note 9.[20]

Even assuming an agency's unreasoned practice could inform the proper interpretation of a statute, the district court examined the wrong practice. The court emphasized DHS's historical role in issuing TPS terminations under section 1254a.

---

*Mayburg v. Sec'y of Health & Hum. Servs.*, 740 F.2d 100, 106-07 (1st Cir. 1984) (rejecting agency's "longstanding" interpretation as contrary to statute).

[19] Historical practice—often going back centuries—is still relevant when it comes to addressing *constitutional* questions. *See, e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (considering "long settled and established practice" when evaluating "constitutional provisions regulating the relationship between Congress and the President" (citation modified)). But an agency cannot claim deference on a matter of statutory interpretation based on its practice alone.

[20] In addressing the same statutory question, another court in the same District rightly declined to rely on Defendants' asserted "practice." *Ethiopia Op.*, 840 F. Supp. 3d at 93 n.10.

Add.9. But because the meaning of section 1103(a)(1) is in dispute, the only conceivably relevant practice is Defendants' application of *that* provision. As the examples above illustrate, the Executive Branch has not consistently applied an EOIR-only understanding of section 1103(a)(1), and the Attorney General clearly has not been limited to exercising only EOIR-related powers since 2002. *See supra* pp. 30-33.[21]

### C. Plaintiffs' *Ultra Vires* Claim Is Not "Self-Defeating"

The district court faulted Plaintiffs' position as purportedly "self-defeating," reasoning that South Sudan's TPS designation would be invalidated "by the same token as its termination." Add.11. That conclusion misses three fundamental points.

*First*, Plaintiffs' claim is brought under the APA and challenges a single final agency action: the Termination. *See* JA204, 273-278. If Plaintiffs prevail on that claim, the APA authorizes this Court to "set aside" *only that particular* agency action. 5 U.S.C. § 706(2); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (rejecting "broad programmatic attack[s]" because APA challenges are limited to "discrete agency action[s]"). Article III similarly "restricts" this Court's

---

[21] The district court later suggested that the reservation in section 1103(a)(1) might include both the EOIR powers in section 1103(g)(1) and "other simultaneously or subsequently enacted statutory provisions, but not prior ones." Add.10. To the extent the district court adopted that theory, it fails for all the same reasons. For example, it would require adding words to the statute and ignoring the examples of immigration-related Attorney General powers discussed above, all of which were enacted "prior" to the Homeland Security Act in 2002.

jurisdiction to relief that redresses the particular "executive action" that has caused Plaintiffs' injuries. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Any challenge to the TPS designation would require a separate lawsuit of doubtful justiciability and timeliness.[22] These jurisdictional principles are central to our constitutional structure. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (relating Article III standing to "separation of powers" (citation omitted)).

*Second*, if the Executive Branch were to rescind South Sudan TPS beneficiaries' status on the ground that the initial designation was unlawful, that rescission would be a new agency action subject to the APA and judicial review. *See, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24-28 (2020). *Regents* demonstrates that even "illegal" programs must be "wound down" in a way that considers "reliance interests," recognizes available "alternatives," and is otherwise consistent with the APA. *Id.* at 13, 25, 30. There are certainly "alternatives" here. For example, the Executive Branch could identify separate authority for a TPS designation—or conclude that at least *part* of the TPS program is independently authorized on other grounds—rather than rescinding it *in toto*. *See Mullin*, 609 U.S. at 329 (explaining that, prior to TPS statute's enactment, "the Executive Branch sometimes provided similar relief as a matter of discretion without any express

[22] For example, since the South Sudan TPS designation was issued in 2011, a future lawsuit would likely be well beyond the six-year statute of limitations for APA claims. *See* 28 U.S.C. § 2401(a).

statutory authorization"). Those options place any future TPS rescission squarely within the *Regents* framework.

*Third*, procedural due process would apply to any rescission, which would deprive TPS beneficiaries of protected liberty and property interests and therefore trigger due process safeguards. *See infra* Part II.

The district court relied on *O'Connell v. Marrero-Recio*, 724 F.3d 117 (1st Cir. 2013), but that is a case about internally contradictory allegations, which Plaintiffs do not assert. Add.11. In raising a First Amendment claim, a government employee plaintiff claimed both that a law "stripped her of policy-making authority" and that she experienced discrimination based on a "disagreement over how to implement" the law—an implicit admission "that she retained some level of authority over how [the law] was carried out." *Id.* at 128-29. No such internal contradiction exists here. Plaintiffs challenge only the termination of South Sudan's TPS designation, and at most, their lawsuit raises an argument that *could*—in a justiciable lawsuit or as the basis for subsequent agency action—support action that operates against their interests. But that speculative contention about *future* litigation or agency action offers no sound basis to rule against Plaintiffs in *this* case.

### D. Nothing Forecloses the Review of Plaintiffs' *Ultra Vires* Claim

There is no obstacle to reviewing Plaintiffs' *ultra vires* claim on the merits. The TPS statute's judicial review bar applies to actions taken by "the Attorney

General"—not the DHS Secretary—and is thus inapplicable here. 8 U.S.C. § 1254a(b)(5)(A).[23] Put another way, application of the review bar is "intertwined with the merits," such that the merits may be considered. *Perttu v. Richards*, 605 U.S. 460, 472-74 (2025). Every court presented with the *ultra vires* claim at issue here has applied these principles and reached the merits.[24] The district court below similarly reached the merits after "assum[ing], without deciding, that it ha[d] statutory authority to consider the merits of" the *ultra vires* claim. Add.5.

Nor does *Mullin* foreclose Plaintiffs' *ultra vires* claim. The *ultra vires* argument pressed here—that the authority to terminate a TPS designation is vested in the Attorney General, not the DHS Secretary—was never presented, disputed, or addressed in *Mullin*. *See Doe v. Mullin*, 2026 WL 2279577, at *6 (N.D. Ill. Aug. 7, 2026) ("*Burma Op.*") ("No party in *Mullin* raised the issue of who has TPS authority in the first place under the statute."); *Ethiopia Op.*, 840 F. Supp. 3d at 91 (relying on *Burma Op.* reasoning). It is well established that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*,

[23] The provision states in full: "There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A).

[24] *See Doe v. Mullin*, 2026 WL 2279577, at *6 (N.D. Ill. Aug. 7, 2026); *Ethiopia Op.*, 840 F. Supp. 3d at 91; *Somalia Op.*, 2026 WL 2364398, at *11 (D. Mass. Aug. 14, 2026).

266 U.S. 507, 511 (1925); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (referencing *Webster v. Fall* and declining to resolve an issue based on a prior Supreme Court decision, which "did not address" key, relevant considerations); *Whitman v. United States*, 574 U.S. 1003 (2014) (Scalia, J., statement respecting denial of *certiorari*) (prior decision's "drive-by ruling ... deserve[d] little weight" in part because the decision included "scarcely any explanation" on the issue). Because no party in *Mullin* "briefed or argued the question" now presented, *Mullin* does not preclude the claim. *Cousins v. Sec'y of U.S. Dep't of Transp.*, 880 F.2d 603, 608 (1st Cir. 1989).

## II. The DHS Secretary's Deprivation of Plaintiffs' Liberty and Property Interests Violated Procedural Due Process

The Secretary's Termination is invalid not only because it is *ultra vires*, but also because it deprived Plaintiffs of liberty and property interests without constitutionally guaranteed procedural safeguards.

The Due Process Clause applies "to all 'persons' within the United States," including noncitizens, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), and "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests," *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To state a procedural due process claim, a plaintiff must (1) "identify a protected liberty or property interest" and (2) show the defendants deprived him of that interest "without

constitutionally adequate process." *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006).

Both elements are satisfied here. Plaintiffs have protected liberty and property interests in the mandatory benefits conferred by their TPS status: protection from removal and work authorization. And here, Plaintiffs were deprived of those non-discretionary benefits without adequate process because the Secretary terminated South Sudan's TPS designation without adhering to basic requirements of notice and consultation with appropriate Government agencies mandated by the TPS statute *and*—independently—the Constitution. The district court's contrary conclusion rested on a fundamental mischaracterization of the liberty and property interests at stake, and the unfounded view that due process protections do not exist outside the context of individual adjudications. Reversal is required.[25]

### A. TPS Recipients Have Constitutionally Protected Liberty and Property Interests in Their TPS Benefits

Plaintiffs' TPS status clearly conveys protected liberty and property interests. Once a country is designated for TPS, the statute automatically conveys protection from removal and work authorization to *prima facie* eligible TPS beneficiaries. 8 U.S.C. § 1254a(a)(1)(A)-(B), (a)(4)(B). These are classic liberty and property

[25] *Mullin* does not bear on Plaintiffs' procedural due process claim because *Mulli*n did not address due process. *See supra* pp. 12, 41-42. And because *Mullin* expressly reserved constitutional questions, it provides no basis for extending the statute's jurisdictional bar to Plaintiffs' due process challenge. *Id*.

interests that trigger due process safeguards. *See, e.g.*, *Bell v. Burson*, 402 U.S. 535, 539 (1971) (licenses "essential in the pursuit of a livelihood" trigger "procedural due process"); *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom"); *Truax v. Raich*, 239 U.S. 33, 41 (1915) (recognizing "the right to work for a living … is of the very essence of the personal freedom and opportunity" the Constitution protects); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) (due process protects "[t]he right to live with and not be separated from one's immediate family"). And it is settled that "a person receiving … benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972).

Although wholly discretionary benefits subject only to "unilateral expectations" do not qualify for due process protections, *see Roth*, 408 U.S. at 577, TPS benefits are non-discretionary and mandatory once a country has been designated for TPS and an applicant makes a *prima facie* eligibility showing. *See* 8 U.S.C. § 1254a(a)(1)(A)-(B), (a)(4)(B) (the government "*shall* not remove" and "*shall* authorize … employment"); *see also Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021) (TPS "protects [beneficiaries] from removal and authorizes them to work here for as long as the TPS designation lasts"). True, protection from removal and

work authorization depend on the existence of a designation, which is to some extent discretionary. But once established, the designation automatically extends until the government issues a valid termination based on defined, statutorily mandated criteria. *See* 8 U.S.C. §§ 1254a(a)(1)-(2), (b)(3); *see also supra* pp. 5-7 (summarizing TPS statutory framework). TPS recipients thus have a "legitimate claim of entitlement" arising from the TPS statute's "rules or mutually explicit understandings." *Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972); *see also Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989) (entitlement exists when the law "mandat[es] the outcome" and "relevant criteria [are] met"); *Beitzell v. Jeffrey*, 643 F.2d 870, 874 (1st Cir. 1981) ("[T]he more circumscribed is the government's discretion … to withhold a benefit, the more likely that benefit constitutes property.").

It is thus no surprise that courts have recognized that TPS beneficiaries have protected liberty and property interests in protection from removal and work authorization that they receive pursuant to the statute. *See, e.g.*, *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023) ("[A] prima facie eligible TPS applicant has a property interest in temporary employment authorization subject to due process protections."); *Saget v. Trump*, 375 F. Supp. 3d 280, 333 (E.D.N.Y. 2019) ("Protecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law.").

### B. Plaintiffs Were Deprived of Protected Interests Without Constitutionally Adequate Process

Because Plaintiffs possess protected liberty and property interests, they are entitled to procedural safeguards against "the risk of an erroneous deprivation of such interest[s]." *Mathews*, 424 U.S. at 335. Plaintiffs' due process claim rests on two basic procedural safeguards that are required by the TPS statute *and independently* by the Constitution: notice of the actual "basis for the determination," and "consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b)(3)(A). The DHS Secretary violated procedural due process by flouting those requirements.

#### 1. *The Secretary Was Required to Provide Adequate Notice of the Basis for Termination, But Failed to Do So*

Notice is the bedrock of due process. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties … and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The "right to be heard has little reality or worth" without notice. *Id.* Indeed, the "essence of due process is the requirement that a person in jeopardy of serious loss [be given] notice of the case against him and [an] opportunity to meet it." *Mathews*, 424 U.S. at 348 (citation and quotation marks omitted).

It follows directly from these first principles that constitutionally adequate notice must provide notice of the *basis* for a deprivation. For notice to be effective, it must give affected parties a "meaningful opportunity" to respond, *Mathews*, 424 U.S. at 349, and "present their objections," *Mullane*, 339 U.S. at 314. Notice that provides false, misleading, or pretextual reasons for the deprivation offers no such opportunity. A party cannot meaningfully challenge the basis for a deprivation without knowing what the actual basis of that deprivation is. Similarly, one of the foundational due process objectives is reducing the risk of "erroneous deprivation[s]." *Mathews*, 424 U.S. at 335. A false, misleading, or pretextual notice obscures the facts and *increases* the risk of error.

Courts have accordingly recognized that due process requires notice of the "ground for the decision" that causes a deprivation. *See, e.g.*, *Castillo-Villagra v. INS*, 972 F.2d 1017, 1031 (9th Cir. 1992). And they have held that failing to provide notice of the real reason for a deprivation violates due process. *See, e.g.*, *Febus v. Gallant*, 866 F. Supp. 45, 46 (D. Mass. 1994) (due process violated where a benefits notice failed to disclose the "actual" reason for termination, leaving the recipient without "an adequate basis to contest" it); *David v. Heckler*, 591 F. Supp. 1033, 1043 (E.D.N.Y. 1984) (holding due process requires Medicare notices to disclose "the actual basis of a denial of reimbursement"); *see also R.J.S.V. v. Hernandez*, 2026

WL 2085854, at *7 (W.D. Wash. July 20, 2026) (due process violation where "lack of detail" in notice "would make it impossible for anyone to meaningfully respond").

Here, the Secretary failed to provide the notice that the Constitution requires, because—as the district court found—she failed to provide the actual "basis for the determination." 8 U.S.C. § 1254a(b)(3)(A). For example, the notice cited fraud and public-safety concerns that were contradicted by USCIS, recycled "stock language" that was cited "regardless of USCIS's actual findings," and relied on "cherry-picked positive data" inconsistent with the administrative record. JA182-183. The Secretary's failure to provide "the real reason" for the deprivation, JA185, violated due process.

2. *The Secretary Was Required to Engage in Consultation, But Failed to Do So*

Due process also required the Secretary to engage in consultation, which she failed to do.

Due process requires fact-finding procedures that guard against erroneous deprivations. *Mathews*, 424 U.S. at 344. Courts have repeatedly upheld procedures that require decisionmakers to consult other sources before a deprivation occurs. *See, e.g.*, *id.* at 343-49; *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005) (tiered review system involving multiple reviewers ensured accuracy); *Morrissey v. Brewer*, 408 U.S. 471, 485-90 (1972) (two-step process for parole revocation involving preliminary internal consultation satisfied due process).

*Mathews* itself illustrates this point. In *Mathews*, the Supreme Court found the disability termination procedures constitutionally adequate in part because they required consultation through "unbiased medical reports by physician specialists" and extensive information gathering. 424 U.S. at 343-49. The TPS statute's consultation requirement serves the same function: it ensures any TPS termination rests on accurate information about "conditions in the foreign state" by requiring consultation with expert agencies with extensive knowledge of such conditions. 8 U.S.C. § 1254a(b)(3)(A); *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 115 (1976) (explaining, in its due-process analysis, that an agency "has an obligation to perform its responsibilities with some degree of expertise").

The *Mathews* factors confirm that consultation is required to satisfy due process. *Mathews*, 424 U.S. at 335. Under *Mathews*, whether procedures are constitutionally adequate turns on (1) the private interest affected, (2) the risk of erroneous deprivation and the value of additional safeguards, and (3) the burden on the government. *Id.* The private interests at stake here are profound: the right to live and work in the United States without detention or removal to a country that the district court found "remains dangerous and unstable." JA190-192 (also finding irreparable harm). The risk of error is likewise substantial because terminations turn on complex, country-specific factual assessments within the expertise of the State Department and other agencies, and no alternative process permits beneficiaries to

challenge the TPS termination itself. *See* 8 C.F.R. § 244.19. Meanwhile, the government's burden is minimal because the TPS statute already requires consultation. *See, e.g.*, *League of Women Voters v. Newby*, 838 F.3d 1, 14 (D.C. Cir. 2016).

The Secretary failed to engage in the required consultation here. As the district court found, "no communications between DHS and State Department officials about country conditions are included in the administrative record," save for a "single email chain" regarding foreign policy concerns that the district court found "plainly … inadequate." JA186. The court therefore concluded that Plaintiffs were likely to establish that the DHS Secretary "fail[ed] to consult with appropriate agencies" before terminating TPS for South Sudan. JA188.

### C. The District Court Mischaracterized Plaintiffs' Interests and the Nature of Their Challenge

The district court's conclusion that Plaintiffs were owed no process rested on at least three critical errors.

*First*, the court mischaracterized the protected interests at stake. Plaintiffs do not assert "invocable individual liberty or property interests in the TPS designation *itself*," as the district court put it. Add.13 (emphasis added). Rather, Plaintiffs have pointed to protection from removal and work authorization as the liberty and property interests that trigger due process protection. *See* JA204 ("TPS holders have substantial liberty and property rights in their TPS status, which confers both

protection from removal and work authorization"); JA269-272 (similar). *Those* are the concrete benefits that are stripped away—without any further individualized process—when a TPS designation is terminated, and *those* are the interests that trigger necessary due process safeguards.

*Second*, and relatedly, the district court determined that due process did not apply because Plaintiffs challenged an "agency action" that was "generally-applicable" rather than an "individual adjudication[]." Add.13. But that is a false dichotomy. Courts have often recognized that due process protections apply when a broadly applicable government action functions to revoke individuals' liberty or property interests—even when it affects a large number of individuals at once. *See, e.g.*, *Make the Rd. N.Y. v. Mullin*, 179 F.4th 16, 20, 33-34 (D.C. Cir. 2026) (due process applied to nationwide DHS directive expanding the class designation for expedited removal); *Washington v. Trump*, 847 F.3d 1151, 1164-67 (9th Cir. 2017) (due process applied to bar implementation of travel ban Executive Order restricting entry of individuals from seven countries); *Nozzi v. Hous. Auth. of L.A.*, 806 F.3d 1178, 1186-87, 1192-99 & n.16 (9th Cir. 2015) (housing authority violated due process by implementing a subsidy reduction affecting an estimated 20,250 beneficiaries of Section 8 housing vouchers without adequate notice); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 283-85 (E.D.N.Y. 2018) (DACA recipients stated

due process claims where a generally applicable rescission policy caused rejection of renewal requests).

This Court's decision in *Garcia-Rubiera v. Fortuno*, 665 F.3d 261 (1st Cir. 2011), confirms that due process applies outside the context of individualized adjudications. There, the Court held that a generally applicable statutory reimbursement scheme for auto insurance—which fell "somewhere in between legislative action and individual adjudications"—violated procedural due process by failing to provide affected vehicle owners with adequate notice of the reimbursement process. *Id.* at 272-76. The particular *defect* in the notice here is different, but *Garcia-Rubiera* confirms that due process protections do not disappear simply because a scheme is generally applicable or affects many individuals at once.

Even if the legislative/adjudicative distinction were dispositive, the Termination is more akin to adjudication because it requires applying established statutory criteria to conditions in a particular country to determine whether its existing designation may continue, *see* 8 U.S.C. § 1254a(b)(3)(A)-(C)—a far cry from the prospective, generally applicable rules characteristic of legislative action. *See, e.g., Club Misty, Inc. v. Laski*, 208 F.3d 615, 622 (7th Cir. 2000) (recognizing adjudication applies existing laws to "present or past facts," whereas legislation "changes existing conditions by making a new rule").

*Third*, the court erred in dismissing Plaintiffs' due process claim as a "repackage[d]" statutory claim. Add.14. To begin, the due process claim is far narrower. Plaintiffs do not contend that every procedural requirement set out in the TPS statute is constitutionally required—only two core procedural protections. More fundamentally, the due process claim is grounded in a distinct source of law: the Due Process Clause of the Fifth Amendment. The fact that the relevant notice and consultation requirements are *also* required by statute is unremarkable—and simply shows that Congress (in addition to the Framers and the courts) recognized the significance of these procedural protections. *See also, e.g.*, *Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014) ("[S]tatutorily required procedures [can] assure compliance with constitutional due process requirements …." (citing *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011))); *Dia v. Ashcroft*, 353 F.3d 228, 239 (3d Cir. 2003) (en banc) (noncitizens' "due process rights … stem[] from those statutory rights granted by Congress and the principle that '[m]inimum due process rights attach to statutory rights.'" (quoting *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996))).

The district court's due process analysis was wrong at virtually every turn. This Court should reverse.

## III. The Remaining Factors Overwhelmingly Favor Plaintiffs, as the District Court Previously Found

The remaining, non-merits factors—irreparable harm, the balance of the equities, and the public interest—overwhelmingly favor Plaintiffs, as the district court found in connection with its first postponement order.

**Irreparable Harm:** The district court found that Plaintiffs "easily meet their burden" of showing irreparable harm, based on an administrative record showing that South Sudan "remains dangerous and unstable," which "Defendants largely do not contest." JA190-191; *see also, e.g.*, JA105 (USCIS report reflecting "escalat[ing]" "armed violence" and a "dire humanitarian situation in South Sudan"); JA147-148 (UN report reflecting "escalating violence" and "rising abductions"); JA190-191 (State Department "Level 4: Do Not Travel" advisory for South Sudan). The court also found that, for many TPS beneficiaries including Plaintiffs, TPS is their sole basis for remaining in this country and that the "'loss of liberty' during removal proceedings would *itself 'constitute irreparable harm.'*" JA191 (quoting *Guerrero Orellana v. Moniz*, 802 F. Supp. 3d 297, 312 (D. Mass. 2025)) (emphasis added). Even short of removal, a gap in protected status could cause loss of work authorization and ineligibility for other immigration relief. JA191-192. The record amply supports these findings.

**Equities and Public Interest:** The court likewise found that the balance of the equities and the public interest—which merge when the government opposes relief—"favor Plaintiffs." JA192-193. It found that the "many irreparable harms that South Sudanese TPS holders imminently face upon termination of South Sudan's TPS designation outweigh the largely unsubstantiated concerns raised by Defendants." JA193. And it explained that "there is 'no public interest in the perpetuation of unlawful agency action.'" JA192 (quoting *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025)). These findings are also firmly grounded in the administrative record. *See, e.g.*, JA193 (citing USCIS report confirming no fraud or public safety concerns involving South Sudanese TPS holders); *see also* JA90.

## CONCLUSION

The DHS Secretary's termination of South Sudan's TPS designation was *ultra vires* and violated Plaintiffs' procedural due process rights. This Court should reverse the denial of the motion for leave to amend the complaint and the denial of the motion for interim relief under 5 U.S.C. § 705.

October 21, 2026

Respectfully submitted,

By: */s/ Daniel G. Randolph*

Daniel G. Randolph
Mark H. Lynch
Kathleen Choi
Yevgeniy Pilipovskiy
Kristin M. Oakley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-6000
drandolph@cov.com
mlynch@cov.com
kchoi@cov.com
ypilipovskiy@cov.com
koakley@cov.com

Sarah Leadem
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
sleadem@cov.com

Melissa Keaney
Nargis Aslami
Abbey Rutherford
MUSLIM ADVOCATES
1763 Columbia Rd. N.W. #14324
Washington, D.C. 20009
Tel: (202) 897-2622
melissa@muslimadvocates.org
nargis@muslimadvocates.org
abbey@muslimadvocates.org

Erik Matthew Crew
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Rd
Ste H1
San Diego, CA 92120
ecrew@haitianbridge.org

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type-style, and type volume limitations. This brief was prepared in 14-point Times New Roman, a proportionally spaced typeface, in compliance with Federal Rules of Appellate Procedure 32(a)(5) and (6). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,933 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

October 21, 2026

*/s/ Daniel G. Randolph*
Daniel G. Randolph

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I, Daniel Randolph, hereby certify that on October 21, 2026, I caused the foregoing document to be filed with the Clerk of the Court of the United States Court of Appeals for the First Circuit using the Court's CM/ECF system.

*<u>/s/ Daniel G. Randolph</u>*
Daniel G. Randolph

*Counsel for Plaintiffs-Appellants*

# ADDENDUM

**No. 26-1898**

## ADDENDUM TABLE OF CONTENTS


| Document | Page |
|---|---|
| **Orders and Decisions** | |
| Memorandum and Order Denying Plaintiffs' Motion for Leave to Amend the Complaint and Renewed Motion for Postponement Under 5 U.S.C. § 705 (D. Mass. Aug. 7, 2026) (ECF No. 122) | Add.1 |
| Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50484 (Nov. 6, 2025) | Add.16 |
| **Constitutional, Statutory, and Regulatory Addendum** | |
| U.S. Const. amend. V | Add.20 |
| 6 U.S.C. § 251 | Add.20 |
| 6 U.S.C. § 271 (Excerpt) | Add.20 |
| 6 U.S.C. § 544 & Note | Add.21 |
| 6 U.S.C. § 552 | Add.44 |
| 6 U.S.C. § 557 | Add.45 |
| 8 U.S.C. § 1103 | Add.46 |
| 8 U.S.C. § 1105 | Add.49 |
| 8 U.S.C. § 1189 (Excerpts) | Add.51 |
| 8 U.S.C. § 1231 (Excerpt) | Add.55 |
| 8 U.S.C. § 1254a | Add.50 |
| 8 U.S.C. § 1451 (Excerpt) | Add.57 |
| 8 U.S.C. § 1532 | Add.66 |
| 8 U.S.C. § 1533 | Add.66 |
| 8 C.F.R. § 244.1 | Add.69 |
| 8 C.F.R. § 244.19 | Add.70 |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; MARY DOE; DAVID DOE; PETER DOE; and JACOB DOE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>Defendants. | Civil Action<br>No. 25-cv-13939-PBS |

**MEMORANDUM AND ORDER**

August 7, 2026

Saris, J.

## INTRODUCTION

This litigation challenges the termination of the temporary protected status ("TPS") designation of South Sudan. See Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50484 (Nov. 6, 2025). On February 12, 2026, the Court postponed the termination determination under 5 U.S.C. § 705 on the ground that the Secretary of Homeland Security violated the Administrative Procedure Act ("APA"), 5

U.S.C. § 551 et seq. See Afr. Cmtys. Together v. Noem, 820 F. Supp. 3d 48, 72 (D. Mass. 2026). Following the Supreme Court's June 25, 2026, decision in Mullin v. Doe, 146 S. Ct. 2121 (2026), which involved the termination of TPS for Syria and Haiti, the First Circuit summarily reversed the postponement order and remanded for further proceedings, see Afr. Cmtys. Together v. Mullin, No. 26-1254, 2026 WL 2186097, at *1 (1st Cir. July 29, 2026). The Court presumes familiarity with these three decisions.

Now before the Court is Plaintiffs' motion to amend their complaint to add two new claims (Dkt. 94), which were not raised to or addressed by the Supreme Court. Plaintiffs have also renewed their motion for postponement based on the proposed new claims (Dkt. 116). After a hearing on the motion to amend and full briefing, the Court concludes that Plaintiffs' proposed new claims would be futile and unlikely to succeed. Plaintiffs' motions therefore are **DENIED**.

## LEGAL STANDARD

### I. Motion to Amend

A party seeking to amend a pleading at this stage of the litigation requires either "the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." Id. In the absence of a specific reason to deny a motion to amend, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated

failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment," the court's leave "should, as the rules require, be 'freely given.'" Amyndas Pharms., S.A. v. Zealand Pharma A/S, 48 F.4th 18, 36 (1st Cir. 2022) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

**II. Motion to Postpone**

The APA provides that, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of" the court's review of the agency action. 5 U.S.C. § 705. In determining whether to postpone agency action under § 705, courts assess the factors that govern the issuance of a preliminary injunction. See, e.g., Nat'l TPS All. v. Noem, 150 F.4th 1000, 1015 (9th Cir. 2025); Colorado v. U.S. EPA, 989 F.3d 874, 883 (10th Cir. 2021); Cook County v. Wolf, 962 F.3d 208, 221 (7th Cir. 2020).

Accordingly, a party moving under § 705 must establish that (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of" postponement of the challenged agency action; (3) "the balance of equities tips in [its] favor"; and (4) postponement of the agency action "is in the public interest." Sosa v. Mass. Dep't of Corr., 80 F.4th 15, 25

(1st Cir. 2023) (quoting Dist. 4 Lodge of the Int'l Ass'n of Machinists Loc. Lodge 207 v. Raimondo, 40 F.4th 36, 39 (1st Cir. 2022)). The first factor "is the sine qua non" of the analysis. US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC, 121 F.4th 339, 347 (1st Cir. 2024). The third and fourth factors "merge when the [g]overnment is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

## DISCUSSION

Plaintiffs seek postponement of the termination of South Sudan's TPS designation based on two new proposed claims: (1) a claim that former Secretary of Homeland Security Kristi Noem acted ultra vires in terminating the designation because that authority belongs exclusively to the Attorney General and (2) a procedural due process claim that former Secretary Noem's alleged failure to consult with appropriate agencies and to publish the true basis for the termination determination deprived Plaintiffs of protected liberty and property interests without adequate process. The Court addresses each claim in turn.

### I. Ultra Vires Claim

First, Plaintiffs request to amend their complaint to assert a claim that only the Attorney General, not the Secretary of Homeland Security, has statutory authority to terminate a TPS designation. Defendants argue that the Court is barred by 8 U.S.C. § 1254a(b)(5)(A) from reviewing this claim. The Supreme Court has

held that § 1254a(b)(5)(A)'s "judicial-review bar applies to all non-constitutional claims." Mullin, 146 S. Ct. at 2137. Plaintiffs nevertheless contend that an ultra vires claim is not governed by this provision. The Court assumes, without deciding, that it has statutory authority to consider the merits of this proposed claim. See id. (plurality opinion) (explaining that a court may bypass a jurisdictional question when adjudicating a motion for interim relief, such as a motion to postpone under § 705). Even if such authority exists, the claim is futile and unlikely to succeed.

The parties agree that the TPS statute, as enacted in 1990, refers solely to the Attorney General. See 8 U.S.C. § 1254a. But in connection with creating the Department of Homeland Security as part of the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, and a subsequent appropriations bill, see Homeland Security Act Amendments of 2003, Pub. L. No. 108-7, 117 Stat. 11, Congress mandated that

> [t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers.

8 U.S.C. § 1103(a)(1). Also in the Homeland Security Act, Congress added a new subsection to the same section of the statute, providing that

> [t]he Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

Id. § 1103(g)(1).

Plaintiffs concede that the TPS statute is a "law[] relating to the immigration and naturalization of aliens" but contend that the authority to terminate a TPS designation was carved out of § 1103(a)(1)'s transfer of authority because that power had been "conferred upon the . . . Attorney General" by § 1254a. 8 U.S.C. § 1103(a)(1). Defendants initially responded that § 1103(a)(1) transferred TPS authority to the Secretary of Homeland Security because § 1103(g)(1) defined the only immigration powers of the Attorney General that were not to be transferred -- i.e., those previously exercised by the Executive Office for Immigration Review ("EOIR") -- and those powers did not include the administration of the TPS program.[1] Plaintiffs take the position that § 1103(g)(1) merely represents one non-exclusive example of the Attorney General's retained authority.

[1] In a subsequently filed brief, Defendants hedged that "§ 1103(a)'s proviso is properly understood to explain that the transfer covered functions except otherwise provided elsewhere" and cited § 1103(g) as one example. Dkt. 118 at 8.

This dispute presents a matter of first impression regarding the proper interpretation of 8 U.S.C. § 1103(a)(1) and (g)(1). For over two decades, the executive and judicial branches alike have operated under the unchallenged understanding that the Secretary of Homeland Security has the statutory authority to administer the TPS program. And the Supreme Court has stated that "[r]esponsibility for TPS decisions rests with the Secretary of Homeland Security." Mullin, 146 S. Ct. at 2129 (citing 6 U.S.C. §§ 552(d), 557));[2] see also Jill H. Wilson, Cong. Rsch. Serv., RS20844, Temporary Protected Status and Deferred Enforced Departure 4 n.24 (2025) ("When TPS was enacted in 1990, most immigration-related functions, including designating countries for TPS, fell under the authority of the Attorney General. With the creation of the Department of Homeland Security in 2002, most of the Attorney General's immigration-related authority transferred

[2] The Supreme Court cited 6 U.S.C. §§ 552(d) and 557 when referring to the Secretary of Homeland Security's TPS authority. These sections are housekeeping provisions that ensure that statutory terms be construed as referring to the Department of Homeland Security wherever a substantive transfer of authority has occurred. See 6 U.S.C. § 552(d) ("References relating to an agency that is transferred to the Department [of Homeland Security] . . . shall be deemed to refer, as appropriate, to the Department [of Homeland Security] . . . ." (emphasis added)); id. § 557 ("With respect to any function transferred by or under this chapter . . . , reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department [of Homeland Security] to which such function is so transferred." (emphases added)).

to the Secretary of [Homeland Security] as of March 1, 2003." (citation omitted)). This issue has not been raised in earlier briefing in this case, and the parties have not cited any other TPS case where it has been litigated. Nor have they identified any relevant legislative history (and the Court has likewise found none).

Plaintiffs and Defendants propose different constructions of the relevant statutory provisions. Under Plaintiffs' view, in which § 1103(a)(1) reserves to the Attorney General all duties previously conferred upon him, § 1103(g)(1)'s provision that the Attorney General would retain all functions exercised "by the Attorney General with respect to the Executive Office for Immigration Review" would be redundant. 8 U.S.C. § 1103(g)(1). On the other hand, if Defendants are correct that § 1103(g)(1) describes the immigration-related authority retained by the Attorney General, then § 1103(a)(1)'s reference to the Attorney General is unnecessary. Either construction thus results in statutory ambiguity. See Mullin v. Al Otro Lado, 146 S. Ct. 2079, 2092-93 (2026) (noting that although "[t]he anti-surplusage canon is useful," "Congress sometimes 'enacts provisions that are superfluous'" (quoting Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 107 (2011))). The statute is not crystal clear, but that does not "relieve[] [the Court] of its obligation to independently interpret" it. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 400

(2024); see id. (noting that "[c]ourts . . . routinely confront statutory ambiguities").

In the Court's view, the "best reading" of § 1103 is the one initially espoused by Defendants. Id. Section 1103(a)(1) provides that only certain powers "conferred upon the . . . Attorney General" are not transferred to the Secretary of Homeland Security, and § 1103(g)(1) defines what those immigration-related duties are. 8 U.S.C. § 1103(a)(1). Moreover, Defendants' interpretation is consistent with the Department of Homeland Security's "longstanding 'practice'" of administering the TPS program since the Homeland Security Act's passage. Loper Bright, 603 U.S. at 386 (quoting NLRB v. Noel Canning, 573 U.S. 513, 525 (2014)); see id. (noting that such practice is "especially" relevant when conducted "roughly contemporaneously with enactment of the statute" at issue). As the Supreme Court stated in Mullin, if that understanding is wrong, "Congress would have ample means to" correct it. 146 S. Ct. at 2137.

This interpretation of § 1103 is also consistent with its "context[] and structure." Bondi v. VanDerStok, 604 U.S. 458, 484 (2025) (quoting Van Buren v. United States, 593 U.S. 374, 394 (2021)). Prior to 2002, § 1103(a) provided that the "Attorney General" was charged with immigration authority "except insofar as this chapter or [other immigration] laws relate to the powers, functions, and duties conferred upon the President, the Secretary

of State, the officers of the Department of State, or diplomatic or consular officers." 8 U.S.C. § 1103(a) (1996). Through the Homeland Security Act and the subsequent appropriations bill, Congress made only two amendments to § 1103: first, it replaced "Attorney General" with "Secretary of Homeland Security" in § 1103(a)(1) (and added "Attorney General" to the list of officials in § 1103(a)(1)'s "except" clause), and second, it added § 1103(g), which specifically defined the Attorney General's reserved powers "under this chapter and all other laws relating to the immigration and naturalization of aliens" (notably, the same language used in § 1103(a)(1)). See Homeland Security Act § 1102(2)(A), (3); Homeland Security Act Amendments § 105(1). This drafting history indicates that Congress likely intended § 1103(g)(1) -- along with other simultaneously or subsequently enacted statutory provisions, but not prior ones -- to define the immigration powers retained by the Attorney General notwithstanding the transfer-of-authority provision contemporaneously enacted in § 1103(a)(1).[3]

[3] Plaintiffs posit that this interpretation of § 1103 calls into question whether certain duties currently performed by the Attorney General should in fact be performed by the Secretary of Homeland Security. See 8 U.S.C. § 1533(a)(1) (discussing Attorney General's authority relating to an alien terrorist removal court); id. § 1451(f) (discussing Attorney General's role relating to a certificate of naturalization); id. § 1103(b) (discussing Attorney General's power over certain land acquisitions). Those specific issues are not before the Court.

Finally, the Court further notes that under Plaintiffs' interpretation of § 1103, their ultra vires claim would likely still be futile. That is because if, as Plaintiffs posit, the Attorney General enjoys the exclusive right to terminate a TPS designation, he likewise has the sole authority to designate a country for TPS in the first place. See 8 U.S.C. § 1254a. South Sudan's original TPS designation would thus be invalid by the same token as its termination. It is true, as Plaintiffs note, that only the termination determination is at issue in this litigation. But that does not negate the fact that as a logical matter, Plaintiffs' arguments rest upon a self-contradictory, self-defeating foundation. See, e.g., O'Connell v. Marrero-Recio, 724 F.3d 117, 129 (1st Cir. 2013) (considering extent to which "arguments are self-defeating").[4]

## II. Procedural Due Process Claim

The Court now turns to Plaintiffs' proposed procedural due process claim. The Supreme Court did not address this claim in Mullin, and it did not resolve the question of whether

[4] Plaintiffs further suggest that under Department of Homeland Security v. Regents of the University of California, Defendants could not wind down South Sudan's TPS designation on the basis that the wrong official promulgated the designation without meeting certain procedural requirements and considering reliance interests. See 591 U.S. 1, 24-33 (2020). But Regents concerned arbitrary-and-capricious claims under the APA, which the Supreme Court held unreviewable in Mullin, see Mullin, 146 S. Ct. at 2133-37, and in any event, Plaintiffs' reference to Regents does not negate the logical fallacy posed by their ultra vires claim.

§ 1254a(b)(5)(A) bars judicial review of constitutional claims. See 146 S. Ct. at 2137 (plurality opinion).

Plaintiffs assert that they have constitutionally protected liberty and property interests in South Sudan's TPS designation because it affords them protection against removal and authorization to work. They contend that Defendants violated procedural due process by depriving Plaintiffs of these interests without obeying the procedural requirements of the TPS statute -- i.e., interagency consultation and publication of the true basis for the termination determination in the Federal Register. See Afr. Cmtys. Together, 820 F. Supp. 3d at 56 (describing these requirements).

The First Circuit has explained that the requirements of procedural due process "turn[] on whether the government conduct affecting the protected [liberty or] property interest is legislative or adjudicative in nature." García-Rubiera v. Fortuño, 665 F.3d 261, 272 (1st Cir. 2011). On one end of this "continuum," if a protected interest "is affected by generally-applicable legislative action," the interest-holder is "not entitled to notice above and beyond the notice provided by the enactment and publication of the statute" at issue. Id. "At the other end" of the continuum are "individual adjudications, which require more specific procedures, as well as more specific notice." Id. (citation omitted) (citing Mathews v. Eldridge, 424 U.S. 319, 335

(1976)); see also Hill v. U.S. Dep't of the Interior, 151 F.4th 420, 434 & n.6 (D.C. Cir. 2025) (distinguishing between deprivations that are "'the direct consequence' of a statute" and ones resulting from "individualized determination[s] or adjudication[s]" (quoting Atkins v. Parker, 472 U.S. 115, 130 (1985))).

At least one case has held that the protections against removal and work authorizations stemming from a TPS designation are constitutionally protected liberty and property interests. See Mansor v. U.S. Citizenship & Immigr. Servs., 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023) (holding that individuals eligible for TPS from a country designated for TPS "ha[ve] a property interest in temporary employment authorization subject to due process protections"). Here, however, Plaintiffs do not assert a denial of individual benefits under South Sudan's TPS designation; rather, they bring a programmatic challenge against the termination of the designation altogether. For that reason, this litigation is a far cry from a dispute over "individual adjudications" subject to the Mathews v. Eldridge framework. García-Rubiera, 665 F.3d at 272. Instead, Plaintiffs' proposed procedural due process claim is closer to a challenge to a "generally-applicable" agency action. Id. Plaintiffs thus have no invocable individual liberty or property interests in the TPS designation itself.

Plaintiffs contend that former Secretary Noem violated their due process rights by failing to consult with appropriate agencies and to publish the true basis for her termination determination in the Federal Register, as required by the TPS statute. In other words, Plaintiffs repackage their previously asserted APA claims -- which they concede are not reviewable by this Court in light of Mullin, see 146 S. Ct. at 2133-37 -- as constitutional ones under the label of procedural due process. But the Supreme Court rejected materially identical challenges under the APA, and Plaintiffs have no liberty or property interests left other than those provided by statute or regulation based on their individual circumstances through other statutory provisions.[5]

[5] Plaintiffs cite Washington v. Trump, 847 F.3d 1151 (9th Cir. 2017) (per curiam), and Batalla Vidal v. Nielsen, 291 F. Supp. 3d 260 (E.D.N.Y. 2018), rev'd on other grounds by, Regents, 591 U.S. 1, in support of the proposition that "[c]ourts have applied procedural due process protections to determinations that affect large groups of people at once." Dkt. 114 at 8. But these two cases each involved government action that directly impacted individuals' due process rights. Washington concerned an executive order that failed to provide "notice and a hearing prior to restricting an individual's ability to travel." 847 F.3d at 1164. And the relevant portion of Batalla Vidal related to the denials of individual renewal requests under the Deferred Action for Childhood Arrivals program. See 291 F. Supp. 3d at 281. Neither case supports Plaintiffs' contention that a procedural due process claim may be premised on alleged procedural errors in the government's termination of an entire program pursuant to a validly enacted statute.

## ORDER

For the foregoing reasons, Plaintiffs' newly proposed claims would be futile, see Amyndas Pharms., 48 F.4th at 36, and unlikely to succeed on the merits, see Sosa, 80 F.4th at 25. Plaintiffs' motion to amend their complaint (Dkt. 94) and renewed motion for postponement (Dkt. 116) therefore are **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge

50484

# Notices

Federal Register

Vol. 90, No. 213

Thursday, November 6, 2025

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2837–25; DHS Docket No. USCIS–2014–0004]**

**RIN 1615–ZB79**

## Termination of the Designation of South Sudan for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is terminating the designation of South Sudan for Temporary Protected Status. The designation of South Sudan is set to expire on November 3, 2025. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined that South Sudan no longer continues to meet the conditions for the designation for Temporary Protected Status. The Secretary, therefore, is terminating the Temporary Protected Status designation of South Sudan as required by statute. This termination is effective January 5, 2026. After January 5, 2026, nationals of South Sudan (and aliens having no nationality who last habitually resided in South Sudan) who have been granted Temporary Protected Status under South Sudan's designation will no longer have Temporary Protected Status.

**DATES:** The designation of South Sudan for Temporary Protected Status is terminated, effective at 11:59 p.m., local time, on January 5, 2026.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, (240) 721–3000.

**SUPPLEMENTARY INFORMATION:**

### List of Abbreviations

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
FR—Federal Register
FRN—Federal Register Notice
Government—U.S. Government
INA—Immigration and Nationality Act
Secretary—Secretary of Homeland Security
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

### What is Temporary Protected Status?

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for Temporary Protected Status if the Secretary determines that certain country conditions exist. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1). The Secretary, in her discretion, may grant Temporary Protected Status to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's Temporary Protected Status designation or extension, the Secretary—after consultation with appropriate U.S. Government agencies—must review the conditions in the foreign state designated for Temporary Protected Status to determine whether the conditions for the Temporary Protected Status designation continue to be met. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for Temporary Protected Status designation, Temporary Protected Status will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for Temporary Protected Status designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). There is no judicial review of ''any determination of the [Secretary] with respect to the designation, or termination or extension of a designation of a foreign state'' for Temporary Protected Status. *See* INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).

Temporary Protected Status is a temporary immigration benefit granted to eligible nationals of a country designated for Temporary Protected Status under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the designation period, Temporary Protected Status beneficiaries are eligible to remain in the United States and may not be removed, so long as they continue to meet the requirements of Temporary Protected Status. In addition, Temporary Protected Status beneficiaries are authorized to work and obtain an Employment Authorization Document (EAD), if requested, for a period of one year from the date of adjudication or the duration of the Temporary Protected Status designation, whichever is less. Temporary Protected Status beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of Temporary Protected Status does not result in or lead to lawful permanent resident status or any other immigration status.

To qualify for Temporary Protected Status, beneficiaries must meet the eligibility requirements at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2) in accordance with the implementing regulations at 8 CFR parts 244 and 1244. When the Secretary terminates a country's designation, beneficiaries return to the same immigration status or category that they maintained before Temporary Protected Status, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for Temporary Protected Status, as long as it is still valid on the date Temporary Protected Status terminates.

### Designation of South Sudan for Temporary Protected Status

South Sudan was initially designated for Temporary Protected Status on October 13, 2011, based on ongoing armed conflict and extraordinary and

temporary conditions.[1] Following the initial designation, DHS extended and newly designated South Sudan for Temporary Protected Status in 2013,[2] 2014,[3] and 2016.[4] In 2017,[5] 2019,[6] and 2020,[7] DHS extended Temporary Protected Status for South Sudan, based on ongoing armed conflict and extraordinary and temporary conditions. In 2022 [8] and 2023,[9] former Secretary Mayorkas extended and newly designated Temporary Protected Status. In May 2025, Temporary Protected Status for South Sudan was automatically extended for six months, from May 4, 2025, to November 3, 2025.[10] The automatic extension occurred because Secretary Noem was provided with a non-current record from the Department of State that was signed November 6, 2024, which, together with other factors, prevented Secretary Noem from making an informed decision by the March 4, 2025, statutory deadline.

**Secretary's Authority To Terminate the Designation of South Sudan for Temporary Protected Status**

At least 60 days before the expiration of a foreign state's Temporary Protected Status designation or extension, the Secretary—after consultation with appropriate U.S. Government agencies—must review the conditions in the foreign state designated for Temporary Protected Status to determine whether the country continues to meet the conditions for the designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state no longer meets the conditions for the Temporary Protected Status designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See id.* The Secretary may determine the appropriate effective date of the termination and expiration of any Temporary Protected Status-related documentation, such as Employment Authorization Documents. *See id.; see also* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary ''option'' to allow for a certain ''orderly transition'' period if she determines it to be appropriate).

**Reasons for the Secretary's Termination of the Temporary Protected Status Designation for South Sudan**

Consistent with INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, the Secretary reviewed current country conditions in South Sudan and considered whether South Sudan continues to meet the conditions for the designation under INA section 244(b)(1)(A) or (C), 8 U.S.C. 1254a(b)(1)(A) or (C). This review included examining: (a) whether there is ongoing armed conflict within the state, and (b) due to such conflict, requiring aliens who are nationals of that state to return would pose a serious threat to their personal safety. It also included reviewing: (c) whether extraordinary and temporary conditions in South Sudan that prevent South Sudanese nationals from returning in safety continue to exist, and (d) if permitting South Sudanese nationals to remain temporarily in the United States is contrary to the national interest of the United States. Based on the Department's review, the Secretary has determined the situation in South Sudan no longer meets the criteria for an ongoing armed conflict that poses a serious threat to the personal safety of returning South Sudanese nationals. While there is inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory attacks, and ethnic polarization, return to full-scale civil war, to-date, has been avoided. Recent diplomatic developments between the U.S. Department of State and South Sudan's transitional government indicate South Sudan's willingness to ensure the safety and reintegration of its returning nationals.[11] Further, regarding the extraordinary and temporary conditions, there have been improvements in South Sudan's civil safety outlook, which would allow aliens to safely return to the country. The United Nations Mission in the Republic of South Sudan is also building the capacity of South Sudan's local police and justice system so South Sudan's government can further protect its own citizens.[12] Improvements in displacement trends,[13] infrastructure,[14] and governance [15] point to civilian movement and a national trajectory of increased civilian safety and security as South Sudan seeks to make gains in stabilizing the country, with the support of the international community.

[1] *Designation of Republic of South Sudan for Temporary Protected Status,* 76 FR 63629 (Oct. 13, 2011).

[2] *Extension and Redesignation of South Sudan for Temporary Protected Status,* 78 FR 1866 (Jan. 9, 2013).

[3] *Extension and Redesignation of South Sudan for Temporary Protected Status,* 79 FR 52019 (Sept. 2, 2014).

[4] *Extension and Redesignation of South Sudan for Temporary Protected Status,* 81 FR 4051 (Jan. 25, 2016).

[5] *Extension of South Sudan for Temporary Protected Status,* 82 FR 44205 (Sept. 21, 2017).

[6] *Extension of the Designation of South Sudan for Temporary Protected Status,* 84 FR 13688 (Apr. 5, 2019).

[7] *Extension of the Designation of South Sudan for Temporary Protected Status,* 85 FR 69344 (Nov. 2, 2020).

[8] *Extension and Redesignation of South Sudan for Temporary Protected Status,* 87 FR 12190 (Mar. 3, 2022).

[9] *Extension and Redesignation of South Sudan for Temporary Protected Status,* 88 FR 60971 (Sept. 6, 2023).

[10] *Extension of South Sudan Designation for Temporary Protected Status,* 90 FR 19217 (May 6, 2025).

[11] South Sudan says it will accept deportee amid Rubio's visa revocations, AXIOS, Apr. 8, 2025, available at: *https://www.axios.com/2025/04/07/south-sudan-rubio-visa-revocation.*

[12] United Nations Mission in the Republic of South Sudan, United Nations, available at *https://unmiss.unmissions.org/background.*

[13] Over 500,000 South Sudanese nationals have returned to their homeland since the 2018 peace agreement. United Nations High Commissioner for Refugees, South Sudan Refugee Crisis, 2024, available at *https://www.unrefugees.org/emergencies/south-sudan/.*

[14] The South Sudanese government has taken a step forward in its national fiber optic infrastructure project, with the Steering Committee approving a budget of over $9 million for the design phase. This project, in conjunction with Intelsat and Whitaker Peace and Development Initiative's project to deliver high speed internet to community centers in South Sudan and Uganda will be a cornerstone of the government's digital transformation agenda aimed at improving connectivity and expanding access to broadband internet across the country. Tech Africa News, South Sudan Approves $9M Budget for National Fiber Optic Network Design, June 30, 2025, available at *https://techafricanews.com/2025/06/30/south-sudan-approves-9m-budget-for-national-fiber-optic-network-design/;* Developing Telecoms, Intelsat and NGO to deliver high-speed internet in South Sudan and Uganda, June 30, 2025, available at *https://developingtelecoms.com/telecom-business/humanitarian-communications/18698-intelsat-and-ngo-to-deliver-high-speed-internet-in-south-sudan-and-uganda.html.*

[15] From 2020–2024, the South Sudan Enhancing Community Resilience and Local Governance Project, a $45 million initiative, funded by the World Bank and implemented by the United Nations Office for Project Services and the International Organization for Migration on behalf of the Government of South Sudan, completed 345 sub-projects, building schools, health facilities, water points, roads, markets, and community centers, provided nearly 740,000 people with improved access to essential services, and reactivated and established community-level government institutions. The successor to this program is the Enhancing Community Resilience and Local Government Project Phase II, a $150 million project with a focus on flood resilience, disaster risk management, and institutional capacity building at all levels of government. World Bank, Building community resilience from the ground up in South Sudan, Feb. 13, 2025, available at *https://www.worldbank.org/en/news/feature/2025/01/24/building-community-resilience-from-the-ground-up-in-south-sudan.*

Although residual challenges from the civil war remain, there is no longer an ongoing armed conflict that poses a serious threat to the personal safety of returning South Sudanese nationals. The Secretary has also determined that while certain extraordinary and temporary conditions remain, the termination of the South Sudan designation is required because it is contrary to the national interest to permit South Sudanese nationals (or nationals having no nationality who last habitually resided in South Sudan) to remain temporarily in the United States.

In the Temporary Protected Status statute, Congress expressly prohibits the Secretary from designating a country for Temporary Protected Status based on extraordinary and temporary conditions if she finds that ''permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.'' INA 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). Accordingly, as the Department and the Attorney General have long recognized, such a ''national interest'' assessment is an essential element of a determination whether to extend or terminate a country's Temporary Protected Status designation, including the 2023 South Sudan designation, which was based on ''extraordinary and temporary conditions.'' [16]

''National interest'' is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.,* potential nexus to criminal gang membership), national security, migration factors (*e.g.,* pull factors), immigration policy (*e.g.,* enforcement prerogatives), and economic considerations (*e.g.,* adverse effects on U.S. workers, impact on U.S. communities).[17] Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

There are compelling foreign policy reasons for ending the Temporary Protected Status designation for South Sudan as the designation can carry implicit foreign policy messages. Considering the Department of State's stated goal of ensuring that South Sudan accepts the return of its citizens in a timely manner when the United States seeks to remove them,[18] the transitional South Sudanese government's current compliance with such removals,[19] and the continued partnership between the United States and South Sudan in third country removals,[20] the termination of the Temporary Protected Status designation for South Sudan serves the diplomatic interests of the United States by sending consistent foreign policy messaging at a pivotal moment in U.S.-South Sudan relations.

In addition to foreign policy concerns, there are public safety and national security risks associated with the continued designation of South Sudan for Temporary Protected Status. A portion of the South Sudan Temporary Protected Status population has been subjects of administrative investigation for fraud, public safety and national security concerns. The Secretary accordingly took account of those cases in making her determination that permitting South Sudanese Temporary Protected Status beneficiaries to remain in the United States is contrary to the national interest of the United States.

President Trump in his recent immigration and border-related executive orders and proclamations, clearly articulated an array of policy imperatives bearing upon the national interest. In Executive Order 14159, President Trump underscored that enforcing the immigration laws ''is critically important to the national security and public safety of the United States.'' [21] In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[22] Among the directed actions are to ensure that the Temporary Protected Status designations are consistent with the Temporary Protected Status statute and ''are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute.'' [23]

DHS estimates that there are 232 current approved beneficiaries under the designation of South Sudan for Temporary Protected Status. As of October 6, 2025, there are 73 total pending applications for the designation of South Sudan for Temporary Protected Status.[24]

**Effective Date of Termination of the Designation**

The Temporary Protected Status statute provides that the termination of a country's Temporary Protected Status designation may not be effective earlier than 60 days after the notice is published in the **Federal Register** or, if later, the expiration of the most-recent previous extension. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

The Temporary Protected Status statute authorizes the Secretary, at her discretion, to allow for an extended ''orderly transition'' period with respect to the termination and the expiration of any Temporary Protected Status-related documentation, such as Employment Authorization Documents. The Secretary has determined, in her discretion, that a 60-day transition period is sufficient and warranted here given the Secretary's finding that continuing to permit the South Sudanese nationals to remain temporarily in the United States is contrary to the U.S. national interest. *See* INA sec. 244(d)(3), 8 U.S.C.

---

[16] *Cf., e.g., Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension,* 63 FR 15437, 15438 (Mar. 31, 1998) (terminating Liberia Temporary Protected Status designation after ''consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Liberia; and (b) whether permitting nationals of Liberia . . . to remain temporarily in the United States is contrary to the national interest of the United States'').

[17] *See, e.g., Poursina* v. *USCIS,* 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, ''that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts'' (citing *Trump* v. *Hawaii,* 585 U.S. 667, 684–86 (2018)); *Flores* v. *Garland,* 72 F.4th 85, 89–90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.,* 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D–J–,* 23 I&N Dec. 572, 579–81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is ''sound immigration policy'' and an ''important national security interest''); *Matter of Dhanasar,* 26 I&N Dec. 884, 890–91 (AAO 2016) (taking into account impact on U.S. workers in ''national interest'' assessments).

[18] Defending America's Security through Visa and Travel Restrictions on South Sudan, U.S. Department of State, Apr. 5, 2025, available at: *https://www.state.gov/defending-americas-security-through-visa-and-travel-restrictions-on-south-sudan/.*

[19] South Sudan says it will accept deportee amid Rubio's visa revocations, AXIOS, Apr. 8, 2025, available at: *https://www.axios.com/2025/04/07/south-sudan-rubio-visa-revocation.*

[20] U.S. Pushes More African Countries to Accept Deported Migrants, The Wall Street Journal, July 9, 2025, available at: *https://www.wsj.com/politics/policy/u-s-pushes-more-african-countries-to-accept-deported-migrants-b6f330c5?mod=Searchresults_pos1&page=1;* MSN, U.S. completes deportation of 8 men to South Sudan after weeks of legal wrangling, July 5, 2025, available at *https://www.msn.com/en-us/news/world/us-completes-deportation-of-8-men-to-south-sudan-after-weeks-of-legal-wrangling/ar-AA1I2eRU.*

[21] E.O. 14159, *Protecting the American People Against Invasion,* sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[22] *Id.,* sec. 16, 90 FR 8446.

[23] *Id.,* sec. 16(b), 90 FR 8446.

[24] Estimates as of October 6, 2025.

1254a(d)(3).[25] Accordingly, the termination of the South Sudan Temporary Protected Status designation will be effective 60 days from this notice's publication date.[26]

DHS recognizes that South Sudanese Temporary Protected Status beneficiaries continue to be authorized to work during the 60-day transition period.[27] Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of certain Employment Authorization Documents previously issued under the Temporary Protected Status designation of South Sudan through January 5, 2026. Therefore, as proof of continued employment authorization through January 5, 2026, Temporary Protected Status beneficiaries can show their Employment Authorization Documents that have the notation A–12 or C–19 under Category and a ''Card Expires'' dates of November 3, 2023, May 3, 2025, and November 3, 2025.

The Secretary has considered putative reliance interests in the South Sudan Temporary Protected Status designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous Temporary Protected Status terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. Temporary Protected Status designations are time-limited and must be periodically reviewed, and Temporary Protected Status notices clearly notify aliens of the designations' expiration dates. Whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3)(A)–(B), (d)(3); 8 U.S.C. 1254a(b)(3)(A)–(B), (d)(3).

**Notice of the Termination of the Temporary Protected Status Designation of South Sudan**

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in South Sudan; (b) whether permitting the nationals of South Sudan (and aliens having no nationality who last habitually resided in South Sudan) to remain temporarily in the United States is contrary to the national interest of the United States; (c) whether South Sudan is experiencing ongoing armed conflict that poses a serious threat to the personal safety of South Sudan nationals, and (d) whether extraordinary and temporary conditions in South Sudan that prevent South Sudanese nationals from returning in safety continue to exist. Based on my review, I have determined that South Sudan no longer continues to meet the conditions for Temporary Protected Status under INA section 244(b)(1)(A) or (C), 8 U.S.C. 1254a(b)(1)(A) or (C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of South Sudan for Temporary Protected Status is terminated effective at 11:59 p.m., local time, on January 5, 2026.

(2) Information concerning the termination of Temporary Protected Status for nationals of South Sudan (and aliens having no nationality who last habitually resided in South Sudan) under the designation will be available at local USCIS offices upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will also be published on the USCIS website at *www.uscis.gov.*

**Kristi Noem,**

*Secretary of Homeland Security.*

[FR Doc. 2025–19800 Filed 11–5–25; 8:45 am]

BILLING CODE 9111–97–P

---

[25] Whether to allow for an additional ''orderly departure'' period following a Temporary Protected Status designation termination (beyond the statutory minimum of 60 days) is an ''option'' left to the Secretary's unfettered discretion. INA 244(d)(3), 8 U.S.C. 1254a(d)(3). Although DHS has allowed such extended periods for certain Temporary Protected Status terminations, *see, e.g., Termination of the Designation of Sudan for Temporary Protected Status,* 82 FR 47228 (Oct. 11, 2017) (12-month orderly transition period); *Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation,* 68 FR 52407 (Sept. 3, 2003) (6-month orderly transition period), certain other Temporary Protected Status designations were terminated without allowing for such transition periods, *see, e.g., Termination of Designation of Angola Under the Temporary Protected Status Program,* 68 FR 3896 (Jan. 27, 2003) (no orderly transition period); *Termination of Designation of Lebanon Under Temporary Protected Status Program,* 58 FR 7582 (Feb. 8, 1993) (same)

[26] *See* 8 CFR 244.19 (''Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.'').

[27] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

---

## POSTAL SERVICE

### International Product Change—Priority Mail Express International, Priority Mail International & First-Class Package International Service Agreement

**AGENCY:** Postal Service.

**ACTION:** Notice.

**SUMMARY:** The Postal Service gives notice of filing a request with the Postal Regulatory Commission to add a Priority Mail Express International, Priority Mail International & First-Class Package International Service contract to the list of Negotiated Service Agreements in the Competitive Product List in the Mail Classification Schedule.

**DATES:** Date of notice: November 6, 2025.

**FOR FURTHER INFORMATION CONTACT:** Christopher C. Meyerson, (202) 268–7820.

**SUPPLEMENTARY INFORMATION:** The United States Postal Service hereby gives notice that, pursuant to 39 U.S.C. 3642 and 3632(b)(3), on October 30, 2025, it filed with the Postal Regulatory Commission a *USPS Request to Add Priority Mail Express International, Priority Mail International & First-Class Package International Service Contract 99 to Competitive Product List.* Documents are available at *www.prc.gov,* Docket Nos. MC2026–60 and K2026–60.

**Daria Valan,**

*Attorney, Ethics and Legal Compliance.*

[FR Doc. 2025–19797 Filed 11–5–25; 8:45 am]

BILLING CODE 7710–12–P

---

## DEPARTMENT OF THE TREASURY

### United States Mint

### Notice of Meeting

**ACTION:** Notice of meeting.

Pursuant to United States Code, Title 31, section 5135(b)(8)(C), the United States Mint announces the Citizens Coinage Advisory Committee (CCAC) public meeting scheduled for November 18, 2025.

*Date:* November 18, 2025.

*Time:* 11:00 a.m.–4:00 p.m. (Eastern Time).

## U.S. Const. amend. V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## 6 U.S.C. § 251

### § 251. Transfer of functions

In accordance with subchapter XII (relating to transition provisions), there shall be transferred from the Commissioner of Immigration and Naturalization to the Secretary all functions performed under the following programs, and all personnel, assets, and liabilities pertaining to such programs, immediately before such transfer occurs:

(1) The Border Patrol program.

(2) The detention and removal program.

(3) The intelligence program.

(4) The investigations program.

(5) The inspections program.

## 6 U.S.C. § 271 (Excerpt)

### § 271. Establishment of Bureau of Citizenship and Immigration Services

* * *

### (b) Transfer of functions from Commissioner

In accordance with subchapter XII (relating to transition provisions), there are transferred from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services the following functions, and all personnel, infrastructure, and funding provided to the Commissioner in support of such functions immediately before the effective date specified in section 455:

(1) Adjudications of immigrant visa petitions.

(2) Adjudications of naturalization petitions.

(3) Adjudications of asylum and refugee applications.

(4) Adjudications performed at service centers.

(5) All other adjudications performed by the Immigration and Naturalization Service immediately before the effective date specified in section 455.

* * *

**6 U.S.C. § 542 & Note**

**§ 542. Reorganization plan**

**(a) Submission of plan**

Not later than 60 days after November 25, 2002, the President shall transmit to the appropriate congressional committees a reorganization plan regarding the following:

(1) The transfer of agencies, personnel, assets, and obligations to the Department pursuant to this chapter.

(2) Any consolidation, reorganization, or streamlining of agencies transferred to the Department pursuant to this chapter.

**(b) Plan elements**

The plan transmitted under subsection (a) shall contain, consistent with this chapter, such elements as the President deems appropriate, including the following:

(1) Identification of any functions of agencies transferred to the Department pursuant to this chapter that will not be transferred to the Department under the plan.

(2) Specification of the steps to be taken by the Secretary to organize the Department, including the delegation or assignment of functions transferred to the Department among officers of the Department in order to permit the Department to carry out the functions transferred under the plan.

(3) Specification of the funds available to each agency that will be transferred to the Department as a result of transfers under the plan.

(4) Specification of the proposed allocations within the Department of unexpended funds transferred in connection with transfers under the plan.

(5) Specification of any proposed disposition of property, facilities, contracts, records, and other assets and obligations of agencies transferred under the plan.

(6) Specification of the proposed allocations within the Department of the functions of the agencies and subdivisions that are not related directly to securing the homeland.

**(c) Modification of plan**

The President may, on the basis of consultations with the appropriate congressional committees, modify or revise any part of the plan until that part of the plan becomes effective in accordance with subsection (d).

**(d) Effective date**

**(1) In general**

The reorganization plan described in this section, including any modifications or revisions of the plan under subsection (d), shall become effective for an agency on the earlier of—

(A) the date specified in the plan (or the plan as modified pursuant to subsection (d)), except that such date may not be earlier than 90 days after the date the President has transmitted the reorganization plan to the appropriate congressional committees pursuant to subsection (a); or

(B) the end of the transition period.

**(2) Statutory construction**

Nothing in this subsection may be construed to require the transfer of functions, personnel, records, balances of appropriations, or other assets of an agency on a single date.

**(3) Supersedes existing law**

Paragraph (1) shall apply notwithstanding section 905(b) of title 5.

## References in Text

This chapter, referred to in subsecs. (a) and (b), was in the original "this Act", meaning Pub. L. 107–296, Nov. 25, 2002, 116 Stat. 2135, known as the Homeland Security Act of 2002, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 101 of this title and Tables.

# DEPARTMENT OF HOMELAND SECURITY REORGANIZATION PLAN

November 25, 2002

H. Doc. No. 108–16, 108th Congress, 1st Session, provided:

## INTRODUCTION

This Reorganization Plan is submitted pursuant to Section 1502 of the Department [sic] of Homeland Security Act of 2002 [6 U.S.C. 542] ("the Act"), which requires submission, not later than 60 days after enactment [Nov. 25, 2002], of a reorganization plan regarding two categories of information concerning plans for the Department of Homeland Security ("the Department" or "DHS"):

(1) The transfer of agencies, personnel, assets, and obligations to the Department pursuant to this Act [Pub. L. 107–296, Nov. 25, 2002, 116 Stat. 2135].

(2) Any consolidation, reorganization, or streamlining of agencies transferred to the Department pursuant to this Act. Section 1502(a).

Section 1502(b) of the Act identifies six elements, together with other elements "as the President deems appropriate," as among those for discussion in the plan. Each of the elements set out in the statute is identified *verbatim* below, followed by a discussion of current plans with respect to that element.

This plan is subject to modification pursuant to Section 1502(d) of the Act, which provides that on the basis of consultations with appropriate congressional committees the President may modify or revise any part of the plan until that part of the plan becomes effective. Additional details concerning the process for establishing the Department will become available in the coming weeks and months, and the President will work closely with Congress to modify this plan consistent with the Act.

## PLAN ELEMENTS

**(1) Identification of any functions of agencies transferred to the Department pursuant to this Act that will not be transferred to the Department under the plan.**

Except as otherwise directed in the Act, all functions of agencies that are to be transferred to the Department pursuant to the Act will be transferred to the Department under the plan. The functions of agencies being transferred to the Department which the Act directs are not to be transferred are the following:

- Pursuant to Section 201(g)(1) of the Act [6 U.S.C. 121(g)(1)], the Computer

Investigations and Operations Section ("CIOS") of the National Infrastructure Protection Center ("NIPC") of the Federal Bureau of Investigation ("FBI") will not transfer to the Department with the rest of NIPC. CIOS is the FBI headquarters entity responsible for managing all FBI computer intrusion field office cases (whether law enforcement or national security related).

- Pursuant to Sections 421(c) & (d) of the Act [6 U.S.C. 231(c), (d)], the regulatory responsibilities and quarantine activities relating to agricultural import and entry inspection activities of the United States Department of Agriculture ("the USDA") Animal and Plant Health Inspection Service ("APHIS") will remain with the USDA, as will the Secretary of Agriculture's authority to issue regulations, policies, and procedures regarding the functions transferred pursuant to Sections 421(a) & (b) of the Act.
- Pursuant to Subtitle B of Title IV of the Act [6 U.S.C. 211 et seq.], the authorities of the Secretary of the Treasury related to Customs revenue functions, as defined in the statute, will not transfer to the Department.
- Functions under the immigration laws of the United States with respect to the care of unaccompanied alien children will not transfer from the Department of Justice to DHS, but will instead transfer to the Department of Health and Human Services pursuant to Section 462 of the Act [6 U.S.C. 279].

**(2) Specification of the steps to be taken by the Secretary to organize the Department, including the delegation or assignment of functions transferred to the Department among officers of the Department in order to permit the Department to carry out the functions transferred under the plan.**

A. *Steps to be taken by the Secretary to organize the Department*. The President intends that the Secretary will carry out the following actions on the dates specified. All of the following transfers shall be deemed to be made to DHS, and all offices and positions to be established and all officers and officials to be appointed or named shall be deemed to be established, appointed, or named within DHS.

*January 24, 2003 (effective date of the Act pursuant to Section 4 [6 U.S.C. 101 note]):*

- Establish the Office of the Secretary.
- Begin to appoint, upon confirmation by the Senate, or transfer pursuant to the transfer provisions of the Act, as many of the following officers as may be possible:

(1) Deputy Secretary of Homeland Security

(2) Under Secretary for Information Analysis and Infrastructure Protection

(3) Under Secretary for Science and Technology

(4) Under Secretary for Border and Transportation Security

(5) Under Secretary for Emergency Preparedness and Response

(6) Director of the Bureau of Citizenship and Immigration Services

(7) Under Secretary for Management

(8) Not more than 12 Assistant Secretaries

(9) General Counsel

(10) Inspector General

(11) Commissioner of Customs

- Name, as soon as may be possible, officers to fill the following offices created by the Act:

(1) Assistant Secretary for Information Analysis

(2) Assistant Secretary for Infrastructure Protection

(3) Privacy Officer

(4) Director of the Secret Service

(5) Chief Information Officer

(6) Chief Human Capital Officer

(7) Chief Financial Officer

(8) Officer for Civil Rights and Civil Liberties

(9) Director of Shared Services

(10) Citizenship and Immigration Ombudsman

(11) Director of the Homeland Security Advanced Research Projects Agency

- Establish, within the Office of the Secretary, the Office for State and Local Government Coordination, the Office of International Affairs, and the Office of National Capital Region Coordination.

- Establish the Homeland Security Advanced Research Projects Agency and the Acceleration Fund for Research and Development of Homeland Security Technologies.

- Establish within the Directorate of Science and Technology the Office for National Laboratories.

- Establish the Bureau of Border Security [now Bureau of Immigration and Customs Enforcement], the Bureau of Citizenship and Immigration Services, and the Director of Shared Services.

- Establish the Transportation Security Oversight Board with the Secretary of Homeland Security as its Chair.

*March 1, 2003:*

- Transfer the Critical Infrastructure Assurance Office ("CIAO") of the Department of Commerce, the National Communications System ("the NCS"), the NIPC of the FBI (other than the CIOS), the National Infrastructure Simulation and Analysis Center ("NISAC"), the Energy Assurance Office ("EAO") of the Department of Energy, and the Federal Computer Incident Response Center of the General Services Administration ("FedCIRC").

- Transfer the Coast Guard.

- Transfer the Customs Service, the Transportation Security Administration ("the TSA"), functions of the Immigration and Naturalization Service ("the INS"), the Federal Protective Service ("the FPS"), the Office of Domestic Preparedness ("the ODP"), and the Federal Law Enforcement Training Center ("the FLETC").

- Transfer the functions of the Secretary of Agriculture relating to agricultural import and entry inspection activities under the laws specified in Section 421(b) of the Act [6 U.S.C. 231(b)] from the Animal and Plant Health Inspection Service.

- Transfer the United States Secret Service.

- Transfer the following programs and activities to the Directorate of Science and Technology:

  - The chemical and biological national security and supporting programs and activities of the nonproliferation and verification research and development program of the Department of Energy.

  - The life sciences activities related to microbial pathogens of the Biological and Environmental Research Program of the Department of Energy.

  - The National Bio-Weapons Defense Analysis Center of the Department of Defense.

  - The nuclear smuggling programs and activities within the proliferation detection program of the nonproliferation and verification research and development program of the Department of Energy.

- ○ The nuclear assessment program and activities of the assessment, detection, and cooperation program of the international materials protection and cooperation program of the Department of Energy and the advanced scientific computing research program and activities at Lawrence Livermore National Laboratory of the Department of Energy.

- ○ The Environmental Measurements Laboratory of the Department of Energy.

- Transfer the Federal Emergency Management Agency ("FEMA").

- Transfer the Integrated Hazard Information System of the National Oceanic and Atmospheric Administration, which shall be renamed "FIRESTAT."

- Transfer the National Domestic Preparedness Office of the FBI, including the functions of the Attorney General relating thereto.

- Transfer the Domestic Emergency Support Team of the Department of Justice, including the functions of the Attorney General relating thereto.

- Transfer the Metropolitan Medical Response System of the Department of Health and Human Services, including the functions of the Secretary of Health and Human Services and Assistant Secretary for Public Health Emergency Preparedness relating thereto.

- Transfer the National Disaster Medical System of the Department of Health and Human Services, including the functions of the Secretary of Health and Human Services and Assistant Secretary for Public Health Emergency Preparedness relating thereto.

- Transfer the Office of Emergency Preparedness and the Strategic National Stockpile of the Department of Health and Human Services, including the functions of the Secretary of Health and Human Services and Assistant Secretary for Public Health Emergency Preparedness relating thereto.

- Transfer to the Secretary the authority (in connection with an actual or threatened terrorist attack, major disaster, or other emergency in the United States) to direct the Nuclear Incident Response Team of the Department of Energy to operate as an organizational unit.

*June 1, 2003:*

- Transfer the Plum Island Animal Disease Center of USDA.

- Establish the Homeland Security Science and Technology Advisory Committee.

*By September 30, 2003:*

- Complete any incidental transfers, pursuant to Section 1516 of the Act [6 U.S.C. 556], of personnel, assets, and liabilities held, used, arising from, available, or to be made available, in connection with the functions transferred by the Act.

B. *Delegation or Assignment Among Officers of Functions Transferred to the Department*. The President intends that the Secretary will delegate or assign transferred functions within the Department as follows:

**1. Information Analysis and Infrastructure Protection**

a. *Under Secretary for Information Analysis and Infrastructure Protection ("IA and IP"):* Will be responsible for oversight of functions of NIPC, NCS, CIAO, NISAC, EAO, and FedCIRC transferred by the Act, the management of the Directorate's Information Analysis and Infrastructure Protection duties, and the administration of the Homeland Security Advisory System.

b. *Assistant Secretary for Information Analysis:* Will oversee the following Information Analysis functions:

- Identify and assess the nature and scope of terrorist threats to the homeland; detect and identify threats of terrorism against the United States; and, understand such threats in light of actual and potential vulnerabilities of the homeland.

- In coordination with the Assistant Secretary for Infrastructure Protection, integrate relevant information, analyses, and vulnerability assessments (whether such information, analyses, or assessments are provided or produced by the Department or others) in order to identify priorities for protective and support measures by the Department, other agencies of the Federal Government, State and local government agencies and authorities, the private sector, and other entities.

- Ensure the timely and efficient access by the Department to all information necessary to discharge the responsibilities under Section 201 of the Act [6 U.S.C. 121], including obtaining such information from other agencies of the Federal Government.

- Review, analyze, and make recommendations for improvements in the policies and procedures governing the sharing of law enforcement information, intelligence information, intelligence-related information, and other information relating to homeland security within the Federal Government and between the Federal Government and State and local

government agencies and authorities.

- Disseminate, as appropriate, information analyzed by the Department within the Department, to other agencies of the Federal Government with responsibilities relating to homeland security, and to agencies of State and local governments and private sector entities with such responsibilities in order to assist in the deterrence, prevention, preemption of, or response to, terrorist attacks against the United States.

- Consult with the Director of Central Intelligence and other appropriate intelligence, law enforcement, or other elements of the Federal Government to establish collection priorities and strategies for information, including law enforcement-related information, relating to threats of terrorism against the United States through such means as the representation of the Department in discussions regarding requirements and priorities in the collection of such information.

- Consult with State and local governments and private sector entities to ensure appropriate exchanges of information, including law enforcement-related information, relating to threats of terrorism against the United States.

- Ensure that—
    1. Any material received pursuant to the Act is protected from unauthorized disclosure and handled and used only for the performance of official duties; and
    2. Any intelligence information under the Act is shared, retained, and disseminated consistent with the authority of the Director of Central Intelligence to protect intelligence sources and methods under the National Security Act of 1947 (50 U.S.C. Section 401, et seq.) and related procedures and, as appropriate, similar authorities of the Attorney General concerning sensitive law enforcement information.

- Request additional information from other agencies of the Federal Government, State and local government agencies, and the private sector relating to threats of terrorism in the United States, or relating to other areas of responsibility assigned by the Secretary, including the entry into cooperative agreements through the Secretary to obtain such information.

- Establish and utilize, in conjunction with the Chief Information Officer of the Department, a secure communications and information technology

infrastructure, including data-mining and other advanced analytical tools, in order to access, receive, and analyze data and information in furtherance of statutory responsibilities, and to disseminate information acquired and analyzed by the Department, as appropriate.

- Ensure, in conjunction with the Chief Information Officer of the Department, that any information databases and analytical tools developed or utilized by the Department—
  1. Are compatible with one another and with relevant information databases of other agencies of the Federal Government; and
  2. Treat information in such databases in a manner that complies with applicable Federal law on privacy.

- Coordinate training and other support to the elements and personnel of the Department, other agencies of the Federal Government, and State and local governments that provide information to the Department, or are consumers of information provided by the Department, in order to facilitate the identification and sharing of information revealed in their ordinary duties and the optimal utilization of information received from the Department.

- Coordinate with elements of the intelligence community and with Federal, State, and local law enforcement agencies, and the private sector, as appropriate.

- Provide intelligence and information analysis and support to other elements of the Department.

c. Assistant *Secretary for Infrastructure Protection:* Will oversee the following Infrastructure Protection functions:

- Carry out comprehensive assessments of the vulnerabilities of the key resources and critical infrastructure of the United States, including the performance of risk assessments to determine the risks posed by particular types of terrorist attacks within the United States (including an assessment of the probability of success of such attacks and the feasibility and potential efficacy of various countermeasures to such attacks).

- In coordination with the Assistant Secretary for Information Analysis, integrate relevant information, analyses, and vulnerability assessments (whether such information, analyses, or assessments are provided or produced by the Department or others) in order to identify priorities for protective and support measures by the Department, other agencies of the

Federal Government, State and local government agencies and authorities, the private sector, and other entities.

- Develop a comprehensive national plan for securing the key resources and critical infrastructure of the United States, including power production, generation, and distribution systems, information technology and telecommunications systems (including satellites), electronic financial and property record storage and transmission systems, emergency preparedness communications systems, and the physical and technological assets that support such systems.

- Recommend measures necessary to protect the key resources and critical infrastructure of the United States in coordination with other agencies of the Federal Government and in cooperation with State and local government agencies and authorities, the private sector, and other entities.

- In coordination with the Under Secretary for Emergency Preparedness and Response, provide to State and local government entities, and upon request to private entities that own or operate critical information systems, crisis management support in response to threats to, or attacks on, critical information systems.

- Provide technical assistance, upon request, to the private sector and other government entities, in coordination with the Under Secretary for Emergency Preparedness and Response, with respect to emergency recovery plans to respond to major failures of critical information systems.

- Coordinate with other agencies of the Federal Government to provide specific warning information, and advice about appropriate protective measures and countermeasures, to State and local government agencies and authorities, the private sector, other entities, and the public.

**2. Science and Technology**

*Under Secretary for Science and Technology:* Will be responsible for performing the functions set forth in Section 302 of the Act [6 U.S.C. 182], including the following:

- Advise the Secretary regarding research and development efforts and priorities in support of the Department's missions.

- Develop, in consultation with other appropriate executive agencies, a national policy and strategic plan for identifying priorities, goals, objectives, and policies for, and coordinating the Federal Government's

civilian efforts with respect to, identifying and developing countermeasures to chemical, biological, radiological, nuclear, and other emerging terrorist threats, including the development of comprehensive, research-based definable goals for such efforts and of annual measurable objectives and specific targets to accomplish and evaluate the goals for such efforts.

- Support the Under Secretary for Information Analysis and Infrastructure Protection by assessing and testing homeland security vulnerabilities and possible threats.

- Conduct basic and applied research, development, demonstration, testing, and evaluation activities that are relevant to any or all elements of the Department, through both intramural and extramural programs, except that such responsibility does not extend to human health-related research and development activities.

- Establish priorities for directing, funding, and conducting national research, development, test and evaluation, and procurement of technology and systems for—

    1. preventing the importation of chemical, biological, radiological, nuclear, and related weapons and material; and
    2. detecting, preventing, protecting against, and responding to terrorist attacks.

- Establish a system for transferring homeland security developments or technologies to Federal, State, and local governments, and to private sector entities.

- Enter into work agreements, joint sponsorships, contracts, or any other agreements with the Department of Energy regarding the use of the national laboratories or sites and support of the science and technology base at those facilities.

- Collaborate with the Secretary of Agriculture and the Attorney General as provided in Section 212 of the Agricultural Bioterrorism Protection Act of 2002 (7 U.S.C. §8401), as amended by Section 1709(b) of the Act.

- Collaborate with the Secretary of Health and Human Services and the Attorney General in determining any new biological agents and toxins that shall be listed as “select agents” in Appendix A of part 72 of title 42, Code of Federal Regulations, pursuant to Section 351A of the Public Health Service Act (42 U.S.C. §262a).

- Support United States leadership in science and technology.
- Establish and administer the primary research and development activities of the Department, including the long-term research and development needs and capabilities for all elements of the Department.
- Coordinate and integrate all research, development, demonstration, testing, and evaluation activities of the Department.
- Coordinate with other appropriate executive agencies in developing and carrying out the science and technology agenda of the Department to reduce duplication and identify unmet needs.
- Develop and oversee the administration of guidelines for merit review of research and development projects throughout the Department, and for the dissemination of research conducted or sponsored by the Department.

**3. Border and Transportation Security**

The Directorate of Border and Transportation Security ("BTS") will include the following: the Bureau of Border Security [now Bureau of Immigration and Customs Enforcement]; the Office for Domestic Preparedness; the Customs Service [now Bureau of Customs and Border Protection]; the Transportation Security Administration; FLETC; and FPS.

The BTS Directorate will also have in place the key leaders of the new Directorate to include:

a. *Under Secretary for BTS:* Will be responsible for oversight of all responsibilities set forth in Section 402 of the Act [6 U.S.C. 202], including the following:

- Prevent the entry of terrorists and the instruments of terrorism into the United States.
- Secure the borders, territorial waters, ports, terminals, waterways, and air, land, and sea transportation systems of the United States, including managing and coordinating those functions transferred to the Department at ports of entry.
- Establish and administer rules, in accordance with Section 428 of the Act [6 U.S.C. 236], governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States.
- Establish national immigration enforcement policies and priorities.

- Administer the customs laws of the United States, except as otherwise provided in the Act.
- Conduct the inspection and related administrative functions of the USDA transferred to the Secretary of Homeland Security under Section 421 of the Act [6 U.S.C. 231].
- In carrying out the foregoing responsibilities, ensure the speedy, orderly, and efficient flow of lawful traffic and commerce.
- Carry out the immigration enforcement functions specified under Section 441 of the Act [6 U.S.C. 251] that were vested by statute in, or performed by, the Commissioner of the INS (or any officer, employee, or component of the INS) immediately before the date on which the transfer of functions takes place.

b. *Assistant Secretary for Border Security:* Will report directly to the Under Secretary for Border and Transportation Security, and whose responsibilities will include the following:

- Establish and oversee the administration of the policies for performing such functions as are—

  1. transferred to the Under Secretary for Border and Transportation Security by Section 441 of the Act and delegated to the Assistant Secretary by the Under Secretary for Border and Transportation Security; or

  2. otherwise vested in the Assistant Secretary by law.

- Advise the Under Secretary for Border and Transportation Security with respect to any policy or operation of the Bureau of Border Security [now Bureau of Immigration and Customs Enforcement] that may affect the Bureau of Citizenship and Immigration.

*c. Director of the Office for Domestic Preparedness*—Will report directly to the Under Secretary for Border and Transportation Security and will have the primary responsibility within the Executive Branch of the Federal Government for the preparedness of the United States for acts of terrorism, including the following responsibilities:

- Coordinate preparedness efforts at the Federal level, and work with all State, local, tribal, parish, and private sector emergency response providers on all matters pertaining to combating terrorism, including training, exercises, and equipment support.
- Coordinate or, as appropriate, consolidate communications and systems

of communications relating to homeland security at all levels of government.

- Direct and supervise terrorism preparedness grant programs of the Federal Government (other than those programs administered by the Department of Health and Human Services) for all emergency response providers.
- Incorporate homeland security priorities into planning guidance on an agency level for the preparedness efforts of the Office for Domestic Preparedness.
- Provide agency-specific training for agents and analysts within the Department, other agencies, and State and local agencies, and international entities.
- As the lead executive branch agency for preparedness of the United States for acts of terrorism, cooperate closely with the FEMA, which shall have the primary responsibility within the executive branch to prepare for and mitigate the effects of nonterrorist-related disasters in the United States.
- Assist and support the Secretary, in coordination with other Directorates and entities outside the Department, in conducting appropriate risk analysis and risk management activities of State, local, and tribal governments consistent with the mission and functions of the Directorate.
- Supervise those elements of the Office of National Preparedness of FEMA that relate to terrorism, which shall be consolidated within the Department in the ODP established pursuant to Section 430 of the Act [6 U.S.C. 238].

**4. Emergency Preparedness and Response**

The Emergency Preparedness and Response Directorate will be headed by the Under Secretary for Emergency Preparedness and Response.

*Under Secretary for EP&R:* Will be responsible for all of those functions included within Section 502 of the Act [6 U.S.C. 312], including:

- Helping to ensure the effectiveness of emergency response providers to terrorist attacks, major disasters, and other emergencies.
- With respect to the Nuclear Incident Response Team (regardless of whether it is operating as an organizational unit of the Department pursuant to the Act):

1. Establishing standards and certifying when those standards have been met;

2. Conducting joint and other exercises and training and evaluating performance; and,

3. Providing funds to the Department of Energy and the Environmental Protection Agency, as appropriate, for homeland security planning, exercises and training, and equipment.

- Providing the Federal Government's response to terrorist attacks and major disasters, including:

1. Managing such response;

2. Directing the Domestic Emergency Support Team, the Strategic National Stockpile, the National Disaster Medical System, and (when operating as an organizational unit of the Department pursuant to the Act) the Nuclear Incident Response Team;

3. Overseeing the Metropolitan Medical Response System; and

4. Coordinating other Federal response resources in the event of a terrorist attack or major disaster.

- Aiding the recovery from terrorist attacks and major disasters;
- Building a comprehensive national incident management system with Federal, State, and local government personnel, agencies, and authorities, to respond to such attacks and disasters.
- Consolidating existing Federal Government emergency response plans into a single, coordinated national response plan; and
- Developing comprehensive programs for developing interoperative communications technology, and helping to ensure that emergency response providers acquire such technology.

**5. Other Officers and Functions**

a. *Director of the Bureau of Citizenship and Immigration Services:* Will report directly to the Deputy Secretary; and will be responsible for the following:

- Establishing the policies for performing such functions as are transferred to the Director by Section 451 of the Act [6 U.S.C. 271] or otherwise vested in the Director by law.
- Oversight of the administration of such policies.

- Advising the Deputy Secretary with respect to any policy or operation of the Bureau of Citizenship and Immigration Services that may affect the Bureau of Border Security [now Bureau of Immigration and Customs Enforcement] of the Department, including potentially conflicting policies or operations.
- Establishing national immigration services policies and priorities.
- Meeting regularly with the Ombudsman described in Section 452 of the Act [6 U.S.C. 272] to correct serious service problems identified by the Ombudsman.
- Establishing procedures requiring a formal response to any recommendations submitted in the Ombudsman's annual report to Congress within three months after its submission to Congress.

b. *Citizenship and Immigration Services Ombudsman:* Will report directly to the Deputy Secretary; and will be responsible for the following:

- Assisting individuals and employers in resolving problems with the Bureau of Citizenship and Immigration Services;
- Identifying areas in which individuals and employers have problems in dealing with the Bureau of Citizenship and Immigration Services; and
- Proposing changes in the administrative practices of the Bureau of Citizenship and Immigration Services to mitigate identified problems.

**(3) Specification of the funds available to each agency that will be transferred to the Department as a result of transfers under the plan.**

- The attached tables [not set out in the Code] provide estimates of the funds available to the agencies and entities that will be transferred to the Department by operation of the Act. The two tables include total funding (mandatory and discretionary including fees) and discretionary funding net of fees. The tables provide the enacted levels for 2002 and 2002 supplementals, and the President's requested levels for 2003.

Because of the current state of the 2003 budget process, information concerning the funds that will be available to each transferring agency on the date of the proposed transfers is not currently available and will not likely be available during the time period in which the President is to submit this Reorganization Plan. As additional information becomes available, it will be provided as may be required in accordance with the procedures under the Act for modification of this Plan or other applicable law.

**(4) Specification of the proposed allocations within the Department of unexpended funds transferred in connection with transfers under the plan.**

- The attached tables [not set out in the Code] provide estimates of the unobligated balances as of September 30, 2002, for the agencies and programs that will be transferred to the Department. The first table provides estimates of unobligated balances for the accounts that are moving to the Department in whole. The second table provides estimates of the unobligated balances in the accounts of which only a portion will be transferring to the new Department. These latter estimates, however, are of the unobligated balances for the full account, only a portion of which are associated with the activities that will be transferred to the Department. In addition, these unobligated balances are based on the Department of Treasury's estimates as of September 30, 2002, which are the latest available figures. Since October 1, 2002, Departments and agencies (except the Department of Defense) have been operating under continuing resolutions, and, as such, have been spending these balances to maintain current operations.

Authority to reallocate unexpended funds of agencies transferred under this Plan is found in H.J. Res. 124 [Pub. L. 107–294, Nov. 23, 2002, 116 Stat. 2062], the continuing resolution in effect currently and until January 11, 2003. The resolution provides authority for the Office of Management and Budget to transfer an amount not to exceed $140,000,000 from unobligated balances of appropriations enacted before October 1, 2002 "for organizations and entities that will be transferred to the new Department and for salaries and expenses associated with the initiation of the Department." Such authority may be exercised upon providing 15 days' notice to the Appropriations Committees. We anticipate that it may be necessary to provide funding through such transfers both for transferring entities and for salaries and expenses associated with the initiation of the Department, including, for example, those associated with establishing the Office of the Secretary and other new offices provided for in the Act. Any plan to use such funding will follow the procedures required under the continuing resolution, including the provision of at least 15 days' notice to the Appropriations Committees.

**(5) Specification of any proposed disposition of property, facilities, contracts, records, and other assets and obligations of agencies transferred under the plan.**

- There is no intention to dispose of property, facility, contracts, records, and other assets and obligations of agencies transferred under the plan. All of such assets and obligations will transfer with each agency pursuant to Section

1511(d)(1) of the Act [6 U.S.C. 551(d)(1)].

- Prior to and during the transition period (as defined by Section 1501(a)(2) of the Act [6 U.S.C. 541(a)(2)]), the Department may identify property, facilities, contracts, records, and other assets and obligations of agencies transferred that would be candidates for disposition due to duplication, non-use, obsolescence, and the like. If and when any such proposed dispositions are identified, we will follow provisions of the Act relating to modification of this plan or further notification of Congress.

**(6) Specification of the proposed allocations within the Department of the functions of the agencies and subdivisions that are not related directly to securing the homeland.**

- As agencies and subdivisions are transferred into the Department, any functions of those entities that are not directly related to securing the homeland will continue to be allocated to the agencies and subdivisions in which they are currently incorporated.

[Bureau of Border Security renamed Bureau of Immigration and Customs Enforcement, and Customs Service renamed Bureau of Customs and Border Protection, by Reorganization Plan Modification for the Department of Homeland Security, H. Doc. No. 108–32, 108th Congress, 1st Session, set out below.]

[For transfer of functions of Strategic National Stockpile to Secretary of Health and Human Services, with certain exceptions, see section 3(c)(1), (2) of Pub. L. 108–276, set out as a note under section 247d–6b of Title 42, The Public Health and Welfare.]

## MESSAGE OF THE PRESIDENT

38 Weekly Compilation of Presidential Documents 2095, Dec. 2, 2002; H. Doc. No. 108–16, provided:

The White House, *Washington, November 25, 2002.*

*Dear Mr. Speaker: (Dear Mr. President:)*[1]

Pursuant to section 1502 of the Homeland Security Act of 2002 [6 U.S.C. 542], I submit herewith the enclosed Reorganization Plan for the Department of Homeland Security. The Reorganization Plan provides information concerning the elements identified in section 1502(b), and is subject to modification pursuant to section 1502(d) of the Act. In accordance with section 1502(a) of the Act, please transmit this Reorganization Plan to the appropriate congressional committees.

The details of this Plan are set forth in the enclosed letter from the Director of the Office of Management and Budget. I concur with his comments and observations.

Sincerely,

GEORGE W. BUSH.

[1] Editorial note. This is the text of identical letters addressed to the Speaker of the House of Representatives and the President of the Senate.

Enclosure.

## REORGANIZATION PLAN MODIFICATION FOR THE DEPARTMENT OF HOMELAND SECURITY

January 30, 2003

H. Doc. No. 108–32, 108th Congress, 1st Session, provided:

### INTRODUCTION

This Reorganization Plan Modification is submitted pursuant to the Homeland Security Act ("the Act") of 2002 [Pub. L. 107–296, Nov. 25, 2002, 116 Stat. 2135]. All elements of the Department of Homeland Security Reorganization Plan of November 25, 2002 ("the Plan") [set out above] remain as submitted except for those modifications addressed herein.

### PURPOSE OF MODIFICATION

This modification of the Plan is to establish and specify organizational units within the Border and Transportation Security Directorate. This modification presents a structural change, but does not consolidate, discontinue, or diminish transferred agencies' current operations in the field.

### PLAN MODIFICATIONS

(a) *Rename the "Bureau of Border Security" the "Bureau of Immigration and Customs Enforcement."* As required by the Act, this Bureau will be headed by an Assistant Secretary who will report directly to the Undersecretary for Border and Transportation Security.

This Bureau will comprise Immigration Naturalization Service (INS) interior enforcement functions, including the detention and removal program, the intelligence program, and the investigations program. At the same time, pursuant to this modification, the interior enforcement resources and missions of the Customs Service and the Federal Protective Service will be added to this Bureau. The mission of the Bureau is:

1. To enforce the full range of immigration and customs laws within the interior of the United States; and,

2. To protect specified federal buildings.

The Assistant Secretary will:

1. Establish and oversee the administration of the policies for performing the detention and removal program, the intelligence program, and the investigation program functions as are—

(a) transferred to the Under Secretary for Border and Transportation Security by Section 441 of the Act [6 U.S.C. 251] and delegated to the Assistant Secretary by the Under Secretary for Border and Transportation Security; or

(b) otherwise vested in the Assistant Secretary by law.

2. Advise the Under Secretary for Border and Transportation Security with respect to any policy or operation of the Bureau that may affect the Bureau of Citizenship and Immigration Services established under subtitle E of the Act [probably means subtitle E of title IV of the Act, 6 U.S.C. 271 et seq.], including potentially conflicting policies and operations.

(b) *Rename the "Customs Service" the "Bureau of Customs and Border Protection." This Bureau will be headed by the Commissioner of Customs and will* report to the Under Secretary for Border and Transportation Security.

The Bureau will contain the resources and missions relating to borders and ports of entry of the Customs Service, the INS, including the Border Patrol and the inspections program, and the agricultural inspections function of the Agricultural Quarantine Inspection program.

The Commissioner will:

1. Establish and oversee the administration of the policies for performing the Border Patrol and inspections program functions as are—

(a) transferred to the Under Secretary for Border and Transportation Security by Section 441 of the Act [6 U.S.C. 251] and delegated to the Commissioner by the Under Secretary for Border and Transportation Security; or

(b) otherwise vested in the Assistant Secretary [probably should be "Commissioner"] by law.

2. Advise the Under Secretary for Border and Transportation Security with respect to any policy or operation of the Bureau that may affect the Bureau of Citizenship and Immigration Services established under subtitle E of the Act [probably means subtitle E of title IV of the Act, 6 U.S.C. 271 et seq.], including potentially conflicting policies and operations.

## IMPLEMENTATION DATE

March 1, 2003

## ELEMENTS REQUIRED BY THE ACT TO BE SUBMITTED WITH MODIFIED PLAN

(1) *Identification of any functions of agencies transferred to the Department pursuant to this Act that will not be transferred to the Department under the plan.*

None.

(2) *Specification of the steps to be taken by the Secretary to organize the Department, including the delegation or assignment of functions transferred to the Department among officers of the Department in order to permit the Department to carry out the functions transferred under the plan.*

See plan modifications above.

(3) *Specification of the funds available to each agency that will be transferred to the Department as a result of transfers under the plan.*

The table attached at Tab A [not set out in the Code] provides estimates of the funds available to the agencies affected by this modification that will be transferred to the Department by operation of the Act. The table includes total funding (mandatory and discretionary including fees) and discretionary funding net of fees. The table provides the President's requested levels for 2003.

Because of the current state of the 2003 budget process, information concerning the funds that will be available to each transferring agency on the date of the proposed transfers is not currently available. As additional information becomes available, it will be provided as may be required in accordance with the procedures under the Act for modification of this Plan or other applicable law.

(4) *Specification of the proposed allocations within the Department of unexpended funds transferred in connection with transfers under the plan.*

The table attached at Tab B [not set out in the Code] provides updated estimates of the unobligated balances as of September 30, 2002, for the agencies affected by this modification that will be transferred to the Department. Since October 1, 2002, these agencies have been operating under continuing resolutions, and, as such, have been spending these balances to maintain current operations. As additional information becomes available, it will be provided as may be required in accordance with the procedures under the Act for modification of this Plan or other applicable law.

(5) *Specification of any proposed disposition of property, facilities, contracts, records, and other assets and obligations of agencies transferred under the plan.*

There is no intention to dispose of property, facilities, contracts, records, and other assets and obligations of agencies transferred under this modification. All such assets and obligations will transfer with each agency pursuant to Section 1511(d)(1) of the Act [6 U.S.C. 551(d)(1)].

(6) *Specification of the proposed allocations within the Department of the functions of the agencies and subdivisions that are not related directly to securing the homeland.*

The functions of the agencies affected by this modification that are not directly related to securing the homeland will continue to be performed by the bureaus formed by this planned reorganization.

**MESSAGE OF THE PRESIDENT**

39 Weekly Compilation of Presidential Documents 136, Feb. 3, 2003; H. Doc. No. 108–32, provided:

The White House, *Washington, January 30, 2003.*

*Dear Mr. Speaker: (Dear Mr. President:)*[1]

Pursuant to section 1502 of the Homeland Security Act of 2002 [6 U.S.C. 542] (Public Law 107–296) (the "Act"), I submit herewith the enclosed Reorganization Plan Modification for the Department of Homeland Security (DHS), which represents a modification of certain aspects of the DHS Reorganization Plan [set out above] I submitted to you on November 25, 2002. The modification involves organizational units within the DHS Border and Transportation Security Directorate. The enclosed Reorganization Plan Modification provides information concerning the elements identified in section 1502(b), and is itself subject to modification pursuant to section 1502(d) of the Act. In accordance with section 1502(a) of the Act, please transmit this Reorganization Plan Modification to the appropriate congressional committees.

Sincerely,

GEORGE W. BUSH.

[1] **Editorial note**. This is the text of identical letters addressed to the Speaker of the House of Representatives and the President of the Senate.

**6 U.S.C. § 552**

**§ 552. Savings provisions**

**(a) Completed administrative actions**

(1) Completed administrative actions of an agency shall not be affected by the enactment of this chapter or the transfer of such agency to the Department, but shall continue in effect according to their terms until amended, modified, superseded, terminated, set aside, or revoked in accordance with law by an officer of the United States or a court of competent jurisdiction, or by operation of law.

(2) For purposes of paragraph (1), the term "completed administrative action" includes orders, determinations, rules, regulations, personnel actions, permits, agreements, grants, contracts, certificates, licenses, registrations, and privileges.

**(b) Pending proceedings**

Subject to the authority of the Secretary under this chapter—

(1) pending proceedings in an agency, including notices of proposed rulemaking, and applications for licenses, permits, certificates, grants, and financial assistance, shall continue notwithstanding the enactment of this chapter or the transfer of the agency to the Department, unless discontinued or modified under the same terms and conditions and to the same extent that such discontinuance could have occurred if such enactment or transfer had not occurred; and

(2) orders issued in such proceedings, and appeals therefrom, and payments made pursuant to such orders, shall issue in the same manner and on the same terms as if this chapter had not been enacted or the agency had not been transferred, and any such orders shall continue in effect until amended, modified, superseded, terminated, set aside, or revoked by an officer of the United States or a court of competent jurisdiction, or by operation of law.

**(c) Pending civil actions**

Subject to the authority of the Secretary under this chapter, pending civil actions shall continue notwithstanding the enactment of this chapter or the transfer of an agency to the Department, and in such civil actions, proceedings shall be had, appeals taken, and judgments rendered and enforced in the same manner and with the same effect as if such enactment or transfer had not occurred.

**(d) References**

References relating to an agency that is transferred to the Department in statutes, Executive orders, rules, regulations, directives, or delegations of authority that precede such transfer or the effective date of this chapter shall be deemed to refer,

as appropriate, to the Department, to its officers, employees, or agents, or to its corresponding organizational units or functions. Statutory reporting requirements that applied in relation to such an agency immediately before the effective date of this chapter shall continue to apply following such transfer if they refer to the agency by name.

**(e) Employment provisions**

(1) Notwithstanding the generality of the foregoing (including subsections (a) and (d)), in and for the Department the Secretary may, in regulations prescribed jointly with the Director of the Office of Personnel Management, adopt the rules, procedures, terms, and conditions, established by statute, rule, or regulation before the effective date of this chapter, relating to employment in any agency transferred to the Department pursuant to this chapter; and

(2) except as otherwise provided in this chapter, or under authority granted by this chapter, the transfer pursuant to this chapter of personnel shall not alter the terms and conditions of employment, including compensation, of any employee so transferred.

**(f) Statutory reporting requirements**

Any statutory reporting requirement that applied to an agency, transferred to the Department under this chapter, immediately before the effective date of this chapter shall continue to apply following that transfer if the statutory requirement refers to the agency by name.

**6 U.S.C. § 557**

---

**§ 557. Reference**

With respect to any function transferred by or under this chapter (including under a reorganization plan that becomes effective under section 542 of this title) and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

**8 U.S.C. § 1103**

**§ 1103. Powers and duties of the Secretary, the Under Secretary, and the Attorney General**

**(a) Secretary of Homeland Security**

(1) The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however*, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

(2) He shall have control, direction, and supervision of all employees and of all the files and records of the Service.

(3) He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

(4) He may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.

(5) He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper.

(6) He is authorized to confer or impose upon any employee of the United States, with the consent of the head of the Department or other independent establishment under whose jurisdiction the employee is serving, any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

(7) He may, with the concurrence of the Secretary of State, establish offices of the Service in foreign countries; and, after consultation with the Secretary of State, he may, whenever in his judgment such action may be necessary to accomplish the purposes of this chapter, detail employees of the Service for duty in foreign countries.

(8) After consultation with the Secretary of State, the Attorney General may authorize officers of a foreign country to be stationed at preclearance facilities in the United States for the purpose of ensuring that persons traveling from or through the United States to that foreign country comply with that country's immigration and related laws.

(9) Those officers may exercise such authority and perform such duties as United States immigration officers are authorized to exercise and perform in that foreign country under reciprocal agreement, and they shall enjoy such reasonable privileges and immunities necessary for the performance of their duties as the government of their country extends to United States immigration officers.

(10) In the event the Attorney General determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response, the Attorney General may authorize any State or local law enforcement officer, with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving, to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon officers or employees of the Service.

(11) The Attorney General, in support of persons in administrative detention in non-Federal institutions, is authorized—

(A) to make payments from funds appropriated for the administration and enforcement of the laws relating to immigration, naturalization, and alien registration for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State; and

(B) to enter into a cooperative agreement with any State, territory, or political subdivision thereof, for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention services in any State or unit of local government which agrees to provide guaranteed bed space for persons detained by the Service.

**(b) Land acquisition authority**

(1) The Attorney General may contract for or buy any interest in land, including temporary use rights, adjacent to or in the vicinity of an international land border when the Attorney General deems the land essential to control and guard the boundaries and borders of the United States against any violation of this chapter.

(2) The Attorney General may contract for or buy any interest in land identified pursuant to paragraph (1) as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable.

(3) When the Attorney General and the lawful owner of an interest identified pursuant to paragraph (1) are unable to agree upon a reasonable price, the Attorney General may commence condemnation proceedings pursuant to section 3113 of title 40.

(4) The Attorney General may accept for the United States a gift of any interest in land identified pursuant to paragraph (1).

**(c) Commissioner; appointment**

The Commissioner shall be a citizen of the United States and shall be appointed by the President, by and with the advice and consent of the Senate. He shall be charged with any and all responsibilities and authority in the administration of the Service and of this chapter which are conferred upon the Attorney General as may be delegated to him by the Attorney General or which may be prescribed by the Attorney General. The Commissioner may enter into cooperative agreements with State and local law enforcement agencies for the purpose of assisting in the enforcement of the immigration laws.

**(d) Statistical information system**

(1) The Commissioner, in consultation with interested academicians, government agencies, and other parties, shall provide for a system for collection and dissemination, to Congress and the public, of information (not in individually identifiable form) useful in evaluating the social, economic, environmental, and demographic impact of immigration laws.

(2) Such information shall include information on the alien population in the United States, on the rates of naturalization and emigration of resident aliens, on aliens who have been admitted, paroled, or granted asylum, on nonimmigrants in the United States (by occupation, basis for admission, and duration of stay), on aliens who have not been admitted or have been removed from the United States, on the number of applications filed and granted for cancellation of removal, and on the number of aliens estimated to be present unlawfully in the United States in each fiscal year.

(3) Such system shall provide for the collection and dissemination of such information not less often than annually.

**(e) Annual report**

(1) The Commissioner shall submit to Congress annually a report which contains a summary of the information collected under subsection (d) and an analysis of trends in immigration and naturalization.

(2) Each annual report shall include information on the number, and rate of denial administratively, of applications for naturalization, for each district office of the Service and by national origin group.

**(f) Minimum number of agents in States**

The Attorney General shall allocate to each State not fewer than 10 full-time active duty agents of the Immigration and Naturalization Service to carry out the functions of the Service, in order to ensure the effective enforcement of this chapter.

**(g) Attorney General**

**(1) In general**

The Attorney General shall have such authorities and functions under this chapter and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review, or by the Attorney General with respect to the Executive Office for Immigration Review, on the day before the effective date of the Immigration Reform, Accountability and Security Enhancement Act of 2002.

**(2) Powers**

The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.

**8 U.S.C. § 1105**

---

**§ 1105. Liaison with internal security officers; data exchange**

**(a) In general**

The Commissioner and the Administrator shall have authority to maintain direct and continuous liaison with the Directors of the Federal Bureau of Investigation and the Central Intelligence Agency and with other internal security officers of the Government for the purpose of obtaining and exchanging information for use in enforcing the provisions of this chapter in the interest of the internal and border security of the United States. The Commissioner and the Administrator shall

maintain direct and continuous liaison with each other with a view to a coordinated, uniform, and efficient administration of this chapter, and all other immigration and nationality laws.

**(b) Access to National Crime Information Center files**

(1) The Attorney General and the Director of the Federal Bureau of Investigation shall provide the Department of State and the Service access to the criminal history record information contained in the National Crime Information Center's Interstate Identification Index (NCIC-III), Wanted Persons File, and to any other files maintained by the National Crime Information Center that may be mutually agreed upon by the Attorney General and the agency receiving the access, for the purpose of determining whether or not a visa applicant or applicant for admission has a criminal history record indexed in any such file.

(2) Such access shall be provided by means of extracts of the records for placement in the automated visa lookout or other appropriate database, and shall be provided without any fee or charge.

(3) The Federal Bureau of Investigation shall provide periodic updates of the extracts at intervals mutually agreed upon with the agency receiving the access. Upon receipt of such updated extracts, the receiving agency shall make corresponding updates to its database and destroy previously provided extracts.

(4) Access to an extract does not entitle the Department of State to obtain the full content of the corresponding automated criminal history record. To obtain the full content of a criminal history record, the Department of State shall submit the applicant's fingerprints and any appropriate fingerprint processing fee authorized by law to the Criminal Justice Information Services Division of the Federal Bureau of Investigation.

**(c) Reconsideration upon development of more cost effective means of sharing information**

The provision of the extracts described in subsection (b) may be reconsidered by the Attorney General and the receiving agency upon the development and deployment of a more cost-effective and efficient means of sharing the information.

**(d) Regulations**

For purposes of administering this section, the Department of State shall, prior to receiving access to NCIC data but not later than 4 months after October 26, 2001, promulgate final regulations—

(1) to implement procedures for the taking of fingerprints; and

(2) to establish the conditions for the use of the information received from the Federal Bureau of Investigation, in order—

(A) to limit the redissemination of such information;

(B) to ensure that such information is used solely to determine whether or not to issue a visa to an alien or to admit an alien to the United States;

(C) to ensure the security, confidentiality, and destruction of such information; and

(D) to protect any privacy rights of individuals who are subjects of such information.

## 8 U.S.C. § 1189 (Excerpts)

### § 1189. Designation of foreign terrorist organizations

**(a) Designation**

**(1) In general**

The Secretary is authorized to designate an organization as a foreign terrorist organization in accordance with this subsection if the Secretary finds that—

(A) the organization is a foreign organization;

(B) the organization engages in terrorist activity (as defined in section 1182(a)(3)(B) of this title or terrorism (as defined in section 2656f(d)(2) of title 22), or retains the capability and intent to engage in terrorist activity or terrorism) [1]; and

(C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.

**(2) Procedure**

**(A) Notice**

**(i) To congressional leaders**

Seven days before making a designation under this subsection, the Secretary shall, by classified communication, notify the Speaker and Minority Leader of the House of Representatives, the President pro tempore, Majority Leader, and Minority Leader of the Senate, and the members of the relevant committees of the House of Representatives and the Senate, in writing, of the intent to designate an organization under this subsection, together with the findings made under paragraph (1) with respect to that organization, and the factual basis therefor.

**(ii) Publication in Federal Register**

The Secretary shall publish the designation in the Federal Register seven days after providing the notification under clause (i).

**(B) Effect of designation**

(i) For purposes of section 2339B of title 18, a designation under this subsection shall take effect upon publication under subparagraph (A)(ii).

(ii) Any designation under this subsection shall cease to have effect upon an Act of Congress disapproving such designation.

**(C) Freezing of assets**

Upon notification under paragraph (2)(A)(i), the Secretary of the Treasury may require United States financial institutions possessing or controlling any assets of any foreign organization included in the notification to block all financial transactions involving those assets until further directive from either the Secretary of the Treasury, Act of Congress, or order of court.

**(3) Record**

**(A) In general**

In making a designation under this subsection, the Secretary shall create an administrative record.

**(B) Classified information**

The Secretary may consider classified information in making a designation under this subsection. Classified information shall not be subject to disclosure for such time as it remains classified, except that such information may be disclosed to a court ex parte and in camera for purposes of judicial review under subsection (c).

**(4) Period of designation**

**(A) In general**

A designation under this subsection shall be effective for all purposes until revoked under paragraph (5) or (6) or set aside pursuant to subsection (c).

**(B) Review of designation upon petition**

**(i) In general**

The Secretary shall review the designation of a foreign terrorist organization under the procedures set forth in clauses (iii) and (iv) if the

designated organization files a petition for revocation within the petition period described in clause (ii).

**(ii) Petition period**

For purposes of clause (i)—

(I) if the designated organization has not previously filed a petition for revocation under this subparagraph, the petition period begins 2 years after the date on which the designation was made; or

(II) if the designated organization has previously filed a petition for revocation under this subparagraph, the petition period begins 2 years after the date of the determination made under clause (iv) on that petition.

**(iii) Procedures**

Any foreign terrorist organization that submits a petition for revocation under this subparagraph must provide evidence in that petition that the relevant circumstances described in paragraph (1) are sufficiently different from the circumstances that were the basis for the designation such that a revocation with respect to the organization is warranted.

**(iv) Determination**

**(I) In general**

Not later than 180 days after receiving a petition for revocation submitted under this subparagraph, the Secretary shall make a determination as to such revocation.

**(II) Classified information**

The Secretary may consider classified information in making a determination in response to a petition for revocation. Classified information shall not be subject to disclosure for such time as it remains classified, except that such information may be disclosed to a court ex parte and in camera for purposes of judicial review under subsection (c).

**(III) Publication of determination**

A determination made by the Secretary under this clause shall be published in the Federal Register.

**(IV) Procedures**

Any revocation by the Secretary shall be made in accordance with paragraph (6).

**(C) Other review of designation**

**(i) In general**

If in a 5-year period no review has taken place under subparagraph (B), the Secretary shall review the designation of the foreign terrorist organization in order to determine whether such designation should be revoked pursuant to paragraph (6).

**(ii) Procedures**

If a review does not take place pursuant to subparagraph (B) in response to a petition for revocation that is filed in accordance with that subparagraph, then the review shall be conducted pursuant to procedures established by the Secretary. The results of such review and the applicable procedures shall not be reviewable in any court.

**(iii) Publication of results of review**

The Secretary shall publish any determination made pursuant to this subparagraph in the Federal Register.

**(5) Revocation by Act of Congress**

The Congress, by an Act of Congress, may block or revoke a designation made under paragraph (1).

**(6) Revocation based on change in circumstances**

**(A) In general**

The Secretary may revoke a designation made under paragraph (1) at any time, and shall revoke a designation upon completion of a review conducted pursuant to subparagraphs (B) and (C) of paragraph (4) if the Secretary finds that—

(i) the circumstances that were the basis for the designation have changed in such a manner as to warrant revocation; or

(ii) the national security of the United States warrants a revocation.

**(B) Procedure**

The procedural requirements of paragraphs (2) and (3) shall apply to a revocation under this paragraph. Any revocation shall take effect on the date

specified in the revocation or upon publication in the Federal Register if no effective date is specified.

**(7) Effect of revocation**

The revocation of a designation under paragraph (5) or (6) shall not affect any action or proceeding based on conduct committed prior to the effective date of such revocation.

**(8) Use of designation in trial or hearing**

If a designation under this subsection has become effective under paragraph (2)(B) a defendant in a criminal action or an alien in a removal proceeding shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing.

* * *

**(d) Definitions**

As used in this section—

(1) the term "classified information" has the meaning given that term in section 1(a) of the Classified Information Procedures Act (18 U.S.C. App.);

(2) the term "national security" means the national defense, foreign relations, or economic interests of the United States;

(3) the term "relevant committees" means the Committees on the Judiciary, Intelligence, and Foreign Relations of the Senate and the Committees on the Judiciary, Intelligence, and International Relations of the House of Representatives; and

(4) the term "Secretary" means the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General.

## 8 U.S.C. § 1231 (Excerpt)

### § 1231. Detention and removal of aliens ordered removed

* * *

**(i) Incarceration**

(1) If the chief executive officer of a State (or, if appropriate, a political subdivision of the State) exercising authority with respect to the incarceration of an undocumented criminal alien submits a written request to the Attorney General, the Attorney General shall, as determined by the Attorney General—

(A) enter into a contractual arrangement which provides for compensation to the State or a political subdivision of the State, as may be appropriate, with respect to the incarceration of the undocumented criminal alien; or

(B) take the undocumented criminal alien into the custody of the Federal Government and incarcerate the alien.

(2) Compensation under paragraph (1)(A) shall be the average cost of incarceration of a prisoner in the relevant State as determined by the Attorney General.

(3) For purposes of this subsection, the term "undocumented criminal alien" means an alien who—

(A) has been convicted of a felony or two or more misdemeanors; and

(B)(i) entered the United States without inspection or at any time or place other than as designated by the Attorney General;

(ii) was the subject of exclusion or deportation proceedings at the time he or she was taken into custody by the State or a political subdivision of the State; or

(iii) was admitted as a nonimmigrant and at the time he or she was taken into custody by the State or a political subdivision of the State has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 1258 of this title, or to comply with the conditions of any such status.

(4)(A) In carrying out paragraph (1), the Attorney General shall give priority to the Federal incarceration of undocumented criminal aliens who have committed aggravated felonies.

(B) The Attorney General shall ensure that undocumented criminal aliens incarcerated in Federal facilities pursuant to this subsection are held in facilities which provide a level of security appropriate to the crimes for which they were convicted.

(5) There are authorized to be appropriated to carry out this subsection—

(A) $750,000,000 for fiscal year 2006;

(B) $850,000,000 for fiscal year 2007; and

(C) $950,000,000 for each of the fiscal years 2008 through 2011.

(6) Amounts appropriated pursuant to the authorization of appropriations in paragraph (5) that are distributed to a State or political subdivision of a State, including a municipality, may be used only for correctional purposes.

**8 U.S.C. § 1254a**

## § 1254a. Temporary protected status

### (a) Granting of status

#### (1) In general

In the case of an alien who is a national of a foreign state designated under subsection (b) (or in the case of an alien having no nationality, is a person who last habitually resided in such designated state) and who meets the requirements of subsection (c), the Attorney General, in accordance with this section—

(A) may grant the alien temporary protected status in the United States and shall not remove the alien from the United States during the period in which such status is in effect, and

(B) shall authorize the alien to engage in employment in the United States and provide the alien with an "employment authorized" endorsement or other appropriate work permit.

#### (2) Duration of work authorization

Work authorization provided under this section shall be effective throughout the period the alien is in temporary protected status under this section.

#### (3) Notice

(A) Upon the granting of temporary protected status under this section, the Attorney General shall provide the alien with information concerning such status under this section.

(B) If, at the time of initiation of a removal proceeding against an alien, the foreign state (of which the alien is a national) is designated under subsection (b), the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

(C) If, at the time of designation of a foreign state under subsection (b), an alien (who is a national of such state) is in a removal proceeding under this subchapter, the Attorney General shall promptly notify the alien of the temporary protected status that may be available under this section.

(D) Notices under this paragraph shall be provided in a form and language that the alien can understand.

#### (4) Temporary treatment for eligible aliens

(A) In the case of an alien who can establish a prima facie case of eligibility for benefits under paragraph (1), but for the fact that the period of registration

under subsection (c)(1)(A)(iv) has not begun, until the alien has had a reasonable opportunity to register during the first 30 days of such period, the Attorney General shall provide for the benefits of paragraph (1).

(B) In the case of an alien who establishes a prima facie case of eligibility for benefits under paragraph (1), until a final determination with respect to the alien's eligibility for such benefits under paragraph (1) has been made, the alien shall be provided such benefits.

**(5) Clarification**

Nothing in this section shall be construed as authorizing the Attorney General to deny temporary protected status to an alien based on the alien's immigration status or to require any alien, as a condition of being granted such status, either to relinquish nonimmigrant or other status the alien may have or to execute any waiver of other rights under this chapter. The granting of temporary protected status under this section shall not be considered to be inconsistent with the granting of nonimmigrant status under this chapter.

**(b) Designations**

**(1) In general**

The Attorney General, after consultation with appropriate agencies of the Government, may designate any foreign state (or any part of such foreign state) under this subsection only if—

(A) the Attorney General finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

(B) the Attorney General finds that—

(i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) the Attorney General finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the Attorney General finds that

permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

A designation of a foreign state (or part of such foreign state) under this paragraph shall not become effective unless notice of the designation (including a statement of the findings under this paragraph and the effective date of the designation) is published in the Federal Register. In such notice, the Attorney General shall also state an estimate of the number of nationals of the foreign state designated who are (or within the effective period of the designation are likely to become) eligible for temporary protected status under this section and their immigration status in the United States.

**(2) Effective period of designation for foreign states**

The designation of a foreign state (or part of such foreign state) under paragraph (1) shall—

(A) take effect upon the date of publication of the designation under such paragraph, or such later date as the Attorney General may specify in the notice published under such paragraph, and

(B) shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B).

For purposes of this section, the initial period of designation of a foreign state (or part thereof) under paragraph (1) is the period, specified by the Attorney General, of not less than 6 months and not more than 18 months.

**(3) Periodic review, terminations, and extensions of designations**

**(A) Periodic review**

At least 60 days before end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the Attorney General, after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met. The Attorney General shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register.

**(B) Termination of designation**

If the Attorney General determines under subparagraph (A) that a foreign state (or part of such foreign state) no longer continues to meet the conditions for designation under paragraph (1), the Attorney General shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination). Such termination is effective in accordance with subsection (d)(3), but shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C).

**(C) Extension of designation**

If the Attorney General does not determine under subparagraph (A) that a foreign state (or part of such foreign state) no longer meets the conditions for designation under paragraph (1), the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months).

**(4) Information concerning protected status at time of designations**

At the time of a designation of a foreign state under this subsection, the Attorney General shall make available information respecting the temporary protected status made available to aliens who are nationals of such designated foreign state.

**(5) Review**

**(A) Designations**

There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.

**(B) Application to individuals**

The Attorney General shall establish an administrative procedure for the review of the denial of benefits to aliens under this subsection. Such procedure shall not prevent an alien from asserting protection under this section in removal proceedings if the alien demonstrates that the alien is a national of a state designated under paragraph (1).

**(c) Aliens eligible for temporary protected status**

**(1) In general**

**(A) Nationals of designated foreign states**

Subject to paragraph (3), an alien, who is a national of a state designated under subsection (b)(1) (or in the case of an alien having no nationality, is a person

who last habitually resided in such designated state), meets the requirements of this paragraph only if—

(i) the alien has been continuously physically present in the United States since the effective date of the most recent designation of that state;

(ii) the alien has continuously resided in the United States since such date as the Attorney General may designate;

(iii) the alien is admissible as an immigrant, except as otherwise provided under paragraph (2)(A), and is not ineligible for temporary protected status under paragraph (2)(B); and

(iv) to the extent and in a manner which the Attorney General establishes, the alien registers for the temporary protected status under this section during a registration period of not less than 180 days.

**(B) Registration fee**

The Attorney General may require payment of a reasonable fee as a condition of registering an alien under subparagraph (A)(iv) (including providing an alien with an "employment authorized" endorsement or other appropriate work permit under this section). The amount of any such fee shall not exceed $50. In the case of aliens registered pursuant to a designation under this section made after July 17, 1991, the Attorney General may impose a separate, additional fee for providing an alien with documentation of work authorization. Notwithstanding section 3302 of title 31, all fees collected under this subparagraph shall be credited to the appropriation to be used in carrying out this section.

**(2) Eligibility standards**

**(A) Waiver of certain grounds for inadmissibility**

In the determination of an alien's admissibility for purposes of subparagraph (A)(iii) of paragraph (1)—

(i) the provisions of paragraphs (5) and (7)(A) of section 1182(a) of this title shall not apply;

(ii) except as provided in clause (iii), the Attorney General may waive any other provision of section 1182(a) of this title in the case of individual aliens for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest; but

(iii) the Attorney General may not waive—

(I) paragraphs (2)(A) and (2)(B) (relating to criminals) of such section,

(II) paragraph (2)(C) of such section (relating to drug offenses), except for so much of such paragraph as relates to a single offense of simple possession of 30 grams or less of marijuana, or

(III) paragraphs (3)(A), (3)(B), (3)(C), and (3)(E) of such section (relating to national security and participation in the Nazi persecutions or those who have engaged in genocide).

**(B) Aliens ineligible**

An alien shall not be eligible for temporary protected status under this section if the Attorney General finds that—

(i) the alien has been convicted of any felony or 2 or more misdemeanors committed in the United States, or

(ii) the alien is described in section 1158(b)(2)(A) of this title.

**(3) Withdrawal of temporary protected status**

The Attorney General shall withdraw temporary protected status granted to an alien under this section if—

(A) the Attorney General finds that the alien was not in fact eligible for such status under this section,

(B) except as provided in paragraph (4) and permitted in subsection (f)(3), the alien has not remained continuously physically present in the United States from the date the alien first was granted temporary protected status under this section, or

(C) the alien fails, without good cause, to register with the Attorney General annually, at the end of each 12-month period after the granting of such status, in a form and manner specified by the Attorney General.

**(4) Treatment of brief, casual, and innocent departures and certain other absences**

(A) For purposes of paragraphs (1)(A)(i) and (3)(B), an alien shall not be considered to have failed to maintain continuous physical presence in the United States by virtue of brief, casual, and innocent absences from the United States, without regard to whether such absences were authorized by the Attorney General.

(B) For purposes of paragraph (1)(A)(ii), an alien shall not be considered to have failed to maintain continuous residence in the United States by reason of a brief, casual, and innocent absence described in subparagraph (A) or due

merely to a brief temporary trip abroad required by emergency or extenuating circumstances outside the control of the alien.

**(5) Construction**

Nothing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for temporary protected status under this section.

**(6) Confidentiality of information**

The Attorney General shall establish procedures to protect the confidentiality of information provided by aliens under this section.

**(d) Documentation**

**(1) Initial issuance**

Upon the granting of temporary protected status to an alien under this section, the Attorney General shall provide for the issuance of such temporary documentation and authorization as may be necessary to carry out the purposes of this section.

**(2) Period of validity**

Subject to paragraph (3), such documentation shall be valid during the initial period of designation of the foreign state (or part thereof) involved and any extension of such period. The Attorney General may stagger the periods of validity of the documentation and authorization in order to provide for an orderly renewal of such documentation and authorization and for an orderly transition (under paragraph (3)) upon the termination of a designation of a foreign state (or any part of such foreign state).

**(3) Effective date of terminations**

If the Attorney General terminates the designation of a foreign state (or part of such foreign state) under subsection (b)(3)(B), such termination shall only apply to documentation and authorization issued or renewed after the effective date of the publication of notice of the determination under that subsection (or, at the Attorney General's option, after such period after the effective date of the determination as the Attorney General determines to be appropriate in order to provide for an orderly transition).

**(4) Detention of alien**

An alien provided temporary protected status under this section shall not be detained by the Attorney General on the basis of the alien's immigration status in the United States.

**(e) Relation of period of temporary protected status to cancellation of removal**

With respect to an alien granted temporary protected status under this section, the period of such status shall not be counted as a period of physical presence in the United States for purposes of section 1229b(a) of this title, unless the Attorney General determines that extreme hardship exists. Such period shall not cause a break in the continuity of residence of the period before and after such period for purposes of such section.

**(f) Benefits and status during period of temporary protected status**

During a period in which an alien is granted temporary protected status under this section—

(1) the alien shall not be considered to be permanently residing in the United States under color of law;

(2) the alien may be deemed ineligible for public assistance by a State (as defined in section 1101(a)(36) of this title) or any political subdivision thereof which furnishes such assistance;

(3) the alien may travel abroad with the prior consent of the Attorney General; and

(4) for purposes of adjustment of status under section 1255 of this title and change of status under section 1258 of this title, the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant.

**(g) Exclusive remedy**

Except as otherwise specifically provided, this section shall constitute the exclusive authority of the Attorney General under law to permit aliens who are or may become otherwise deportable or have been paroled into the United States to remain in the United States temporarily because of their particular nationality or region of foreign state of nationality.

**(h) Limitation on consideration in Senate of legislation adjusting status**

**(1) In general**

Except as provided in paragraph (2), it shall not be in order in the Senate to consider any bill, resolution, or amendment that—

(A) provides for adjustment to lawful temporary or permanent resident alien status for any alien receiving temporary protected status under this section, or

(B) has the effect of amending this subsection or limiting the application of this subsection.

**(2) Supermajority required**

Paragraph (1) may be waived or suspended in the Senate only by the affirmative vote of three-fifths of the Members duly chosen and sworn. An affirmative vote of three-fifths of the Members of the Senate duly chosen and sworn shall be required in the Senate to sustain an appeal of the ruling of the Chair on a point of order raised under paragraph (1).

**(3) Rules**

Paragraphs (1) and (2) are enacted—

(A) as an exercise of the rulemaking power of the Senate and as such they are deemed a part of the rules of the Senate, but applicable only with respect to the matters described in paragraph (1) and supersede other rules of the Senate only to the extent that such paragraphs are inconsistent therewith; and

(B) with full recognition of the constitutional right of the Senate to change such rules at any time, in the same manner as in the case of any other rule of the Senate.

**(i) Annual report and review**

**(1) Annual report**

Not later than March 1 of each year (beginning with 1992), the Attorney General, after consultation with the appropriate agencies of the Government, shall submit a report to the Committees on the Judiciary of the House of Representatives and of the Senate on the operation of this section during the previous year. Each report shall include—

(A) a listing of the foreign states or parts thereof designated under this section,

(B) the number of nationals of each such state who have been granted temporary protected status under this section and their immigration status before being granted such status, and

(C) an explanation of the reasons why foreign states or parts thereof were designated under subsection (b)(1) and, with respect to foreign states or parts thereof previously designated, why the designation was terminated or extended under subsection (b)(3).

**(2) Committee report**

No later than 180 days after the date of receipt of such a report, the Committee on the Judiciary of each House of Congress shall report to its respective House such oversight findings and legislation as it deems appropriate.

## 8 U.S.C. § 1451 (Excerpt)

### § 1451. Revocation of naturalization

* * *

#### (f) Cancellation of certificate of naturalization

Whenever an order admitting an alien to citizenship shall be revoked and set aside or a certificate of naturalization shall be canceled, or both, as provided in this section, the court in which such judgment or decree is rendered shall make an order canceling such certificate and shall send a certified copy of such order to the Attorney General. The clerk of court shall transmit a copy of such order and judgment to the Attorney General. A person holding a certificate of naturalization or citizenship which has been canceled as provided by this section shall upon notice by the court by which the decree of cancellation was made, or by the Attorney General, surrender the same to the Attorney General.

* * *

## 8 U.S.C. § 1532

### § 1532. Establishment of removal court

#### (a) Designation of judges

The Chief Justice of the United States shall publicly designate 5 district court judges from 5 of the United States judicial circuits who shall constitute a court that shall have jurisdiction to conduct all removal proceedings. The Chief Justice may, in the Chief Justice's discretion, designate the same judges under this section as are designated pursuant to section 103(a) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1803(a)).

#### (b) Terms

Each judge designated under subsection (a) shall serve for a term of 5 years and shall be eligible for redesignation, except that of the members first designated—

(1) 1 member shall serve for a term of 1 year;

(2) 1 member shall serve for a term of 2 years;

(3) 1 member shall serve for a term of 3 years; and

(4) 1 member shall serve for a term of 4 years.

**(c) Chief judge**

**(1) Designation**

The Chief Justice shall publicly designate one of the judges of the removal court to be the chief judge of the removal court.

**(2) Responsibilities**

The chief judge shall—

(A) promulgate rules to facilitate the functioning of the removal court; and

(B) assign the consideration of cases to the various judges on the removal court.

**(d) Expeditious and confidential nature of proceedings**

The provisions of section 103(c) of the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1803(c)) shall apply to removal proceedings in the same manner as they apply to proceedings under that Act [50 U.S.C. 1801 et seq.].

**(e) Establishment of panel of special attorneys**

The removal court shall provide for the designation of a panel of attorneys each of whom—

(1) has a security clearance which affords the attorney access to classified information, and

(2) has agreed to represent permanent resident aliens with respect to classified information under section 1534(e)(3) of this title in accordance with (and subject to the penalties under) this subchapter.

**8 U.S.C. § 1533**

---

**§ 1533. Removal court procedure**

**(a) Application**

**(1) In general**

In any case in which the Attorney General has classified information that an alien is an alien terrorist, the Attorney General may seek removal of the alien under this subchapter by filing an application with the removal court that contains—

(A) the identity of the attorney in the Department of Justice making the application;

(B) a certification by the Attorney General or the Deputy Attorney General that the application satisfies the criteria and requirements of this section;

(C) the identity of the alien for whom authorization for the removal proceeding is sought; and

(D) a statement of the facts and circumstances relied on by the Department of Justice to establish probable cause that—

(i) the alien is an alien terrorist;

(ii) the alien is physically present in the United States; and

(iii) with respect to such alien, removal under subchapter II would pose a risk to the national security of the United States.

**(2) Filing**

An application under this section shall be submitted ex parte and in camera, and shall be filed under seal with the removal court.

**(b) Right to dismiss**

The Attorney General may dismiss a removal action under this subchapter at any stage of the proceeding.

**(c) Consideration of application**

**(1) Basis for decision**

In determining whether to grant an application under this section, a single judge of the removal court may consider, ex parte and in camera, in addition to the information contained in the application—

(A) other information, including classified information, presented under oath or affirmation; and

(B) testimony received in any hearing on the application, of which a verbatim record shall be kept.

**(2) Approval of order**

The judge shall issue an order granting the application, if the judge finds that there is probable cause to believe that—

(A) the alien who is the subject of the application has been correctly identified and is an alien terrorist present in the United States; and

(B) removal under subchapter II would pose a risk to the national security of the United States.

**(3) Denial of order**

If the judge denies the order requested in the application, the judge shall prepare a written statement of the reasons for the denial, taking all necessary precautions not to disclose any classified information contained in the Government's application.

**(d) Exclusive provisions**

If an order is issued under this section granting an application, the rights of the alien regarding removal and expulsion shall be governed solely by this subchapter, and except as they are specifically referenced in this subchapter, no other provisions of this chapter shall be applicable.

**8 C.F.R. § 244.1**

---

**§ 244.1 Definitions.**

As used in this part:

*Brief, casual, and innocent absence* means a departure from the United States that satisfies the following criteria:

(1) Each such absence was of short duration and reasonably calculated to accomplish the purpose(s) for the absence;

(2) The absence was not the result of an order of deportation, an order of voluntary departure, or an administrative grant of voluntary departure without the institution of deportation proceedings; and

(3) The purposes for the absence from the United States or actions while outside of the United States were not contrary to law.

*Charging document* means the written instrument which initiates a proceeding before an Immigration Judge. For proceedings initiated prior to April 1, 1997, these documents include an Order to Show Cause, a Notice to Applicant for Admission Detained for Hearing before Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien. For proceedings initiated after April 1, 1997, these documents include a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien.

*Continuously physically present* means actual physical presence in the United States for the entire period specified in the regulations. An alien shall not be considered to have failed to maintain continuous physical presence in the United States by virtue of brief, casual, and innocent absences as defined within this section.

*Continuously resided* means residing in the United States for the entire period specified in the regulations. An alien shall not be considered to have failed to

maintain continuous residence in the United States by reason of a brief, casual and innocent absence as defined within this section or due merely to a brief temporary trip abroad required by *emergency or extenuating circumstances outside the control of the alien.*

*Felony* means a crime committed in the United States, punishable by imprisonment for a term of more than one year, regardless of the term such alien actually served, if any, except: When the offense is defined by the State as a misdemeanor and the sentence actually imposed is one year or less regardless of the term such alien actually served. Under this exception for purposes of section 244 of the Act, the crime shall be treated as a misdemeanor.

*Foreign state* means any foreign country or part thereof as designated by the Attorney General pursuant to section 244 of the Act.

*Misdemeanor* means a crime committed in the United States, either:

(1) Punishable by imprisonment for a term of one year or less, regardless of the term such alien actually served, if any, or

(2) A crime treated as a misdemeanor under the term “felony” of this section.

For purposes of this definition, any crime punishable by imprisonment for a maximum term of five days or less shall not be considered a felony or misdemeanor.

*Prima facie* means eligibility established with the filing of a completed application for Temporary Protected Status containing factual information that if unrebutted will establish a claim of eligibility under section 244 of the Act.

*Register* means to properly file, with the director, a completed application, with proper fee, for Temporary Protected Status during the registration period designated under section 244(b) of the Act.

**8 C.F.R. § 244.19**

**§ 244.19 Termination of designation.**

Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the Federal Register, or on the last day of the most recent extension of designation by the Attorney General, automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.