**No. 26-1898**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

AFRICAN COMMUNITIES TOGETHER; DAVID DOE, individually and on behalf of all others similarly situated; JACOB DOE, individually and on behalf of all others similarly situated; MARY DOE, individually and on behalf of all others similarly situated; PETER DOE, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security; UNITED STATES DEPT. OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UNITED STATES,

*Defendants-Appellees*

On Appeal from the United States District Court for the District of Massachusetts

**JOINT APPENDIX**

Daniel G. Randolph
Mark H. Lynch
Kathleen Choi
Yevgeniy Pilipovskiy
Kristin M. Oakley
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

Sarah Leadem
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000

*Counsel for Plaintiffs-Appellants*

Abraham R. George
Donald Campbell Lockhart
U.S. ATTORNEY'S OFFICE
DISTRICT OF MASSACHUSETTS
1 Courthouse Way
Suite 9200
Boston, MA 02210
(617) 748-3266

*Counsel for Defendants-Appellees*

*(Continued Inside Cover)*

Melissa Keaney
Nargis Aslami
Abbey Rutherford
MUSLIM ADVOCATES
1763 Columbia Rd. N.W.
#14324
Washington, D.C. 20009
(202) 897-2622

Erik Matthew Crew
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Rd
Ste H1
San Diego, CA 92120
(949) 603-7411

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS


| Dkt. | Date | Description | Page |
|---|---|---|---|
| — | — | Docket Sheet | 1 |
| 1 | 12/22/2025 | Complaint | 14 |
| 59-1 | 01/27/2026 | **Excerpts of Administrative Record, Part 1 of 9:** | 86 |
| 59-1 | 01/27/2026 | DHS Email, South Sudan Temporary Protected Status Statistics (AR000115–118) | 86 |
| 59-1 | 01/27/2026 | DHS, South Sudan Temporary Protected Status Results (Redacted) (AR000121) | 90 |
| 59-1 | 01/27/2026 | USCIS Memorandum for the DHS Secretary, Temporary Protected Status for South Sudan, Decision (Redacted) (AR000133–143) | 91 |
| 59-1 | 01/27/2026 | USCIS Memorandum for the DHS Secretary, Attachment A: Temporary Protected Status Legal Authority (AR000144–145) | 102 |
| 59-1 | 01/27/2026 | USCIS Memorandum for the DHS Secretary, Attachment B: USCIS RAIO Country of Origin Information Considerations Report, South Sudan (AR000146–165) | 104 |
| 59-1 | 01/27/2026 | USCIS Memorandum for the DHS Secretary, Attachment C: USCIS OP&S Policy Considerations Report, South Sudan (AR000166–182) | 124 |
| 59-3 | 01/27/2026 | **Excerpts of Administrative Record, Part 3 of 9:** | 141 |
| 59-3 | 01/27/2026 | U.S. Department of State, South Sudan Travel Advisory (AR000757–760) | 141 |
| 59-3 | 01/27/2026 | U.S. Department of Homeland Security Consultation with U.S. Department of State (AR000775–776) | 145 |

| Dkt. | Date | Description | Page |
|---|---|---|---|
| 59-9 | 01/27/2026 | **Excerpts of Administrative Record, Part 9 of 9:** | 147 |
| 59-9 | 01/27/2026 | United Nations Mission in South Sudan, UNMISS Gravely Concerned by Escalating Violence in Eastern Equatoria, Calls for Restraint (AR002185) | 147 |
| 59-9 | 01/27/2026 | United Nations Mission in South Sudan, UNMISS Gravely Concerned by Rising Abductions in Greater Yei, Calls for Collective Action (AR002186–2187) | 148 |
| 59-9 | 01/27/2026 | United Nations Mission in South Sudan, Background (AR002188–2190) | 150 |
| 65 | 02/12/2026 | Memorandum and Order Granting Plaintiffs' Motion for Postponement of Agency Action | 153 |
| 94-1 | 07/13/2026 | Plaintiffs' Proposed Amended Complaint | 199 |
| 123 | 08/07/2026 | Notice of Appeal | 281 |
| 125 | 08/10/2026 | Transcript of July 29, 2026 Hearing | 284 |

APPEAL

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:25−cv−13939−PBS

African Communities Together et al v. Noem et al
Assigned to: District Judge Patti B. Saris
Case in other court: USCA − First Circuit, 26−01254
First Circuit, 26−01898
Cause: 05:551 Administrative Procedure Act

Date Filed: 12/22/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 12/22/2025 | 1 | COMPLAINT against Kristi L NOEM, U.S. DEPARTMENT OF HOMELAND SECURITY (DHS), UNITED STATES OF AMERICA, U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS) Filing fee: $ 405, receipt number AMADC−11435127 (Fee Status: Filing Fee paid), filed by AFRICAN COMMUNITIES TOGETHER, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Aslami, Nargis) (Entered: 12/22/2025) |
| 12/23/2025 | 2 | ELECTRONIC NOTICE of Case Assignment. District Judge Patti B. Saris assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (JKK) (Entered: 12/23/2025) |
| 12/23/2025 | 3 | MOTION Leave To Proceed Under Pseudonym by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Exhibit Memorandum Of Law In Support Of Motion)(Aslami, Nargis) (Entered: 12/23/2025) |
| 12/23/2025 | 4 | AFFIDAVIT of Golnaz Fakhimi in Support re 3 MOTION Leave To Proceed Under Pseudonym filed by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Exhibit Declaration of Mary Doe, # 2 Exhibit Declaration of David Doe, # 3 Exhibit Declaration of Peter Doe, # 4 Exhibit Declaration of Jacob Doe)(Aslami, Nargis) (Entered: 12/23/2025) |
| 12/23/2025 | 5 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (LP) (Entered: 12/23/2025) |
| 12/23/2025 | 6 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 3 MOTION Leave To Proceed Under Pseudonym. (LP) (Entered: 12/23/2025) |
| 12/23/2025 | 7 | MOTION Postponement Under 5 U.S.C. § 705 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Memorandum of Law in Support of Motion, # 2 Certificate of Conferral, # 3 Proposed Order)(Aslami, Nargis) (Entered: 12/23/2025) |
| 12/23/2025 | 8 | AFFIDAVIT of Golnaz Fakhimi in Support re 7 MOTION Postponement Under 5 U.S.C. § 705 filed by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Ex 1, # 2 Ex 2, # 3 Ex 3, # 4 Ex 4, # 5 Ex 5, # 6 Ex 6−10, # 7 Ex 11−15, # 8 Ex 16−26, # 9 Ex 27−31, # 10 Ex 32, # 11 Ex 33−35, # 12 Ex 36, # 13 Ex 37−43, # 14 Ex 44, # 15 Ex 45−47, # 16 Ex 48−50, # 17 Ex 51−53, # 18 Ex 54−55, # 19 Ex 56−57, # 20 Ex 58−61, # 21 Ex 62−67, # 22 Ex 68 (Part 1), # 23 Ex 68 (Part 2), # 24 Ex 69, # 25 Ex 70−81, # 26 Ex 82−83, # 27 Ex 84 (Part 1), # 28 Ex 84 (Part 2), # 29 Ex 84 (Part 3), # 30 Ex 85 (Part 1), # 31 Ex 85 (Part 2), # 32 Ex 85 (Part 3), # 33 Ex 85 (Part 4), # 34 Ex 85 (Part 5), # 35 Ex 85 (Part 6), # 36 Ex 85 (Part 7), # 37 Ex 86−88, # 38 Ex 89 (Part 1), # 39 Ex 89 (Part 2), # 40 Ex 90 (Part 1), # 41 Ex 90 (Part 2), # 42 Ex 91 (Part 1), # 43 Ex 91 (Part 2), # 44 Ex 92 (Part 1), # 45 Ex 92 (Part 2), # 46 Ex 92 (Part 3), # 47 Ex 92 (Part 4), # 48 Ex 93, # 49 Ex 94−96)(Aslami, Nargis) (Entered: 12/23/2025) |
| 12/23/2025 | 9 | NOTICE of Appearance by Nargis Aslami on behalf of African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Aslami, Nargis) (Entered: 12/23/2025) |

| | | |
|---|---|---|
| 12/23/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Golnaz Fakhimi Filing fee: $ 125, receipt number BMADC−11438559 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Affidavit of Golnaz Fakhimi in Support of Mot. for Admission PHV)(Aslami, Nargis) (Entered: 12/23/2025) |
| 12/23/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Abbey Rutherford; Collin Poirot Filing fee: $ 250, receipt number AMADC−11438583 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Affidavit in Support of Admission PHV, # 2 Affidavit in Support of Admission PHV)(Aslami, Nargis) (Entered: 12/23/2025) |
| 12/23/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice for admission of Erik Crew Filing fee: $ 125, receipt number BMADC−11438585 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Affidavit in Supp. of Admission PHV)(Aslami, Nargis) (Entered: 12/23/2025) |
| 12/23/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael E. Cunniff Filing fee: $ 125, receipt number AMADC−11438591 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Affidavit in Supp. of Admission PHV, # 2 Text of Proposed Order Granting Admission PHV)(Aslami, Nargis) Modified on 12/24/2025 (LP). (Main Document 13 replaced on 12/26/2025) (MAL). (Attachment 1 replaced on 12/26/2025) (MAL). (Attachment 2 replaced on 12/26/2025) (MAL). (Entered: 12/23/2025) |
| 12/24/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Paul Killebrew Filing fee: $ 125, receipt number AMADC−11439322 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Certification in Support of Motion, # 2 Proposed PHV Order)(Aslami, Nargis) (Entered: 12/24/2025) |
| 12/24/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice for admission of Sarah Leadem Filing fee: $ 125, receipt number AMADC−11439342 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Certification in Support of Motion, # 2 Proposed PHV Order)(Aslami, Nargis) (Entered: 12/24/2025) |
| 12/24/2025 | 16 | MOTION for Leave to Appear Pro Hac Vice for admission of Ayana M. Lindsey Filing fee: $ 125, receipt number AMADC−11439348 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Certification in Support of Motion, # 2 Proposed PHV Order)(Aslami, Nargis) (Entered: 12/24/2025) |
| 12/24/2025 | 17 | MOTION for Leave to Appear Pro Hac Vice for admission of Mark H. Lynch Filing fee: $ 125, receipt number AMADC−11439363 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Certification in Support of Motion, # 2 Proposed PHV Order)(Aslami, Nargis) (Entered: 12/24/2025) |
| 12/24/2025 | 18 | MOTION for Leave to Appear Pro Hac Vice for admission of Stephen Petkis Filing fee: $ 125, receipt number AMADC−11439377 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Certification in Support of Motion, # 2 Proposed PHV Order)(Aslami, Nargis) (Entered: 12/24/2025) |
| 12/24/2025 | 19 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 10 Motion for Leave to Appear Pro Hac Vice Added Golnaz Fakhimi.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(LP) (Entered: 12/24/2025) |
| 12/24/2025 | 20 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 11 Motion for Leave to Appear Pro Hac Vice Added Abbey Rutherford and Collin Poirot.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be |

| | | |
|---|---|---|
| | | found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(LP) (Entered: 12/24/2025) |
| 12/24/2025 | 21 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 12 Motion for Leave to Appear Pro Hac Vice Added Erik Crew.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(LP) (Entered: 12/24/2025) |
| 12/24/2025 | 22 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 14 Motion for Leave to Appear Pro Hac Vice Added Paul Killebrew.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(LP) (Entered: 12/24/2025) |
| 12/24/2025 | 23 | ELECTRONIC NOTICE of Hearing.<br><br>Plaintiff shall serve a copy of the 1 Complaint and 7 Emergency Motion to the Government in advance of the scheduled status conference. Plaintiff shall also serve a copy of this hearing notice as well as dial−in information.<br><br>Telephone Conference set for 12/26/2025 02:00 PM in Remote Proceeding : Boston before District Judge Angel Kelley. (MAL) (Entered: 12/24/2025) |
| 12/24/2025 | 24 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 15 Motion for Leave to Appear Pro Hac Vice Added Sarah Leadem.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(LP) (Entered: 12/24/2025) |
| 12/24/2025 | 25 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 16 Motion for Leave to Appear Pro Hac Vice Added Ayana Lindsey.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(LP) (Entered: 12/24/2025) |

| | | |
|---|---|---|
| 12/24/2025 | 26 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 17 Motion for Leave to Appear Pro Hac Vice Added Mark H. Lynch.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(LP) (Entered: 12/24/2025) |
| 12/24/2025 | 27 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 18 Motion for Leave to Appear Pro Hac Vice Added Stephen Petkis.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(LP) (Entered: 12/24/2025) |
| 12/24/2025 | 28 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 13 Motion for Leave to Appear Pro Hac Vice Added Michael E. Cunniff.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(LP) (Entered: 12/24/2025) |
| 12/26/2025 | 29 | NOTICE of Appearance by Erik Matthew Crew on behalf of African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Crew, Erik) (Entered: 12/26/2025) |
| 12/26/2025 | 30 | ELECTRONIC NOTICE of Hearing.<br><br>Telephone Conference set for 12/26/2025 02:00 PM in Remote Proceeding : Boston before District Judge Angel Kelley.<br><br>*HEARING NOTICE REGENERATED TO REFLECT CORRECT PRESIDING JUDGE*<br><br>(MAL) (Entered: 12/26/2025) |
| 12/26/2025 | 31 | NOTICE of Appearance by Golnaz Fakhimi on behalf of African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Fakhimi, Golnaz) (Entered: 12/26/2025) |
| 12/26/2025 | 32 | NOTICE of Appearance by Michael Fitzgerald on behalf of Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America (Fitzgerald, Michael) (Entered: 12/26/2025) |
| 12/26/2025 | 33 | Electronic Clerk's Notes for proceedings held before District Judge Angel Kelley: Status Conference held on 12/26/2025 by video conference. The Court heard from the parties briefly on the pending matter. Plaintiffs to file additional briefing re administratively stay/TRO by end of day on December 26, 2025; government to respond by mid−day on December 29, 2025. Oral motion made by Plaintiff to correct lead plaintiff's name; request granted. (Court Reporter: Linda Walsh at lwalshsteno@gmail.com.)(Attorneys present: Fakhimi, Fitzgerald) (MAL) (Entered: 12/26/2025) |
| 12/26/2025 | 34 | NOTICE of Appearance by Abbey Rose Koenning Rutherford on behalf of African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Rutherford, Abbey) |

| | | |
|---|---|---|
| | | (Entered: 12/26/2025) |
| 12/26/2025 | 35 | LETTER/RESPONSE TO COURT ORDER filed by Golnaz Fakhimi . (Aslami, Nargis) Modified docket text on 1/2/2026 in accordance with document filed. (CGK). (Entered: 12/26/2025) |
| 12/29/2025 | 36 | RESPONSE TO COURT ORDER by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America re 33 Status Conference,, *and Reply to Doc. No. 35*. (Fitzgerald, Michael) (Entered: 12/29/2025) |
| 12/30/2025 | 37 | District Judge Angel Kelley: ELECTRONIC ORDER entered. MEMORANDUM AND ORDER.<br><br>For the foregoing reasons and to preserve the status quo in advance of the assigned Judge’s full consideration of the merits, the effective date of the decision issued on November 6, 2025, and published at 90 Fed. Reg 50484 to terminate the designation of Temporary Protected Status for South Sudan, effective as of 12:00 A.M. on January 6, 2026, is hereby ***STAYED*** subject to further Order of this Court or higher courts. During the period of the ***STAY*** of the termination, the termination shall be null, void, and of no legal effect. Thus, the legal consequences of being in TPS status based on South Sudan’s designation shall continue to apply, including being eligible for work authorization and having protection against deportation and detention based on TPS status. The legal consequences of having a pending TPS application based on South Sudan’s designation shall also continue to apply, including eligibility for work authorization and having protection against deportation based on a pending TPS application.<br><br>***SO ORDERED.***<br><br>(CEH) (Entered: 12/30/2025) |
| 12/31/2025 | 38 | NOTICE of Appearance by Ayana M. Lindsey on behalf of African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Lindsey, Ayana) (Entered: 12/31/2025) |
| 01/06/2026 | 39 | ELECTRONIC NOTICE Setting Hearing on Motion 7 MOTION Postponement Under 5 U.S.C. § 705 :<br><br>Motion Hearing set for **1/15/2026 11:00 AM in Courtroom 19** (In person only) before District Judge Patti B. Saris. (LP) (Entered: 01/06/2026) |
| 01/07/2026 | 40 | NOTICE of Appearance by Stephen Petkis on behalf of African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Petkis, Stephen) (Entered: 01/07/2026) |
| 01/07/2026 | 41 | MOTION for Leave to File Excess Pages by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America.(Fitzgerald, Michael) (Entered: 01/07/2026) |
| 01/08/2026 | 42 | District Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 41 Motion for Leave to File Excess Pages by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (CGK)<br><br>(Entered: 01/08/2026) |
| 01/09/2026 | 43 | Opposition re 7 MOTION Postponement Under 5 U.S.C. § 705 filed by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America. (Fitzgerald, Michael) (Entered: 01/09/2026) |
| 01/12/2026 | 44 | MOTION for Leave to File Excess Pages *for Reply Brief* by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.(Petkis, Stephen) (Entered: 01/12/2026) |
| 01/12/2026 | 45 | District Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 44 Motion for Leave to File Excess Pages for Reply Brief by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. |

| | | |
|---|---|---|
| | | Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (CGK)<br><br>(Entered: 01/12/2026) |
| 01/12/2026 | 46 | ELECTRONIC NOTICE RESETTING HEARING ** In person with remote access provided ** on 7 MOTION Postponement Under 5 U.S.C. § 705 :<br><br>MOTION HEARING SET FOR 1/15/2026 11:00 AM in Courtroom 19 (In person with remote access provided) before District Judge Patti B. Saris.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.<br><br>Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.<br><br>(CGK) (Entered: 01/12/2026) |
| 01/12/2026 | 47 | NOTICE of Appearance by Michael E. Cunniff on behalf of African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Cunniff, Michael) (Entered: 01/12/2026) |
| 01/12/2026 | 48 | NOTICE OF CLARIFICATION re 46 Notice of Hearing on Motion.<br><br>**MOTION HEARING on 1/15/2026 11:00 AM will be held IN PERSON** .<br><br>Audio access to the hearing will be available to the media and public. Please check the Court schedule. For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here. (LP) (Entered: 01/12/2026) |
| 01/13/2026 | 49 | NOTICE of Appearance by Collin Poirot on behalf of African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Poirot, Collin) (Entered: 01/13/2026) |
| 01/13/2026 | 50 | REPLY to Response to 7 MOTION Postponement Under 5 U.S.C. § 705 filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Petkis, Stephen) (Entered: 01/13/2026) |
| 01/14/2026 | 51 | NOTICE of Appearance by Paul Killebrew on behalf of African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Killebrew, Paul) (Entered: 01/14/2026) |
| 01/14/2026 | 52 | REPLY to Response to 7 MOTION Postponement Under 5 U.S.C. § 705 *[CORRECTED]* filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Petkis, Stephen) (Entered: 01/14/2026) |
| 01/15/2026 | 53 | Electronic Clerk's Notes for proceedings held before District Judge Patti B. Saris:<br><br>Motion Hearing held on 1/15/2026 in person.<br><br>Government to file administrative record by 1/26/26.<br><br>Parties to submit supplemental briefing within seven days of filing of administrative record.<br><br>Matters taken under advisement.<br><br>(Court Reporter: Lee Marzilli at leemarz47@gmail.com.) (MM) (Entered: 01/15/2026) |
| 01/20/2026 | 54 | Transcript of Motion Hearing held on January 15, 2026, before Judge Patti B. Saris. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or |

| | | |
|---|---|---|
| | | viewed through PACER after it is released. Court Reporter Name and Contact Information: Lee Marzilli at leemarz47@gmail.com. Redaction Request due 2/10/2026. Redacted Transcript Deadline set for 2/20/2026. Release of Transcript Restriction set for 4/20/2026. (DRK) (Entered: 01/20/2026) |
| 01/20/2026 | 55 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 01/20/2026) |
| 01/26/2026 | 56 | NOTICE by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America *of Production of Administrative Record* (Fitzgerald, Michael) (Entered: 01/26/2026) |
| 01/27/2026 | 57 | District Judge Patti B. Saris: ELECTRONIC ORDER entered. In addition to delivering a courtesy copy, the government shall file an electronic copy of the administrative record as soon as possible today. (LP) (Entered: 01/27/2026) |
| 01/27/2026 | 58 | NOTICE of Appearance by Mark H. Lynch on behalf of African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Lynch, Mark) (Entered: 01/27/2026) |
| 01/27/2026 | 59 | NOTICE of Filing of Administrative Record by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America . (Attachments: # 1 Exhibit AR Part 1 of 9, # 2 Exhibit AR Part 2 of 9, # 3 Exhibit AR Part 3 of 9, # 4 Exhibit AR Part 4 of 9, # 5 Exhibit AR Part 5 of 9, # 6 Exhibit AR Part 6 of 9, # 7 Exhibit AR Part 7 of 9, # 8 Exhibit AR Part 8 of 9, # 9 Exhibit AR Part 9 of 9)(Fitzgerald, Michael) (Entered: 01/27/2026) |
| 02/02/2026 | 60 | Supplemental MEMORANDUM in Opposition re 7 MOTION Postponement Under 5 U.S.C. § 705 filed by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America. (Fitzgerald, Michael) (Entered: 02/02/2026) |
| 02/02/2026 | 61 | Supplemental MEMORANDUM in Support re 7 MOTION Postponement Under 5 U.S.C. § 705 filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Declaration of Michael Cunniff, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(Cunniff, Michael) (Entered: 02/02/2026) |
| 02/02/2026 | 62 | Supplemental MEMORANDUM in Support re 7 MOTION Postponement Under 5 U.S.C. § 705 filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Affidavit Declaration of Michael E. Cunniff in Support of, # 2 Exhibit Exhibit 1 (excerpt from Certified Administrative Record), # 3 Exhibit Exhibit 2 (excerpt from Certified Administrative Record), # 4 Exhibit Exhibit 3 (excerpt from Certified Administrative Record), # 5 Exhibit Exhibit 4 (excerpt from Certified Administrative Record), # 6 Exhibit Exhibit 5 (excerpt from Certified Administrative Record), # 7 Exhibit Exhibit 6 (excerpt from Certified Administrative Record), # 8 Exhibit 7 (excerpt from Certified Administrative Record))(Cunniff, Michael) (Entered: 02/02/2026) |
| 02/05/2026 | 63 | SUMMONS Returned Executed by David Doe, Mary Doe, African Communities Together, Peter Doe, Jacob Doe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Petkis, Stephen) (Entered: 02/05/2026) |
| 02/05/2026 | 64 | SUMMONS Returned Executed as to US Attorney by David Doe, Mary Doe, African Communities Together, Peter Doe, Jacob Doe. Kristi L. Noem served on 12/30/2025, answer due 3/2/2026; U.S Citizenship and Immigration Services served on 12/30/2025, answer due 3/2/2026; U.S. Department of Homeland Security served on 12/30/2025, answer due 3/2/2026; United States of America served on 12/30/2025, answer due 3/2/2026. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Petkis, Stephen) (Entered: 02/05/2026) |
| 02/12/2026 | 65 | District Judge Patti B. Saris: MEMORANDUM AND ORDER entered re 7 Motion for Postponement Under 5 U.S.C. § 705 by African American Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.<br><br>Plaintiffs' motion to postpone the effective date of Defendants' termination of South Sudan's TPS designation (Dkt. 7 ) is **ALLOWED**. |

| | | |
|---|---|---|
| | | (CGK)<br><br>(Entered: 02/12/2026) |
| 02/25/2026 | 66 | MOTION for Extension of Time to March 16, 2026 to File Answer re 1 Complaint, *or Other Response to the Complaint* by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America.(Fitzgerald, Michael) (Entered: 02/25/2026) |
| 02/25/2026 | 67 | District Judge Patti B. Saris: ELECTRONIC ORDER entered Allowed re 66 Motion for Extension of Time to File Answer re 1 Complaint, or Other Response to the Complaint.<br><br>Response due by 3/16/2026.<br>(CGK)<br><br>(Entered: 02/25/2026) |
| 03/13/2026 | 68 | NOTICE OF APPEAL as to 65 Order on Motion for Miscellaneous Relief, by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 4/2/2026. (Fitzgerald, Michael) (Entered: 03/13/2026)** |
| 03/13/2026 | 69 | MOTION to Stay re 65 MEMORANDUM AND ORDER entered re 7 Motion for Postponement Under 5 U.S.C. § 705 by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America.(Fitzgerald, Michael) Modified docket text on 3/13/2026 as to link the motion to stay being filed to. (CGK). (Entered: 03/13/2026) |
| 03/13/2026 | 70 | MEMORANDUM in Support re 69 MOTION to Stay re 65 Order on Motion for Miscellaneous Relief, filed by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America. (Fitzgerald, Michael) (Entered: 03/13/2026) |
| 03/13/2026 | 71 | MOTION for Leave to File Excess Pages *(Unopposed)* by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America.(Fitzgerald, Michael) (Entered: 03/13/2026) |
| 03/14/2026 | 72 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 68 Notice of Appeal. (MAP) (Entered: 03/14/2026) |
| 03/14/2026 | 73 | USCA Case Number 26−1254 for 68 Notice of Appeal filed by Kristi L. Noem, U.S. Department of Homeland Security, U.S Citizenship and Immigration Services, United States of America. (MAP) (Entered: 03/14/2026) |
| 03/16/2026 | 74 | District Judge Patti B. Saris: ELECTRONIC ORDER entered RE: 71 Motion for Leave to File Excess Pages. **ALLOWED**. Defendants' motion and Plaintiffs' opposition may each be enlarged by 10 pages.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document. (LP)<br><br>(Entered: 03/16/2026) |
| 03/16/2026 | 75 | MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America.(Fitzgerald, Michael) (Entered: 03/16/2026) |

| | | |
|---|---|---|
| 03/16/2026 | 76 | MEMORANDUM in Support re 75 MOTION to Dismiss for Lack of Jurisdiction *and Failure to State a Claim* filed by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America. (Fitzgerald, Michael) (Entered: 03/16/2026) |
| 03/19/2026 | 77 | District Judge Patti B. Saris: ELECTRONIC ORDER entered.<br><br>"Plaintiffs shall respond to Defendants' motion to stay (Dkt. 69 ) by Friday, March 27."<br><br>(CGK)<br><br>(Entered: 03/19/2026) |
| 03/20/2026 | 78 | MOTION for Extension of Time to April 13, 2026 and April 3, 2026 to Oppose Defendants' Motion to Dismiss Plaintiffs' Complaint and to Oppose Defendants' Motion to Stay by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.(Aslami, Nargis) (Entered: 03/20/2026) |
| 03/23/2026 | 79 | District Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 78 Motion for Extension of Time to Oppose Defendants' Motion to Dismiss Plaintiffs' Complaint and to Oppose Defendants' Motion to Stay.<br><br>Response to motion to stay pending appeal due 4/3/2026; Response to motion to dismiss due 4/13/2026.<br>Modified on 3/25/2026 to correct response deadlines. (CGK).<br>(CGK)<br><br>(Entered: 03/23/2026) |
| 04/03/2026 | 80 | Opposition re 69 MOTION to Stay re 65 MEMORANDUM AND ORDER entered re 7 Motion for Postponement Under 5 U.S.C. § 705 filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Lindsey, Ayana) (Entered: 04/03/2026) |
| 04/09/2026 | 81 | District Judge Patti B. Saris: ORDER entered re 69 Motion to Stay by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America.<br><br>Defendants' motion for a stay pending appeal (Dkt. 69 ) is **DENIED**.<br><br>(CGK)<br><br>(Entered: 04/09/2026) |
| 04/13/2026 | 82 | MOTION to Stay *Deadline to Oppose Defendants Motion to Dismiss (Unopposed)* by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.(Killebrew, Paul) (Entered: 04/13/2026) |
| 04/13/2026 | 83 | District Judge Patti B. Saris: ELECTRONIC ORDER entered ALLOWED re 82 Motion to Stay Deadline to Oppose Defendants Motion to Dismiss (Unopposed)(CGK) (Entered: 04/13/2026) |
| 04/22/2026 | 84 | Joint MOTION to Hold Proceedings in Abeyance by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Proposed Order)(Aslami, Nargis) (Entered: 04/22/2026) |
| 04/23/2026 | 85 | District Judge Patti B. Saris: ORDER entered. ORDER Holding Proceedings in Abeyance. (CGK) (Entered: 04/23/2026) |
| 04/24/2026 | 86 | MOTION to Withdraw as Attorney by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.(Fakhimi, Golnaz) (Entered: 04/24/2026) |
| 04/30/2026 | 87 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 86 Motion to Withdraw as Attorney. Attorney Golnaz Fakhimi terminated. (LP) (Entered: 04/30/2026) |
| 05/14/2026 | 88 | NOTICE of Withdrawal of Appearance by Michael E. Cunniff (Cunniff, Michael) (Entered: 05/14/2026) |

| | | |
|---|---|---|
| 06/29/2026 | 89 | MOTION Lift Abeyance, Issue Indicative Ruling, and Stay pending Appeal 705 Order by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America.(Fitzgerald, Michael) (Entered: 06/29/2026) |
| 06/30/2026 | 90 | District Judge Patti B. Saris: ELECTRONIC ORDER entered re 89 MOTION Lift Abeyance, Issue Indicative Ruling, and Stay 705 Order pending Appeal.<br><br>"Plaintiffs shall respond to Defendants' motion (Dkt. 89 ) within fourteen days. The Court will not issue an indicative order until after the response deadline."<br><br>(CGK)<br><br>(Entered: 06/30/2026) |
| 07/13/2026 | 91 | MOTION for Leave to Appear Pro Hac Vice for admission of Daniel G. Randolph Filing fee: $ 125, receipt number AMADC−11883122 by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 PHV Certification, # 2 PHV Proposed Order)(Aslami, Nargis) (Entered: 07/13/2026) |
| 07/13/2026 | 92 | MOTION for Leave to Appear Pro Hac Vice for admission of Melissa Keaney Filing fee: $ 125, receipt number AMADC−11883143 by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 PHV Certification, # 2 PHV Proposed Order)(Aslami, Nargis) (Entered: 07/13/2026) |
| 07/13/2026 | 93 | MEMORANDUM in Opposition re 89 MOTION Lift Abeyance, Issue Indicative Ruling, and Stay 705 Order filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Killebrew, Paul) (Entered: 07/13/2026) |
| 07/13/2026 | 94 | MOTION to Amend 1 Complaint, by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Attachments: # 1 Exhibit 1 − Proposed Amended Complaint, # 2 Exhibit 2 − Redline of Complaint, # 3 Proposed Order)(Killebrew, Paul) (Entered: 07/13/2026) |
| 07/13/2026 | 95 | MEMORANDUM in Support re 94 MOTION to Amend 1 Complaint, filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Killebrew, Paul) (Entered: 07/13/2026) |
| 07/13/2026 | 96 | Emergency MOTION for Administrative Stay and to Postpone Effective Date of Agency Action (Renewed) by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.(Killebrew, Paul) (Entered: 07/13/2026) |
| 07/13/2026 | 97 | MEMORANDUM in Support re 96 Emergency MOTION for Administrative Stay and to Postpone Effective Date of Agency Action (Renewed) filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Killebrew, Paul) (Entered: 07/13/2026) |
| 07/14/2026 | 98 | District Judge Patti B. Saris: Defendants' motion to issue an indicative ruling is DENIED. Plaintiffs have raised new issues in a motion to amend (Dkt. 94 ) which the Court does not have jurisdiction to address because the case is on appeal. (CAM) (Entered: 07/14/2026) |
| 07/14/2026 | 99 | District Judge Patti B. Saris: ENDORSED ORDER entered re 96 Motion. DENIED without prejudice. The Court lacks jurisdiction because the case is on appeal. (CAM) (Entered: 07/14/2026) |
| 07/15/2026 | 100 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 91 Motion for Leave to Appear Pro Hac Vice re Daniel G. Randolph.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney. |

| | | |
|---|---|---|
| | | (CAM) (Entered: 07/15/2026) |
| 07/15/2026 | 101 | District Judge Patti B. Saris: ELECTRONIC ORDER entered granting 92 Motion for Leave to Appear Pro Hac Vice Added Melissa Keaney.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(CAM) (Entered: 07/15/2026) |
| 07/15/2026 | 102 | NOTICE of Appearance by Daniel Gerard Randolph on behalf of African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Randolph, Daniel) (Entered: 07/15/2026) |
| 07/16/2026 | 103 | NOTICE of Appearance by Melissa Shay Keaney on behalf of African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Keaney, Melissa) (Entered: 07/16/2026) |
| 07/22/2026 | 104 | Emergency MOTION to Stay by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.(Killebrew, Paul) (Entered: 07/22/2026) |
| 07/22/2026 | 105 | MEMORANDUM in Support re 104 Emergency MOTION to Stay filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Killebrew, Paul) (Entered: 07/22/2026) |
| 07/23/2026 | 106 | District Judge Patti B. Saris: ELECTRONIC ORDER entered re 104 Emergency Motion to Stay by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.<br><br>Plaintiffs have moved for an administrative stay pending resolution of their motion to amend their complaint and renewed motion for postponement. As previously noted by this Court, a court "may issue an administrative stay 'in an exercise of its docket−management authority.' Administrative stays are not a reflection of the merits, but instead allow the court time to consider the merits of a case that cannot be successfully or appropriately evaluated in haste." Dkt. 37 at 3 (citation omitted) (quoting United States v. Texas, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring)).<br><br>After review, the Court **ALLOWS** Plaintiffs' motion for an administrative stay (Dkt. 104 ) as follows. To preserve the status quo, the effective date of the decision issued on November 6, 2025, and published at 90 Fed. Reg. 50484, to terminate the designation of Temporary Protected Status for South Sudan (the "Termination") will be **STAYED**, subject to further order of this Court or higher courts, pending resolution of Plaintiffs' motion to amend and renewed motion for postponement. During the period of the stay of the Termination, the Termination shall be null, void, and of no legal effect. This Order is effective immediately upon this Court's receipt of the First Circuit's mandate in African Communities Together v. Mullin, No. 26−1254.<br><br>(CGK)<br><br>(Entered: 07/23/2026) |
| 07/27/2026 | 107 | Opposition re 94 MOTION to Amend 1 Complaint, filed by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America. (Fitzgerald, Michael) (Entered: 07/27/2026) |
| 07/28/2026 | 108 | ELECTRONIC NOTICE of Hearing.<br><br>This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible.<br><br>Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: |

| | | |
|---|---|---|
| | | https://forms.mad.uscourts.gov/courtlist.html.<br><br>For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.<br><br>Hearing set for 7/29/2026 02:30 PM in Remote Proceeding before District Judge Patti B. Saris. (MM) (Entered: 07/28/2026) |
| 07/29/2026 | 109 | MOTION for Leave to File *a Reply in Support re 94 Motion to Amend Complaint* by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.(Killebrew, Paul) (Entered: 07/29/2026) |
| 07/29/2026 | 110 | District Judge Patti B. Saris: ELECTRONIC ORDER entered re 109 Motion for Leave to File a Reply in Support re 94 Motion to Amend Complaint.<br><br>"Allowed. Any reply brief shall be filed by noon on July 31, 2026." (CGK)<br><br>(Entered: 07/29/2026) |
| 07/29/2026 | 111 | USCA Judgment as to 68 Notice of Appeal, The matter is remanded for further proceedings in light of and consistent with Mullin. Mandate shall issue forthwith. (CGK) (Entered: 07/29/2026) |
| 07/29/2026 | 112 | MANDATE of USCA as to 68 Notice of Appeal. Appeal 68 Terminated. (CGK) (Entered: 07/29/2026) |
| 07/29/2026 | 113 | Electronic Clerk's Notes for proceedings held before District Judge Patti B. Saris:<br><br>Hearing held on 7/29/2026 by video.<br><br>Reply brief shall be filed by 7/31/2026, all matters taken under advisement.<br><br>(Court Reporter: Robert Paschal at rwp.reporter@gmail.com.) (MM) (Entered: 07/29/2026) |
| 07/31/2026 | 114 | REPLY to Response to 94 MOTION to Amend 1 Complaint, filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Randolph, Daniel) (Entered: 07/31/2026) |
| 07/31/2026 | 115 | NOTICE by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America *of Decision not to Seek Leave to File a Sur−Reply* (Fitzgerald, Michael) (Entered: 07/31/2026) |
| 07/31/2026 | 116 | Emergency MOTION to Postpone Effective Date of Agency Action *(Renewed)* by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.(Killebrew, Paul) (Entered: 07/31/2026) |
| 07/31/2026 | 117 | MEMORANDUM in Support re 116 Emergency MOTION to Postpone Effective Date of Agency Action *(Renewed)* filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Killebrew, Paul) (Entered: 07/31/2026) |
| 08/05/2026 | 118 | Opposition re 116 Emergency MOTION to Postpone Effective Date of Agency Action *(Renewed)* filed by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America. (Fitzgerald, Michael) (Entered: 08/05/2026) |
| 08/05/2026 | 119 | MOTION for Leave to File *a Reply in Support of Renewed Postponement Motion* by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe.(Killebrew, Paul) (Entered: 08/05/2026) |
| 08/05/2026 | 120 | District Judge Patti B. Saris: ELECTRONIC ORDER entered re 119 Motion for Leave to File a Reply in Support of Renewed Postponement Motion.<br><br>"Allowed. The brief shall be filed by 12:00 P.M. on August 6, 2026."<br><br>(CGK)<br><br>(Entered: 08/05/2026) |

| | | |
|---|---|---|
| 08/06/2026 | 121 | REPLY to Response to 116 Emergency MOTION to Postpone Effective Date of Agency Action *(Renewed)* filed by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. (Killebrew, Paul) (Entered: 08/06/2026) |
| 08/07/2026 | 122 | District Judge Patti B. Saris: ORDER entered. MEMORANDUM AND ORDER. Plaintiffs' motion to amend their complaint (Dkt. 94) and renewed motion for postponement (Dkt. 116) therefore are **DENIED**.(LP) (Entered: 08/07/2026) |
| 08/07/2026 | 123 | NOTICE OF APPEAL as to 122 Memorandum & ORDER by African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe. Filing fee: $ 605, receipt number AMADC−11946088 Fee Status: Not Exempt.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 8/27/2026. (Randolph, Daniel) (Entered: 08/07/2026)** |
| 08/10/2026 | 124 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 123 Notice of Appeal. (CGK) (Entered: 08/10/2026) |
| 08/10/2026 | 125 | Transcript of Hearing by videoconference held on July 29, 2026, before Judge Patti B. Saris. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Robert Paschal at rwp.reporter@gmail.com. Redaction Request due 8/31/2026. Redacted Transcript Deadline set for 9/10/2026. Release of Transcript Restriction set for 11/9/2026. (DRK) (Entered: 08/10/2026) |
| 08/10/2026 | 126 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 08/10/2026) |
| 08/10/2026 | 127 | USCA Case Number 26−1898 for 123 Notice of Appeal, filed by David Doe, Mary Doe, Jacob Doe, Peter Doe, African Communities Together. (CM) (Entered: 08/13/2026) |
| 08/19/2026 | 128 | NOTICE of Appearance by Rayford A. Farquhar on behalf of U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America (Farquhar, Rayford) (Entered: 08/19/2026) |
| 08/19/2026 | 129 | Assented to MOTION to Withdraw as Attorney by Kristi L. Noem, U.S Citizenship and Immigration Services, U.S. Department of Homeland Security, United States of America.(Fitzgerald, Michael) (Entered: 08/19/2026) |
| 08/24/2026 | 130 | District Judge Patti B. Saris: ELECTRONIC ORDER entered Allowed re 129 Motion to Withdraw as Attorney.<br>Attorney Michael Fitzgerald terminated (CGK) (Entered: 08/24/2026) |
| 09/30/2026 | 131 | NOTICE of Appearance by Yevgeniy Pilipovskiy on behalf of African Communities Together, David Doe, Jacob Doe, Mary Doe, Peter Doe (Pilipovskiy, Yevgeniy) (Entered: 09/30/2026) |
| 10/01/2026 | 132 | NOTICE of Withdrawal of Appearance by Joy A. Chen (Chen, Joy) (Entered: 10/01/2026) |

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; MARY DOE; DAVID DOE; PETER DOE; and JACOB DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **COMPLAINT**<br><br>Civil Action No. ____________________<br><br>Pursuant to L. R. 5.1(c), Plaintiffs note they are requesting **emergency relief** against agency action taking effect at **12:00am, January 6, 2026**. |

## INTRODUCTION

1. South Sudan is currently facing a humanitarian crisis, and ongoing armed conflict continues to threaten the safety of its nationals, as the country teeters on the brink of another civil war.

2. Congress enacted Temporary Protected Status ("TPS") to protect eligible individuals from removal to countries designated unsafe on account of dire conditions like armed conflict, natural disaster, or other extraordinary circumstances. *See* 8 U.S.C. § 1254a. TPS provides eligible beneficiaries with the right to live and work legally in the United States during a period when it is unsafe for them to return to their country of origin.

3. The United States government designated South Sudan for TPS in 2011, following South Sudan's independence from Sudan after over two decades of civil war. The initial

designation turned both on the existence of armed conflict and on other extraordinary circumstances. Since then, the United States has repeatedly and consistently redesignated or extended South Sudan on each of those grounds. The redesignations have recognized the ongoing, devastating, and widespread armed conflict in the country—which has included gender-based and sexual violence, arbitrary arrests and confinement, torture and physical violence, and the killing of civilians. Every redesignation has also recognized other extraordinary circumstances, such as food insecurity, destructive droughts and flooding, population displacement, barriers to accessing humanitarian relief, and disease outbreaks.

4. Approximately 232 South Sudanese nationals are currently TPS beneficiaries and, as a result, find refuge in the United States. Approximately 73 South Sudanese nationals have pending applications for that same protection.

5. Through a November 6, 2025, notice in the Federal Register, U.S. Department of Homeland Security ("DHS") Secretary Kristi Noem announced the January 5, 2026, termination of TPS for South Sudan ("the Termination"). As a result of the Termination, South Sudanese TPS holders in the U.S. will lose their protected status as of midnight on January 6, 2026, and face unconscionable harm. People with pending applications and the U.S.-based dependents and immediate relatives of recipients and applicants will also be harmed.

6. The individual plaintiffs are four South Sudanese nationals with TPS, who have lived in the United States for years and have deep ties to this country and their communities here. They are each members of African Communities Together ("ACT"). ACT is an associational Plaintiff that represents the interests of South Sudanese TPS recipients and applicants in the U.S., as well as their U.S.-based families.

7. Plaintiffs bring this action to challenge Defendants' Termination as unlawful. Defendants' actions put the individual Plaintiffs and other TPS recipients at imminent risk of losing critical humanitarian protection, robs people with pending applications of the opportunity for that protection, harms members of Plaintiff ACT, and harms the U.S.-based dependents and immediate relatives of recipients and applicants.

8. Should TPS for South Sudan terminate imminently and unlawfully, the individual Plaintiffs and other South Sudanese TPS holders will face an impossible choice: to uproot their lives yet again, in search of safety in a third country; to remain in the United States without TPS, at risk of deportation, related immigration confinement, and loss of work authorization and eligibility for a driver's license; or to relocate to South Sudan, a country where their safety and even their lives would assuredly risk be in peril, as the U.S. Department State has affirmed in its Travel Advisory for South Sudan.

9. The Termination is one of a series of purposeful and pretextual terminations by Secretary Noem of TPS for several non-European countries whose nationals are majority non-white. To date, the Trump Administration has sought to terminate TPS for all other countries whose designations have been up for periodic review, including: Ethiopia, Cameroon, Haiti, Afghanistan, Nepal, Burma, Syria, Nicaragua, Honduras, and Venezuela. The decisions to terminate TPS for these countries and for South Sudan are part of the Trump Administration's ongoing effort to eliminate access to the Congressionally authorized TPS program. The apparent goal of that effort is to significantly reduce the number of non-white and non-European immigrants in the United States.

10. Defendants' decision to terminate TPS for South Sudan violates the TPS statute and the Administrative Procedure Act ("APA") because it was made without consulting

appropriate agencies; without due consideration of available and objective evidence of South Sudan's dire conditions; in disregard of established DHS practices; and in improper reliance on impermissible factors, as well as being politically influenced. Each of these procedural deficiencies violates the APA.

11. Defendants' unexplained decision to have the Termination take effect 60 days after its announcement independently violates the APA, because it is a stark departure from the established past practice of providing an orderly transition period of at least six months or more.

12. The insufficiency of the 60-day wind-down period is compounded by other severe and recent policy changes that impede access to other immigration benefits. One such change is a blanket pause on all asylum processing in the U.S., announced on December 2, 2025. That blanket pause makes accessing asylum ahead of the Termination virtually impossible.

13. Accessing any other immigration status ahead of the Termination also seems virtually impossible because of: (1) the Administration's blanket pause, announced on December 2, 2025, on the processing of immigration benefits applications from people in the U.S. who are the nationals of any countries subject to entry bans that the Administration instituted effective June 9, 2025; (2) the extension of the entry bans to nationals of South Sudan and 19 other majority Black countries, including 17 other African countries, announced on December 16, 2025, and effective January 1, 2026; and (3) a December 18, 2025, social media announcement by the Director of USCIS, expanding the processing pause on immigration benefits applications to applicants in the U.S. who are South Sudanese nationals.

14. Because the Termination was motivated, at least in part, by racial and/or national-origin-based animus, it also violates the Fifth Amendment of the United States Constitution. The dehumanizing rhetoric that Secretary Noem, President Trump, and officials in his Administration

have consistently used to describe and justify their TPS decisions demonstrates their underlying animus against immigrants who are not white or descended from Europeans, including South Sudanese immigrants. That animus and related rhetoric have been particularly stark for the nationals of majority Black countries.

15. For all of these reasons, this Court should issue an emergency postponement of the Termination and otherwise set aside the Termination.

## THE PARTIES

### Plaintiffs

16. **Plaintiff African Communities Together ("ACT")** is a non-profit, membership-based organization that fights for civil rights, opportunity, and a better life for African immigrants, their families, and their communities across the United States. It was founded in 2013 and is incorporated in New York.

17. ACT has thousands of members nationwide. Its membership is diverse and includes people around the U.S. who are the nationals or descendants of myriad African nations, as well as their U.S.-based family members. ACT's membership has diverse citizenship and immigration statuses and includes TPS holders and/or applicants from South Sudan and other African countries, including Sudan and Ethiopia.

18. ACT's members who are South Sudanese TPS recipients and/or applicants live around the United States, including in Massachusetts.

19. ACT brings this action on behalf of itself and its members, including the individual Plaintiffs.

20. **Plaintiff Mary Doe** is a Black woman who is a South Sudanese national and a TPS holder. Mary has lived in the U.S. for years, and TPS is currently her sole form of immigration

status. She is a member of ACT and works and lives in the U.S., in the same town as her elder sister and her sister's five children, who range in age from 11 to 21. Her sister and sister's children are all U.S. citizens. Mary is very close with them, and they rely on her to help with her sister's business, which enables her sister to spend more time caring for her children.

21. In their community and surrounding ones, Mary earns her living as an outreach worker for low-income women who are pregnant or who otherwise have children under three years old. She provides education and support to these women to promote their wellbeing and their children's wellbeing. She currently has many clients, all of whom are U.S. citizens or green card holders. She enjoys her work and finds it rewarding to serve her community.

22. Mary's values are informed by her Christian faith. She is a member of a local church, whose functions she attends regularly.

23. Mary's TPS status allows her eligibility for her driver's license, which is essential for her career and daily life.

24. **Plaintiff David Doe** is a Black man who is a South Sudanese national and a TPS holder. David has lived in the U.S. for years, and TPS is his sole form of immigration status currently.

25. David is a member of ACT. He lives and works in the U.S., as an addiction case manager. In that capacity, he supports vulnerable community members in their efforts to achieve recovery and sobriety that enables them, their families, and their communities to begin to heal from the ravages of drug and alcohol addiction. He has found his work so gratifying that he is working to become a licensed addiction counselor.

26. David relies on TPS for eligibility for his driver's license, which is essential for the work he does and for assorted aspects of his daily life.

27. **Plaintiff Peter Doe** is a Black man who is a South Sudanese national and a TPS holder. David has lived in the U.S. for years, and TPS is his sole form of immigration status currently. Peter is a member of ACT and lives in the U.S. The place he calls home in the U.S. is where his cousin lives, who is more like a brother to him. Peter loves their community, including its diversity.

28. **Plaintiff Jacob Doe** is a Black man who is a South Sudanese national, a TPS holder, and a member of ACT.

29. Jacob has lived in the U.S. for years, with a host family. Everyone in the host family is a U.S. citizen and is affiliated with a local church. Jacob and his host family have built a friendship and a bond with each other that are important to Jacob, because they mitigate his separation from his own family since coming to the United States.

30. Jacob and his host family volunteer together and attend church together. Jacob is deeply involved in the community through church programs. He volunteers by teaching the youth about Christ and helping out when the church feeds the homeless and the hungry. Every Saturday he volunteers by coaching children sports to get them outside and away from their phones and to teach them important lessons about the value of teamwork.

31. While in the U.S., Jacob has obtained contract work, drilling and repairing water wells. Through this work, he has been essential to providing water to community members, including rural communities. He has responded to urgent calls, including natural disasters that rendered drinking water inaccessible, as well as to routine calls for drilling and repairing water wells. Throughout these experiences, he has enjoyed being a dependable member of the teams that do this work and that rely on their grit to keep doing it.

32. Jacob longs to save up enough money to attend college in the U.S., if possible, and to gain employment that can help him support his family, who are struggling to survive outside the U.S. Their access to the most basic necessities is very limited and irregular, including for his mother, who is ill; and they have relied on whatever financial support that Jacob is able to provide them.

33. Through TPS, Mary, David, Peter, and Jacob have immigration status, access to related federal benefits (like work authorization), access to related state benefits (like driver's licenses), protection against deportation charges and related confinement within the U.S., and protection against forced removal to South Sudan—where they and many others face grave and deadly dangers because of ongoing armed conflict and other extraordinary circumstances there.

**Defendants**

34. **Defendant Kristi Noem** is the Secretary of the U.S. Department of Homeland Security. As the highest-ranking officer for DHS, Secretary Noem has statutory authority over all TPS extension, termination, and designation decisions.[1] She is sued in her official capacity.

35. **Defendant U.S. Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). DHS, together with its component agencies, is responsible for administering and enforcing the TPS program. Its highest-ranking officer is its Secretary, and references herein to "the Secretary" correspond to the DHS Secretary.

---

[1] *See* 8 U.S.C. § 1254a(b); *see also* 6 U.S.C. § 557 (transferring certain functions from the Attorney General).

36. **Defendant U.S. Citizenship and Immigration Services** is the sub-agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

37. **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

**JURISDICTION AND VENUE**

38. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States, including the Fifth Amendment to the Constitution and the APA, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution.

39. The Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., the APA, 5 U.S.C. § 701 *et seq.*, and its common law equitable powers.

40. The APA waives the Government's sovereign immunity from claims alleging unlawful agency action and "seeking relief other than money damages." 5 U.S.C. § 702. In addition, sovereign immunity does not bar claims against federal officials for non-monetary injunctive relief to prevent violations of federal law.[2]

41. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one Plaintiff and putative class representative resides in this judicial district.

---

[2] *Larson v. Domestic & Foreign Com.* Corp., 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

**THE STATUTORY SCHEME FOR TPS AND RELATED AGENCY PRACTICES**

42. Congress created TPS as a response to unconstrained executive discretion in immigration humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief, through a process that lacked "any specific … criteria."[3]

43. Congress designed TPS to ensure that future nationality-based protections would be based on "identifiable conditions" rather than "the vagaries of our domestic politics." 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute). Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before and provide beneficiaries with certainty about "what [their] rights are, how [an agency] determines what countries merit [protected] status," and "how long [beneficiaries] will be able to stay." *Id.* at 25837 (statement of Rep. Bill Richardson).

44. Since 1990, the TPS statute has given the executive branch authority to provide humanitarian relief to nationals of designated countries who are already present in the United States. *See* 8 U.S.C. § 1254a. The statute provides that the Secretary of DHS may designate a country for TPS where (A) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (B) [there is a natural disaster] or (C) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C).

---

[3] *See* Lynda J. Oswald, Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters, 85 Mich. L. Rev. 152, 157–60, 178 n.153 (1986) (quoting Letter from Att'y Gen. William F. Smith to Rep. Lawrence J. Smith. (July 19, 1983)).

45. Significantly, Congress included the "national interest of the United States" provision only in subsection (C), for designations based on "extraordinary and temporary conditions"; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

46. The statute first requires the Secretary to consult with "appropriate agencies." 8 U.S.C. § 1254a(b)(1). After that, the Secretary "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the [Secretary] may specify." *Id.* §1254a(b)(2).

47. As long as the Secretary consults appropriate agencies and determines certain country conditions exist, she may designate a country for TPS.

48. By contrast, Congress limited the Secretary's discretion to periodically review TPS designations. *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020) ("GAO Report") at 15–18, 27 (differentiating between the discretion afforded before and after an initial designation).

49. The statutory requirements for periodic review of a designation are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

50. The periodic review process typically begins months before the 60-day deadline. *See* GAO Report at 20–21. As part of the process, both USCIS and the U.S. Department of State

("State Department") usually have prepared country conditions memoranda and recommendations for the Secretary. *See id.* 15–16; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process).[4]

51. Customarily, USCIS manages and coordinates the TPS periodic review process for the Secretary, soliciting a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") unit within USCIS and soliciting a country conditions report and recommendation from the State Department.[5] After considering the materials provided, USCIS prepares for the Secretary a detailed recommendation, based on country conditions, and called a "Director Memo."[6]

52. Once the Secretary makes her decision, the statute requires that she "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

53. Unless the Secretary timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months." 8 U.S.C. § 1254a(b)(3)(C). The statute thus "essentially provides extension as a default."[7]

---

[4] The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case en banc, so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

[5] *See* GAO Report at 15–21; *see also, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 299–300 (E.D.N.Y. 2019).

[6] *See, e.g.*, *Saget*, 375 F. Supp. 3d at 299–300.

[7] *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 851 (N.D. Cal.), *aff'd*, 150 F.4th 1000 (9th Cir. 2025) ("*NTPSA I* PI Decision").

54. In contrast, if the Secretary timely "determine[s]" (after consulting appropriate agencies and reviewing objective evidence of country conditions) that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal Register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

55. The Secretary has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, the agency provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period.[8] The practice of furnishing orderly transitions of at least 6 months has been ongoing for over thirty years, and the Trump Administration applied it during its first term in office. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago and involved a designation that had been in place for three years or less.[9]

56. To be eligible for TPS, individuals from a designated country must meet stringent requirements, including: (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier)

---

[8] *See Nat'l TPS Alliance v. Noem*, No. 3:25-cv-05687-TLT, Dkt. No. 28 (C.D. Cal. 2025) (chart submitted into evidence, documenting the transition periods for all TPS terminations from 1992 to 2018, almost all of which lasted between 6 to 18 months).

[9] *Id.*

date designated by the Secretary; (3) satisfaction of the criteria for admissibility as a noncitizen or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history (including misdemeanors in some cases); and (5) the submission of an application, extensive documentation, and fees. *See* 8 U.S.C. § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9.

57. Further, an individual is ineligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

58. Congress ensured that people who are granted TPS would enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the United States; "shall not be detained" by the Secretary of Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. *See id*. § 1254a(b)(1).

59. Individuals who apply for TPS and are *prima facie* eligible for it may receive work authorization and protection from deportation while the application is pending. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

## SOUTH SUDAN'S INITIAL TPS DESIGNATION AND REPEATED EXTENSIONS AND REDESIGNATIONS, SPANNING 2011–2025

60. South Sudan is a country in eastern Africa whose nationals are predominantly Black. The country gained independence from Sudan in 2011 after a 22-year war, which was one of the longest and most severe armed conflicts ever recorded.[10]

61. Despite gaining its official independence, severe and widespread armed conflict persisted in South Sudan. In 2013, ongoing regional and ethnic armed conflicts escalated into the South Sudanese Civil War, which formally lasted seven years.

62. The conflict was marked by hundreds of thousands of deaths, millions of internally and externally displaced peoples, widespread starvation, and economic devastation. This conflict and its devastation are well-documented, including by the U.S. State Department.[11]

63. For seven years of its fourteen-year statehood, South Sudan has experienced full-scale war. For the other seven years, humanitarian crises and widespread armed conflict have resulted in rampant armed violence, consistent and gross human rights abuses, and other extreme threats to peoples' lives and safety.[12]

---

[10] *See generally* Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629 (Oct. 31, 2011); Center for Preventive Action, *Civil War in Sudan*, COUNCIL FOR FOREIGN RELATIONS (Nov. 6, 2025), https://www.cfr.org/global-conflict-tracker/conflict/power-struggle-sudan.

[11] Lauren Ploch Blanchard, Cong. Rsch. Serv., IF10218.19, *South Sudan*, (May 9, 2025) (collecting State Department commentary), https://www.congress.gov/crs-product/IF10218.

[12] *See generally* Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629 (Oct. 13, 2011); Extension and Redesignation of South Sudan for Temporary Protected Status, 78 Fed. Reg. 1,866 (Jan. 9, 2013); Extension and Redesignation of South Sudan for Temporary Protected Status, 79 Fed. Reg. 52,019 (Sept. 2, 2014); Extension and Redesignation of South Sudan for Temporary Protected Status, 81 Fed. Reg. 4,051 (Jan. 25, 2016); Extension of South Sudan for Temporary Protected Status, 82 Fed. Reg. 44,205 (Sept. 21, 2017); Extension of the Designation of South Sudan for Temporary Protected Status, 84 Fed. Reg. 13,688 (Apr. 5, 2019); Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344 (Nov. 2, 2020); Extension and Redesignation of South Sudan for Temporary Protected Status, 87 Fed. Reg. 12,190 (Mar. 3, 2022).

64. The Secretary of Homeland Security first designated South Sudan for TPS in November 2011, based both on armed conflict, 8 U.S.C. § 1254a(b)(1)(A), and on other extraordinary circumstances, 8 U.S.C. § 1254a(b)(1)(C). The designation identified relevant conditions warranting the country's designation for TPS on both grounds, including: escalating intercommunal armed conflict, targeted attacks on civilians, mass displacement related to the armed conflict, mass food insecurity, and lack of access to drinking water.[13] In 2013, the Secretary extended and redesignated South Sudan for another eighteen-month period, based on the continuation of conditions that existed at the initial designation, including ongoing armed conflict and other extraordinary circumstances.[14]

65. On eight occasions, successive Secretaries of Homeland Security repeatedly extended and/or redesignated South Sudan for TPS, each time citing ongoing armed conflict, human rights abuses, and humanitarian catastrophe.[15] Each extension and redesignation underscored that these conditions prevented the safe return of South Sudanese nationals from the diaspora.[16]

---

[13] Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629, 63,630–31 (Oct. 13, 2011).

[14] Extension and Redesignation of South Sudan for Temporary Protected Status, 78 Fed. Reg. 1,866, 1,868–69 (Jan. 9, 2013).

[15] *See generally* Extension and Redesignation of South Sudan for Temporary Protected Status, 78 Fed. Reg. 1,866 (Jan. 9, 2013); Extension and Redesignation of South Sudan for Temporary Protected Status, 79 Fed. Reg. 52,019 (Sept. 2, 2014); Extension and Redesignation of South Sudan for Temporary Protected Status, 81 Fed. Reg. 4,051 (Jan. 25, 2016); Extension of South Sudan for Temporary Protected Status, 82 Fed. Reg. 44,205 (Sept. 21, 2017); Extension of the Designation of South Sudan for Temporary Protected Status, 84 Fed. Reg. 13,688 (Apr. 5, 2019); Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344 (Nov. 2, 2020); Extension and Redesignation of South Sudan for Temporary Protected Status, 87 Fed. Reg. 12,190 (Mar. 3, 2022). Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971 (Sep. 6, 2023).

[16] *Id.*

66. In its sixth extension, in November of 2020, after the official end of the civil war, the Secretary noted that "[d]espite a decrease in large-scale fighting and limited progress on the country's political transition, ongoing armed conflict persists in several areas in South Sudan among both signatories and non-signatories to the peace agreement."[17] The Secretary further noted pervasive sexual and gender-based violence; the conscription of children into armed groups; the arbitrary detention, torture, and extrajudicial killing of civilians; the mass displacement of civilians; widespread food insecurity, exacerbated both by droughts and flooding; and deep economic crisis.[18]

67. In September 2023, DHS reviewed South Sudan's TPS and redesignated the country through May 2025, under both the armed conflict and extraordinary and temporary conditions subsections of the statute.[19]

68. As to armed conflict, DHS found that "[i]n spite of the 2018 peace agreement that established the current transitional government [] South Sudan faces 'often violent political contestations,' and the lack of stable government has facilitated ongoing violence that is 'nearly always characterized by gross human rights violations that [have] targeted civilians and caused mass displacements' in parts of the country."[20] The 2023 redesignation recognized that conflict among armed actors had continued and that armed groups were prepared to return to war, even though the country was not currently undergoing a full-blown civil war.[21] It further noted related circumstances, including: arbitrary arrests, detentions, and killing of civilians; sexual and gender-

---

[17] Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344, 69,346 (Nov. 2, 2020).
[18] *Id*. at 69,346–47.
[19] Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971 (Sept. 6, 2023).
[20] *Id*. at 60,974.
[21] *Id*.

based violence; physical abuse; forced recruitment, including of children, into armed forces; and looting and destruction of civilian property.[22]

69. As to other extraordinary circumstances, DHS noted the impacts of widespread flooding, disease outbreaks, food insecurity, and barriers to accessing humanitarian relief.[23]

70. In May 2025, DHS announced that South Sudan's TPS designation had automatically extended for an additional six months, stating there was insufficient information regarding current country conditions and the "national interest" to issue a determination.[24]

**<u>DEFENDANTS' TERMINATION OF SOUTH SUDAN'S TPS DESIGNATION</u>**

71. On November 6, 2025, Defendants issued a notice in the Federal Register terminating South Sudan's TPS designation, beyond January 5, 2026. The Termination reflects a variety of procedural and statutory irregularities driven by DHS's institution of new guidance providing that TPS periodic review should "[f]ocus on conditions described in the original designation," *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-2 at 1693—while disregarding intervening conditions.

***Failure to Consult Appropriate Agencies***

72. On information and belief, prior to the Termination, and consistent with DHS's new guidance for periodic reviews, Defendant Noem did not meaningfully consult with appropriate federal agencies, as otherwise required by the TPS statute. *See* 8 U.S.C. § 1254a(b)(3)(A). To date, Defendants have not publicly specified, in the Termination notice or elsewhere, any particular consultation they conducted or whether they followed even the general practice of soliciting a

---

[22] *Id.*
[23] *Id.* at 60,974–75.
[24] Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19,217, 19,222 (May 6, 2025).

country conditions report from USCIS.[25] However, discovery obtained in *NTPSA II* reveals that, in the course of periodic reviews of the TPS designations for South Sudan and Afghanistan, occurring in or around February 2025, the consultation the Defendants did undertake was intended to place a heavy thumb on the scales in favor of termination: "The DMs [Director Memos] **should include additional information that would support different decision outcomes**. For example, are there improvements that have been made in the country? What about information about fraud/abuse of the program? . . . There are some stats pending, but [it is not clear] where that will be added." *See NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-16 at 3 (emphases added). This does not appear to be an isolated example: Defendant Noem has issued previous terminations under similar conditions, without appropriately conducting the required consultation.[26] As revealed in discovery during the *NTPSA II* litigation, in or around March 2025 DHS stopped receiving country conditions information from the State Department as part of the TPS periodic review process.[27]

***Failure to Consider Objective and Available Evidence of Country Conditions***

73. The TPS statute requires Defendant Noem to consider objective and available evidence of country conditions during her periodic review of the TPS designation for South Sudan. *See* 8 U.S.C. § 1254a(b)(3)(A). She did not do so.

---

[25] *But cf.* GAO Report at 20–26.

[26] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*") (Dkt. No. 97) (discovery order indicating that Secretary Noem issued the terminations for Nicaragua, Honduras, and Nepal's TPS designations without reviewing country conditions reports from the relevant agencies); *see also supra* ¶¶ 48–52 ("The Statutory Scheme of TPS and Related Agency Practices") (noting the requirement for interagency consultation.).

[27] *See* Exs. in Supp. of Pls' Mot. for SJ, Dkt. 176-22 at 1504_003; Dkt. 176-27 at 1524; Dkt. 176-28 at 2342, *Nat'l TPS All. v. Noem*, Case No. 3:25-cv-05687-TLT (N.D. Cal. July 7, 2025) ("*NTPSA II*").

74. Instead, she cherry-picked "improvements." *See* 90 Fed. Reg. at 50,485; *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-16 at 3. The Secretary's failure to *fully* consider current conditions in South Sudan relevant to TPS redesignation was based on the new DHS guidance, which marks an arbitrary and unexplained return to a methodology for periodic reviews found to be unlawful during the prior Trump Administration.[28] The Termination does not acknowledge or explain Defendant Noem's reliance on the new and legally suspect DHS guidance.

***Failure to Consider Evidence of Ongoing Armed Conflict and Its Ramifications***

75. In her Termination, Defendant Noem failed to consider the available, objective evidence of ongoing armed conflict in South Sudan, including evidence of numerous considerations the Department previously found relevant to periodic review of the armed-conflict basis for South Sudan's TPS designation.

76. Secretary Noem's entire explanation for the Termination of South Sudan's designation based on ongoing armed conflict is contained in two sentences: one stating that full-scale war is no longer present, and one stating that the transitional government has "indicate[d]" a willingness to accept and ensure the safety of returning nationals.[29]

77. However, a plethora of available and objective evidence establishes that, throughout 2025, armed conflict and related violence escalated and further endangered the already tenuous 2018 peace agreement that had arisen out of the civil war. Armed conflict between warring political and communal factions has escalated to levels not previously experienced since the 2018

[28] *See Ramos v. Nielsen* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).
[29] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025).

peace agreement,[30] and experts are warning of an imminent return to full-scale war.[31] Ugandan forces have deployed to South Sudan's capital city; war in neighboring Sudan is spilling across South Sudan's porous border; and political sectarianism is increasing.[32]

78. In April 2025, the State Department recognized that "South Sudan is on the brink of openly renewed conflict and political upheaval, with tensions escalating following a Nuer militia's capture of an army base in Nasir in March."[33]

79. Since April, the situation has only worsened. In October 2025, a U.N. Commissioner on Human Rights in South Sudan stated: "South Sudan's political transition is falling apart[.][] The ceasefire is not holding, political detentions have become a tool of repression, the peace agreement's key provisions are being systematically violated, and the government forces are using aerial bombardments in civilian areas. All indicators point to a slide back toward another deadly war."[34]

80. The South Sudanese army's "indiscriminate airstrikes in populated areas" have resulted "in civilian casualties, the displacement of the civilian population, and the destruction of

---

[30] Office of the U.N. High Comm'r for Human Rights, Press Release, *South Sudan: U.N. Commission Urges General Assembly to Bolster Dialogue and Justice Efforts, to Avert Return to Full Scale War*, (Oct. 29, 2025), https://www.ohchr.org/en/press-releases/2025/10/south-sudan-un-commission-urges-general-assembly-bolster-dialogue-and?sub-site=HRC.
[31] Human Rights Council, Commission on Human Rights in South Sudan, *Plundering a Nation: how rampant corruption unleashed a human rights crisis in South Sudan*, ¶ 1, U.N. Doc. A/HRC/60/CRP.5 (Sept. 16, 2025).
[32] Center for Preventive Action, *Instability in South Sudan*, COUNCIL FOR FOREIGN RELATIONS (Mar. 21, 2025), https://www.cfr.org/global-conflict-tracker/conflict/civil-war-south-sudan.
[33] U.S. Dep't of State, Overseas Security Advisory Council, *South Sudan Country Security Report*, (Apr. 30, 2025), https://www.osac.gov/Content/Report/60d44686-9142-4338-937d-1c78087363c9.
[34] Office of the U.N. High Comm'r (Oct. 29, 2025), *supra* n. 30.

medical facilities, schools, and homes."[35] Nearly 400,000 civilians have been newly displaced by the armed conflict, and two million more remain displaced inside South Sudan.[36]

81. The U.N. has noted that "[k]illed, displaced and starved, civilians are bearing the brunt of the human rights crisis, while violence by SSPDF [South Sudan People's Defence Forces] in populated civilian areas signals a return to full-scale war."[37] Civilians in South Sudan are regularly killed, displaced, or face other risks because of the ongoing armed conflict.[38]

82. Among those other risks is "one of the highest rates of gender-based violence (GBV) in the region, with 2.7 million people at risk."[39] "The bodies of women and girls continu[e] to be subjected to extreme forms of sexual violations by armed groups and militias. National authorities are complicit in these crimes, and in forced recruitment and other grave violations against children."[40] The "state policy of extrajudicial killings" further "inflames conflicts in areas where intra-communal violence is already rife,"[41] and intra-communal strife alone has been exacting "a deadly toll on civilians with a 33 per cent year-on-year increase."[42]

---

[35] Office of the U.N. High Comm'r for Human Rights, Press Release, *South Sudan: Türk alarmed by deteriorating human rights situation amid rising violence and political tensions* (Sep. 26, 2025), https://www.ohchr.org/en/press-releases/2025/09/south-sudan-turk-alarmed-deteriorating-human-rights-situation-amid-rising.
[36] *Id.*
[37] Human Rights Council, *supra* n. 31.
[38] *Id.*
[39] U.N. Population Fund, *Knowledge, Attitudes and Practices Survey on Gender-based Violence in Upper Nile, Jonglei and Unity states, South Sudan*, 6 (Jan. 2025), https://reliefweb.int/report/south-sudan/knowledge-attitudes-and-practices-survey-gender-based-violence-south-sudan-final-report-january-2025?_gl=1*aj340a*_ga*MTg5MzA1NzMxNS4xNzY2MDU5NTU1*_ga_E60ZNX2F68*czE3NjYwNTk1NTUkbzEkZzEkdDE3NjYwNTk4NjIkajYwJGwwJGgw.
[40] Office of the U.N. High Comm'r (Oct. 29, 2025), *supra* n. 30.
[41] *Id.*
[42] Office of the U.N. High Comm'r (Sep. 16, 2025), *supra* n. 35.

83. Indeed, the U.S. State Department continues to maintain a Level 4 "Do Not Travel" advisory for South Sudan due to "crime, kidnapping, and *armed conflict*" and has stated that "*[a]rmed conflict* is ongoing and includes fighting between various political and ethnic groups. Weapons are readily available to the population."[43]

84. The Termination does not address any of this available, objective evidence of ongoing armed conflict, all of which directly correlates to considerations the prior DHS Secretary deemed relevant to the periodic review of the armed-conflict basis for South Sudan's TPS designation. The Termination does not explain Defendant Noem's departure from applying considerations her agency previously deemed material.

85. In the Department of Homeland Security's 2023 periodic review of TPS for South Sudan, the Secretary of Homeland Security considered conflict between state and nonstate actors; "collective punishment of civilians" by government forces, "often based on ethnicity"; "simmering ethnic conflict" resulting in displacement and human rights abuses; and resulting "dire consequences" for women and children, including gender-based violence and "grave violations against children."[44]

86. In her Termination, Defendant Noem acknowledged that "there is inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory

---

[43] *South Sudan Travel Advisory*, U.S. DEP'T OF STATE (NOV. 13, 2025), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SouthSudan.html (emphases added).

[44] Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971, 60,974 (Sept. 6, 2023).

attacks, and ethnic polarization"[45] but inexplicably glossed over this armed conflict solely because "return to full-scale civil war, to date has been avoided."[46]

87. The Termination fails to explain Defendant Noem's departure from the Department's explicit prior finding that armed conflict short of "full-scale civil war" is still relevant to redesignation of TPS for South Sudan when it involves widespread, gross human rights abuses, including violence against civilians, gender-based violence, grave violations against children, and mass displacements[47]: factors that objective, available evidence shows still apply[48] and that the Termination did not address.[49]

88. Instead, the Termination relied improperly on the transitional government's resumed acceptance of deportees from the U.S. to infer "South Sudan's willingness to ensure the safety and reintegration of its returning nationals."[50] That inference is flatly contradicted by objective evidence of how the current South Sudanese government is a substantial source of grave harm to its nationals,[51] which the Termination did not address.[52] The inference also departs from the prior DHS Secretary's consideration in 2023 of South Sudanese governmental violence against its nationals as relevant to the periodic review of the armed-conflict basis for South Sudan's TPS designation.[53] The Termination does not explain why Defendant Noem departed from her agency's prior consideration of that factor.

---

[45] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025).
[46] *Id.*
[47] Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971, 60,974 (Sept. 6, 2023).
[48] *See supra* ¶¶ 77–83.
[49] 90 Fed. Reg. at 50,485.
[50] *Id.*
[51] *See supra* ¶¶ 79–83.
[52] *See supra* note 49
[53] *See supra* note 47.

***Failure to Consider Evidence of Extraordinary and Temporary Conditions***

89. In her Termination, Defendant Noem failed to consider available, objective evidence of ongoing, extraordinary, and temporary conditions in South Sudan, including evidence of numerous factors the Department previously found relevant to periodic review of the extraordinary-circumstances basis for South Sudan's TPS designation.

90. The prior periodic review, in 2023, considered acute food insecurity; environmental and health concerns, including widespread flooding and disease outbreaks; and barriers to humanitarian access.[54] Available and objective evidence demonstrates that all of these conditions still exist.

91. The United Nations Office for the Coordination of Humanitarian Affairs ("UNOCHA") estimates 927,000 people have been harmed by recent flooding across South Sudan, with 335,000 people displaced by floods alone.[55] The overall number of internally displaced people within South Sudan is nearing 2 million.[56]

92. Floods more than double the frequency of cholera outbreaks in South Sudan, by imperiling access to clean water and impeding humanitarian access to affected areas.[57] Since the cholera outbreak was declared in October 2024, over 80,000 cholera cases and 1,400 cholera deaths have been documented.[58] U.N. agencies and others have declared that the cholera outbreak

---

[54] 88 Fed. Reg. 60,971, 60,975.
[55] U.N. Office for the Coordination of Humanitarian Affairs (OCHA), *South Sudan: Floods Snapshot* (Oct. 17, 2025), https://www.unocha.org/publications/report/south-sudan/south-sudan-floods-snapshot-17-october-2025.
[56] European Comm'n, European Civil Protection and Humanitarian Aid Operations, *South Sudan* (Nov. 25, 2025), https://civil-protection-humanitarian-aid.ec.europa.eu/where/africa/south-sudan_en.
[57] U.N. News, *South Sudan's longest cholera outbreak enters critical stage* (July 8, 2025), https://news.un.org/en/story/2025/07/1165348.
[58] *Id.*

"'is not merely a public health crisis, but a multi-sectoral emergency exacerbated by flooding, displacement, and limited access to basic services.'"[59]

93. Over 7.5 million people in South Sudan face acute food insecurity.[60] The Reconstituted Joint Monitoring and Evaluation Commission ("RJMEC") for South Sudan reported in September 2025 that "[a]cute food insecurity and malnutrition continued to be driven by the severe impacts of persistent conflict, expanding flood extent, economic deterioration, and a high returnee and refugee burden on household access to local food sources and life-saving humanitarian food assistance."[61]

94. The crisis of food insecurity in South Sudan is exacerbated by substantial barriers to access to humanitarian relief within the country. The RJMEC, which monitors incidents regarding aid distribution, found that U.N. aid distribution was disrupted at least seventy times in September 2025 alone, and that at least 56 of those times involved "violence against humanitarian staff" or "active hostilities disrupting the delivery of critical humanitarian services."[62] The RJMEC noted "[t]here is a need to urgently restore humanitarian access, particularly in conflict-affected areas, to avert a possible full-scale food and nutrition catastrophe."[63]

---

[59] *Id.*
[60] U.N. Peacekeeping, *Stakes rise for South Sudan: What's happening, and why it matters* (Nov. 11, 2025), https://peacekeeping.un.org/en/stakes-rise-south-sudan-whats-happening-and-why-it-matters.
[61] H.E. Amb. Maj. Gen. George Aggrey Owinow, *Quarterly Report on the State of Implementations of the Revitalised Agreement on the Resolution of the Conflict in the Republic of South Sudan for the period of July 1st to September 30th, 2025*, RECONSTITUTED JOINT MONITORING AND EVALUATION COMMISSION (RJMEC) SOUTH SUDAN, Report No. 028/25, (Oct. 23, 2025), https://www.jmecsouthsudan.org/index.php/reports/rjmec-quarterly-reports/270-rjmec-quarterly-report-on-the-status-of-implementation-of-the-r-arcss-from-1st-july-to-30th-september-2025/file
[62] *Id.* at ¶ 58.
[63] *Id.*

95. Humanitarian challenges in South Sudan are deepened by crises in neighboring Sudan. Since the civil war in Sudan started in 2023, 1.2 million people have fled into South Sudan.[64] "South Sudan is facing its most perilous moment since independence in 2011. The war in Sudan, coupled with political instability, flooding, and food shortages at home, has pushed 9.3 million people into humanitarian need."[65]

96. Instead of considering any of this objective and available evidence of worsening conditions, the Termination appears to have considered only modest positive developments: two infrastructure grants from the World Bank; a $9 million grant for an internet project still in the development phase; a refugee-flow statistic from nearly four years ago; and the presence of a United Nations Mission that has existed since 2011.[66]

97. The Termination did not explain why or how any of these developments has obviated the need to consider the factors that the prior periodic review considered, which available and objective evidence demonstrates still exist and therefore warranted consideration within Defendant Noem's periodic review.

***Consideration of U.S. "National Interest," Which Is Contrary to the TPS Statute and Departs from Past Agency Practice Without Explanation***

98. Defendant Noem relies on the claim that the continued temporary presence of South Sudanese TPS beneficiaries is contrary to the "national interest" of the United States and cites various purported examples. One such example asserts that "a portion of the South Sudan

---

[64] Nathan Carey, *"We escaped hell, but we arrived in another one"*, Norwegian Refugee Council (Nov. 5, 2025), https://www.nrc.no/perspectives/2025/we-escaped-hell-but-we-arrived-in-another-one.

[65] *Id.*

[66] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, n. 13, 14, 15 (Nov. 6, 2025).

Temporary Protected Status population has been subjects of administrative investigation for fraud, public safety and national security concerns."[67]

99. It is impossible to know what Defendant Noem is referring to here. There is no citation; no individuals or alleged conduct is identified; nor are the circumstances of the claimed 'administrative investigation' discernible. In fact, this allegation appears to be boilerplate language lifted directly from the termination notices for Syria, Afghanistan, and Haiti.[68]

100. Under the statute, TPS protections are unavailable *ab initio* to individuals with disqualifying criminal history (including misdemeanors in some cases), or who are found to be inadmissible on grounds relating to national security, foreign policy, or on many other bases.[69] It is improper to conclude, as the Secretary does here, that the conduct of any single South Sudanese who might be ineligible under these grounds disqualifies the entire South Sudanese population in the United States from TPS.

101. Furthermore, the consideration of the domestic "national interest" is procedurally improper during a periodic review, because the statute instructs the Secretary to look only at "the conditions in the foreign state (or part of such foreign state) for which a designation is in effect . . . [and] whether the conditions for such designation . . . continue to be met," 8 U.S.C. § 1254a(b)(3)(A). Consideration of United States national interests is also procedurally improper in the context of a TPS designation based on ongoing armed conflict, *see* 8 U.S.C. § 1254a(b)(1)(A), and had not been invoked as a basis for *any* terminations prior to 2025.

---

[67] *Id.* at 40,486.

[68] *See* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,398, 45,401 (Sept. 22, 20250; Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760, 28,763 (Jul. 1, 2025).

[69] 8 U.S.C. § 1254a(c)(1)(A); 8 U.S.C. § 1254a(c)(2)(B); 8 U.S.C. § 1182; 8 U.S.C. 1158(b)(2)(A).

***Unreasoned Departure from the Past Agency Practice of Orderly Transition Periods***

102. The Termination was published a mere 60 days prior to the effective date,[70] the minimum required under the statute. This is a significant departure from established policy and practice of affording more orderly transition period of 6 month or longer.[71]

## THE FIRST TRUMP ADMINISTRATION'S EFFORTS TO ELIMINATE ACCESS TO TPS

103. The South Sudan Termination is a resumption of the first Trump Administration's attempts to end TPS designations for non-European countries whose nationals are majority non-white. Between 2017 and 2018, DHS announced terminations of TPS designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 877–78 (N.D. Cal. 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, comprising approximately 98 percent of all TPS holders at the time.[72] In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

104. Documents obtained in litigation and congressional investigations subsequently revealed that the 2017 and 2018 termination decisions were not based on an objective review of country conditions as required by statute—and as had been the past practice over multiple administrations, both Democratic and Republican—but rather were part of a "predetermined presidential agenda to end TPS." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1094–99 (N.D. Cal. 2018) (vacated and remanded on different grounds; quoting then-DHS Secretary Duke's assurance

[70] Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19,217, 19,218 (May 6, 2025).
[71] *See supra* note 8.
[72] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y, TIMES (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.

to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close").[73]

105. Moreover, every district court to consider animus as a motivating factor in these terminations found that they were part of a policy "to decrease the presence of non-white immigrants in the United States."[74]

106. DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F. Supp. 3d at 1101.

107. The courts that reviewed these decisions consistently found that DHS had radically changed the way it approached TPS decisions and justified the terminations by considering a much narrower range of country conditions than had been considered in the past. *See Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019); *Ramos*, 336 F. Supp. 3d at 1097–98; *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 412–14 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 321 (D. Md. 2018).

---

[73] *See also* Minority Staff of S. Comm. on Foreign Rels., 116th Cong., *Playing Politics with Humanitarian Protections: How Political Aims Trumped U.S. National Security and the Safety of TPS Recipients* 41 (U.S. Gov't Publ'g Off. Wash. 2019) (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

[74] *Saget v. Trump*, 375 F. Supp. 3d 280, 368–72 (E.D.N.Y. 2019) (also finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); *see also Ramos*, 336 F. Supp. 3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras).

108. To justify these terminations and undermine the TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support that claim.

109. The U.S. District Court for the Eastern District of New York found that the Acting Secretary of Homeland Security, Elaine Duke, decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute. *Saget*, 375 F. Supp. 3d at 343, 347–48, 359–62. Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance. *Id*. at 307–09. Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest," despite the fact that virtually any criminal record would be enough to disqualify an individual applicant for TPS eligibility. *See id*. at 352; *cf*. 8 U.S.C. § 1254a (b)(1)(C), (c)(2)(B). Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – i.e., that non-whites commit crimes and are on the public dole." *Ramos*, 336 F. Supp. 3d at 1105.

110. After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad . . . The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result." *Id*. at 1092, 1097–98; *see also Centro Presente*, 332 F. Supp. 3d at 416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had

abated rather than a fuller evaluation of whether the country would be able to safely accept returnees”).

111. The U.S. District Court for the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti’s TPS termination, finding that the termination “was preordained and pretextual” and “was made in part due to political influence,” violating the TPS statute’s requirement that decisions be based on country conditions. *Saget*, 375 F. Supp. 3d at 346.

112. Indeed, then-Acting Secretary Duke’s writings revealed that “she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS.” *Ramos*, 336 F. Supp. 3d at 1099. Specifically, she expressed that her TPS decision-making was based on “an America first view,” a term that invoked President Trump’s preference for immigration from majority-white European countries. *Id*. at 1099–1100, 1104.

113. As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan did not go into effect. *See, e.g.*, *Ramos*, 709 F. Supp. 3d at 878–79. DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.[75] *See id*. And in 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, Nepal, and El Salvador and instead extended TPS designations for those countries. *See id*. In doing so, DHS extensively criticized the flawed

[75] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).

country-conditions analyses in the termination decisions issued under the first Trump Administration.[76]

**THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END ACCESS TO TPS**

***Secretary Noem, President Trump, and Vice President Vance Commit to Terminating TPS***

114. Even before she became Secretary of DHS, Defendant Noem publicly committed to ending TPS for reasons unrelated to relevant country conditions. During her confirmation hearing, she claimed that TPS "has been abused and manipulated by the Biden Administration," and suggested that the "extensions" of TPS were impermissible because "[t]he program was intended to be temporary."[77]

115. Defendant Noem repeatedly asserted that TPS was a program to benefit people who had entered the country illegally or who commit crimes in the United States. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."[78] In her press statement announcing the partial vacatur of TPS for Haiti, Defendant Noem emphasized that "TPS is a type of immigration status available

[76] *See* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023) (same for Nepal).

[77] *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 15, 2025), https://www.c-span.org/program/senate-committee/homeland-securitysecretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484 (at approximately 1:50:54); *see also* NBC News (@NBCNews), *Meet the Press full broadcast* – Feb. 2, YouTube (Feb. 2, 2025), https://www.youtube.com/watch?v=FpeMXrvxHco (at approximately 16:25).

[78] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad6860

to nationals of certain designated countries that allows aliens,[79] *even if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[80] Defendant Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti has been designated for TPS since 2010"; and because "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[81]

116. President Trump, Vice President Vance, and Trump surrogates have likewise expressed their disagreement with TPS and characterized designations as illegal, or, in the Vice President Vance's words, "a magic amnesty wand."[82]

117. Before taking office, both the President and the Vice-President made clear their intent to target TPS designations for termination.[83] President Trump, while campaigning, said that

---

[79] The term "alien" is used throughout the Immigration and Nationality Act to describe non-citizens, but it and the related term "illegal alien" are considered by some to be a derogatory term used particularly to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). *See, e.g.*, Kai Wei, et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) SOC. SCIS. J. 1, 10–11 (2019), https://www.mdpi.com/20760760/8/3/93#B63-socsci-08-00093. Notably the current Trump Administration concertedly specified that it would use these terms, as a matter of policy, and departing from the contrary policy of the Biden Administration. *See, e.g.*, Todd Lyons, Acting Director, U.S. Immigr. & Customs Enforcement, *Updated Terminology for Communications Materials and Internal and External Communications* (Mar. 31, 2025), https://www.ice.gov/doclib/foia/policy/memo_CommsTerminology_03.31.2025.pdf.

[80] Press Release, *U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS* (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphases in original).

[81] *Id.* (Here, Secretary Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS).

[82] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, NEWSWEEK (Sept. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.

[83] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. TIMES (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

he would "[a]bsolutely … revoke" TPS from Haitians, saying, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal."[84]

118. He decried TPS as a "little trick," asserting that Haitian migrants "are illegal immigrants" who were "destroying the town" of Springfield, Ohio.[85]

119. For his part, Vice President Vance, said that "[w]e're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[86] Because TPS is a statute enacted by Congress to be a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief grounded in individualized assessments), this statement can only be understood as an attack on TPS itself. Vice President Vance expressed this view repeatedly while campaigning.[87]

---

[84] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed*, NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[85] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concernced'*, ROLLINGSTONE (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621.

[86] Timothy Nerozzi, *Trump ends Temporary Protected Status for more than 300,000 Venezuelans in US*, WASH. EXAM'R (Feb. 3, 2025), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporaryprotected-status-venezuelans/.

[87] *See, e.g.*, CNN-News 18 (@cnnnews18), CNN's Dana Bash And JD Vance Clash Over Claims About Haitian Immigrants, YouTube (Sept. 16, 2024), http://youtube.com/watch?v=djpTr5r0zMQ (at approximately 5:10, disputing anchor's characterization of TPS holders as being in the United States legally and calling TPS designations a "magic amnesty wand."); *Senator JD Vance Campaigns in Raleigh, North Carolina*, C-SPAN (Sept. 18, 2024), https://www.c-span.org/program/campaign-2024/senator-jdvance-campaigns-in-raleigh-north-carolina/649012 (at approximately 41:00, "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally . . . . if Kamala Harris waves the wand illegally and says these people are now here legally. I'm still going to call them an illegal alien.").

120. According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS designations as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[88]

**DEFENDANTS' RENEWED EFFORTS TO END TPS**

121. Neither the adverse decisions of federal courts nor DHS's 2023 analysis of conditions in South Sudan have deterred the second Trump Administration from pursuing its plan to effectively end access to TPS consistent with campaign promises. To date, the Administration has attempted to terminate every TPS designation that has come up for review, announcing terminations for South Sudan, Ethiopia, Cameroon, Haiti, Syria, Afghanistan, Nepal, Burma, Nicaragua, Honduras, and Venezuela. The termination decisions—including the termination of TPS for South Sudan—reflect preordained outcomes driven by the very sort of partisan politics the statute is intended to exclude from consideration.

122. On his first day in office, President Trump issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14159 § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025) ("Invasion EO"). The supposed "invasion" involved purportedly "unprecedented" levels of irregular entry into the United States. *Id.* § 1. The executive order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans." *Id.*

---

[88] *See* Charlie Savage *et al.*, *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

123. The Executive Order directs the Secretary of Homeland Security to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." Invasion EO § 16(b). Although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens in the United States." *Id.*

124. Immediately after Defendant Noem was confirmed as Secretary of Homeland Security, Defendants began to implement the Executive Order's mandate, and several of Secretary Noem's termination decisions rely explicitly on this order. In fact, when publicizing the Venezuela TPS vacatur described below, Defendant Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives a directive, the Department of Homeland Security will follow it."[89]

125. Within days of taking office, Defendant Noem began improperly terminating TPS designations, following the same procedurally improper playbook that was eventually used to terminate South Sudan.

***Failure to Consult Appropriate Agencies and to Consider Country Conditions Within Periodic Reviews Conducted in 2025***

126. Defendant Noem failed to consult with other agencies as required by the TPS statute and disregarded objective and available evidence of country conditions in multiple terminations. Instead, she relied on pretextual justifications for the terminations. Just days after entering office,

---

[89] Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 6:57 PM), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (statement appears in posted video clip from CNN interview).

Secretary Noem reversed Venezuela's TPS extension, an unprecedented action that a federal court later found to be a pretext to cover her "desire to totally undo" the redesignation signed by then-Secretary Alejandro Mayorkas.[90] This decision granting preliminary relief was stayed by the Supreme Court in a nonprecedential decision with no analysis. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025). The Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, *Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay, 145 S. Ct. at 2729. Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious.[91] That merits decision and the vacatur were then stayed by the Supreme Court in another nonprecedential decision with no analysis. *Noem v. Nat'l TPS All.*, No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).

127. Quickly after issuing the Venezuela termination, Defendant Noem then "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."[92] The same district court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions],"[93] and a separate district court also found the action unlawful and set it aside. *See Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 273 (E.D.N.Y 2025).

---

[90] *NTPSA I* PI Decision at 855.
[91] *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ("*NTPSA I* SJ Decision").
[92] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter "Haiti Termination Press Release"].
[93] *NTPSA I* SJ Decision at *34.

128. On May 12, 2025, DHS terminated Afghanistan's TPS designation despite an ongoing State Department warning against any travel to the country "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[94] Secretary Noem claimed that conditions had "notabl[y] improve[d]." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309, 20,310 (May 13, 2025).

129. In her terminations for Cameroon, Nepal, and Honduras, Defendant Noem claimed that notable country conditions improvements justified ending the designations, but she ignored entire categories of conditions that DHS had previously considered.[95]

130. Discovery produced in litigation challenging Defendants' termination of TPS for Nepal, Honduras and Nicaragua [96] confirms that USCIS drafted decision memoranda recommending termination for Honduras and Nicaragua before drafters had reviewed USCIS country conditions reports. For Nepal and Nicaragua, USCIS drafted decision memoranda without ever receiving any recommendation or contemporaneous conditions report from the State Department. This process violated the statutory directives to engage in interagency consultation and further evidence Defendants' ends-oriented approach.

---

[94] *Travel Advisory Afghanistan*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/afghanistan-advisory.html.

[95] *Compare* Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023), *with* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,151; Compare Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023), *with* Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697; Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304 (June 21, 2023); *see also* Honduras Termination Notice (not addressing political violence or crime).

[96] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*").

131. Each of these terminations and the failure to consult appropriate agencies demonstrates that the Trump Administration's aim of dismantling TPS has been implemented through decision-making that was predetermined, pretextual, and procedurally deficient.

***Impermissible Consideration of "National Interest" at the Periodic Review Stage***

132. Defendant Noem also impermissibly based multiple TPS termination decisions primarily on U.S. national interest grounds, which cannot be considered at the periodic review stage of the TPS process.[97] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States.").

133. Defendant Noem based her termination of Haiti on U.S. "national interest." Haiti, like Venezuela was designated for TPS on the grounds of extraordinary and temporary conditions. The Secretary rested her termination decision on her finding that extension of TPS status was not in the U.S. "national interest." This is procedurally inappropriate, and the facts used to justify the decision—the total societal collapse Haitian citizens are facing—weigh *in favor of* extending TPS status. *Id.* at 28,763.

134. In her terminations for Afghanistan, Haiti, and Syria, Defendant Noem used verbatim language for each country, claiming that "DHS records indicate that there are . . .

[97] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042; Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,513–14 (Feb. 24, 2025); Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697, 23,698 (June 4, 2025); Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57).

nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security."[98]

135. These terminations were the first to rely on a purported U.S. "national interest" to terminate a TPS designation. Until 2025, when the second Trump administration took power, no TPS designation for any country in the 35-year history of the TPS statute had ever been terminated based on "national interest." But in President Trump's second term alone, four countries' TPS designations have been terminated based exclusively or primarily on Secretary Noem's assessment of "national interest." 90 Fed. Reg. 9040 (Venezuela); 90 Fed. Reg. 20309 (Afghanistan); 90 Fed. Reg. 23697 (Cameroon); 90 Fed. Reg. 28760 (Haiti). These terminations were the first to rely on a purported U.S. "national interest" to terminate a TPS designation. There is a reason for this: U.S. "national interest" is not a factor that can be considered at the periodic review stage, nor for TPS designations for countries facing armed conflict.[99] There is a reason for this: U.S. "national interest" is not a factor that can be considered at the periodic review stage, nor for TPS designations for countries facing armed conflict.[100]

---

[98] *See* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,398, 45,401 (Sept. 22, 20250; Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760, 28,763 (Jul. 1, 2025).

[99] *See* 8 U.S.C. § 1254a(b)(1) (including "national interest" as a relevant consideration only under subsection (C)); 8 U.S.C. § 1254a(b)(3) (providing that the outcome of the periodic review of a designation depends solely on "whether the conditions for such designation under this subsection continue to be met"); Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57) (reviewing the TPS statute and finding that "periodic review, including review for termination, is limited to consideration of country conditions, and not to proclamations of the national interest divorced from those country conditions").

[100] *See* 8 U.S.C. § 1254a(b)(1) (including "national interest" as a relevant consideration only under subsection (C)); 8 U.S.C. § 1254a(b)(3) (providing that the outcome of the periodic review of a designation depends solely on "whether the conditions for such designation under this subsection continue to be met"); Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57) (reviewing the TPS statute and finding that "periodic review, including review for

***Impermissible Breaks from Past Practice***

136. Six of the nine terminated countries had been designated since at least 2015. Rather than adhere to DHS's longstanding practice of providing at least a six-month orderly transition period when ending a TPS designation of substantial length, the Secretary denied that there was any such practice. *See* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,153–54 n.24. While acknowledging "that certain previous TPS terminations allowed for an extended transition," she noted that "certain other TPS designations were terminated without allowing for an extended transition period." *Id*. That is incomplete and inaccurate. DHS maintained a clear practice over the prior twenty years of providing at least a six-month orderly transition period for any TPS termination, and even before that had provided at least a six-month transition for any country designated for TPS for more than three years.

137. In the past month, the Trump Administration has taken further action to systematically dismantle TPS. On November 25, 2025, Defendant Noem issued a termination for Burma. On November 28, 2025, the Administration issued a termination notice for Haiti. On December 12, 2025, the Administration announced the forthcoming termination for Ethiopia.

138. The Administration has also signaled repeatedly its intent to terminate TPS for Somalis in Minnesota, despite the absence of any basis in the TPS statute or DHS practice to target TPS beneficiaries for termination on the basis of where they reside in the United States.[101]

---

termination, is limited to consideration of country conditions, and not to proclamations of the national interest divorced from those country conditions").

[101] 8 U.S. Code § 1254a (notably missing any commentary on terminations that are limited to a specific city or state, while detailing the process for terminations); Donald J. Trump (@realDonaldTrump), Truth Social, (Nov. 21, 2025, 5:37 PM EST), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.

***Decision-Making Based on Animus***

139. The Trump Administration's ongoing policy of dismantling the TPS program, carried out through the pretextual terminations discussed above, is based on race, national origin, and ethnicity-based animus in violation of Fifth Amendment to the U.S. Constitution. While federal courts have yet to rule on the merits of the equal protection claims included in the previous litigation challenging the terminations discussed above, many interim rulings have recognized a likelihood of success on the merits of the claim that the Trump Administration's terminations are based on unconstitutional animus.[102] This same animus motivated the termination of TPS for South Sudan.

**DEFENDANTS' TERMINATION WAS MOTIVATED BY DISCRIMINATORY ANIMUS TOWARDS NON-WHITE, NON-EUROPEAN IMMIGRANTS GENERALLY AND BLACK AND AFRICAN IMMIGRANTS, SPECIFICALLY**

140. President Trump, Defendant Noem, and other members of the Trump Administration have built their political platforms and public-facing personas on unabashed animus toward non-white people, particularly non-white immigrants, and, among them, particularly Black and African immigrants. This animus substantially motivated the Trump Administration's plan to end TPS designations and is evidenced by numerous statements made by

[102] Mem. Op., *CASA, Inc. v. Noem*, 2025 WL 1907378 (D. Md. July 10, 2025)(Docket No. 122), at 11 (noting "[a]t this early stage, the Court finds that CASA has adequately pleaded facts in several of these categories of direct and circumstantial evidence that, when read as a whole and in the most favorable light to CASA, permit a reasonable inferenced of a policy or practice of race discrimination in TPS determinations.); Mem. Order Granting Pl's Mot. to Postpone, *NTPSA I*, at [59], (Dkt. No. 93)(stating "[b]ased on the extensive record provided by Plaintiffs, the Court finds that Plaintiffs have raised a substantial claim of unconstitutional animus."); Order Granting Pl. Mot'n to Postpone, *NTPSA II*, at 29, (Dkt. No. 73) (stating "[i]n totality, Plaintiffs have produced sufficient evidence demonstrating racial and discriminatory animus in support of their Fifth Amendment claim. Color is neither a poison nor a crime. Therefore, Plaintiffs have provided sufficient evidence to establish that Plaintiffs will likely succeed on the merits of their Fifth Amendment claim.").

Defendant Noem, President Trump, and other Administration officials. A limited sample of those statements follows.

***Defendants Have Repeated White Nationalist and Racist Rhetoric***

141. Defendants and their Administration have repeated rhetoric used within white nationalist, anti-immigrant ideology.

142. The so-called "Replacement Theory" of white nationalism, for example, is a unifying theme of the Trump Administration's. This conspiracy theory turns on the idea that non-white immigrants will "replace" the white race, and in doing so undermine the country's perceived white foundation, history, and culture.[103]

143. Echoing the white nationalist Replacement Theory, President Trump and his administration have long expressed animus against non-white immigrants in general and non-white TPS-holders in particular.

144. Secretary Noem has endorsed the core premise of Replacement Theory and has described irregular immigration across the southern border as an "invasion happening on purpose… to remake the foundation of this country."[104]

145. Deputy Chief of Staff for Policy and Homeland Security Advisor to the President Stephen Miller has long "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[105] The Southern Policy Law Center reviewed 900 emails sent by Miller to media outlets going back to 2015, and found repeated themes of white genocide and a focus on

---

[103] *See The 'Great Replacement' Theory, Explained*, National Immigration Forum, https://forumtogether.org/article/the-great-replacement-theory-explained/.

[104] *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS NEWS (Mar. 5, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/ (at approximately 4:57).

[105] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOUTHERN POVERTY LAW CENTER (Nov. 12, 2019).

interracial crime.[106] Miller also lauded historical immigration laws that imposed quotas based on racist assumptions.[107]

146. President Trump himself has repeatedly "retweeted" posts from avowed white nationalists, such as @WhiteGenocideTM, and publicly dined with prominent, self-declared white supremacists, implicitly endorsing their racist views and amplifying their racist message.[108]

147. While campaigning in 2023 and 2024, President Trump explicitly adopted those racist views, and said that non-white, non-European immigrants "*from Africa*" and Asia are "poisoning the blood of our country."[109]

148. In October 2024, during an interview with conservative radio host Hugh Hewitt, President Trump further emphasized his belief about the genetic inferiority of non-white, non-European immigrants. Speaking about "allowing people to come to an open border," he said, "many of them murdered far more than one person, and they're now happily living in the United

---

[106] *Id.*

[107] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . Show Miller praising racist immigration reactions from a century ago, while bitterly lamenting the law that repealed them.").

[108] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC NEWS (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *OPINION: Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?* USA TODAY (Sep. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[109] *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country"*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15) (emphases added); Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YouTube (Sep. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45).

States. You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."[110]

149. By contrast, President Trump told a predominantly white crowd at a Minnesota campaign rally, that they have "good genes."[111]

150. President Trump has referred to non-white, non-European immigrants as "animals,"[112] and compared them to snakes that will bite and kill anyone foolish enough to shelter them.[113] When discussing undocumented immigrants during a March 2024 rally, he stated, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[114] Secretary Noem has referred to non-white immigrants as "dirt bags."[115]

---

[110] Jack Traylor et al., *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271 .

[111] *Id.*

[112] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* POLITIFACT (May 17, 2018), https://www.politifact.com/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").

[113] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMESS (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. . . . And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.]").

[114] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/

[115] Secretary Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM EST), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBS Mornings (@CBSMornings), *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, YouTube (Jan. 29, 2025),

151. In his speech at the Republican National Convention in July 2024, President Trump, repeating the white nationalist talking points discussed above, stated: "[t]he greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East…"[116]

152. On September 23, 2025, President Trump used his platform at the U.N. General Assembly to critique the United Nations' humanitarian aid for migrants as "funding an assault on Western countries and their borders," and warning of "the death of Western Europe."[117]

153. As recently as November 27, 2025, Trump declared his intent to "permanently pause migration from all Third World Countries,"[118] and claimed that "most" of the 53 million "foreign" people in the United States "are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels."[119]

154. Over the past few months, the Trump Administration—including the Department of Homeland Security and Department of Labor—have ramped up their symbolic embrace of white nationalist ideology and the animus it carries with it.

---

https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem during the New York City raids she referenced has reported that nearly half of those arrested had no criminal history.

[116] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. TIMES (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.

[117] *Trump Speaks at U.N.*, REV, https://www.rev.com/transcripts/trump-speaks-at-un.

[118] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, 11:26 PM), https://truthsocial.com/@realDonaldTrump/posts/115625427648743414.

[119] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

155. On October 14, 2025, DHS posted a one-word tweet: "Remigrate."[120] This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism," and "has been seen as a euphemism for ethnic cleansing."[121]

156. President Trump has repeatedly embraced this white nationalist call. Earlier in 2025, he stated: "America was invaded and occupied. I am reversing the Invasion. It's called Remigration."[122] President Trump "directed" the "entire Administration to put every resource possible behind this effort, and reverse the tide of Mass Destruction Migration that has turned once Idyllic Towns into scenes of Third World Dystopia. Our Federal Government will continue to be focused on the REMIGRATION of Aliens."[123]

157. Also in 2025, President Trump called for "the Largest Mass Deportation Operation in History,"[124] saying "[i]t's called "REMIGRATION" and, it will, MAKE AMERICA GREAT AGAIN!"[125] (quotation marks in original). President Trump has repeatedly called for this "single largest Mass Deportation Program in History,"[126] all while specifically encouraging the immigration of white people, from places like South Africa and Europe.

---

[120] Homeland Security (@DHSgov), X (Oct. 14, 2025, 3:06 PM), https://x.com/DHSgov/status/1978175527329358094.

[121] Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate- homeland-security/; *see also* Chelsea Bailey, *DHS Issued a Call to 'Remigrate.' Here's the History of the Term Often Associated with Far-Right Groups*, CNN US (Oct. 19, 2025), https://www.cnn.com/2025/10/19/us/remigrate-dhs-explained.

[122] Donald J. Trump (@realDonaldTrump), Truth Social (June 12, 2025, 6:45 PM), https://truthsocial.com/@realDonaldTrump/posts/114672816056718064.

[123] Donald J. Trump (@realDonaldTrump), Truth Social (June 15, 2025, 8:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

[124] Donald J. Trump (@realDonaldTrump), Truth Social (July 5, 2025, 12:50 PM), https://truthsocial.com/@realDonaldTrump/posts/114801653749329102.

[125] *Id.*

[126] Donald J. Trump (@realDonaldTrump), Truth Social (June 15, 2025, 8:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

158. In the Fall of 2025, DHS posted a series of anti-immigrant posters that demonstrate discriminatory animus through their text and/or images. *See Figures A, B*. The Department of Labor has posted similarly charged symbolic language. *See Figures C, D, E, F*. Through Project Firewall, depicted in Figures C–F, the Department of Labor coordinates with DHS to constrain the availability of employment-based visas and immigration status.




*Figure A*[127]




*Figure B*[128]

[127] Graphic posted by U.S. Dep't of Homeland Security (@homelandgov.bskysocial), Bluesky (Oct. 18, 2025, 1:56 PM), https://bsky.app/profile/homelandgov.bsky.social/post/3m3iec6j2xs2m.
[128] Graphic posted by U.S. Dep't of Homeland Security (@homelandgov.bskysocial), Bluesky (Nov. 7, 2025, 11:48 AM), https://bsky.app/profile/homelandgov.bsky.social/post/3m52jswz7d22e, Bluesky (Nov. 7, 2025, 11:48 AM), https://bsky.app/profile/homelandgov.bsky.social/post/3m52jswz7d22e .




*Figure C*[129]




*Figure D*[130]

---

[129] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 18, 2025, at 6:08 PM), https://bsky.app/profile/dol.gov/post/3m3isfbppcs2f.@dol.gov).

[130] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 17, 2025, at 6:24 PM), https://bsky.app/profile/dol.gov/post/3m3gcseptrs22 (post "pinned" to the top of the Department of Labor's Bluesky profile as of Dec. 9, 2025).




Figure E[131]




Figure F[132]

***Defendants' Animus Toward Black, African, and Other Non-White Immigrants***

159. During his First Administration, President Trump repeatedly denigrated immigrants from countries designated for TPS. Most infamously, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need more Haitians?" He asked officials to "take them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."[133]

---

[131] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 21, 2025, 6:14 PM), https://bsky.app/profile/dol.gov/post/3m3qe5ocyn22p.

[132] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 23, 2025, 10:06PM), https://bsky.app/profile/dol.gov/post/3m3vrz4sanc2h.

[133] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, WASH. POST. (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.

160. During the 2024 election campaign, President Trump doubled down on those remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland . . . [and] Norway"—all of which are countries whose nationals are majority white—and non-European countries whose nationals are majority non-white, which he described as "unbelievable places and countries, countries that are a disaster."[134]

161. On December 9, 2025, President Trump tripled down on his prior remarks at an event in Pennsylvania, in which "he boasted about pausing immigration applications from what he called 'third-world countries' including 'hellholes like Afghanistan, Haiti, Somalia and many other countries.'"[135]

162. In response, someone in the audience yelled out "shithole!", to which President Trump responded by saying:

> "Remember, I said that to the senators. They came in, the Democrats, they wanted to be bipartisan, so they came in and they said, 'This is totally off the record, nothing mentioned here, we want to be honest,' because our country was going to hell."
>
> "And we had a meeting, and I say, 'Why is it we only take people from s---hole countries,' right? Why can't we have some people from Norway, Sweden? Just a few? Let's have a few from [] Denmark. Do you mind sending us a few people? Send us some nice people. Do you mind? But we always take people from Somalia, places that are a disaster, right? Filthy, dirty, disgusting, ridden with crime."[136]

---

[134] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[135] Lalee Ibssa and Karen Travers, *Trump ramps up anti-immigrant rhetoric, embraces 's---hole countries' phrase*, ABC NEWS (Dec. 10, 2025), https://abcnews.go.com/Politics/trump-ramps-anti-immigrant-rhetoric-embraces-phrase-hole/story?id=128279166.

[136] *Id.; see also Speech: Donald Trump Holds a Political Rally in Mount Pocono, Pennsylvania – Dec. 9, 2025*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-mount-pocono-pennsylvania=december-9-2025/.

163. The vitriol against Somalis was on ample display only one week prior, on December 2, 2025, during a Cabinet meeting, in which President Trump stated:

> I don't want them in our country, I'll be honest with you, OK? Somebody would say, oh, that's not politically correct. I don't care. I don't want them in our country. Their country is no good for a reason. Their country stinks and we don't want them in our country. I can say that about other countries too. We don't want them -- the hell -- we have to rebuild our country. You know, our country is at a tipping point. We could go bad; we're at a tipping point. I don't know if people mind me saying that, but I'm saying it. We could go one way or the other and we're going to go the wrong way if we keep taking in garbage into our country.[137]

164. Only days before that Cabinet meeting, President Trump posted the following on social media: "I am, as President of the United States, hereby terminating, effective immediately,

[137] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-december-2-2025/. On December 2, 2025, the same day as this Cabinet meeting, USCIS instituted a new policy pausing all asylum processing in the U.S. and pausing the processing of immigration benefits applications from people in the U.S. who come from any of the 19 countries whose nationals are subject to entry bans that the President instituted effective June 9, 2025. The nationals of these countries are majority non-white, including those of 8 countries who are majority Black. *See* Policy Mem., U.S. Citizenship & Immigr. Serv., Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf (citing Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, Fed. Reg. 22491 (June 4, 2025), https://www.govinfo.gov/content/pkg/FR-2025-06-10/pdf/2025-10669.pdf). Days later, on December 16, 2025, President Trump announced an expansion of the entry bans, to take effect January 1, 2026. The newest entry bans extend to an additional 22 countries, the nationals of which are majority non-white. The nationals of 20 of those countries are majority Black. Of those 20 countries, 18 are African, including South Sudan. Presidential Proclamation, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*, (Dec. 16, 2025), https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/. On December 18, 2025, the Director of USCIS announced on social media that the processing pause on immigration applications would extend to applicants who are nationals of countries, including South Sudan, that President Trump had newly designated for entry bans only two days prior. *See* Camilo Montoya-Galvez, *Trump administration pauses immigration cases for people from another 20 countries*, CBS News, (Dec. 18, 2025), https://www.cbsnews.com/news/trump-administration-pauses-immigration-cases-another-20-countries/.

the Temporary Protected Status (TPS Program) for Somalis in Minnesota. Somali gangs are terrorizing the people of that great State, and BILLIONS of Dollars are missing. Send them back to where they came from. It's OVER! President DJT."[138] Notably, the TPS statute does not authorize the President to effect an immediate termination of TPS, let alone for a subset of beneficiaries within a given U.S. city, over social media.

165. President Trump's disregard for immigrants from majority Black countries, including African countries, is nothing new. On the campaign trail to his current presidency, then-candidate Trump often remarked disparagingly about African immigrants, including people from South Sudan's neighboring country, the Democratic Republic of the Congo.

166. In September 2024, candidate Trump told a crowd in Uniondale, New York: "[t]hey are vicious, violent criminals that are being let into our country. They're people that their countries, who are very smart—they don't want them. That's why all over the world; a lot of people coming out of jails in the Congo, in Africa … They're coming from the Congo, they're coming from Africa, they're coming from the Middle East, they're coming from all over the world."[139]

167. In August 2024, candidate Trump claimed:

> "We have criminals from all over the world pouring into our country right now. Your jobs will never be obsolete… She [then-Vice President Kamala Harris] has allowed millions of people—open border—to flow into our country totally unchecked, totally unvetted. This isn't just from South America — people think it's just South America — this is Africa, Asia, the Middle East. A lot of people coming from the Congo in Africa, the Congo, rough, rough, rough, and they're prisoners, they're prisoners, and we say 'where do you come from?' 'Africa' 'Where in Africa?' 'Prison' 'What did

[138] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 21, 2025, 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.

[139] Donald J. Trump (Shared by @TeamTrump), Truth Social (Sep. 18, 2024, 8:17 PM), https://truthsocial.com/@TeamTrump/posts/112996067996354335.

> you do?' 'We don't want to say.' They turn out to be murderers, these are rough, these are rough people…"[140]

168. In April 2024, at a speech to law enforcement officials in Grand Rapids, Michigan, candidate Trump claimed that immigrants have "wrecked our country," and that other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists… from Congo, from Yemen, from Somalia, from Syria."[141]

169. In June of 2024 candidate Trump said again, "[T]hey come from Africa. They come from Asia. They come from South America. They come from the Middle East. What's happening to our country is unbelievable. They're poisoning our country."[142]

170. In October 2023, President Trump repeatedly boasted of his successes in excluding Black immigrants, stating for example: "I banned refugees from Somalia, very dangerous places, and from all of the most dangerous places all over the world… [s]ome very rough people, some very, very rough people come out of these areas."[143]

171. In 2022, President Trump claimed that immigrants were "storming" the country, including from "all of Africa."[144]

---

[140] Donald J. Trump (Shared by @TeamTrump), Truth Social (Aug. 20, 2024, 3:46 PM), https://truthsocial.com/@TeamTrump/posts/112996067996354335.

[141] *Speech: Donald Trump Addresses Law Enforcement Officials in Grand Rapids - April 2, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/.

[142] *Speech: Donald Trump Attends a Club 47 Birthday Fundraiser in Florida - June 15, 2024*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-club-47-birthday-fundraiser-west-palm-beach-florida-june-14-2024/#108.

[143] *Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/#101.

[144] *Speech: Donald Trump Holds a Political Rally in Robstown, Texas - October 22, 2022*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-texas-october-22-2022/#20.

***Favorable Treatment of White Immigrants***

172. In stark contrast, the Trump Administration has shown a strong bias in favor of immigrant populations it perceives to be white. On February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs Secretary Noem (among others) to: "[T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."[145]

173. President Trump previously posted on Truth Social that "any Farmer (with family!) from South Africa, seeking to flee that country to reasons of safety, will be invited into the United States of America with a rapid pathway to Citizenship. This process will begin immediately!"[146]

174. In October 2025, President Trump announced that the refugee cap for the coming year would be reduced from 125,000 last year, to just 7,500 people for 2026—the majority of whom will be white South Africans.[147]

**EXTRAORDINARY AND IRREPARABLE HARMS IF TPS FOR SOUTH SUDAN IS TERMINATED IMMINENTLY AND UNLAWFULLY**

175. Defendants' decision to terminate TPS imminently and unlawfully for South Sudan would strip TPS status from more than 230 South Sudanese TPS recipients, including the individual Plaintiffs and other members of Plaintiff ACT; at least 73 South Sudanese nationals with pending applications for TPS; and the U.S. citizen and lawful permanent resident dependents

---

[145] Exec. Order No. 14204, 90 Fed. Reg. 9497, 9497 (Feb. 12, 2025).

[146] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 7, 2025, at 9:05 AM), https://truthsocial.com/@realDonaldTrump/posts/112894686703859511.

[147] Rebecca Santana, *Trump Limits Annual U.S. Refugees to 7,500. It'll be mostly white South Africans,* PBS NEWS (Oct. 30, 2025), https://www.pbs.org/newshour/nation/trump-limits-annual-refugees-to-u-s-to-7500-itll-be-mostly-white-south-africans.

and immediate relatives of recipients and applicants. Some of these people, such as the individual Plaintiffs, have lived in the United States for years and are otherwise deeply embedded in their communities. Should Defendants' unlawful and imminent Termination take effect beyond January 5, 2026, the harms caused to them and many others would be myriad and severe.

176. For the TPS recipients, including all of the individual Plaintiffs, those harms can include: losing TPS as a sole source of immigration status; losing eligibility for related federal benefits (such as work authorization); losing eligibility for related state benefits (such as driver's licenses); facing the risk of deportation charges and of related immigration confinement; facing related, forced separation from loved ones and community in the U.S.; and facing forced removal to South Sudan and the risks of harm there, including deadly harm, on account of ongoing armed conflict and its ramifications, as well as other, compounded humanitarian crises, spanning severe flooding, a deadly cholera outbreak, mass internal displacement, acute food insecurity, and barriers to accessing humanitarian aid.

177. For the TPS applicants, the harms include no longer having any basis for consideration of their pending application for TPS, losing related protection against deportation, and losing access to TPS.

178. For the individual Plaintiffs and all other TPS recipients, TPS applicants, and their U.S.-based family members, the harms include the stress and torment of possible forced separation from loved ones and the fear that the applicants and recipients could face grave harm, including death, if forcibly removed to South Sudan.

179. All of these harms are compounded by the fact that the Administration only provided a 60-day wind-down period for South Sudanese TPS recipients, which is insufficient for them, applicants, and their U.S.-based family members to respond or plan fairly.

180. The unfairness of the 60-day wind-down is exacerbated by other severe policy changes that the Administration has implemented, including:

A) A December 2, 2025, set of policy changes that the Administration announced that (1) pauses all asylum processing within the U.S., and (2) pauses the processing of immigration benefits applications for applicants who come from countries whose nationals are subject to the entry bans instituted effective June 9, 2025;

B) A December 16, 2025, Presidential Proclamation that extends the entry bans to nationals of South Sudan, effective January 1, 2026; and

C) A December 18, 2025, expansion of the processing pause on immigration benefits applications to applicants in the U.S. who are South Sudanese nationals.[148]

181. The blanket pause on asylum processing that is currently in place renders impossible any access to asylum for South Sudanese TPS holders and/or applicants, ahead of the January 5, 2026, termination date for TPS for South Sudan.

182. The blanket pause on the processing of other immigration benefits for applicants in the U.S. who are South Sudanese nationals renders impossible for South Sudanese TPS holders and/or applicants any access to another immigration status in the U.S., ahead of the January 5, 2026, termination date for TPS for South Sudan.

183. Defendants' actions also threaten deportation and related immigration confinement for TPS holders and applicants who are not presently eligible for alternative paths to legal status, even though TPS was established expressly to serve this population—individuals who cannot

[148] Camilo Montoya-Galvez, *Trump administration pauses immigration cases for people from another 20 countries*, CBS NEWS, (Dec. 18, 2025), https://www.cbsnews.com/news/trump-administration-pauses-immigration-cases-another -20-countries/.

safely return to South Sudan but may not fit the specific legal requirements of asylum and related forms of humanitarian protection.

184. And the loss of TPS in some instances can also limit the possibility of acquiring an alternative legal status for which an individual would otherwise be eligible but for which maintenance of or current legal status is a prerequisite.[149]

185. TPS holders, including all of the individual Plaintiffs, who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[150] And the recent institution of a new entry ban against South Sudanese nationals, effective January 1, 2026, could separately frustrate or render impossible the ability of the individual Plaintiffs and every other South Sudanese TPS holder or applicant to be able to come back into the U.S. on another immigration status.

186. TPS holders who may be entitled to a fear-based form of immigration relief— such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries. The current Trump Administration has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief. *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward, including to South Sudan. *Id.*

---

[149] *See Temporary Protected Status: An Overview*, AMERICAN IMMIGRATION COUNCIL, (Nov. 25, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/temporary-protected-status-tps-overview/ (noting some TPS recipients may be eligible to adjust status).
[150] 8 U.S.C. § 1182(a)(9)(A)(ii), (B)(i)(II).

187. TPS holders also face the prospect of losing employment authorization. This can result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders risk losing their homes or other material assets, leading to further economic harm.

188. Many TPS holders also face the imminent loss of their driver's licenses (or state identification cards) and, with them, their mobility and freedom of movement, because in many states driver's licenses and state-issued identification are limited to those with legal immigration status.[151] In addition, because the Defendant Noem's termination goes into effect so quickly, TPS holders, including all of the individual Plaintiffs, have been afforded almost no time to make alternative arrangements for themselves and their families.

189. Compounding the destabilizing harms of loss of legal status, employment authorization, and driver's licenses and state identification cards are the severe risks of family separation, loss of healthcare, psychological harm, and stigma.

190. The risk of deportation renders TPS holders and applicants vulnerable to separation from U.S. citizen dependents, immediate relatives, and other family and loved ones. There are many South Sudanese TPS holders and applicants in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens, lawful permanent residents, or who hold other forms of lawful status. These TPS holders and applicants face the risk of having to choose between being forced to leave their family members behind, without any ability to reunite with them in the U.S., given the newest entry bans taking effect agains South Sudanese nationals effective January 1, 2026, or bringing their U.S. citizen children

---

[151] *See, e.g.*, *REAL ID Checklist*, California DMV, https://www.dmv.ca.gov/portal/driverlicenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

(or other family members) to a country that is unsafe and in dire straits, where the children have never lived and, in many cases, have never even visited.

191. TPS holders and their families will be deprived of employer-sponsored health insurance and in some cases public health care. Despite having paid into Social Security, TPS holders also face the loss of this crucial benefit.

192. Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. South Sudanese TPS holders, including the individual Plaintiffs, have been experiencing tremendous emotional and psychological harm since the announcement of the Termination, giving rise to the risk of heightened anxiety, trauma, insomnia, and depression. The psychological harms resulting from Defendants' actions will only intensify as the effective date approaches.

193. South Sudanese TPS holders and applicants have also suffered the additional dignitary harm of being subject to an agency action motivated by racial, ethnic, or national-origin discrimination.

## CLASS ACTION ALLEGATIONS

194. This case seeks class-action status pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of the following, proposed classes of people who face harm because of the termination of TPS for South Sudan, scheduled to take effect beyond January 5, 2025:

A) All current recipients of TPS for South Sudan (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan) who are present in the U.S.;

B) All people, present in the U.S., who have pending applications for TPS that reflect their prima facie eligibility for it (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan);

C) The U.S. citizen dependents or immediate relatives of U.S.-based recipients of TPS for South Sudan (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan); and

D) The U.S. citizen dependents or immediate relatives of U.S.-based people with pending applications for TPS that reflect their prima facie eligibility for it (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan).

195. The proposed classes are each sufficiently numerous so as to make joinder impracticable. Based on Defendants' own accounting in the Federal Register notice, the recipient class consists of 232 TPS holders and the applicant class consists of 73 applicants. There are common questions of law and fact affecting the members of each proposed class, including: (a) whether Defendants' decision to terminate of South Sudanese TPS was preordained and/or pretextual, without regard to country conditions and prior to consulting with other appropriate agencies in violation of the TPS statute; (b) whether the TPS statute authorizes the Secretary to consider "national interest" as a sole justification to terminate TPS; (c) whether Defendants' decision to terminate TPS was impermissibly motivated by animus based on race, ethnicity, or national origin; and (d) whether Defendants' failure to provide more than the minimum 60-day notice before terminating South Sudan's TPS designation violates the APA.

## CAUSES OF ACTION

**COUNT ONE**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(D)**
**(All Plaintiffs Against All Defendants)**
***(Failure to Follow Procedures Required by Law)***

196. All the foregoing allegations are repeated and realleged as though fully set forth herein.

197. The Administrative Procedure Act (APA), 5 U.S.C. 701 et seq., ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. 702. Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

198. Secretary Noem's Termination constitutes "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. 704, because the Defendants' Termination results in the TPS holders' loss of TPS "automatically and without further notice or right of appeal."[152]

199. Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

200. The TPS statute requires the Secretary to "consul[t] with appropriate agencies of the Government", "review the conditions in the foreign state… for which a designation is in effect under this subsection," and "determine whether the conditions for designation" continue to be met. 8 U.S.C. § 1254a(b)(3)(A).

[152] 8 C.F.R. § 244.19.

201. Secretary Noem's Termination was procedurally improper in numerous ways, each of which constitutes a violation of the APA.

202. Secretary Noem failed to consult with appropriate agencies as required by the periodic review procedures. Secretary Noem additionally failed to review the conditions in South Sudan as required by the periodic review procedures.

203. Secretary Noem failed to base her Termination on "whether the conditions for designation" continue to be met and based it instead on a predetermined domestic policy of the Trump administration to restrict access to TPS for non-white, non-European, African immigrants.

204. Secretary Noem's Termination relied on "national interest" considerations divorced from the conditions inside South Sudan, which are procedurally improper during a periodic review.

205. Secretary Noem's Termination of South Sudan's designation based on ongoing armed conflict under 8 U.S.C. § 1254a(b)(1)(A) was procedurally improper because it was based on her consideration of "national interest" as a factor, in violation of the TPS statute.

206. The specific national interest factors Secretary Noem considered (ensuring South Sudan's compliance with lawful deportations, for example) had no nexus to the continued temporary, *lawful* presence of fewer than four hundred South Sudanese nationals in the United States, as required under the statute.

207. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

208. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT TWO**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A)**
**(All Plaintiffs Against All Defendants)**
***(Departing from Prior Policy Sub Silentio, Without Good Reason)***

209. All the foregoing allegations are repeated and realleged as though fully set forth herein.

210. To engage in procedurally appropriate decision-making, an agency must "display awareness that it is changing position."[153] Agencies "may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books."[154] And the APA requires a "more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."[155]

211. Defendants' Termination of the TPS designation for South Sudan with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it was an unacknowledged and unreasoned departure from decades of decision-making practices and procedures.

212. Separately and independently, Defendants' Termination of the TPS designation for South Sudan violated the APA because it was an unacknowledged and unreasoned departure from decades of decision-making practices and procedures in which domestic U.S. "national interest" divorced from consideration of objective and available evidence of relevant conditions in the designated country were not invoked as a basis for terminating a TPS designation.

213. Separately and independently, Defendants' Termination of the TPS designation for South Sudan violated the APA because it was an unacknowledged and unreasoned departure from

---

[153] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).
[154] *Id.*
[155] *Id.*, at 516.

decades of decision-making practices and procedures in which the Secretary's country conditions consideration during periodic review included an assessment of intervening conditions since the most recent designation, redesignation, or extension.

214. Plaintiffs will suffer irreparable injury resulting from the unlawful departure from the prior policy.

215. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT THREE**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A) & (C)**
**(All Plaintiffs Against All Defendants)**
***(Arbitrary and Capricious, Abuse of Discretion, Contrary to Law)***

216. All the foregoing allegations are repeated and realleged as though fully set forth herein.

217. Under the APA, the Court must hold unlawful and set aside an agency action, finding, or conclusion found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A) & (C).

218. Defendants' Termination was arbitrary and capricious, not in accordance with the law, and in excess of statutory authority and limitations for the following reasons, each of which constitutes an independent violation of the APA:

A) Defendants did not consider objective, available evidence of relevant country conditions—including ongoing armed conflict, imminent risk of full-scale civil war, and myriad extraordinary and temporary conditions, including severe

flooding, a deadly cholera outbreak, significant internal population displacement, acute food insecurity, and barriers to accessing humanitarian aid;

B) Defendants failed to consult appropriate agencies in the course of their periodic review, including by disregarding relevant and available country conditions findings by the U.S. Department of State;

C) In the Termination of the armed-conflict-based designation, Defendants improperly disregarded and directly contradicted the Department's recent, explicit determination that an conditions short of an official or full-blown civil war are still relevant for periodic review of an armed conflict designation under 8 U.S.C. 1254a(b)(1)(A);

D) Defendants' Termination of the extraordinary and temporary conditions designation failed to address the specific conditions in South Sudan that the Department had otherwise previously deemed relevant to its periodic review;

E) Defendants' Termination was infected by undue political influence;

F) Defendants' Termination was motivated by impermissible racial preferences rather than any rational justification; and

G) Defendants' Termination was predicated on the legally incorrect belief that TPS designations, including the designations of South Sudan, are themselves illegal, and the belief that TPS holders are present in the United States illegally.

219. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination;

220. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT FOUR**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(B)**
**(All Plaintiffs Against All Defendants)**
***(Contrary to Constitutional Right, Power, Privilege, or Immunity)***

221. All the foregoing allegations are repeated and realleged as though fully set forth herein.

222. Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

223. Defendants' Termination was impermissibly motivated by racial and/or national origin animus against African and other non-white or non-European immigrants, and their pattern of TPS cancellations described herein cannot be explained other than by reference to race and/or national origin.

224. As such, Defendants' Termination violates Plaintiffs' rights to Equal Protection under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." *Id.*

225. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

226. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT FIVE**
**Fifth Amendment**
**U.S. Constitution, Am. 5**
**(All Plaintiffs Against All Defendants)**
***(Equal Protection Under the Law)***

227. All the foregoing allegations are repeated and incorporated as though fully set forth herein.

228. The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that motivated in part by a racially discriminatory intent or purpose. Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race or national origin.[156]

229. Defendants' decision to terminate South Sudan's TPS designation impermissibly and intentionally discriminates against Plaintiffs because of their race and/or national origin.

230. Defendants' Termination was motivated by racial and/or national origin animus against African and other non-white or non-European immigrants, and their pattern of TPS cancellations described herein cannot be explained other than by reference to race and/or national origin.

231. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

232. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful as violative of the Fifth Amendment's guarantee of equal protection.

[156] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that the termination of TPS for South Sudan was unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment;

2. Declare that the decision to provide only 60 days' notice before the termination of TPS for South Sudan take effect was unlawful under the APA;

3. Immediately postpone or stay the termination of TPS for South Sudan from taking effect or being put into effect beyond January 5, 2026;

4. Set aside or otherwise vacate the termination of TPS for South Sudan as beyond Defendants' authority and/or unlawful under the APA;

5. Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for South Sudan;

6. Order Defendants to take all steps necessary to ensure that the TPS designation for South Sudan remains in full force and effect unless and until it lawfully expires lawfully or is terminated lawfully;

7. Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

8. Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: December 22, 2025

Respectfully submitted,

*/s/ Nargis Aslami*

Nargis Aslami
Golnaz Fakhimi (*pro hac vice* forthcoming)
Collin Poirot (*pro hac vice* forthcoming)
Abbey Rutherford (*pro hac vice* forthcoming)
MUSLIM ADVOCATES

1032 15th Street N.W. #362,
Washington, D.C. 20005
202.897.2622
Nargis@muslimadvocates.org
Golnaz@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/ Erik Crew*
Erik Crew (*pro hac vice* forthcoming)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-741
ecrew@haitianbridge.org

*/s/ Mark H. Lynch*
Mark H. Lynch (*pro hac vice* forthcoming)
Stephen Petkis (*pro hac vice* forthcoming)
Paul Killebrew (*pro hac vice* forthcoming)
Ayana M. Lindsey (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
MLynch@cov.com
SPetkis@cov.com
PKillebrew@cov.com
ALindsey@cov.com

Sarah Leadem (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
(415) 591-6000
SLeadem@cov.com

Michael E. Cunniff (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001
(212) 841-1000
MCunniff@cov.com

*Counsel for Plaintiffs African Communities Together, Mary Doe, David Doe, Peter Doe, Jacob Doe, and the Proposed Class*

**From:** Williamson, Bryan J
**To:** Parisi, Jessica R; Akhter, Faisal K (Kamal)
**Cc:** Strano, Andria J
**Subject:** FW: TPS Data Request for South Sudan
**Date:** Thursday, July 3, 2025 3:53:52 PM

FYSA

Thanks,

**Bryan Williamson**
Project Manager
Regulatory Management Branch
Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
[redacted]

**From:** MILLER, SARAH [redacted]>
**Sent:** Thursday, July 3, 2025 3:36 PM
**To:** Williamson, Bryan J [redacted]>; OPS-HAD <[redacted]>
**Cc:** Baker, Bryan [redacted]>; Smith, Mirna <[redacted]>; Turner, Ebony N [redacted]>; Akhter, Faisal K (Kamal) [redacted]>; Office of Homeland Security Statistics [redacted]>
**Subject:** RE: TPS Data Request for South Sudan

Some people who received this message don't often get email from [redacted]. Learn why this is important

Hi Bryan,
Here are the three requested stats for South Sudan:

Potentially newly eligible population under a new designation

| | |
|---|---|
| Newly potentially eligible given a new designation with continuous residence date of 07/01/2025 | 260 |
| Breakout: | |
| Nonimmigrants in valid status who arrived since 09/04/2023 | 220 |
| Nonimmigrants out of status who arrived since 09/04/2023 | 30 |
| Post-09/04/2023 entrants (border/port encounters) w/o repatriation or relief | 10 |
| Post-09/04/2023 border crossers not apprehended | 0 |

Note: Details may not sum to total due to rounding. Estimate does not include LPRs.

Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Repatriations to South Sudan: Fiscal Years 2020-2025 to Date

| Fiscal Year | Repatriations |
|---|---|
| 2020 | 40 |
| 2021 | 20 |

South Sudan TPS AR000115

| | |
|---|---|
| 2022 | - |
| 2023 | - |
| 2024 | - |
| 2025 YTD | 20 |

Notes: To protect privacy, table cells are rounded to the nearest ten. Table only includes removals and returns by ICE ERO. Removals and returns by other components are not included.
Source: OHSS Analysis of ICE ERO data as of May 31, 2025.

Nonimmigrant South Sudanese Overstays: Fiscal Years 2020-2025 to Date

| Fiscal Year of Admit Until Date | NI Visa Overstays |
|---|---|
| 2020 | 50 |
| 2021 | 10 |
| 2022 | 50 |
| 2023 | 30 |
| 2024 | 50 |
| 2025 YTD | 50 |

Notes: To protect privacy, table cells are rounded to the nearest ten. Table presents counts of events; individuals who overstayed multiple times will appear multiple times. Table contains system identified overstay leads. TPS status may not keep an individual in legal status. Includes overstays who entered with the following nonimmigrant COAs: A3, B1, B2, CW1, CW2, E1, E2, E2C, E3, E3D, F1, F2, G5, H1B, H1C, H2A, H2B, H2R, H3, H4, J1, J2, K1, K2, K3, K4, L1, L1A, L1B, L2, M1, M2, N8, N9, O1, O2, O3, P1, P2, P3, P4, Q1, R1, R2, TD, TN, V1, V2, V3, WB, WT through Air or Sea Ports of Entry.
Source: OHSS query of ADIS-R data. Fiscal year 2020-2024 data are as of the conclusion of each fiscal year. FY2025 data is as of July 2, 2025.

**Sarah Miller, PhD**
Statistician
Migration Analysis Center
Office of Homeland Security Statistics
DHS Office of Strategy, Policy, and Plans

---

**From:** Williamson, Bryan J <[redacted]>
**Sent:** Tuesday, June 10, 2025 4:26 PM
**To:** MILLER, SARAH [redacted]>
**Cc:** Baker, Bryan [redacted]>; OPS-HAD [redacted]>; Smith, Mirna <[redacted]>; Turner, Ebony N [redacted]>; Akhter, Faisal K (Kamal) [redacted]>; Office of Homeland Security Statistics [redacted]>
**Subject:** RE: TPS Data Request for South Sudan

Hi Sarah,

Can we get 5 years of data for the removals and overstays, so starting in FY20? We understand that FY20 & FY21 will be affected by covid but would still be good to have the data.

Thanks,

**Bryan Williamson**
Project Manager
Regulatory Management Branch
Regulatory Coordination Division
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
Cell: [redacted]

---

**From:** MILLER, SARAH [redacted]>
**Sent:** Tuesday, June 10, 2025 3:52 PM
**To:** Williamson, Bryan J [redacted]v>
**Cc:** Baker, Bryan [redacted]>; OPS-HAD [redacted]>; Smith, Mirna [redacted]; Turner, Ebony N [redacted]>; Akhter, Faisal K (Kamal) [redacted]; Williamson, Bryan J [redacted]; Office of Homeland Security Statistics [redacted]>
**Subject:** RE: TPS Data Request for South Sudan

Hi Bryan,
Confirming receipt of the request!
To clarify for removals and overstay events, starting with FY2022 is good?

**Sarah Miller, PhD**
Statistician
Migration Analysis Center
Office of Homeland Security Statistics
DHS Office of Strategy, Policy, and Plans

---

**From:** Williamson, Bryan J [redacted]>
**Sent:** Friday, June 6, 2025 10:00 AM
**To:** Office of Homeland Security Statistics [redacted]>
**Cc:** MILLER, SARAH [redacted]>; Baker, Bryan [redacted]>; OPS-HAD [redacted]>; Smith, Mirna [redacted]>; Turner, Ebony N [redacted]>; Akhter, Faisal K (Kamal) [redacted]>; Williamson, Bryan J [redacted]>
**Subject:** TPS Data Request for South Sudan

Good morning OHSS,

TPS for South Sudan will expire on Monday, November 3, 2025. S1 must make a decision **no later than** Thursday, September 4, 2025.

Please provide:

• Potentially newly eligible population under a new designation
• ICE ERO removals to South Sudan (by FY, through 2025 YTD)
• Overstay events by nationals of South Sudan (by FY, through 2025 YTD)

Please send the requested data to [redacted] and [redacted] by Sunday, July 6, 2025

Thank you,
OP&S TPS Team

## SOUTH SUDAN TEMPORARY PROTECTED STATUS (TPS) RESULTS

### Statement of Findings Determination on TPS Receipts Provided by TPS Country:

| Fraud Record Determinations | Total |
|---|---|
| Fraud Found | - |
| Fraud Not Found | - |
| No SOF Information Found | 228 |
| **Total** | **228** |

**Notes:** Receipt data provided were passed through FDNS-DS NexGen to identify if any receipt had an associated Statement of Findings.
**Source:** FDNS-NexGen as of 6-25-2025

### TPS Alien Numbers Provided where the Alien Number is Associated with a Public Safety Record and TPS Country:

| Public Safety Records | Total |
|---|---|
| EPS | - |
| Non-EPS | - |
| No Public Safety Record Information Found | 228 |
| **Total** | **228** |

**Notes:** Unique alien numbers were passed through FDNS-DS NexGen to identify if the alien number provided had an associated KST/Non-KST National Security Record or EPS/Non-EPS Public Safety Record indicating derogatory information. Only the primary entity on the FDNS Record was queried for each alien number. Please note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple national security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF.
**Source:** FDNS-NexGen as of 6-25-2025

[redacted]

| [redacted] | [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

[redacted] note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple national security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF.
**Source:** FDNS-NexGen as of 6-25-2025

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

U.S. Citizenship and Immigration Services

September 2, 2025

**DECISION**

MEMORANDUM FOR THE SECRETARY

FROM: Joseph B. Edlow
Director

SUBJECT: **Review of the Designation of South Sudan for Temporary Protected Status**

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Secretary's Decision:**

1. *Terminate: Terminate South Sudan's designation*

   Specify the Effective Date of the Termination (60 days or longer): ____________________

   Approve/date ____________________ 09-03-25

[redacted]

**Attachments:**

| | |
|---|---|
| Attachment A: | Temporary Protected Status Legal Authority |
| Attachment B: | USCIS RAIO Country of Origin Information Considerations Report, South Sudan |
| Attachment C: | USCIS OP&S Policy Considerations Report, South Sudan |

**Attachment A - Temporary Protected Status (TPS) Legal Authority**

Pursuant to section 244(b)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security, after consultation with appropriate agencies of the Government, may designate a foreign state (or part thereof) for TPS. The Secretary may then grant TPS to eligible nationals of that foreign state (or in the case of an alien having no nationality who last habitually resided in that state). INA § 244(b)(1) sets forth three possible bases on which the Secretary may designate a foreign state for TPS:

- Ongoing armed conflict in the foreign state and, due to such conflict, requiring the return of aliens who are nationals of that state would pose a serious threat to their personal safety;
- An earthquake, flood, drought, epidemic, or other environmental disaster in a foreign state has resulted in a substantial, but temporary, disruption of living conditions in the area affected, the foreign state is unable to handle adequately the return of aliens who are nationals of the state, *and* the foreign state has officially requested TPS designation; or
- Extraordinary and temporary conditions exist in the foreign state that prevent nationals of the state from returning in safety, unless the Secretary finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

An initial TPS designation is at the discretion of the Secretary but may not be less than 6 months or exceed 18 months. INA § 244(b)(2).

At least 60 days before the expiration of a TPS designation, the Secretary, after consultation with appropriate agencies of the Government, shall review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met and, if so, the length of an extension of the TPS designation (6-, 12-, or 18- months). *See* INA § 244(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the TPS designation, she or he must terminate the designation. *See* INA § 244(b)(3)(B). Although the Secretary must make her or his determination on extension or termination at least 60 days before the expiration of the TPS designation, publication of the required *Federal Register* notice announcing the decision must be "on a timely basis." INA § 244(b)(3)(A). If the Secretary does not make a decision under INA § 244(b)(3)(A) that the foreign state no longer meets the conditions for designation, there is an automatic, minimum six-month extension of a country's TPS designation.
*See* INA § 244(b)(3)(C).

After the Secretary designates a country for TPS, nationals of the country (and persons without nationality who last habitually resided in the country) may apply for TPS, but they must individually demonstrate their eligibility pursuant to the criteria established in INA § 244(c) and the TPS regulations at 8 CFR § 244.1 *et seq*. These criteria include, but are not limited to, requirements that the applicant show continuous physical presence in the United States since the effective date of the country designation and continuous residence since such date as the Secretary determines; admissibility as an immigrant (with limited exceptions); that the applicant

is not ineligible under certain mandatory criminal history, terrorism, and national security bars as specified in INA § 244(c)(2)(A)-(B); and that the applicant is registering for TPS in accordance with regulatory procedures in 8 CFR §§ 244.2–244.9.

If granted TPS, the alien receives employment authorization and an Employment Authorization Document, if requested, that is valid for the duration of the TPS designation. TPS is a temporary benefit that does not, by itself, provide aliens with a basis for seeking lawful permanent resident (LPR) status or any other immigration status. However, receipt of TPS benefits will not bar an otherwise eligible alien from adjusting to LPR status or acquiring another lawful immigration status. When a TPS country's designation ends, TPS beneficiaries return to the same immigration status, if any, that they held prior to TPS (unless that status has expired or been terminated) or any other status they may have acquired while registered for TPS.

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
5900 Capital Gateway Drive
Camp Springs, MD 20588

U.S. Citizenship and Immigration Services

# TEMPORARY PROTECTED STATUS (TPS) COUNTRY OF ORIGIN INFORMATION (COI) CONSIDERATIONS: South Sudan (June 2025)[1]

## OVERVIEW

South Sudan is the youngest recognized country in the world, having become independent of Sudan in July 2011.[2] The United States was one of the first countries to recognize South Sudan on the day of its independence, July 9, 2011.[3] For much of its short history, South Sudan has experienced armed violence. Between December 2013 and September 2018, the country was embroiled in a civil war that resulted in widespread insecurity,[4] 400,000 deaths, and the forced displacement of 2.5 million people (more than a fifth of the population).[5] In September 2018, President Salva Kiir of the Sudan People's Liberation Movement-Army signed a peace agreement with a key opposition group, the Sudan People's Liberation Movement-Army in Opposition , led by First Vice President Riek Machar.[6] Implementation of the peace agreement has been slow in recent years.[7] In September 2024, the government announced the postponement of national elections, originally scheduled for December 2024, until December

[1] This report covers the reporting period from May 16, 2023, to June 13, 2025, and also includes information through July 16, 2025 on the U.S. Department of Homeland Security and U.S. Department of State positions toward South Sudan on visas, travel restrictions, and removals.
[2] South Sudan, United Nations Member States List, available at: https://www.un.org/en/about-us/member-states/south-sudan (last visited Jun. 13, 2025).
[3] Statement Recognizing South Sudan as an Independent and Sovereign State, Office of the Federal Register, National Archives and Records Administration, Jul. 9, 2011, available at: https://www.govinfo.gov/app/details/DCPD-201100497 (last visited July 16, 2025).
[4] Country Analysis: South Sudan, ACAPS, available at: https://www.acaps.org/en/countries/south-sudan (last visited Jun. 13, 2025).
[5] Yemisi Adegoke and Nichola Mandil, Why fears are growing of a return of civil war to South Sudan, British Broadcasting Corporation News, Apr. 11, 2025, available at: https://www.bbc.com/news/articles/c7933p4xe7po (last visited Jun. 13, 2025).
[6] The Revitalized Agreement on the Resolution of the Conflict was signed on September 12, 2018, by President Kiir and First Vice President Riek Machar. This was the second peace agreement between the two parties, the first was in July 2016; however, fighting ensued between the parties and Machar left South Sudan shortly thereafter. The Revitalized Agreement on the Resolution of the Conflict addresses various political, security, and judicial factors, including the establishment of a unity government. However, not all of South Sudan's opposition leaders signed the agreement, including a key opposition group, the National Salvation Front. South Sudan Security Situation, European Asylum Support Office, Apr. 24, 2020, pg. 3, available at: https://www.ecoi.net/en/file/local/2028851/2020_04_Q8_COI_South_Sudan_Security_Situation.pdf (last visited Jun. 13, 2025).
[7] Country Analysis: South Sudan, ACAPS, available at: https://www.acaps.org/en/countries/south-sudan (last visited Jun. 13, 2025).

2026.[8] The announcement triggered protests and subsequent repression by government security forces, tightening the space for political dissent and freedom of expression in the country, according to the United Nations Human Rights Council.[9] On March 26, 2025, security forces detained First Vice-President Machar and 22 other political and military personnel – a move that plunged the country into a political crisis.[10] The opposition party the Sudan People's Liberation Movement-Army in Opposition said Machar's detention has effectively collapsed the 2018 peace agreement.[11]

On top of this political turmoil, armed violence has escalated in various parts of the country, including the greater Upper Nile region, the greater Equatoria region, and the greater Bahr el-Ghazal region.[12] According to the U.S. Ambassador to the United Nations, Dorothy Shea, the heightened violence is fueled by the South Sudan government's conviction "that it can perpetually extend its existence while failing to implement key aspects of the peace agreement and failing to use public revenue to address public needs."[13] The United Nations Special Representative of the Secretary-General also warned that South Sudan is on the brink of a renewed civil war that threatens regional stability.[14]

The violence has worsened an already dire humanitarian situation in South Sudan.[15] The country faces chronic food insecurity[16] and a continued economic crisis.[17] Over two-thirds of the

---

[8] International peace guarantors criticise South Sudan election postponement, Reuters, Sep. 19, 2024, available at: https://www.reuters.com/world/africa/international-peace-guarantors-criticise-south-sudan-election-postponement-2024-09-19/ (last visited Jun. 13, 2025).

[9] Technical Assistance and capacity-building for South Sudan: Report of the Office of the United Nations High Commissioner for Human Rights, United Nations Human Rights Council, Feb. 4, 2025, pg. 9, available at: https://www.ecoi.net/en/file/local/2122389/g2501292.pdf (last visited Jun. 13, 2025).

[10] South Sudan says arrested VP Machar tried to stir rebellion, Reuters, Mar. 28, 2025, available at: https://www.reuters.com/world/africa/kenya-sends-former-pm-odinga-defuse-south-sudan-crisis-2025-03-28/ (last visited Jun. 13, 2025).

[11] Wycliffe Muia and Ashley Lime, VP's arrest ends South Sudan peace deal, his party says, British Broadcasting Corporation News, Mar. 27, 2025, available at: https://www.bbc.com/news/articles/c0q1jppzp4no (last visited Jun. 13, 2025).

[12] South Sudan: Briefing and Consultations, Security Council Report, Apr. 15, 2025, available at: https://www.securitycouncilreport.org/whatsinblue/2025/04/south-sudan-briefing-and-consultations-27.php (last visited Jun. 13, 2025).

[13] Remarks at the UN Security Council Briefing on South Sudan, United States Mission to the United Nations, Apr. 16, 2025, available at: https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-south-sudan-6/ (last visited Jun. 13, 2025).

[14] Situation Report #1: South Sudan Humanitarian Crisis, United Nations Population Fund, Apr. 10, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-situation-report-1-february-2025 (last visited Jun. 13, 2025).

[15] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 14, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).

[16] South Sudan Country Brief, World Food Programme, Feb. 28, 2025, pg. 1, available at: https://reliefweb.int/report/south-sudan/wfp-south-sudan-country-brief-february-2025 (last visited Jun. 13, 2025).

[17] Situation Report #1: South Sudan Humanitarian Crisis, United Nations Population Fund, Apr. 10, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-situation-report-1-february-2025 (last visited Jun. 13, 2025).

population are in need of humanitarian assistance.[18] Just in the last three months since March 2025, over 100,000 South Sudanese were newly displaced to neighboring countries by conflict, and 65,000 displaced internally.[19] Meanwhile, the ongoing civil war in neighboring Sudan has displaced over one million people from Sudan to South Sudan,[20] straining already overstretched resources, disrupting aid delivery, and further destabilizing the country of South Sudan.[21]

The relationship between South Sudan and the United States has at times been marred by issues, such as South Sudan's refusal to accept the return of its citizens in a timely manner. This led the U.S. Department of State in April 2025 to take "actions to revoke all visas held by South Sudanese passport holders and to prevent further issuance of visas to prevent entry into the United States by South Sudanese passport holders."[22] On July 4, 2025, the U.S. Department of Homeland Security removed eight criminal aliens to South Sudan, including one South Sudanese citizen.[23] Several days later, on the occasion of South Sudan's independence day on July 9, U.S. Secretary of State Marco Rubio "reaffirm[ed] the friendship between the people of our two countries."[24]

## ARMED VIOLENCE

### History of the Armed Violence

The armed violence in South Sudan stems from a rivalry between two former rebel leaders – President Salva Kiir and his then-Vice President Riek Machar – both of whom played leading roles in the Sudan People's Liberation Movement during the struggle for independence from Sudan.[25] President Kiir, a member of the Dinka ethnic group (who make up approximately 35–40% of the population of South Sudan), and Machar, an ethnic Nuer (who represent about

---

[18] Situation Report #1: South Sudan Humanitarian Crisis, United Nations Population Fund, Apr. 10, 2025, pg. 1, available at: https://reliefweb.int/report/south-sudan/south-sudan-situation-report-1-february-2025 (last visited Jun. 13, 2025).
[19] Escalating conflict in South Sudan forces many thousands to flee just as aid dwindles, United Nations High Commissioner for Refugees, Jun. 3, 2025, available at: https://www.unhcr.org/news/press-releases/escalating-conflict-south-sudan-forces-many-thousands-flee-just-aid-dwindles (last visited Jun. 13, 2025).
[20] Escalating conflict in South Sudan forces many thousands to flee just as aid dwindles, United Nations High Commissioner for Refugees, Jun. 3, 2025, available at: https://www.unhcr.org/news/press-releases/escalating-conflict-south-sudan-forces-many-thousands-flee-just-aid-dwindles (last visited Jun. 13, 2025).
[21] Situation Report #1: South Sudan Humanitarian Crisis, United Nations Population Fund, Apr. 10, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-situation-report-1-february-2025 (last visited Jun. 13, 2025).
[22] Defending America's Security through Visa and Travel Restrictions on South Sudan, U.S. Department of State, Secretary of State Marco Rubio Press Statement, Apr. 5, 2025, available at: https://www.state.gov/defending-americas-security-through-visa-and-travel-restrictions-on-south-sudan/ (last visited July 16, 2025).
[23] 8 Barbaric Criminal Illegal Aliens Finally Deported to South Sudan After Weeks of Delays by Activist Judges, U.S. Department of Homeland Security Press Releases, Jul. 5, 2025, available at: https://www.dhs.gov/news/2025/07/05/8-barbaric-criminal-illegal-aliens-finally-deported-south-sudan-after-weeks-delays (last visited Jul. 16, 2025).
[24] South Sudan National Day, U.S. Department of State, Secretary of State Marco Rubio Press Statement, Jul. 9, 2025, available at: https://www.state.gov/releases/office-of-the-spokesperson/2025/07/south-sudan-national-day/ (last visited July 16, 2025).
[25] Kiir and Machar: insights into South Sudan's strongmen, The Conversation, May 10, 2022, available at: https://theconversation.com/kiir-and-machar-insights-into-south-sudans-strongmen-182522 (last visited June 21, 2025).

15%)[26], came to embody not only competing political factions but also deep-seated ethnic divisions within South Sudan. Tensions came into the open in July 2013 when Kiir dismissed Machar, shortly after Machar had declared his intention to challenge Kiir for the presidency.[27] The political crisis escalated into violence on December 15, 2013, when fighting broke out among rival factions of the presidential guard. This marked the beginning of a civil war in which civilians were targeted largely along Dinka and Nuer lines.[28] Under mounting pressure from global and regional actors, the warring parties eventually signed a peace agreement in 2018, known as the 2018 Revitalized Agreement on the Resolution of the Conflict in the Republic of South Sudan.[29]

South Sudan's resumption of armed violence in March 2025 is deeply rooted in the government's failure to implement the 2018 peace agreement. Although Riek Machar was reinstated as Vice President in 2020 and a unity government was formed, key provisions remain unfulfilled; these include the reintegration of rival commanders into a unified national army, the adoption of a permanent constitution, and transitional justice. The lack of progress on these commitments led to a recurring cycle of violent clashes between government forces and opposition armed groups.[30] Tensions had been simmering since the postponement of national elections in September 2024 and President Kiir's subsequent dismissal and detention of government officials, resulting in incidents of violence such as a deadly shoot-out at the house of dismissed spy chief Akol Koor Kuc in Juba in November 2024.[31] South Sudan has not held national elections since independence in 2011.[32] Many of the government officials dismissed by President Kiir are allies of First Vice President Machar.[33]

Hostilities escalated drastically in March 2025 when the White Army militia – which was allied to Machar during the civil war – attacked a government base in Upper Nile state.[34] Tensions escalated further when Riek Machar was placed on house arrest on March 26, 2025, amid

---

[26] Central Intelligence Agency Factbook—South Sudan, available at: https://www.cia.gov/the-world-factbook/countries/south-sudan/#people-and-society (last visited on Jun. 21, 2025) (last visited June 21, 2025).
[27] South Sudan: Ethnic Targeting, Widespread Killings, Human Rights Watch, Jan. 16, 2024, available at: https://www.hrw.org/news/2014/01/16/south-sudan-ethnic-targeting-widespread-killings (last visited June 21, 2025).
[28] South Sudan: Ethnic Targeting, Widespread Killings, Human Rights Watch, Jan. 16, 2024, available at: https://www.hrw.org/news/2014/01/16/south-sudan-ethnic-targeting-widespread-killings (last visited June 21, 2025).
[29] Instability in South Sudan, Council on Foreign Relations, Mar. 21, 2025, available at: https://www.cfr.org/global-conflict-tracker/conflict/civil-war-south-sudan (last visited June 21, 2025).
[30] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 15, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).
[31] Nichola Mandil, Mystery in South Sudan after sacked spy boss mired in gun battle, British Broadcasting Corporation News, Nov. 22, 2024, available at: https://www.bbc.com/news/articles/cwy10211wplo (last visited Jun. 13, 2025).
[32] Nichola Mandil, South Sudan president sacks top leaders and spy chief, British Broadcasting Corporation News, available at: https://www.bbc.com/news/articles/cj91dmxz7x9o (last visited Jun. 13, 2025).
[33] Nichola Mandil and Danai Nesta Kupemba, General's arrest violates South Sudan peace deal, opposition says, British Broadcasting Corporation News, Mar. 6, 2025, available at: https://www.bbc.com/news/articles/czrnydyy763o (last visited Jun. 13, 2025).
[34] Yemisi Adegoke and Nichola Mandil, Why fears are growing of a return of civil war to South Sudan, British Broadcasting Corporation News, Apr. 11, 2025, available at: https://www.bbc.com/news/articles/c7933p4xe7po (last visited Jun. 13, 2025).

government accusations that he had orchestrated attacks through the White Army militia. The United Nations and Machar's party condemned the move as a serious violation of the 2018 peace agreement.[35] Violence has since been surging in Upper Nile state, neighboring Unity and Jonglei states, and the greater Equatoria and greater Bahr el-Ghazal regions.[36] The violence has not been limited to the warring parties. Rather, the United Nations Global Protection Cluster reports an "alarming escalation of attacks on civilians and civilian infrastructure, deepening the humanitarian crisis in the country."[37] Heightened restrictions on fundamental freedoms have also affected civil society actors, political activists, journalists, humanitarian workers and members of parliament perceived to be critical of the government.[38]

In March 2025, Uganda intervened in the escalating armed violence with a deployment of special forces to the South Sudanese capital, Juba.[39] Amnesty International has alleged that Uganda violated a United Nations Security Council arms embargo by transferring weapons to government forces.[40]

While much of the current violence in South Sudan stems from political consternation at the national level, localized intercommunal clashes also continue to produce "entrenched patterns of violence involving armed youth, such as cattle raiding, border disputes and retaliatory attacks," according to the United Nations Office for the Coordination of Humanitarian Affairs.[41] In some cases, ethnic polarization is a factor in this subnational violence.[42] For example, in January 2024, clashes between two rival factions of the Dinka ethnic group in a land conflict were

---

[35] South Sudan says arrested VP Machar tried to steer rebellion, Reuters, Mar. 28, 2025, available at: https://www.reuters.com/world/africa/kenya-sends-former-pm-odinga-defuse-south-sudan-crisis-2025-03-28/ (last visited June 21, 2025).

[36] South Sudan: Briefing and Consultations, Security Council Report, Apr. 15, 2025, available at: https://www.securitycouncilreport.org/whatsinblue/2025/04/south-sudan-briefing-and-consultations-27.php (last visited Jun. 13, 2025); Situation in South Sudan: Report of the Secretary General, UN Security Council, Apr. 7, 2025, pg. 4, available at: https://reliefweb.int/report/south-sudan/situation-south-sudan-report-secretary-general-s2025211-enarruzh (last visited Jun. 13, 2025).

[37] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 14, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).

[38] Technical Assistance and capacity-building for South Sudan: Report of the Office of the United Nations High Commissioner for Human Rights, United Nations Human Rights Council, Feb. 4, 2025, pg. 9, available at: https://www.ecoi.net/en/file/local/2122389/g2501292.pdf (last visited Jun. 13, 2025).

[39] Uganda says it has deployed troops in South Sudan capital, Reuters, Mar. 11, 2025, available at: https://www.reuters.com/world/africa/uganda-says-special-forces-deploy-south-sudan-capital-amid-tensions-2025-03-11/ (last visited Jun. 13, 2025).

[40] South Sudan: UN Security Council must renew and enforce arms embargo to protect civilians, Amnesty International, May 14, 2025, available at: https://www.amnesty.org/en/latest/news/2025/05/south-sudan-un-security-council-must-renew-and-enforce-arms-embargo-to-protect-civilians/ (last visited Jun. 13, 2025).

[41] South Sudan: Humanitarian Needs and Response Plan, UN Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 6, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).

[42] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 5, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).

reported in the oil-rich border region of Abyei, which is disputed between Sudan and South Sudan, resulting in the killing of more than 50 people, including United Nations peacekeepers.[43]

[43] Sudan-South Sudan border: Clashes kill dozens in disputed Abyei region, British Broadcasting Corporation News, Jan. 29, 2024, available at: https://www.bbc.com/news/world-africa-68134004 (last visited Jun. 13, 2025).

**Regional Updates**

As of February 2020, South Sudan is divided into 10 administrative states; however, these states can also be grouped into broader regions. The states include: Jonglei, Unity, and Upper Nile, encompassing the greater Upper Nile region; Central Equatoria, Eastern Equatoria, and Western Equatoria, encompassing the greater Equatoria region; Lakes and Warrap, encompassing the Lakes region; and Western Bahr el-Ghazal and Northern Bahr el-Ghazal, encompassing the greater Bahr el-Ghazal region.[44]



[45]

*Upper Nile Region*

Tensions have persisted in recent months in the greater Upper Nile region due to President Salva Kiir's unilateral replacement of opposition officials with loyalists from his own party, the Sudan People's Liberation Movement/Army.[46] Opposition politicians, including First Vice President Riek Machar, were also arrested or subjected to house arrest, threatening to shatter the 2018 peace agreement.[47] As a result, the Upper Nile region has seen a deteriorating security situation

[44] David Deng, Compound fractures: Political formations, armed groups and regional mediation in South Sudan, Institute for Security Studies, Dec. 2018, pg. 6, available at: https://issafrica.s3.amazonaws.com/site/uploads/ear-21-1.pdf (last visited Jun. 13, 2025); South Sudan's President makes surprise announcement to return the war-torn country to 10 states, UN Mission in South Sudan, Feb. 15, 2020, available at: https://www.ecoi.net/en/document/2024861.html (last visited Jun. 13, 2025).
[45] Matthew Pritchard and Aly Verjee, South Sudan: From 10 States to 32 States and Back Again, U.S. Institute of Peace, Mar. 1, 2021, available at: https://web.archive.org/web/20210310034143/https://www.usip.org/publications/2021/03/south-sudan-10-states-32-states-and-back-again (last visited Jun. 13, 2025).
[46] South Sudan: Briefing and Consultations, Security Council Report, Apr. 15, 2025, available at: https://www.securitycouncilreport.org/whatsinblue/2025/04/south-sudan-briefing-and-consultations-27.php (last visited Jun. 13, 2025).
[47] Situation Report #1: South Sudan Humanitarian Crisis, United Nations Population Fund, Apr. 10, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-situation-report-1-february-2025 (last visited Jun. 13, 2025).

with intensifying clashes, airstrikes, and intercommunal violence, particularly in Nasir County.[48] Among the opposition factions that began clashing with government forces in February and March 2025 are Machar's the Sudan People's Liberation Movement-Army in Opposition party,[49] as well as the White Army, a local armed youth from the Nuer community.[50] Kiir has accused Machar of supporting the White Army.[51]

On April 16, 2025, U.S. Ambassador to the United Nations, Dorothy Shea, expressed alarm at the "deteriorating security situation in South Sudan," particularly following Machar's detention, including intensified conflict between government and opposition forces involving reported "ground attacks, aerial bombardments, and indiscriminate use of barrel bombs that have killed many civilians and displaced tens of thousands."[52] For example, in March 2025, government forces used improvised incendiary weapons in at least four attacks in Upper Nile state that resulted in the deaths of at least 58 people.[53] Similarly, at least seven people were killed and 20 injured in May 2025 after government helicopter gunships and a drone bombed a market and hospital in Old Fangak in Jonglei state.[54] The United Nations Human Rights Council has also warned about the consequences of this surge in violence in the Upper Nile region for national stability, on top of the political arrests in the capital, Juba. The United Nations has also condemned a March 2025 attack on a United Nations aircraft that resulted in the death of United Nations personnel and labeled it as a "war crime."[55] As a result of the renewed violence, several embassies, including the United States, Germany and Britain, began closing diplomatic facilities or pulling their employees and urging their citizens to leave in late March 2025.[56]

---

[48] Situation Report #1: South Sudan Humanitarian Crisis, United Nations Population Fund, Apr. 10, 2025, pg. 1, available at: https://reliefweb.int/report/south-sudan/south-sudan-situation-report-1-february-2025 (last visited Jun. 13, 2025).
[49] South Sudan Army Attacks Displace Thousands in Nasir, Human Rights Watch, Feb. 27, 2025, available at: https://www.ecoi.net/en/document/2122356.html (last visited Jun. 13, 2025).
[50] South Sudan: UN Official Calls on All Parties to Protect Children, as Dire Situation in Country Increases Risks of Grave Violations, United Nations Office of the Special Representative of the Secretary-General for Children and Armed Conflict, Mar. 26, 2025, available at: https://reliefweb.int/report/south-sudan/south-sudan-un-official-calls-all-parties-protect-children-dire-situation-country-increases-risks-grave-violations (last visited Jun. 13, 2025).
[51] South Sudan: Briefing and Consultations, Security Council Report, Apr. 15, 2025, available at: https://www.securitycouncilreport.org/whatsinblue/2025/04/south-sudan-briefing-and-consultations-27.php (last visited Jun. 13, 2025).
[52] Remarks at the UN Security Council Briefing on South Sudan, United States Mission to the United Nations, Apr. 16, 2025, available at: https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-south-sudan-6/ (last visited Jun. 13, 2025).
[53] South Sudan: Incendiary Bombs Kill, Burn Civilians, Human Rights Watch, Apr. 9, 2025, available at: https://www.hrw.org/news/2025/04/09/south-sudan-incendiary-bombs-kill-burn-civilians (last visited Jun. 13, 2025).
[54] Will Ross and Natasha Booty, Seven killed in South Sudan hospital and market bombing, charity says, British Broadcasting Corporation News, May 4, 2025, available at: https://www.bbc.com/news/articles/cm2536m9r2eo (last visited Jun. 13, 2025).
[55] South Sudan's Leaders Must Avert another Deadly Crisis and Uphold Peace Agreement, Urges UN Commission, United Nations Human Rights Council, Mar. 8, 2025, available at: https://www.ohchr.org/en/press-releases/2025/03/south-sudans-leaders-must-avert-another-deadly-crisis-and-uphold-peace (last visited Jun. 13, 2025).
[56] Katharine Houreld, South Sudan's president arrests VP, opposition says, risking imminent war, The Washington Post, Mar. 27, 2025, available at: https://www.washingtonpost.com/world/2025/03/27/south-sudan-president-arrest-civil-war-machar/ (last visited Jun. 13, 2025).

In addition, the Upper Nile region continues to face ongoing intra/intercommunal violence among multiple ethnic groups across several states.[57] For example, "[i]n Jonglei, cattle raids and abductions attributed to Murle elements increased with the onset of the dry season, leading to mobilizations by Lou Nuer and Dinka Bor intending to attack the Greater Pibor Administrative Area, although an attack has not yet taken place," according to the United Nations Secretary-General's report in January 2025.[58]

***Equatoria Region***

In the greater Equatoria Region, the National Salvation Front militia has been one of the dominant actors. The founder of the National Salvation Front, Thomas Cirillo Swaka, was the chief of staff of the South Sudan Opposition Group but left the group to form the National Salvation Front after disagreements over federal systems of governance.[59] The National Salvation Front has continued its insurgency in parts of Central Equatoria with abuses against civilians and has refused to participate in the Tumaini peace talks in Kenya with the South Sudanese government since they were launched in May 2024,[60] citing security concerns and a lack of consultation.[61] In September 2024, the government alleged that National Salvation Front militants were responsible for a deadly attack on a bus leaving the capital, Juba, for Kampala, Uganda.[62] Adding to the complexity of violence in this region, the National Salvation Front has broken up into a variety of splinter groups.[63] The army has responded militarily to National Salvation Front presence in Central and Western Equatoria states, exacerbating concern for the protection of civilians.[64] Government forces have reportedly engaged in harassment and arbitrary arrests of people in the region over mere suspicion of National Salvation Front affiliation,[65] raising concerns about denial of due process.[66]

---

[57] Situation in South Sudan: Report of the Secretary-General, United Nations Security Council, Jan. 24, 2025, pg. 4, available at: https://www.ecoi.net/en/file/local/2121112/n2500756.pdf (last visited Jun. 13, 2025).
[58] Situation in South Sudan: Report of the Secretary-General, United Nations Security Council, Jan. 24, 2025, pg. 4, available at: https://www.ecoi.net/en/file/local/2121112/n2500756.pdf (last visited Jun. 13, 2025).
[59] Lois Ewuraesi Osei, An Analysis of the Challenges to the Implementation of the Revitalised Agreement on the Resolution of Conflict in South Sudan from 2018 to 2022, Minor Dissertation, University of Cape Town, 2023, available at: https://open.uct.ac.za/server/api/core/bitstreams/97550ef7-2883-4493-9236-18b1e5105e13/content (last visited Jun. 23, 2025).
[60] Tumaini peace talks between South Sudan Government and hold-out groups resume in Nairobi, United Nations Mission in South Sudan, Dec. 5, 2024, available at: https://unmiss.unmissions.org/tumaini-peace-talks-between-south-sudan-government-and-hold-out-groups-resume-nairobi (last visited Jun. 13, 2025).
[61] World Report: South Sudan, Human Rights Watch, Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120118.html (last visited Jun. 13, 2025).
[62] Nichola Mandil, Kidnap fears follow deadly South Sudan bus attack, British Broadcasting Corporation News, Sep. 24, 2024, available at: https://www.bbc.com/news/articles/c4g52kwwz9no (last visited Jun. 13, 2025).
[63] Situation in South Sudan: Report of the Secretary-General, United Nations Security Council, Jan. 24, 2025, pg. 4, available at: https://www.ecoi.net/en/file/local/2121112/n2500756.pdf (last visited Jun. 13, 2025).
[64] Situation in South Sudan: Report of the Secretary-General, United Nations Security Council, Jan. 24, 2025, pg. 4, available at: https://www.ecoi.net/en/file/local/2121112/n2500756.pdf (last visited Jun. 13, 2025).
[65] Situation in South Sudan: Report of the Secretary-General, United Nations Security Council, Jan. 24, 2025, pg. 4-5, available at: https://www.ecoi.net/en/file/local/2121112/n2500756.pdf (last visited Jun. 13, 2025).
[66] Technical Assistance and capacity-building for South Sudan: Report of the Office of the United Nations High Commissioner for Human Rights, United Nations Human Rights Council, Feb. 4, 2025, pg. 3, available at: https://www.ecoi.net/en/file/local/2122389/g2501292.pdf (last visited Jun. 13, 2025).

On the local level, the United Nations Mission in South Sudan reported escalating intercommunal violence in Eastern Equatoria between cattle keepers and settled farming communities, particularly in and around Magwi county, which reportedly led to retaliatory fighting and civilian displacement in Agoro, Chomboro, Obama and Ayiii villages, as well as Lokiliri in neighboring Central Equatoria state.[67] Likewise in Western Equatoria, the security situation remained fragile due to ongoing intercommunal violence.[68] Retaliatory attacks involving the Azande and Balanda communities persisted despite government security force presence in the area, resulting in 21 civilians killed and 15 injured, the United Nations reported in January 2025.[69]

***Bahr el-Ghazal Region***

Insecurity and violence in the greater Bahr el-Ghazal region remains influenced by various factors, including a complex network of intra/intercommunal conflicts involving multiple ethnic groups.[70] In April 2025, a United Nations Secretary-General report on South Sudan assessed that this region is seeing an increase in revenge attacks and ethnic violence, despite the deployment of security forces and calls from the government for armed actors to disarm.[71]

**United Nations Peacekeeping Mission**

As of February 2025, the United Nations Mission in the Republic of South Sudan includes approximately 18,120 uniformed personnel, comprising 17,000 military troops along with police, civilian experts, and United Nations volunteers.[72] The mission's mandate includes the protection of civilians, facilitation of humanitarian assistance, and support of the peace process. United

---

[67] UNMISS gravely concerned by escalating violence in Eastern Equatoria, calls for restraint, United Nations Mission in South Sudan, Feb. 2, 2025, available at: https://www.ecoi.net/en/file/local/2121503/press_release_unmiss_gravely_concerned_by_escalating_violence_in_eastern_equatoria_calls_for_restraint_.pdf (last visited Jun. 13, 2025).
[68] Situation in South Sudan: Report of the Secretary-General, United Nations Security Council, Jan. 24, 2025, pg. 5, available at: https://www.ecoi.net/en/file/local/2121112/n2500756.pdf (last visited Jun. 13, 2025).
[69] Situation in South Sudan: Report of the Secretary-General, United Nations Security Council, Jan. 24, 2025, pg. 5, available at: https://www.ecoi.net/en/file/local/2121112/n2500756.pdf (last visited Jun. 13, 2025).
[70] Situation in South Sudan: Report of the Secretary General, United Nations Security Council, Apr. 7, 2025, pg. 5, available at: https://reliefweb.int/report/south-sudan/situation-south-sudan-report-secretary-general-s2025211-enarruzh (last visited Jun. 13, 2025).
[71] Situation in South Sudan: Report of the Secretary General, United Nations Security Council, Apr. 7, 2025, pg. 5, available at: https://reliefweb.int/report/south-sudan/situation-south-sudan-report-secretary-general-s2025211-enarruzh (last visited Jun. 13, 2025) ("In Greater Tonj, Warrap, 55 intra-Dinka communal violence incidents were recorded with the onset of the dry season, resulting in 125 killed, 115 injured and four abductions. In Tonj North, clashes among subclans in Awul, Rualbet and Kirik payams resulted in 34 killed and 48 injured in 12 incidents. Despite interventions by state and religious authorities and the deployment of security forces, there was an increase in revenge attacks. The intervention of the South Sudan People's Defence Forces also reignited long-standing tensions with the Dinka from Rualbet and Bul Nuer youth, who in the past have clashed on several occasions with the security forces. In Tonj East, the conflict between Dinka Akook, Dinka Thiik and Dinka Luanyjang resumed, jeopardizing the implementation of resolutions reached at the Tonj East peace dialogue in November 2024. Clashes resulted in 9 killed and 21 injured in seven incidents. The Luanyjang community have recently been involved in conflicts with nearly all neighbouring communities, isolating themselves in the region. Although the Governor called for disarmament of the youths in Greater Tonj to mitigate communal violence, logistical challenges hinder the operation and previous disarmament efforts have failed.").
[72] UNMISS Fact sheet, United Nations, June 21, 2022, available at: https://peacekeeping.un.org/en/mission/unmiss

Nations Mission in the Republic of South Sudan was first established on July 9, 2011, by Security Council Resolution 1996, to help the world's newest nation consolidate peace and security and help establish conditions for development. Due to recurring armed violence and widespread violence, the mission has been renewed multiple times.[73] Most recently, the mission was renewed by Resolution 2779 on May 8, 2025, with its current mandate set to expire on April 30, 2026.[74]

**Recent Peace Negotiations**

Since First Vice President Riek Machar was placed under house arrest in late March 2025, several regional and international actors have urgently stepped in to mediate South Sudan's escalating crisis. The East African Community, led by Kenya's former Prime Minister Raila Odinga (acting on behalf of President Ruto), arrived in late March to encourage dialogue and restraint, although Odinga was reportedly denied access to Machar.[75] Additionally, the African Union dispatched its "Council of the Wise" – including former Burundian President Domitien Ndayizeye and Kenyan judge Effie Owuor – to Juba in early April 2025, to urge Machar's unconditional release and a renewed commitment to the 2018 peace agreement.[76] Western diplomats in Juba and local church leaders have also appealed for renewed dialogue between the parties to the conflict.[77] According to the Institute for Security Studies, despite these mediation efforts, persistent mistrust between President Kiir and Machar continues to erode the 2018 agreement, leaving the peace process fragile and uncertain.[78]

**Risks to Women and Children**

Women and children are particularly vulnerable populations in the context of the escalating armed violence in South Sudan. The World Food Programme reported in March 2025 that the ongoing hostilities in the country are resulting in the exploitation and abuse of women and children, including conflict-related sexual violence.[79] Sexual violence has been used as a war tactic in South Sudan to exact revenge and displace and terrorize populations.[80] The United

---

[73] UNMISS, United Nations, available at https://unmiss.unmissions.org/background (last visited on June 21, 2025)
[74] Security Council Extends Mandate of UN Mission in South Sudan for One Year, Adopting Resolution 2779 (2025) by Vote of 12 in Favor with 3 Abstentions, United Nations, May 8, 2025, available at: https://press.un.org/en/2025/sc16059.doc.htm
[75] South Sudan says arrested VP Machar tried to stir rebellion, Reuters, March 28, 2025, available at: https://www.reuters.com/world/africa/kenya-sends-former-pm-odinga-defuse-south-sudan-crisis-2025-03-28/
[76] African Union mediators arrive in South Sudan to try to rescue peace deal, Reuters, April 3, 2025, available at: https://www.reuters.com/world/africa/african-union-mediators-arrive-south-sudan-try-rescue-peace-deal-2025-04-02/
[77] South Sudan's shaky peace is at risk of collapse. Can it be saved? Chatham House, April 9, 2025, available at: https://www.chathamhouse.org/2025/04/south-sudans-shaky-peace-risk-collapse-can-it-be-saved).
[78] Urgent action needed to steer South Sudan along path to peace, Institute for Security Studies, April 23, 2025, available at: https://issafrica.org/pscreport/psc-insights/urgent-action-needed-to-steer-south-sudan-along-path-to-peace
[79] South Sudan Annual Country Report 2024, World Food Programme, Apr. 3, 2025, pg. 28, https://reliefweb.int/report/south-sudan/south-sudan-annual-country-report-2024-country-strategic-plan-2023-2025 (last visited Jun. 13, 2025).
[80] Technical Assistance and capacity-building for South Sudan: Report of the Office of the United Nations High Commissioner for Human Rights, United Nations Human Rights Council, Feb. 4, 2025, pg. 12, available at: https://www.ecoi.net/en/file/local/2122389/g2501292.pdf (last visited Jun. 13, 2025).

Nations Special Representative for Children and Armed Conflict assessed in March 2025 that armed conflict in the greater Upper Nile region poses grave risks for children given the indiscriminate targeting of civilians, threatening important gains made in child protection since the 2018 peace agreement.[81] The separation of children from their families caused by the ongoing insecurity has resulted in "severe consequences including trafficking, child labor, early marriage, school dropout, and the recruitment and use of children within host communities, internally displaced persons, returnees, and instances of abduction," per the United Nations Protection Cluster.[82]

Even prior to the most recent escalation in hostilities, children in South Sudan were already a vulnerable population facing physical and sexual violence, recruitment into armed groups, psychological distress, and limited access to essential services.[83] Women and girls in the country also face forms of harm deeply rooted in traditional structures, societal and tribal inequalities, and weak rule of law and governance.[84] Sex-based harm includes early and forced marriage,[85] as well as sexual violence, which results not only in physical injuries and sexually transmitted diseases, but also psychological trauma leading to emotional distress and, in extreme cases, suicide.[86]

## HUMANITARIAN NEED

Out of South Sudan's estimated population of 12.2 million people,[87] about 9.3 million (or 76.2 percent) are determined to be in need of humanitarian assistance.[88] This number is up

[81] South Sudan: UN Official Calls on All Parties to Protect Children, as Dire Situation in Country Increases Risks of Grave Violations, United Nations Office of the Special Representative of the Secretary-General for Children and Armed Conflict, Mar. 26, 2025, available at: https://reliefweb.int/report/south-sudan/south-sudan-un-official-calls-all-parties-protect-children-dire-situation-country-increases-risks-grave-violations (last visited Jun. 13, 2025).
[82] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 10, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).
[83] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 29, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).
[84] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 4, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).
[85] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 10, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).
[86] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 5, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).
[87] World Population Dashboard: South Sudan, United Nations Population Fund, 2024, available at: https://www.unfpa.org/data/world-population/SS (last visited Jun. 13, 2025).
[88] European Civil Protection and Humanitarian Aid Operations, European Commission, Apr. 4, 2025, available at https://civil-protection-humanitarian-aid.ec.europa.eu/where/africa/south-sudan_en#:~:text=Related%20information-,Introduction,the%20already%20stressed%20health%20system.

significantly from the 6.4 million in need of such assistance in 2015.[89] The most pressing drivers of the increased need for humanitarian aid are ongoing conflict, deteriorating economic conditions, environmental shocks, and the influx of returnees and refugees to the country.[90]

[89] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 10, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).
[90] South Sudan Health Cluster #01, Health Cluster, World Health Organization, Mar. 10, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-health-cluster-bulletin-01-january-2025 (last visited Jun. 13, 2025).

## FOOD SECURITY

South Sudan has faced long-term chronic food and nutrition insecurity with millions facing acute food insecurity.[91] South Sudanese are currently experiencing some of the highest levels of food insecurity since South Sudan became an independent nation in July 2011.[92] Almost 7.7 million people (about 63 percent of South Sudanese) face hunger levels categorized by the World Food Programme as crisis, emergency, or catastrophic).[93] As a result, malnutrition remains a significant concern in the country,[94] with alarmingly high levels of acute malnutrition reported, according to the United Nations Office for the Coordination of Humanitarian Affairs.[95] In fact, South Sudan is one of the 12 countries identified by the United Nations agency for children in which malnutrition has spiked among pregnant or breastfeeding women, leading to irreversible consequences for children's survival and growth.[96] Continued armed violence is one of the main causes of food scarcity in South Sudan today,[97] in addition to the economic downturn and environmental shocks.[98] About 3.1 million people of the 7.7 million facing crisis, emergency, or catastrophic levels of hunger are in the conflict-hit greater Upper Nile region.[99] Displaced people are also among the worst affected. Almost half of those facing catastrophic levels of hunger in South Sudan were displaced by the civil war in Sudan since April 2023.[100]

[91] South Sudan Annual Country Report 2024, World Food Programme, Apr. 3, 2025, pg. 3, https://reliefweb.int/report/south-sudan/south-sudan-annual-country-report-2024-country-strategic-plan-2023-2025 (last visited Jun. 13, 2025).
[92] Vibhu Mishra, South Sudan: Conflict and hunger push millions to the brink, United Nations News, Apr. 9, 2025, available at: https://news.un.org/en/story/2025/04/1162046 (last visited June 13, 2025).
[93] Hunger hotspots in South Sudan at tipping point as food insecurity nears record levels, World Food Programme , Apr. 9, 2025, available at: https://www.wfp.org/news/hunger-hotspots-south-sudan-tipping-point-food-insecurity-nears-record-levels (last visited Jun. 13, 2025).
[94] South Sudan Health Cluster #01, Health Cluster, World Health Organization, Mar. 10, 2025, pg. 3, available at: https://reliefweb.int/report/south-sudan/south-sudan-health-cluster-bulletin-01-january-2025 (last visited Jun. 13, 2025).
[95] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 10, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).
[96] Emily McGarvey, Malnutrition in pregnancy surges in poor countries, Mar. 7, 2023, available at: https://www.bbc.com/news/world-64870841 (last visited Jun. 13, 2025).
[97] Vibhu Mishra, South Sudan: Conflict and hunger push millions to the brink, United Nations News, Apr. 9, 2025, available at: https://news.un.org/en/story/2025/04/1162046 (last visited June 13, 2025).
[98] South Sudan Country Brief, World Food Programme, Feb. 28, 2025, pg. 1, available at: https://reliefweb.int/report/south-sudan/wfp-south-sudan-country-brief-february-2025 (last visited Jun. 13, 2025).
[99] Hunger hotspots in South Sudan at tipping point as food insecurity nears record levels, World Food Programme, Apr. 9, 2025, available at: https://www.wfp.org/news/hunger-hotspots-south-sudan-tipping-point-food-insecurity-nears-record-levels (last visited Jun. 13, 2025).
[100] Hunger hotspots in South Sudan at tipping point as food insecurity nears record levels, World Food Programme, Apr. 9, 2025, available at: https://www.wfp.org/news/hunger-hotspots-south-sudan-tipping-point-food-insecurity-nears-record-levels (last visited Jun. 13, 2025).

## HEALTHCARE

South Sudan is facing multiple health emergencies.[101] Since October 2024, the country has been grappling with a cholera outbreak.[102] As of the end of December 2024, 612 cholera cases have been reported across 32 countries, resulting in 488 deaths and a fatality rate of 1.9 percent.[103] Malaria cases also remain high in South Sudan, with 81,085 reported cases.[104] Measles outbreaks are widespread at 3,501 suspected cases and 51 deaths reported since 2024.[105] Finally, 13 cases of circulating vaccine-derived poliovirus type-2 have been confirmed.[106] Difficulties combatting these multiple disease outbreaks stem from significant gaps in timely detection, reporting, investigation and response.[107] Some people in the country experience outbreaks of multiple diseases simultaneously.[108] In total, 19 out of the 20 neglected tropical diseases are present in South Sudan.[109, 110] Only 44 percent of the population live within reach of health facilities with consistent access to primary care, and those facilities are generally poorly equipped and staffed.[111]

---

[101] South Sudan Health Cluster #01, Health Cluster, World Health Organization, Mar. 10, 2025, pg. 3, available at: https://reliefweb.int/report/south-sudan/south-sudan-health-cluster-bulletin-01-january-2025 (last visited Jun. 13, 2025).
[102] South Sudan Situation Report #331, World Food Programme, Mar. 4, 2025, available at: https://reliefweb.int/report/south-sudan/wfp-south-sudan-situation-report-331-31-january-2025 (last visited Jun. 13, 2025).
[103] South Sudan Health Cluster #01, Health Cluster, World Health Organization, Mar. 10, 2025, pg. 3, available at: https://reliefweb.int/report/south-sudan/south-sudan-health-cluster-bulletin-01-january-2025 (last visited Jun. 13, 2025).
[104] South Sudan Health Cluster #01, Health Cluster, World Health Organization, Mar. 10, 2025, pg. 3, available at: https://reliefweb.int/report/south-sudan/south-sudan-health-cluster-bulletin-01-january-2025 (last visited Jun. 13, 2025).
[105] South Sudan Health Cluster #01, Health Cluster, World Health Organization, Mar. 10, 2025, pg. 3, available at: https://reliefweb.int/report/south-sudan/south-sudan-health-cluster-bulletin-01-january-2025 (last visited Jun. 13, 2025).
[106] South Sudan Health Cluster #01, Health Cluster, World Health Organization, Mar. 10, 2025, pg. 3, available at: https://reliefweb.int/report/south-sudan/south-sudan-health-cluster-bulletin-01-january-2025 (last visited Jun. 13, 2025).
[107] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 7, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).
[108] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 7, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).
[109] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 7, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).
[110] The World Health organization runs a Neglected Tropical Diseases Programme in South Sudan and other countries to combat the continuing public health challenges posed by a group of 20 diseases prevalent in Africa. South Sudan is unique in having 19 of the 20 diseases prevalent within its territory.
[111] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 7, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).

## FLOODS

Among South Sudan's estimated population of 12.2 million people,[112] about 1.4 million (or 11.5 percent) have been affected by a spate of highly destructive floods in 2024[113] – one of the worst flood seasons the country has seen in decades.[114] Floods typically peak in October and November.[115] About 380,000 people were displaced by floods in 22 counties, leading them to seek shelter on higher ground and food assistance.[116] The floods have had a severe impact, particularly for already vulnerable communities, resulting in home destruction, crop damage, loss of livestock, loss of livelihood, damage to health facilities and water infrastructure, and loss of livelihood.[117] Some of the flood water mixed with chemical pollutants and contaminated water sources.[118]

## ECONOMY

South Sudan is experiencing what the United Nation Office for the Coordination of Humanitarian Affairs has labeled a "severe economic crisis,"[119] stemming from the instability of the ongoing conflict, rising inflation, the displacement of hundreds of thousands from Sudan to South Sudan, and disruptions to the flow of commercial supplies.[120] The collapse of oil production since February 2024 has also negatively impacted the economy and brought basic public services to a halt.[121] The oil sector is the primary driver of the South Sudanese economy, accounting for 50 to 60 percent of gross domestic product and 80 to 90 percent of government

---

[112] World Population Dashboard: South Sudan, United Nations Population Fund, 2024, available at: https://www.unfpa.org/data/world-population/SS (last visited Jun. 13, 2025).
[113] South Sudan: Floods Snapshot, United Nations Office for the Coordination of Humanitarian Affairs, Nov. 29, 2024, available at: https://reliefweb.int/report/south-sudan/south-sudan-floods-snapshot-29-november-2024 (last visited Jun. 13, 2025).
[114] Nichola Mandil, A million people hit by flooding in South Sudan, British Broadcasting Corporation News, Oct. 21, 2024, available at: https://www.bbc.com/news/articles/cgey3e7yrvxo (last visited Jun. 13, 2025).
[115] Situation in South Sudan: Report of the Secretary-General, United Nations Security Council, Jan. 24, 2025, pg. 9-10, available at: https://www.ecoi.net/en/file/local/2121112/n2500756.pdf (last visited Jun. 13, 2025).
[116] Situation in South Sudan: Report of the Secretary-General, United Nations Security Council, Jan. 24, 2025, pg. 5, available at: https://www.ecoi.net/en/file/local/2121112/n2500756.pdf (last visited Jun. 13, 2025).
[117] South Sudan Floods – Operation Updates, International Federation of Red Cross and Red Crescent Societies, Feb. 26, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-floods-operation-update-mdrss014 (last visited Jun. 13, 2025).
[118] Maura Ajak and Stephanie Stafford, 'Dying of thirst' as climate-driven floods mix with oil, British Broadcasting Corporation News, Nov. 10, 2024, available at: https://www.bbc.com/news/articles/c4gpmx7z0xno (last visited Jun. 13, 2025).
[119] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 10, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025). See also: The World Bank in South Sudan, World Bank, available at: https://www.worldbank.org/en/country/southsudan/overview (last visited on Jun. 30, 2025).
[120] South Sudan Annual Country Report 2024, World Food Programme, Apr. 3, 2025, pg. 3, https://reliefweb.int/report/south-sudan/south-sudan-annual-country-report-2024-country-strategic-plan-2023-2025 (last visited Jun. 13, 2025).
[121] Situation Report #1: South Sudan Humanitarian Crisis, United Nations Population Fund, Apr. 10, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-situation-report-1-february-2025 (last visited Jun. 13, 2025).

revenue.[122] Moreover, the World Bank found that "rampant inflation has created a cost-of-living crisis, pushing households deeper into poverty."[123] About 76 percent of the population lives below the poverty line.[124] South Sudan currently has an annual percent change in Gross Domestic Product of -4.3% and an annual inflation rate of 65.7 percent.[125] These economic conditions have caused the cost of living to soar nationwide, impacting the ability of Southern Sudanese people to put food on the table and meet other basic needs.[126] The armed violence in Sudan has significantly reduced foreign trade and trade routes, which affects livelihoods directly given that the country is heavily dependent on imports to meet its domestic demand for staple foods, fuel, medicine, and intermediate and capital goods.[127]

## TOURISM

South Sudan does not have formal tourism industry infrastructure in place on any level, and the Department of State warns potential tourists that they would be traveling at their own risk without emergency response and subsequent appropriate medical treatment available.[128] On March 8, 2025, the Department of State also ordered the departure of non-emergency U.S. government staff from the country due to the current hostilities and violent crime threatening foreign nationals:

> Armed conflict is ongoing and includes fighting between various political and ethnic groups. Weapons are readily available to the population. In addition, cattle raids occur throughout the country and often lead to violence. Violent crime, such as carjackings, shootings, ambushes, assaults, robberies, and kidnappings are common throughout South Sudan, including Juba. Foreign nationals have been the victims of rape, sexual assault, armed robberies, and other violent crimes. […] The U.S. government has limited ability to provide emergency consular services to U.S. citizens in South Sudan. U.S. government personnel working in South Sudan are under a strict curfew. They must use armored vehicles for nearly all movements, and official travel outside Juba is limited. Due to the

---

[122] South Sudan Economic Monitor, The World Bank, Mar. 2025, pg. 21, available at: https://documents1.worldbank.org/curated/en/099031825031520159/pdf/P500556-9f568594-b30c-4fcc-bb7a-b96df92ed5fd.pdf (last visited Jun. 13, 2025).

[123] South Sudan Economic Monitor, The World Bank, Mar. 2025, pg. x, available at: https://documents1.worldbank.org/curated/en/099031825031520159/pdf/P500556-9f568594-b30c-4fcc-bb7a-b96df92ed5fd.pdf (last visited Jun. 27, 2025).

[124] Situation Report #1: South Sudan Humanitarian Crisis, United Nations Population Fund, Apr. 10, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-situation-report-1-february-2025 (last visited Jun. 13, 2025).

[125] South Sudan, Republic of: Datasets, World Economic Outlook, International Monetary Fund, Apr. 2025, available at: https://www.imf.org/external/datamapper/profile/SSD (last visited Jun. 13, 2025).

[126] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 10, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).

[127] South Sudan Economic Monitor, The World Bank, Mar. 2025, pg. 27, available at: https://documents1.worldbank.org/curated/en/099031825031520159/pdf/P500556-9f568594-b30c-4fcc-bb7a-b96df92ed5fd.pdf (last visited Jun. 13, 2025).

[128] South Sudan International Travel Information, U.S. Department of State, Mar. 8, 2025, available at: https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SouthSudan.html#/ (last visited Jun. 13, 2025).

critical crime threat in Juba, walking is also restricted; when allowed, it is limited to a small area in the immediate vicinity of the Embassy and during daylight hours only.[129]

## INFRASTRUCTURE

The armed violence in South Sudan has targeted civilian infrastructure, deepening the humanitarian crisis in the country.[130] The country lacks fundamental infrastructure, such as a reliable road network, which is regularly damaged in floods during the rainy season, rendering vast areas of the country inaccessible.[131] There are very few paved roads and those that do exist are narrow, rutted, and poorly maintained.[132] Housing is a critical protection concern for 1.17 million people in need due to illegal occupation, forced eviction, and land and property grabbing, according to UN Office for the Coordination of Humanitarian Affairs.[133] Weak legal frameworks and dispute resolution mechanisms compound housing risks and exacerbate community conflicts.[134]

## RETURN TO SOUTH SUDAN

Ongoing since April 2023, the civil war in neighboring Sudan has displaced over one million people to South Sudan.[135] Among those displaced from Sudan to South Sudan, 69.5 percent are returning South Sudanese citizens, and 30 percent are Sudanese refugees.[136] Approximately 51 percent are female and 18 percent children under five years old.[137] The influx of displaced people from Sudan has strained already overstretched resources in South Sudan, disrupted aid

---

[129] South Sudan Travel Advisory, U.S. Department of State, Mar. 8, 2025, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/south-sudan-travel-advisory.html (last visited Jun. 13, 2025).
[130] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 14, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).
[131] South Sudan Country Report, Bertelsmann Transformation Index, Bertelsmann Stiftung, 2024, pg. 6, available at: https://bti-project.org/en/reports/country-report/SSD (last visited Jun. 13, 2025).
[132] South Sudan International Travel Information, U.S. Department of State, Mar. 8, 2025, available at: https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SouthSudan.html#/ (last visited Jun. 13, 2025).
[133] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 29-30, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).
[134] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 29-30, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).
[135] Escalating conflict in South Sudan forces many thousands to flee just as aid dwindles, United Nations High Commissioner for Refugees, Jun. 3, 2025, available at: https://www.unhcr.org/news/press-releases/escalating-conflict-south-sudan-forces-many-thousands-flee-just-aid-dwindles (last visited Jun. 13, 2025).
[136] South Sudan Health Cluster #01, Health Cluster, World Health Organization, Mar. 10, 2025, pg. 6, available at: https://reliefweb.int/report/south-sudan/south-sudan-health-cluster-bulletin-01-january-2025 (last visited Jun. 13, 2025).
[137] South Sudan Health Cluster #01, Health Cluster, World Health Organization, Mar. 10, 2025, pg. 6, available at: https://reliefweb.int/report/south-sudan/south-sudan-health-cluster-bulletin-01-january-2025 (last visited Jun. 13, 2025).

delivery, and further destabilized the country.[138] It has also exacerbated food insecurity and eroded traditional livelihood systems.[139] The sheer volume of arrivals has overwhelmed South Sudan's limited infrastructure, particularly in border areas and transit centers, where congestion heightens the risk of violence and health outbreaks.[140] After displaced people reach their destinations, they face a host of reintegration challenges, including: food insecurity, flood impacts, economic hardships, limited access to healthcare and education, lack of civil documentation, and lack of affordable housing.[141] In this way, the war in Sudan has had a "cascading" humanitarian impact in South Sudan and increased the demand for protective services exponentially, according to the United Nations Global Protection Cluster.[142]

Separately, recent diplomatic developments between the U.S. Department of State and South Sudan's transitional government indicate South Sudan's willingness to ensure the safety and reintegration of its returning nationals. In response to Secretary of State Rubio's April 5, 2025, statement compelling South Sudan to "accept the return of its citizens in a timely manner when… the United States… seeks to remove them,"[143] the Foreign Ministry of South Sudan clarified that "the government of South Sudan has consistently maintained open communication and cooperation with U.S. authorities regarding immigration and deportation matters. The government welcomes all its citizens whether they are returning voluntarily or through deportation processes."[144] Subsequently, the South Sudanese government accepted a deportee believed to be a South Sudanese national,[145] and also accepted a deported South Sudanese national as part of the group of eight aliens who arrived in South Sudan on July 4, 2025.[146]

---

[138] Situation Report #1: South Sudan Humanitarian Crisis, United Nations Population Fund, Apr. 10, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-situation-report-1-february-2025 (last visited Jun. 13, 2025).
[139] South Sudan: deepening humanitarian crisis in Upper Nile amid mass displacement from Sudan, REACH, Feb. 2025, available at: https://repository.impact-initiatives.org/document/impact/2da73b1c/REACH-South-Sudan_Upper-Nile-State-Alert_February-2025.pdf (last visited Jun. 13, 2025).
[140] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 7, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).
[141] South Sudan: Humanitarian Needs and Response Plan, United Nations Office for the Coordination of Humanitarian Affairs, Dec. 16, 2024, pg. 7, available at: https://reliefweb.int/report/south-sudan/south-sudan-humanitarian-needs-and-response-plan-2025-december-2024 (last visited Jun. 13, 2025).
[142] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).
[143] Defending America's Security through Visa and Travel Restrictions on South Sudan, U.S. Department of State, Apr. 5, 2025, available at: https://www.state.gov/defending-americas-security-through-visa-and-travel-restrictions-on-south-sudan/ (last visited July 17, 2025).
[144] South Sudan says it rejected U.S. deportee because he was from DRC, United Press International, Apr. 8, 2025, available at: https://www.upi.com/Top_News/US/2025/04/08/South-Sudan-deport-visa-revoke/8401744112006/ (last visited July 17, 2025).
[145] South Sudan says it will accept deportee amid Rubio's visa revocations, AXIOS, Apr. 8, 2025, available at: https://www.axios.com/2025/04/07/south-sudan-rubio-visa-revocation (last visited July 17, 2025).
[146] Los Angeles Times, U.S. completes deportation of 8 men to South Sudan after weeks of legal wrangling, Jul. 5, 2025, available at https://www.msn.com/en-us/news/world/us-completes-deportation-of-8-men-to-south-sudan-after-weeks-of-legal-wrangling/ar-AA1I2eRU, (last visited Jul. 8, 2025).

## RELOCATION WITHIN SOUTH SUDAN

Among the estimated population of 12.2 million people in South Sudan,[147] approximately 1.8 million (or 14.8 percent) are internally displaced persons.[148] Between late February and early June 2025, 65,000 South Sudanese were internally displaced by the escalating armed violence in the country (in addition to the 100,000 newly displaced to neighboring countries).[149] In addition to conflict (whether at the national level or locally driven), the environmental shocks caused by consecutive flooding are also a driver of internal displacement.[150] Internally displaced persons face many of the same challenges as returnees from Sudan in terms of minimal access to basic services and continued vulnerability. Displaced women and children face heightened risk of exploitation, violence and abuse, further exacerbating the already fragile humanitarian situation in the country.[151]

---

[147] World Population Dashboard: South Sudan, United Nations Population Fund, 2024, available at: https://www.unfpa.org/data/world-population/SS (last visited Jun. 13, 2025).
[148] South Sudan: Floods Snapshot, United Nations Office for the Coordination of Humanitarian Affairs, Nov. 29, 2024, available at: https://reliefweb.int/report/south-sudan/south-sudan-floods-snapshot-29-november-2024 (last visited Jun. 13, 2025).
[149] Escalating conflict in South Sudan forces many thousands to flee just as aid dwindles, United Nations High Commissioner for Refugees, Jun. 3, 2025, available at: https://www.unhcr.org/news/press-releases/escalating-conflict-south-sudan-forces-many-thousands-flee-just-aid-dwindles (last visited Jun. 13, 2025).
[150] South Sudan Fact Sheet, UN High Commissioner for Refugees, Mar. 10, 2025, available at: https://reliefweb.int/report/south-sudan/unhcr-south-sudan-factsheet-march-2025 (last visited Jun. 13, 2025).
[151] South Sudan Protection Analysis Update, Global Protection Cluster, Apr. 1, 2025, pg. 2, available at: https://reliefweb.int/report/south-sudan/south-sudan-protection-analysis-update-linkages-sustainable-development-goals-can-significantly-contribute-addressing-root-causes-top-5-protection-risks-south-sudan-march-2025 (last visited Jun. 13, 2025).

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
5900 Capital Gateway Drive
Camp Springs, MD 20588-0009

U.S. Citizenship and Immigration Services

July 31, 2025

**TEMPORARY PROTECTED STATUS**
**POLICY CONSIDERATIONS: South Sudan**
**(July 2025)**[1]

South Sudan was initially designated for Temporary Protected Status on October 13, 2011, on the dual bases of ongoing armed conflict and extraordinary and temporary conditions that prevented nationals of South Sudan from safely returning.[2] The designation of South Sudan for Temporary Protected Status, which had previously been extended and redesignated five times, was automatically extended again in March due to Secretary Noem not receiving sufficient information to make an informed determination on South Sudan's designation by the March 4, 2025 statutory deadline. Accordingly, the Temporary Protected Status designation of South Sudan was automatically extended for six months, from May 4, 2025, through November 3, 2025.

Since the last Temporary Protected Status desig2nation, South Sudan has experienced challenges relating to establishing a permanent government. Elections were delayed again and there has been a high degree of leadership turnover in the wake of government abuses.[3,4] Armed violence continues and is escalating in the wake of these changes. The national emergency declared in Executive Order 13664 of April 3, 2014, with respect to South Sudan will continue in effect beyond April 3, 2025.[5] The situation in and in relation to South Sudan, which has been marked by activities that threaten the peace, security, and stability of South Sudan and the surrounding region, including widespread violence and atrocities, human rights abuses, recruitment and use of child soldiers, attacks on peacekeepers, and obstruction of humanitarian operations, continues to pose an unusual and extraordinary threat to the national security of the United States.[6]

The humanitarian situation remains dire, driven by years of conflict, intercommunal violence,

---

[1] The reporting period for this report is Jan. 1, 2024, to Jun. 30, 2025.
[2] *See Designation of Republic of South Sudan for Temporary Protected Status,76 FR 63629 (Oct. 13, 2011).*
[3] Associated Press, South Sudan postpones Dec. elections by 2 years citing incomplete preparations, Sep. 13, 2024, https://apnews.com/article/south-sudan-elections-postponed-10a4e41a1b967cc51ec52a354a86d489
[4] *Extension of South Sudan Designation for Temporary Protected Status* 90 FR 19217 (May 6, 2025).
[5] Continuation of the National Emergency with Respect to South Sudan – Message from the President of the United States (H. DOC. NO. 119-34); Congressional Record Vol. 171, No. 57
[6] Continuation of the National Emergency with Respect to South Sudan – Message from the President of the United States (H. DOC. NO. 119-34); Congressional Record Vol. 171, No. 57

food insecurity, and the climate crisis. The arrival of hundreds of thousands of migrants fleeing conflict in Sudan, including South Sudanese refugee returnees, Sudanese, and other nationalities, compounded the crisis. [7] Millions face high levels of food insecurity.[8] According to the United Nations Office for the Coordination of Humanitarian Affairs, natural disasters, like floods, affected at least 890,000 people. [9]

Between fiscal year 2012 and 2025, the U.S. Department of State has continuously issued Nonimmigrant Visas to South Sudanese nationals, though the number of Nonimmigrant Visa issuances has been in decline, from on average 120 issuances a month in fiscal year 2012 to approximately 50 a month in fiscal year 2025.[10,11] Furthermore, since 2021, USCIS has received 19 applications for Advance Parole document from South Sudanese nationals residing in the United States for the purpose of traveling to South Sudan since 2017.[12]

**Temporary Protected Status Designation Time Frame:**

- Initial Temporary Protected Status designation period: November 3, 2011, through May 2, 2013[13]
- First extension and redesignation of South Sudan: May 3, 2013, through November 2, 2014[14]
- Second extension and redesignation of South Sudan: November 3, 2014, through May 2, 2016[15]
- Third extension and redesignation of South Sudan: May 3, 2016, through November 2, 2017[16]
- Fourth extension and redesignation of South Sudan: November 3, 2017, through May 2, 2019[17]
- Fifth extension and redesignation of South Sudan: May 3, 2019, through November 2, 2020[18]
- Sixth extension and redesignation of South Sudan: November 3, 2020, through May 2, 2022[19]
- Seventh extension and redesignation of South Sudan: May 3, 2022, through November 3, 2023[20]
- Eighth extension (no redesignation) of South Sudan: November 4, 2023, through May 3, 2025[21]
- Ninth extension (no redesignation) of South Sudan: May 4, 2025, through November 3, 2025[22]

**Reason(s) for Initial Temporary Protected Status Designation for South Sudan:**

---

[7] United Nations High Commissioner for Refugees, New UNHCR household survey unveils alarming suffering for refugees and hosts in South Sudan, Jul. 15, 2024, https://www.unhcr.org/news/press-releases/new-unhcr-household-survey-unveils-alarming-suffering-refugees-and-hosts-south
[8] World Food Programme, Emergency: South Sudan, https://www.wfp.org/emergencies/south-sudan-emergency
[9] United Nations Office for the Coordination of Humanitarian Affairs, South Sudan: Floods Snapshot, Oct. 4, 2024, https://www.unocha.org/publications/report/south-sudan/south-sudan-floods-snapshot-4-Oct.-2024
[10] Dep't of State, Monthly Nonimmigrant Visa Issuance Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html (last visited July 31, 2025)
[11] The latest month in which the Nonimmigrant Visa Issuance data is reported by the Department of State is April, 2025.
[12] USCIS internal data, Policy Research Division, Office of Policy & Strategy, July 2025
[13] *Designation of Republic of South Sudan for Temporary Protected Status,76 FR 63629 (Oct. 13, 2011).*
[14] *Extension and Redesignation of South Sudan for Temporary Protected Status,*78 FR 1866 (Jan. 9, 2013)
[15] *Extension and Redesignation of South Sudan for Temporary Protected Status,79 FR 52019 (Sept. 2, 2014)*
[16] *Extension and Redesignation of South Sudan for Temporary Protected Status,*81 FR 4051 (Jan. 25, 2016)
[17] *Extension of South Sudan for Temporary Protected Status,82 FR 44205 (Sept. 21, 2017)*
[18] *Extension of the Designation of South Sudan for Temporary Protected Status,*84 FR 13688 (Apr. 5, 2019)
[19] *Extension of the Designation of South Sudan for Temporary Protected Status,*85 FR 69344 (Nov. 2, 2020).
[20] *Extension and Redesignation of South Sudan for Temporary Protected Status,*87 FR 12190 (Mar. 3, 2022)
[21] *Extension and Redesignation of South Sudan for Temporary Protected Status,,* 88 FR 60971 (Sept. 6, 2023).
[22] *Extension of South Sudan Designation for Temporary Protected Status* 90 FR 19217 (May 6, 2025).

South Sudan was initially designated for Temporary Protected Status on October 13, 2011, on the dual bases of ongoing armed conflict and extraordinary and temporary conditions that prevented nationals of South Sudan from safely returning.[23]

**Reason(s) for Extension and Redesignation of Temporary Protected Status for South Sudan:**

Since the initial designation, DHS extended and redesignated South Sudan for Temporary Protected Status in 2013, 2014, and 2016.[24] In 2017, 2019, 2020, 2022, and 2023 DHS extended Temporary Protected Status for South Sudan based on ongoing armed conflict and extraordinary and temporary conditions.[25]

Most recently, Secretary Noem was unable to make an informed determination on South Sudan's designation by the March 4, 2025, statutory deadline due to the lack of an updated analysis of current country conditions in South Sudan. Accordingly, the Temporary Protected Status designation of South Sudan was automatically extended for six months, from May 4, 2025, through November 3, 2025.[26]

---

[23] *Designation of Republic of South Sudan for Temporary Protected Status,*76 FR 63629 (Oct. 13, 2011).

[24] See *Extension and Redesignation of South Sudan for Temporary Protected Status,*78 FR 1866 (Jan. 9, 2013); *Extension and Redesignation of South Sudan for Temporary Protected Status,79 FR 52019 (Sept. 2, 2014); Extension and Redesignation of South Sudan for Temporary Protected Status,*81 FR 4051 (Jan. 25, 2016)

[25] See *Extension of South Sudan for Temporary Protected Status,82 FR 44205 (Sept. 21, 2017); Extension of the Designation of South Sudan for Temporary Protected Status,*84 FR 13688 (Apr. 5, 2019); *Extension of the Designation of South Sudan for Temporary Protected Status,*85 FR 69344 (Nov. 2, 2020); *Extension and Redesignation of South Sudan for Temporary Protected Status,*87 FR 12190 (Mar. 3, 2022); *Extension and Redesignation of South Sudan for Temporary Protected Status,,* 88 FR 60971 (Sept. 6, 2023).

[26] *Extension of South Sudan Designation for Temporary Protected Status* 90 FR 19217 (May 6, 2025).

## I. Statutory Basis for Designation

***Do the conditions under which the foreign state was designated for Temporary Protected Status continue to exist?***

As noted in the most recent Federal Register Notice, the armed violence in South Sudan consists of fighting among various factions associated with the government, as well as between government forces and militant groups.[27] The leaders of South Sudan continue to struggle to implement a political transition, fomenting violence, insecurity, displacement, repression of human rights, and humanitarian and economic crises. Impunity fueled widespread sexual violence, ethnic-based conflicts, extrajudicial killings and economic predation.[28] While conflicts persist in South Sudan, a return to a full-scale civil war, to-date, has been avoided.[29]

More than a decade after independence, South Sudan remains impacted by fragility, economic stagnation, and instability. Poverty is ubiquitous, exacerbated by conflict, displacement, and external shocks.[30] Floods in South Sudan have destroyed crops, homes, schools, health care centers, and boreholes for water access, and efforts to provide relief have been stymied by violence, inaccessibility, and gaps in resources and infrastructure.[31] As of November 2024, approximately 7.8 million South Sudanese are projected to face "Crisis" levels of acute food insecurity, or worse.[32] An estimated 9.3 million of South Sudan's total population of more than 11.3 million people (82%) is in need of humanitarian assistance, with multiple factors complicating the provision of relief. [33] The arrival of hundreds of thousands fleeing conflict in Sudan, including South Sudanese refugee returnees, Sudanese, and other nationalities, continues to compound the crisis. Millions faced high levels of food insecurity. [34,35] According to the United Nations Office for the Coordination of Humanitarian Affairs, natural disasters, like floods, affected at least 890,000 people.[36]

### A. Armed violence

---

[27] *Extension and Redesignation of South Sudan for Temporary Protected Status,* 88 FR 60971 (Sept. 6, 2023).

[28] United Nations High Commissioner for Refugees, Report of the Commission on Human Rights in South Sudan, Apr. 4, 2025, https://www.ohchr.org/en/documents/country-reports/ahrc5827-report-commission-human-rights-south-sudan-advance-edited

[29] South Sudan's peace deal at risk of collapse without stronger regional action, warns United Nations Commission, June 13, 2025, United Nations Office of the High Commissioner for Human Rights, https://www.ohchr.org/en/press-releases/2025/06/south-sudans-peace-deal-risk-collapse-without-stronger-regional-action-warns

[30] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview

[31] United Nations Office for the Coordination of Humanitarian Affairs, South Sudan: Floods Snapshot (As of 18 Oct. 2024), Oct. 18, 2024, https://www.unocha.org/publications/report/south-sudan/south-sudan-floods-snapshot-18-Oct.-2024

[32] Humanitarian Action, South Sudan Humanitarian Needs and Response Plan: 2025, Dec. 16, 2024, https://humanitarianaction.info/plan/1223/document/humanitarian-needs-and-response-plan-south-sudan-2025/article/34-food-security-and-livelihoods-0

[33] Humanitarian Action, South Sudan Humanitarian Needs and Response Plan: 2025, Dec. 16, 2024, https://humanitarianaction.info/plan/1223/document/humanitarian-needs-and-response-plan-south-sudan-2025/article/34-food-security-and-livelihoods-0

[34] United Nations High Commissioner for Refugees, New UNHCR household survey unveils alarming suffering for refugees and hosts in South Sudan, Jul. 15, 2024, https://www.unhcr.org/news/press-releases/new-unhcr-household-survey-unveils-alarming-suffering-refugees-and-hosts-south

[35] World Food Programme, Emergency: South Sudan, https://www.wfp.org/emergencies/south-sudan-emergency

[36] United Nations Office for the Coordination of Humanitarian Affairs, South Sudan: Floods Snapshot, Oct 4, 2024, https://www.unocha.org/publications/report/south-sudan/south-sudan-floods-snapshot-4-Oct.-2024

*1. Is the foreign state still involved in ongoing, internal, armed violence?*

The lack of stable government has facilitated ongoing violence in South Sudan that is "nearly always characterized by gross human rights violations that targeted civilians and caused mass displacements" in parts of the country.[37] Outbreaks of civil war in 2013 and 2016, persistent subnational violence, weak management of public resources, and political contestation have undermined post-independence development gains and intensified existing humanitarian needs.[38] Members of government and opposition forces, associated armed militia groups, and ethnic groups are reported to have committed torture and other ill-treatment in conflict zones, including violations of women's and girls' rights, including sexual and gender based violence and rape, gang rape, sexual slavery, kidnappings and forced marriages in the context of conflict-related sexual violence, arbitrary arrests, enforced disappearances, and torture.[39] The "simmering ethnic conflict" in parts of South Sudan has resulted in humanitarian consequences such as displacement and reports of human rights violations and abuses, including those involving the killing of civilians, arbitrary arrests or unjust detentions, looting and destruction of civilian property, physical abuse, forced recruitment, and gender-based violence.[40]

Conflict between armed groups in Upper Nile and southern Central Equatoria led to displacement of civilians and serious abuses. Intercommunal violence in parts of Warrap, Abyei, Northern Bar El Ghazal, and Jonglei intensified.[41] In February 2024, Warrap state government enacted the Green Book which introduces death by firing squad as a penalty for offences such as murder and rape.[42] Between February and July 2024, the United Nations documented 41 extrajudicial executions of suspected criminals by state authorities and security forces.[43] Weapons are readily available to the population and violent crime, such as carjackings, shootings, ambushes, assaults, robberies, and kidnappings are common throughout South Sudan, including Juba.[44] In addition, cattle raids occur throughout the country and often lead to further intercommunal violence.[45]

In a May 2024 report, the United Nations Mission in South Sudan noted that the government's counter-insurgency operations in 2023 against the armed group National Salvation Front in parts

---

[37] United Nations High Commissioner for Refugees, UN report highlights risk of more and gross human rights violations if South Sudan's conflict drivers remain unaddressed, Mar. 1, 2024, https://www.ohchr.org/en/press-releases/2024/03/un-report-highlights-risk-more-and-gross-human-rights-violations-if-south

[38] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview

[39] United Nations Office of the High Commissioner, A/HRC/58/27 - Report of the Commission on Human Rights in South Sudan (Advance edited version), Feb. 21, 2025, https://www.ohchr.org/en/documents/country-reports/ahrc5827-report-commission-human-rights-south-sudan-advance-edited

[40] United Nations High Commissioner for Refugees, Report of the Commission on Human Rights in South Sudan, Apr. 4, 2025, https://www.ohchr.org/en/documents/country-reports/ahrc5827-report-commission-human-rights-south-sudan-advance-edited

[41] Human Rights Division of the United Nations Mission in South Sudan , Brief on Violence Affecting Civilians: Jan.- Mar. 20204, Apr., 2024, https://unmiss.unmissions.org/sites/default/files/q1_2024_brief_violence_affecting_civilians_0.pdf,

[42] United Nations Human Rights Council, UN Commission's inquiry finds South Sudan's leaders fuelling violence, obstructing peace, and perpetuating gross human rights violations, Feb. 28, 2025, https://www.ohchr.org/en/press-releases/2025/02/un-commissions-inquiry-finds-south-sudans-leaders-fuelling-violence

[43] United Nations Security Council, Situation in South Sudan: Report of the Secretary-General, Jul. 29, 2024, https://documents.un.org/doc/undoc/gen/n24/212/85/pdf/n2421285.pdf

[44] U.S. Department of State, South Sudan, Jan. 21, 2025, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SouthSudan.html

[45] Department of State, South Sudan, Jan. 21, 2025, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SouthSudan.html

of Central Equatoria resulted in 60 civilian victims (28 killed, eight injured, and 24 subjected to conflict related sexual violence) and the targeting of civilians perceived as supporters of National Salvation Front. [46] In August 2024, the United Nations noted that abductions by the National Salvation Front and other armed groups in parts of Central Equatoria for the purpose of forced recruitment had increased.[47]

### 2. *Would the return of nationals to South Sudan still pose threat to personal safety?*

The violence in South Sudan, including violence in the context of armed violence, no longer poses a serious threat to the return of South Sudanese nationals (or aliens having no nationality who last habitually resided in South Sudan) to the home state.
South Sudan's 2013-2018 civil war officially concluded with the signing of the Revitalized Agreement on the Resolution of the Conflict in South Sudan in September 2018. The transitional unity government was formed in February 2020. This agreement, while fragile, has held for over five years. While conflicts persist in South Sudan, a return to a full-scale civil war, to-date, has been avoided.[48]

In addition, recent diplomatic developments between the United States' Department of State and South Sudan's transitional government indicate South Sudan's willingness to ensure the safety and reintegration of its returning nationals. In response to Secretary of State Rubio's April 5, 2025, statement compelling South Sudan to "accept the return of its citizens in a timely manner when… the United States… seeks to remove them," the Foreign Ministry of South Sudan clarified that "the government of South Sudan has consistently maintained open communication and cooperation with U.S. authorities regarding immigration and deportation matters. [49] The government welcomes all its citizens whether they are returning voluntarily or through deportation processes."[50] Subsequently, the South Sudanese government accepted a deportee believed to be a South Sudanese national, and also accepted a deported South Sudanese national as part of the group of aliens who arrived in South Sudan on July 4, 2025. [51, 52] The transitional government's consistent acceptance of returning citizens indicates that aliens who are nationals of South Sudan are able to return without facing serious threat to their personal safety.

## B. Extraordinary and Temporary Conditions

---

[46] Human Rights Division of the United Nations Mission in South Sudan, Brief on Violence Affecting Civilians: Jan.- Dec. 2023, Jan. 2024, https://unmiss.unmissions.org/sites/default/files/annual_brief_on_violence_affecting_civilians_2023.pdf
[47] United Nations Mission in South Sudan, UNMISS gravely concerned by rising abductions in Greater Yei, calls for collective action, Aug. 2, 2024, https://unmiss.unmissions.org/unmiss-gravely-concerned-rising-abductions-greater-yei-calls-collective-action
[48] South Sudan's peace deal at risk of collapse without stronger regional action, warns United Nations Commission, June 13, 2025, United Nations Office of the High Commissioner for Human Rights, https://www.ohchr.org/en/press-releases/2025/06/south-sudans-peace-deal-risk-collapse-without-stronger-regional-action-warns
[49] Defending America's Security through Visa and Travel Restrictions on South Sudan, U.S. Department of State, Apr. 5, 2025, https://www.state.gov/defending-americas-security-through-visa-and-travel-restrictions-on-south-sudan/
[50] South Sudan says it rejected U.S. deportee because he was from DRC, United Press International, Apr. 8, 2025, https://www.upi.com/Top_News/US/2025/04/08/South-Sudan-deport-visa-revoke/8401744112006/
[51] South Sudan says it will accept deportee amid Rubio's visa revocations, AXIOS, Apr. 8, 2025, https://www.axios.com/2025/04/07/south-sudan-rubio-visa-revocation
[52] MSN, U.S. completes deportation of 8 men to South Sudan after weeks of legal wrangling, Jul. 5, 2025, https://www.msn.com/en-us/news/world/us-completes-deportation-of-8-men-to-south-sudan-after-weeks-of-legal-wrangling/ar-AA1I2eRU

1. ***Has the foreign state continued to experience extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?***

**Human Rights**

South Sudanese authorities continue to restrict the rights to freedom of expression, association, peaceful assembly, and movement.[53] Journalists, activists, critics, and political opposition members faced intimidation, arbitrary arrest and detention, and torture and other ill-treatment.[54] On June 29, 2024, police and National Security Service agents in Jonglei state detained a photojournalist with the state-run South Sudan Broadcasting Corporation for participating in protests about the cost of living and nonpayment of civil servant salaries. [55]

The government also restricted the space for political parties and members of the opposition groups to campaign[56] in the capital and elsewhere in the country. The obstacles to political space included the requirement that parties and civil society obtain permission from the National Security Service for public events and the government's failure to set up key institutions, such as the Political Parties Council which should register and oversee operations of parties.[57]

The National Security Service continued to unlawfully detain perceived government critics and severely restricted rights. Victims of National Security Service abuses have no credible avenues to seek redress.[58] On July 3, 2024, a parliamentary majority passed amendments to the 2014 National Security Service Act retaining the agency's powers of arrest without a warrant. [59] It also approved legislation for a truth and reparations processes but failed to establish the Hybrid Court. [60] President Kiir neither signed nor sent the law back to parliament within the stipulated 30-day period, so by default the law came into effect, thereby concluding a reform process introduced by the 2015 and 2018 peace deals.[61] The National Security Service deployed a heavy presence, harassed journalists, and detained activists at the parliamentary sitting on the law. [62]

---

[53] United Nations Security Council, Resolution 2779 (2025), May 8, 2025, https://docs.un.org/en/S/RES/2779(2025)
[54] United Nations Office of THE High Commissioner, In South Sudan, scourge of arbitrary detentions undermines fragile peace, July 16, 2025, https://www.ohchr.org/en/stories/2025/07/south-sudan-scourge-arbitrary-detentions-undermines-fragile-peace
[55] Radio Tamazuj, Bor protests: Activists in hiding for fear of arrest, Jun. 26, 2024, https://www.radiotamazuj.org/en/news/article/bor-protests-activists-in-hiding-for-fear-of-arrest
[56] Voice of America, South Sudan Opposition Parties Criticize New Election Laws, Mar. 26, 2024, https://www.voanews.com/a/south-sudan-opposition-parties-criticize-new-election-laws-/7542932.html
[57] Republic of South Sudan, The Political Parties Council, https://ppc.gov.ss/
US Department of State, 2022 Country Reports on Human Rights Practices: South Sudan, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/south-sudan/
[58] United Nations Human Rights Council, 55th Annual report of the United Nations High Commissioner for Human Rights and reports of the Office of the High Commissioner and the Secretary-General, Mar. 13, 2024, https://documents.un.org/doc/undoc/gen/g24/033/78/pdf/g2403378.pdf
[59] Associated Press, Western envoys criticize South Sudan security bill that could allow warrantless detentions, Jul. 11, 2024, https://apnews.com/article/south-sudan-security-bill-arrest-cb3916213db58f335cd667e1e5c86834
[60] Just Security, New Transitional Justice Legislation Provides an Entry Point for Reengaging with State- and Nation-Building Efforts in South Sudan, May 14, 2025, https://www.justsecurity.org/113173/transitional-justice-legislation-nation-building-south-sudan/
[61] Radio Tamazuj, Security Bill set to become law by default: Lawyer, Aug 12, 2024, https://www.radiotamazuj.org/en/news/article/security-bill-set-to-become-law-by-default-lawyer
[62] The Radio Community, NSS briefly detains activists during NSS Bill debate, Jul. 4, 2024, https://theradiocommunity.org/nss-briefly-detains-activists-during-nss-bill-debate-2808

On September 1, 2024, the National Security Service shut down the annual general assembly of the South Sudan Doctors Union without providing a reason. [63] On September 3, 2024, the National Security Service gave the union a list of requirements to fulfill, including a ban on discussing, “controversial issues” and demands to provide a list of all attendees.[64] The union was allowed to meet in October 2024 after meeting the National Security Service’s demands.[65]

On September 6, 2024, the National Security Service released Kalisto Lado, the former mayor of Juba, after holding him for five months in incommunicado detention at the National Security Service detention facilities known as the Blue House. [66, 67] Authorities had accused Lado of possession of a dangerous weapon, terrorism and publishing false information, among other offences, but never brought formal charges against him.[68] The National Security Service released at least 16 detainees who had previously been disappeared for criticizing General Akol Kor Kuc in November 2024.[69]

***What are relevant national interest considerations for the Temporary Protected Status South Sudan designation?***

The U.S. government seeks to promote the safety of nationals of South Sudan (or aliens having no nationality who last habitually resided in South Sudan). This objective must be evaluated along with national interest considerations of the U.S. DHS records indicate there are a small number of members of the South Sudan Temporary Protected Status population that have been under administrative investigation for risk to national security or public safety, or for attempting to obtain immigration benefits through fraud or misrepresentation.[70] DHS data shows approximately 4% of South Sudan Temporary Protected Status beneficiaries or applicants have at least one TECS hit in their immigration benefit request history (which could span over many years and multiple benefit request types).[71,72] It must be noted that a TECS hit does not always lead to derogatory findings or negative adjudicative outcome. This information should be taken into consideration when evaluating whether a Temporary Protected Status decision for South Sudan aligns with the national interest of the United States.

---

[63] Radio Tamazuj, National Security shuts medics’ meeting in Juba, Sep. 3, 2024, https://www.radiotamazuj.org/en/news/article/national-security-shuts-medics-meeting-in-juba

[64] Radio Tamazuj, Doctors’ Union executives linked to National Security over stay in office, scuttle elections, Sept. 8, 2024, https://www.radiotamazuj.org/en/news/article/doctors-union-executive-linked-to-national-security-over-stays-in-office-scuttles-elections

[65] Radio Tamazuj, Doctors’ Union executives linked to National Security over stay in office, scuttle elections, Sept. 8, 2024, https://www.radiotamazuj.org/en/news/article/doctors-union-executive-linked-to-national-security-over-stays-in-office-scuttles-elections

[66] Radio Tamazuj, Former Juba mayor Kalisto released from detention, Sep. 6, 2024, https://www.radiotamazuj.org/en/news/article/former-juba-mayor-kalisto-released-from-detention

[67] The Radio Community, 2024, NSS briefly detains activists during NSS Bill debate, Jul. 4, 2024, https://theradiocommunity.org/nss-briefly-detains-activists-during-nss-bill-debate-2808

[68] Radio Tamazuj, Kalisto Lado charged with attempting to topple govt, arms possession, and conspiracy, Jun. 20 2024, https://www.radiotamazuj.org/en/news/article/kalisto-lado-charged-with-attempting-to-topple-govt-arms-possession-and-conspiracy

[69] BBC, South Sudan’s president sacks his powerful spy chief, Oct. 3, 2024, https://www.bbc.com/news/articles/c3vknnwggdzo

[70] USCIS internal data, Policy Research Division, Office of Policy & Strategy, July 2025

[71] USCIS internal data, Policy Research Division, Office of Policy & Strategy, July 2025

[72] TECS is an information-sharing platform which can assist authorized users to access different databases to identify individuals who pose a risk to national security or public safety, and individuals attempting to obtain immigration benefits through fraud or misrepresentation.

On June 23rd, 2025, the Supreme Court of the United States ruled[73] that the United States can swiftly remove migrants to third countries. South Sudan is one of the countries willing to accept deported migrants, including migrants from other countries. Subsequently, On July 4, 2025, eight immigrants from Cuba, Laos, Mexico, Myanmar, Vietnam and South Sudan arrived in South Sudan following this ruling.[74] It was also reported that the U.S. Government has pushed more African Countries to accept deported migrants[75]. This development should be considered to ensure a decision on Temporary Protected Status for South Sudan serves the broad goals of the United States Government.

## II. Additional Information

***What if any, additional information relevant to this decision should be considered?***

### A. Instability

### Renewed Armed Violence

Simmering tensions in South Sudan between the government and opposition groups erupted in March 2023 when a local militia called the White Army overran a military barracks in Nasir, a town in the country's northeast.[76] Since May 3, 2025, fighting has intensified, with Office of the United Nations High Commissioner for Human Rights citing reports of indiscriminate aerial bombardments and river and ground offensives by the South Sudan People's Defense Forces on Sudan People's Liberation Army positions in parts of Fangak in Jonglei State and in Tonga County in Upper Nile.[77] Although the United Nations has urged South Sudan's leaders to immediately recommit to the 2018 peace deal, diplomatic efforts have stalled.[78]

At least 75 civilians were killed and 78 others injured by the fighting, which displaced thousands from their homes between May 3-20, 2025.[79] Civilian-populated areas have been targeted, including a medical facility operated by Doctors Without Borders.[80] Four passengers of a boat in Yirol Eat died following a deadly river ambush on June 27, 2025.[81] The fighting has uprooted some 165,000 people within South Sudan and sent more than 100,000 others fleeing into four

---

[73] https://www.supremecourt.gov/opinions/24pdf/24a1153_l5gm.pdf
[74] Los Angeles Times, U.S. completes deportation of 8 men to South Sudan after weeks of legal wrangling, Jul. 5, 2025, https://www.msn.com/en-us/news/world/us-completes-deportation-of-8-men-to-south-sudan-after-weeks-of-legal-wrangling/ar-AA1I2eRU
[75] https://www.wsj.com/politics/policy/u-s-pushes-more-african-countries-to-accept-deported-migrants-b6f330c5?mod=Searchresults_pos1&page=1
[76] Associated Press, Civilian casualties mount in South Sudan as fighting between army and local militias escalates, Jun. 3, 2025, https://apnews.com/article/south-sudan-fighting-war-crimes-killed-injured-7932d4af8b576f9e28770193116c63a7
[77] Reuters, UN rights chief urges warring sides in South Sudan to 'pull back from the brink', May 23, 2025, https://www.reuters.com/world/africa/un-rights-chief-urges-warring-sides-south-sudan-pull-back-brink-2025-05-23/
[78] United Nations News, 2025, South Sudan on the brink of civil war, top UN official warns, Mar. 24, 2025, https://news.un.org/en/story/2025/03/1161456
[79] Al Jazeera, South Sudan refugees in Ethiopia face 'health catastrophe', charity warns, May 23, 2025, https://www.aljazeera.com/news/2025/5/23/south-sudan-refugees-in-ethiopia-face-health-catastrophe-charity-warns
[80] Reuters, UN rights chief urges warring sides in South Sudan to 'pull back from the brink', May 23, 2025, https://www.reuters.com/world/africa/un-rights-chief-urges-warring-sides-south-sudan-pull-back-brink-2025-05-23/
[81] Radio Tamazuj, 43 traders survive, 4 killed after recent Yirol East boat attack, Jul. 1, 2025, https://www.radiotamazuj.org/en/news/article/43-traders-survive-4-killed-after-yirol-east-boat-ambush

neighboring countries.[82,83] The United Nations is bracing for a much bigger exodus if the armed violence does not deescalate, and some experts worry that the in-fighting in South Sudan is indicative of a country on the brink of collapse.[84]

**Environmental Conditions**

In March 2024, the government closed all schools for two weeks in response to extreme heat waves, citing concerns for "serious health hazards." [85,86,87,88,89] These school closures interrupted instruction for over 2.1 million children.[90]

In October 2024, over 1 million individuals were affected by severe floods across 42 counties and the Abyei Administrative Area, with residents of the Northern Bahr el Ghazal and Unity states comprising over 40% of the affected population.[91] About 271,000 people were displaced by floods in 17 counties and the Abyei Administrative Area, seeking refuge on higher ground.[92]

**Access to Food and Water**

South Sudan remains in a serious humanitarian crisis, according to the United Nations Office for the Coordination of Humanitarian Affairs latest update.[93] The food security situation continues to deteriorate due to a combination of shocks, including conflict, displacement, flooding, and a high cost of living.[94] The ongoing inflow of returnees and refugees from Sudan is further exasperating this situation.[95] Over 7 million people across South Sudan face acute food

---

[82] United Nations High Commission for Refugees, Escalating conflict in South Sudan forces many thousands to flee just as aid dwindles, Jun. 3, 2025, https://www.unhcr.org/news/press-releases/escalating-conflict-south-sudan-forces-many-thousands-flee-just-aid-dwindles
[83] Associated Press, Civilian casualties mount in South Sudan as fighting between army and local militias escalates, Jun. 3, 2025, https://apnews.com/article/south-sudan-fighting-war-crimes-killed-injured-7932d4af8b576f9e28770193116c63a7
[84] International Institute for Strategic Studies, Tipping points: South Sudan on the brink of collapse?, May 1, 2025, https://www.iiss.org/online-analysis/online-analysis/2025/05/tipping-points-south-sudan-on-the-brink-of-collapse/
[85]Associated Press, South Sudan closes schools after students collapse due to extreme heat, Feb. 21, 2025, https://apnews.com/article/south-sudan-heatwave-schools-close-112a8f2e737dd744886945f7628fccd8
[86] Africa News, South Sudan shutters all schools as it prepares for an extreme heat wave, Aug. 13, 2024, https://www.africanews.com/2024/03/17/south-sudan-shutters-all-schools-as-it-prepares-for-an-extreme-heat-wave/
[87] Voice of America, South Sudan Reopens Schools After Heat Wave, Mar. 26, 2024, https://www.voanews.com/a/schools-to-reopen-in-south-sudan-after-two-weeks-of-extreme-heat/7543675.html
[88] British Broadcasting Commission, South Sudan heatwave: Extreme weather shuts schools and cuts power, Mar. 18, 2024, https://www.bbc.com/news/world-africa-68596499
[89] NASA Earth Observatory, Heat Wave in East Africa, Mar. 18, 2024, https://earthobservatory.nasa.gov/images/152600/heat-wave-in-east-africa
[90] The Telegraph, Lockdown in South Sudan as blistering heatwave closes schools, Mar. 27, 2024, https://www.telegraph.co.uk/global-health/climate-and-people/sudans-heatwave-school-closures-children-lockdown-africa/
[91] British Broadcasting Commission,, A million people hit by flooding in South Sudan, Oct. 21, 2024, https://www.bbc.com/news/articles/cgey3e7yrvxo
[92] United Nations Office for the Coordination of Humanitarian Affairs, South Sudan: Floods Snapshot (As of 4 Oct. 2024), Oct. 4, 2024, https://www.unocha.org/publications/report/south-sudan/south-sudan-floods-snapshot-4-Oct.-2024,
[93] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview
[94] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview
[95] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview

insecurity, accounting for over half of the population.[96] Malnutrition rates are among the highest globally, with pregnant women and 2.3 million children in South Sudan facing acute malnutrition,[97] an increase from 2.1 million at the beginning of the year.[98] Meanwhile, 85% of South Sudanese returnees from Sudan are likely to experience crisis-level or worse food insecurity.[99]

The Integrated Food Security Classification scale shows a deterioration in conditions revealing emergency levels of hunger. Two counties in the Upper Nile State of South Sudan are sliding into famine, according to the Integrated Food Security Classification.[100] Eleven out of 13 counties in South Sudan are now facing emergency levels of food scarcity, and 32,000 of their inhabitants are facing "catastrophic" level hunger conditions, almost three times higher than previous estimates.[101]

**Access to Healthcare**

Poor access to health services, a limited number of health workers and lack of access to health services have produced some of the worst health indicators in the world, with a child mortality rate of 78 deaths per 1,000 live births.[102] Around 75 per cent of all child deaths in South Sudan are due to preventable diseases, such as diarrhea, malaria and pneumonia.[103]

Long distances, limited transportation infrastructure, and insecurity related to ongoing conflicts made it difficult to access services at health facilities.[104] These barriers also inhibited trainings for facility-based health workers on program guidelines and best practices in health service delivery.[105] Public health services were delivered out of healthcare facilities that lacked the necessary infrastructure and staff.[106] The number and quality of well-trained healthcare staff are inadequate to serve the nation's needs.[107] Trained healthcare providers are largely concentrated in the capital city of Juba, resulting in lower quality of services at peripheral healthcare facilities.[108]

---

[96] United Nations News, Famine stalks two counties in South Sudan as fragile peace is threatened, Jun. 12, 2025, https://news.un.org/en/story/2025/06/1164311

[97] World Health Organization, Public Health Situation Analysis: Sudan conflict, Mar. 10 2025, https://www.who.int/publications/m/item/public-health-situation-analysis--sudan-conflict-(10-Mar.-2025)

[98] United Nations News, Famine stalks two counties in South Sudan as fragile peace is threatened, Jun. 12, 2025, https://news.un.org/en/story/2025/06/1164311

[99] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview

[100] United Nations News, Famine stalks two counties in South Sudan as fragile peace is threatened, Jun. 12, 2025, https://news.un.org/en/story/2025/06/1164311

[101] UN News, Famine stalks two counties in South Sudan as fragile peace is threatened, Jun. 12, 2025, https://news.un.org/en/story/2025/06/1164311

[102] UNICEF, South Sudan: Health, https://www.unicef.org/southsudan/what-we-do/health (last visited Jul. 30, 2025)

[103] UNICEF, South Sudan: Health, https://www.unicef.org/southsudan/what-we-do/health (last visited Jul. 30, 2025)

[104] CDC Global Health, Improving Health Service Delivery in South Sudan, Jan. 12, 2024, https://www.cdc.gov/global-health/impact/south-sudan-health-service-delivery.html

[105] CDC Global Health, Improving Health Service Delivery in South Sudan, Jan. 12, 2024, https://www.cdc.gov/global-health/impact/south-sudan-health-service-delivery.html

[106] CDC Global Health, Improving Health Service Delivery in South Sudan, Jan. 12, 2024, https://www.cdc.gov/global-health/impact/south-sudan-health-service-delivery.html

[107] CDC Global Health, Improving Health Service Delivery in South Sudan, Jan. 12, 2024, https://www.cdc.gov/global-health/impact/south-sudan-health-service-delivery.html

[108] CDC Global Health, Improving Health Service Delivery in South Sudan, Jan. 12, 2024, https://www.cdc.gov/global-health/impact/south-sudan-health-service-delivery.html

## Human Rights

South Sudan has one of the world's highest proportions[109] of out-of-school children and one of the lowest literacy rates in the world.[110] More than 2.8 million children, or over 70% of the school-aged child population, are out of school in South Sudan, putting at risk their futures and the future of the country.[111] Some of the out-of-school children are living in pastoral communities, moving with their cattle and are not able to attend regular classes.[112] The largest group of out-of-school children in South Sudan are girls. Poverty, child marriage and cultural and religious views all hinder girls' education.[113]

In June 2024, a girl who reportedly was 14 years old was married in a highly publicized child marriage that contravenes South Sudan's laws protecting children from child marriage. [114,115] The 2024 UN Secretary General's Annual report on children and armed conflict noted that, in 2023, all parties to the South Sudanese conflict committed grave violations against children, including the recruitment and use of 152 children by armed groups as child soldiers, abduction of 32 children and sexual violence against four girls. [116]

## Political Developments

The government launched the Tumaini initiative peace talks with non-signatories to the 2018 peace deal in an attempt to quell much of the internal conflict in South Sudan.[117] The implementation of the 2018 peace deal and of reforms has been slow, The implementation of the 2018 peace deal and of reforms was slow, fueled violence and perpetuated rights abuses.[118] The implementation of the 2018 peace deal and of reforms was slow, fueled violence and perpetuated rights abuses. The Tumaini talks were re-launched in May 2024,[119] with the goal of rebooting the 2018 peace deal, expanding the government and addressing the root cause of conflicts. In July 2024, the Sudan People's Liberation Movement-in-Opposition withdrew from the Tumaini

---

[109] Global Partnership Transforming Education, 2022, South Sudan: Securing a brighter future for children affected by conflict, https://www.globalpartnership.org/results/country-journeys/south-sudan-securing-brighter-future-children-affected-conflict

[110] Global Partnership Transforming Education, 2024, South Sudan Partnership Compact. 2024, Mar. 1, 2024, https://www.globalpartnership.org/content/south-sudan-partnership-compact-2024

[111] United Nations International Children's Emergency Fund [UNICEF], South Sudan: Education, https://www.unicef.org/southsudan/what-we-do/education

[112] United Nations International Children's Emergency Fund [UNICEF], South Sudan: Education, https://www.unicef.org/southsudan/what-we-do/education

[113] United Nations International Children's Emergency Fund,, South Sudan Education, https://www.unicef.org/southsudan/what-we-do/education

[114] The Guardian, A teenage bride wed for a record price: the 'marriage competition' that divided a nation, Sep. 27, 2024, https://www.theguardian.com/global-development/2024/sep/27/south-sudan-juba-dinka-child-marriage-athiak-dau-riak-customs-brideprice,

[115] Nada Foundation, Breaking Free: Tackling Child Marriage in South Sudan, Jan. 28, 2025, https://nadafund.org.uk/breaking-the-chains-addressing-child-marriage-in-south-sudan.html,

[116] United Nations General Assembly, Children and armed conflict: Report of the Secretary-General, Jun. 3, 2024, https://documents.un.org/doc/undoc/gen/n24/095/07/pdf/n2409507.pdf

[117] United Nations Mission in South Sudan, Tumaini peace talks between South Sudan Government and hold-out groups resume in Nairobi, Dec. 5, 2024, https://unmiss.unmissions.org/tumaini-peace-talks-between-south-sudan-government-and-hold-out-groups-resume-nairobi

[118] United Nations Office of the High Commissioner, Violations put peace agreement transition in jeopardy, Apr. 26, 2023, https://www.ohchr.org/en/stories/2023/04/violations-put-peace-agreement-transition-jeopardy

[119] The Organization for World Peace, 'Tumaini' Peace Talks in Progress: Renewed Hopes On The Horizon?, May 28, 2024, https://theowp.org/tumaini-peace-talks-in-progress-renewed-hopes-on-the-horizon/

peace initiative citing concerns that the talks "dealt with matters that were already agreed in the Revitalized Peace Agreement and accordingly have gone beyond its remit," signaling a second failure to secure intercommunal peace for South Sudan.[120]

Subsequently, the National Salvation Front led by Thomas Cirillo Swaka continued an insurgency campaign in parts of Central Equatoria with abuses against civilians and refused to participate in the Tumaini talks citing security concerns and a lack of consultation.[121] In June 2024, Major General Kohn Kenyi Lotio, National Salvation Front deputy chief of staff, broke away to form a separate faction, citing poor leadership. [122,123] On September 22, 2024, the Reconstituted Joint Monitoring and Evaluation Commission, the body that monitors the peace deal, endorsed the Revitalized Peace Agreement but key international partners abstained from the vote. [124,125]

Salva Kiir was endorsed as his party's presidential candidate on May 25, 2023. [126] At this time he warned that an extension of the election timetable would cause a return to conflict and compound the country's human rights crisis, a position which was similarly endorsed by The United Nations Commission on Human Rights in South Sudan.[127] Nevertheless, in September 2024 the South Sudanese announced its plans to postpone the elections that were scheduled to be held in December 2024, due to lack of preparations and enacted a new timeline to address outstanding issues such as unification of forces, national census, voter registration, a new constitution, and judicial reforms. [128,129] Elections are rescheduled for December 2026.[130]

On October 1, 2024, President Kiir dismissed the prior head of the National Security Service,

---

[120] Radio Tamazuj, Dr. Machar's SPLM/A-IO withdraws from Nairobi Talks, rebuffs initialed protocols, Jul. 17, 2024, https://www.radiotamazuj.org/en/news/article/dr-machars-splm-a-io-withdraws-from-nairobi-talks-rebuffs-initialed-protocols

[121] Radio Tamazuj, Q&A: Gen. Thomas Cirillo questions Nairobi peace talks (Part 1), May 14, 2024, https://www.radiotamazuj.org/en/news/article/q-a-gen-thomas-cirillo-questions-nairobi-peace-talks-part-1

[122] National Salvation Army, NAS respects Gen. Loburon's decision to quit and wishes him well, Jul. 24, 2024 https://www.nassouthsudan.com/blog/2024/06/24/nas-respects-gen-luborons-decision-to-quit-and-wishes-him-well

[123] One Citizen Daily Newspaper, INSECURITY: NAS disintegration causes looming threats, Jun. 24, 2024 https://onecitizendaily.com/index.php/2024/06/24/insecurity-nas-disintegration-causes-looming-threats/

[124] Reconstituted Joint Monitoring and Evaluation Commission, Resolution of the RJMEX: 3RD Extraordinary Meeting, Sep. 18, 2024, https://jmecsouthsudan.org/index.php/plenary/plenary-resolutions/253-resolution-of-the-3rd-rjmec-extraordinary-meeting-beijing-juba-hotel-18-Sept.-2024-juba-south-sudan/file

[125] US Embassy in South Sudan, Ambassador Adler's Statement at the Sep. 18 RJMEC, Sept. 18, 2024, https://ss.usembassy.gov/Sept.-18-rjmec-extraordinary-session/

[126] Voice of America, South Sudan in Focus: President Kiir Endorsed For 2024 SPLM Presidential Candidate; WHO Reports Measles Outbreak in Unity State, Jul. 5, 2023, https://www.voaafrica.com/a/7145943.html

[127] United Nations Office of the High Commissioner of Human Rights, South Sudan: extension of transitional government will compound dire human rights crisis if leaders do not change course - UN experts, Sep. 25, 2024, https://www.ohchr.org/en/press-releases/2024/09/south-sudan-extension-transitional-government-will-compound-dire-human

[128] Reconstituted Joint Monitoring and Evaluation Commission, RJMEC Quarterly Report on the status of implementation of the R-ARCSS from 1st Apr. to 30th Jun. 2024, Jul. 16, 2024, https://jmecsouthsudan.org/index.php/reports/rjmec-quarterly-reports/250-rjmec-quarterly-report-on-the-status-of-implementation-of-the-r-arcss-from-1st-Apr.-to-30th-Jun.-2024,

[129] Associated Press, South Sudan postpones Dec. elections by 2 years citing incomplete preparations, Sep. 13, 2024, https://apnews.com/article/south-sudan-elections-postponed-10a4e41a1b967cc51ec52a354a86d489
Al Jazeera, South Sudan postpones Dec. election by two years, Sep. 14, 2024, https://www.aljazeera.com/news/2024/9/14/south-sudan-postpones-Dec.-election-by-two-years

[130] Al Jazeera, South Sudan postpones Dec. election by two years, Sep. 14, 2024, https://www.aljazeera.com/news/2024/9/14/south-sudan-postpones-Dec.-election-by-two-years

General Akol Kor Kuc.[131] No official reason was given for the decision to dismiss Kuc, however, sources suggest that power struggles within the security sector, particularly amid rumors of a potential coup involving him and other senior military officers, influenced the decision.[132] Kuc's tenure as head of the National Security Service has been controversial, with allegations of excessive force and abuse of authority against civil society and activists. His dismissal was seen as a move to address these concerns and to maintain control over the security apparatus in South Sudan.

## B. Improvements

### Economy

Modest growth in South Sudan's Gross Domestic Product has been upended by the Coronavirus-19 pandemic, historic floods, the conflict in neighboring Sudan, and challenges to public financial management.[133] South Sudan's economic outlook is now clouded by shocks to its heavily oil-dependent economy, highlighting the need for diversification.[134] South Sudan continues to depend on bordering Sudan as the only route to export its oil to international markets, and, consequently, the conflict in Sudan has significantly impacted South Sudan's macroeconomic stability.[135] Increasing threats from Sudan's army-backed government to shut down the facilities that South Sudan uses to export its oil suggest further economic hurdles ahead.[136] South Sudan's fiscal capacity to mitigate significant declines in oil production or shocks in global oil and food prices remains severely constrained by substantial challenges in the governance of oil sector revenues and weak fiscal discipline.[137]

### Population Inflows and Outflows

Residents of the Hai Matar village, who were forced to flee their homes in 2013, have returned to their land and moved into shelters built by humanitarians in the wake of the South Sudanese Civil War.[138,139] They are joined by refugees fleeing the civil war in neighboring Sudan.[140] The influx of Sudanese migrants has raised concerns about access to overburdened basic services in

---

[131] British Broadcasting Corporation, South Sudan's president sacks his powerful spy chief, Oct. 3, 20204, https://www.bbc.com/news/articles/c3vknnwggdzo
[132] Sudan's Post, Kiir ousts veteran national security chief Gen. Akol Koor, Oct. 2, 2024, https://www.sudanspost.com/kiir-sacks-gen-akol-koor-as-head-of-nss-names-replacement/
[133] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview
[134] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview
[135] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview
[136] Al Jazeera, South Sudan on edge as Sudan's war threatens vital oil industry, May 21, 2025, https://www.aljazeera.com/news/2025/5/21/south-sudan-on-edge-as-sudans-army-threatens-to-halt-oil-exports
[137] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview
[138] United Nations High Commission for Refugees, South Sudan Refugee Crisis, 2024, https://www.unrefugees.org/emergencies/south-sudan/
[139] Africa News, South Sudan: Civilians return 12 years after fleeing civil war, May 30, 2025, https://www.africanews.com/2025/05/29/south-sudan-civilians-return-12-years-after-fleeing-civil-war/
[140] Reuters, UN rights chief urges warring sides in South Sudan to 'pull back from the brink', May 23, 2025, https://www.reuters.com/world/africa/un-rights-chief-urges-warring-sides-south-sudan-pull-back-brink-2025-05-23/

South Sudan including clean water, healthcare and education for children.[141]

As of March 2025, over 1.1 million Sudanese migrants had arrived in South Sudan, and experts estimate that South Sudan is hosting 544,437 refugees and asylum-seekers from their neighboring state.[142] Estimates indicate that 150,000 more refugees, predominantly from Sudan, will arrive in 2025.[143] This inflow of refugees is likely a reflection of the danger of Sudan rather than a reflection of the safety of South Sudan, as more than 165, 000 South Sudanese have fled the increasing tensions and conflict in South Sudan.[144] Additional population inflows will likely result from the U.S. Supreme Court[145] decision allowing for the removal of aliens to third-party countries, including South Sudan.[146] Eight immigrants from Cuba, Laos, Mexico, Myanmar, Vietnam and South Sudan arrived in South Sudan on July 4, 2025, after a federal judge cleared the way for the Trump administration to relocate them.[147]

Moving forward, ensuring the implementation of the peace agreement, addressing the root causes of fragility, and strengthening public service delivery, institutions, governance, and economic and public financial management systems will prove critical as South Sudan seeks to build resilience against future shocks and create the foundation for a diversified, inclusive, and sustainable growth path.[148] Failure to adequately plan and support incoming refugees will likely exasperate the ongoing humanitarian crisis.

**Human Rights Accountability**

In March 2024, the United Nations Human Rights Council renewed the mandate of the Commission on Human Rights in South Sudan. [149, 150] Additionally, the Action Plan for the Armed Forces on Addressing Conflict-related Sexual Violence in South Sudan was renewed for three years. While implementation stalled when the army failed to nominate members to the implementation committee, but the renewed interest in accountability for human rights violations

---

[141] Africa News, South Sudan: Civilians return 12 years after fleeing civil war, May 29, 2025, https://www.africanews.com/2025/05/29/south-sudan-civilians-return-12-years-after-fleeing-civil-war/
[142] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview
[143] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview
[144] UNHCR, Escalating conflict in South Sudan forces many thousands to flee just as aid dwindles, Jun. 3, 2025, https://www.unhcr.org/africa/news/press-releases/escalating-conflict-south-sudan-forces-many-thousands-flee-just-aid-dwindles
[145] Associated Press, Supreme Court allows Trump to restart swift deportation of migrants away from their home countries, Jun. 23, 2025, https://apnews.com/article/supreme-court-immigration-trump-south-sudan-c7ffbbcede3158a3352b2dbf4439780a
[146] Associated Press, Trump administration asks Supreme Court to clear the way for a South Sudan-bound deportation flight, Jun. 24, 2025, https://apnews.com/article/supreme-court-immigration-trump-south-sudan-fe5c4c22b95610007cd7a163d937668f
[147] Los Angeles Times, U.S. completes deportation of 8 men to South Sudan after weeks of legal wrangling, Jul. 5, 2025, https://www.msn.com/en-us/news/world/us-completes-deportation-of-8-men-to-south-sudan-after-weeks-of-legal-wrangling/ar-AA1I2eRU
[148] World Bank, The World Bank in South Sudan, Apr. 17, 2025, https://www.worldbank.org/en/country/southsudan/overview
[149] United Nations High Commission for Refugees, Resolution adopted by the Human Rights Council on 3 Apr. 2024: Advancing human rights in South Sudan, Apr. 5, 2024, https://documents.un.org/doc/undoc/gen/g24/058/07/pdf/g2405807.pdf,
[150] United Nations High Commission for Refugees, Commission on Human Rights in South Sudan, https://www.ohchr.org/en/hr-bodies/hrc/co-h-south-sudan/index,

during the civil war is a promising sign for returning South Sudanese displaced by the conflict.[151]

In November 2024, the President of South Sudan signed into law two important pieces of legislation establishing a Commission on Truth, Reconciliation and Healing and a Compensation and Reparations Authority [to] advance justice and accountability for victims of abuses committed since war began in 2013. [152] The United Nations Commission urged the African Union to renew its efforts to revive the stalled process of establishing the Hybrid Court for South Sudan.[153] These three transitional justice mechanisms together with critical state-building measures mandated under the 2018 Revitalized Agreement on the Resolution of the Conflict in the Republic of South Sudan form the cornerstone of the country's path toward healing, accountability, and lasting peace.[154]

**Infrastructure Improvements**

The South Sudan Enhancing Community Resilience and Local Governance Project is a $45 million initiative funded by the World Bank and implemented from 2020-2024 by the United Nations Office for Project Services and the International Organization for Migration on behalf of the Government of South Sudan. [155],[156] The project aimed to improve access to basic infrastructure and strengthen community institutions in selected counties on South Sudan.[157] Despite the challenges posed by the Coronavirus-19 pandemic, localized conflicts, and recurrent flooding, the Enhancing Community Resilience and Local Governance Project achieved remarkable results. The project completed 345 sub-projects, building schools, health facilities, water points, roads, markets, and community centers.[158] This infrastructure provided nearly 740,000 people, including over 375,000 women and girls, with improved access to essential services, 99% of which remains functional and in-use as of 2024.[159] In response to severe floods which impacted populations in the target areas, the project constructed emergency dikes which

---

[151] United Nations High Commission for Refugees, Situation in South Sudan: Report of the Secretary General, Jul. 29, 2024, https://unmiss.unmissions.org/sites/default/files/secretary-generals_report_on_the_situation_of_south_sudan_29_Jul._2024.pdf,

[152] Just Security, May 14, 2025, https://www.justsecurity.org/113173/transitional-justice-legislation-nation-building-south-sudan/, (last visited Jul. 9, 2025).

[153] Office of the United Nations High Commissioner for Human Rights, South Sudan: Support for transitional justice processes critical to building sustainable peace, UN Experts say after Ethiopia mission, Nov. 25, 2024, https://www.ohchr.org/en/press-releases/2024/11/south-sudan-support-transitional-justice-processes-critical-building

[154] Office of the United Nations High Commissioner for Human Rights, South Sudan: Support for transitional justice processes critical to building sustainable peace, UN Experts say after Ethiopia mission, Nov. 25, 2024, https://www.ohchr.org/en/press-releases/2024/11/south-sudan-support-transitional-justice-processes-critical-building

[155] World Bank, South Sudan Enhancing Community Resilience and Local Governance Project, Jul. 31, 2024, https://southsudan.iom.int/enhancing-community-resilience-and-local-governance-project-ecrp

[156] World Bank, Building community resilience from the ground up in South Sudan, Feb. 13, 2025, https://www.worldbank.org/en/news/feature/2025/01/24/building-community-resilience-from-the-ground-up-in-south-sudan

[157] World Bank, Building community resilience from the ground up in South Sudan, Feb. 13, 2025, https://www.worldbank.org/en/news/feature/2025/01/24/building-community-resilience-from-the-ground-up-in-south-sudan

[158] World Bank, Building community resilience from the ground up in South Sudan, Feb. 13, 2025, https://www.worldbank.org/en/news/feature/2025/01/24/building-community-resilience-from-the-ground-up-in-south-sudan

[159] World Bank, Building community resilience from the ground up in South Sudan, Feb. 13, 2025, https://www.worldbank.org/en/news/feature/2025/01/24/building-community-resilience-from-the-ground-up-in-south-sudan

protected more than 60,000 people.[160] The project also bolstered the local economy and empowered communities by generating nearly 600,000 workdays, providing short-term employment to thousands of skilled and unskilled workers, including a significant number of women.[161] To enhance flood resilience efforts in Warrap State, the second phase of the World Bank-funded Enhancing Community Resilience and Local Governance Project was officially launched February 6, 2025.[162]

More recently, the South Sudanese government has taken a significant step forward in its national fiber optic infrastructure project, with the steering committee approving a budget of over $9 million for the design phase.[163] This project, in conjunction with Intelsat and Whitaker Peace and Development Initiative's promise to deliver high speed internet to community centers in South Sudan and Uganda, will be a cornerstone of the government's digital transformation agenda aimed at improving connectivity and expanding access to broadband internet across the country. [164]

---

160 World Bank, Building community resilience from the ground up in South Sudan, Feb. 13, 2025, https://www.worldbank.org/en/news/feature/2025/01/24/building-community-resilience-from-the-ground-up-in-south-sudan

161 World Bank, Building community resilience from the ground up in South Sudan, Feb. 13, 2025, https://www.worldbank.org/en/news/feature/2025/01/24/building-community-resilience-from-the-ground-up-in-south-sudan

162 Relief Web, South Sudan Gov't, World Vision launch Enhancing Resilience and Local Governance Phase II (ECRP II) Project in Warrap, Feb. 6, 2025, https://reliefweb.int/report/south-sudan/south-sudan-govt-world-vision-launch-enhancing-resilience-and-local-governance-phase-ii-ecrp-ii-project-warrap

163 Tech Africa News, South Sudan Approves $9M Budget for National Fiber Optic Network Design, Jun. 30, 2025, https://techafricanews.com/2025/06/30/south-sudan-approves-9m-budget-for-national-fiber-optic-network-design/

164 Developing Telecoms, Intelsat and NGO to deliver high-speed internet in South Sudan and Uganda, Jun. 30, 2025, https://developingtelecoms.com/telecom-business/humanitarian-communications/18698-intelsat-and-ngo-to-deliver-high-speed-internet-in-south-sudan-and-uganda.html

# South Sudan Travel Advisory

Travel Advisory March 8, 2025

South Sudan - Level 4: Do Not Travel

C K O

*Updated to reflect changes to security information.*

Do not travel to South Sudan due to **crime**, **kidnapping**, and **armed conflict**.

**Country Summary:** Armed conflict is ongoing and includes fighting between various political and ethnic groups. Weapons are readily available to the population. In addition, cattle raids occur throughout the country and often lead to violence.

Violent crime, such as carjackings, shootings, ambushes, assaults, robberies, and kidnappings are common throughout South Sudan, including Juba. Foreign nationals have been the victims of rape, sexual assault, armed robberies, and other violent crimes.

Reporting in South Sudan without the proper documentation from the South Sudanese Media Authority is considered illegal, and any journalistic work there is very dangerous. Journalists regularly report being harassed in South Sudan, and many have been killed while covering the conflict.

The U.S. government has limited ability to provide emergency consular services to U.S. citizens in South Sudan. U.S. government personnel working in South Sudan are under a strict curfew. They must use armored vehicles for nearly all movements, and official travel outside Juba is limited. Due to the critical crime threat in Juba, walking is also restricted; when allowed, it is limited to a small area in the immediate vicinity of the Embassy and during daylight hours only. The Federal Aviation Administration (FAA) has issued a Notice to Airmen (NOTAM) and/or a Special Federal Aviation Regulation (SFAR). This is due to risks to civil aviation operating within or in the vicinity of South Sudan. For more information U.S. citizens should consult the Federal Aviation Administration's

Prohibitions, Restrictions and Notices. Read the country information page for additional information on travel to South Sudan.

**If you decide to travel to South Sudan:**

- Exercise extreme care in all parts of the country, including Juba. Travel outside of Juba with a minimum of two vehicles along with appropriate recovery and medical equipment in case of mechanical failure or other emergency.
- Avoid travel along border areas.
- Avoid demonstrations and crowds.
- Be aware that photography in public is strictly controlled, and you are required to obtain authorization from the Ministry of Information before taking any photographs or video in public – including while inside a vehicle.
- Check local media for breaking news. Be prepared to adjust your plans.
- We highly recommend that you buy insurance before you travel. Check with your travel insurance provider about evacuation assistance, medical insurance, and trip cancellation coverage.
- Enroll in the Smart Traveler Enrollment Program (STEP) to receive messages and Alerts from the U.S. Embassy and make it easier to locate you in an emergency.
- Review your personal security plan and visit our page on travel to high risk areas.
- Draft a will and designate appropriate insurance beneficiaries and/or power of attorney.
- Discuss a plan with loved ones regarding care/custody of children, pets, property, belongings, non-liquid assets (collections, artwork, etc.), funeral wishes, etc.
- Share important documents, login information, and points of contact with loved

information, and points of contact with loved ones. This is so that they can manage your affairs if you are unable to return as planned to the United States. Review this list of documents to prepare for your trip

- Establish your own personal security plan in coordination with your employer or host organization, or consider consulting with a professional security organization. Your plan should include sheltering in place, maintaining outside communication, and a personal evacuation plan via commercial means.
- Develop a communication plan with family or your employer or host organization (if you are traveling on business). This is so that they can monitor your safety and location as you travel through high-risk areas. Specify how you'll confirm you're safe (text, calls, etc.), how often, and who you'll contact first to share the information.
- Choose one family member to serve as the point of contact. They will communicate with kidnappers/hostage-takers, media, U.S. and host country government agencies, and members of Congress if you are kidnapped or taken hostage.
- Establish a proof of life protocol with your loved ones. This is so that if you are taken hostage, your loved ones can know specific questions (and answers) to ask the hostage-takers to be sure that you are alive (and to rule out a hoax).
- Leave DNA samples with your medical provider in case it is necessary for your family to access them.
- Erase any sensitive photos, comments, or other materials from your social media pages, cameras, laptops, and other electronic devices that could be considered controversial or provocative by local groups.
- Leave your expensive/sentimental belongings behind

behind.

- Review the Country Security Report for South Sudan.
- U.S. citizens who travel abroad should always have a contingency plan for emergency situations. Review the Traveler's Checklist.
- Visit the CDC page for the latest Travel Health Information related to your travel.

**From:** Chretien, Spencer
**To:** LAW, ROB
**Subject:** RE: [External] Upcoming TPS
**Date:** Tuesday, July 22, 2025 6:11:51 PM
**Attachments:** image001.png

---

This email is from an external US Government agency.

Dear Rob,

I confirm that State has no foreign policy concerns with ending these TPS designations on or before those dates. As you are aware, sanctions on Syria have recently been lifted, and we have partnered with South Sudan on immigration-related issues.

Spencer

**Spencer Chretien**
Senior Bureau Official
Population, Refugees, and Migration
Text⍰ ⍰ AI-generated content may be incorrect.

SENSITIVE BUT UNCLASSIFIED

---

**From:** LAW, ROB <[redacted]>
**Sent:** Monday, July 21, 2025 3:27 PM
**To:** Chretien, Spencer <[redacted]>
**Subject:** [External] Upcoming TPS

Spencer,

The following TPS designations are coming up for review:

- Syria: Aug. 1 decision deadline
- South Sudan: September 3 decision deadline
- Burma: September 26 decision deadline
- Ethiopia: October 13 decision deadline

Thanks,

RTL

Rob Law
Senior Counselor, Office of the Secretary
U.S. Department of Homeland Security
M: [redacted]

UNMISS
Your Partner For Peace

# PRESS RELEASE

**UNMISS gravely concerned by escalating violence in Eastern Equatoria, calls for restraint**

**Juba, 02 February 2025** – The United Nations Mission in South Sudan is gravely concerned by escalating violence between cattle keepers and settled farming communities in Eastern Equatoria state.

Most recently on 31 January, armed conflict between pastoralists and settled communities in and around Magwi county has reportedly led to retaliatory fighting in Agoro, Chomboro, Obama and Ayiii villages.

These events have created widespread public fear and resulted in civilian displacement from affected areas in Eastern Equatoria as well as from Lokiliri in neighboring Central Equatoria state.

"UNMISS strongly condemns the ongoing violence and calls on all involved parties to demonstrate restraint. Such attacks and counter attacks must stop," said Nicholas Haysom, Special Representative of the UN Secretary-General and Head of UNMISS.

"The primary responsibility for protecting civilians lies with the Government and I commend their deployment of security forces to restore order, but it is equally imperative that humanitarian access is maintained for aid to reach the newly displaced," he added. "Vitally, national, state and local authorities must make concerted efforts to ensure recurrent conflict between herders and farmers are prevented in future."

For its part, UNMISS continues to intensively engage with communities and authorities to reduce tensions. The Mission is also sending peacekeeping patrols to affected areas to boost security.

**Priyanka Chowdhury | Spokesperson | Communications and Public Information |UNMISS|**

unmiss-spokesperson@un.org; chowdhury20@un.org • http://unmiss.unmissions.org • Facebook • X • Flickr

UNMISS | UNITED NATIONS MISSION IN SOUTH SUDAN

**2 Aug** 2024

## UNMISS GRAVELY CONCERNED BY RISING ABDUCTIONS IN GREATER YEI, CALLS FOR COLLECTIVE ACTION

**JUBA -** The United Nations Mission in South Sudan (UNMISS) is gravely concerned by rising abductions, allegedly carried out by the National Salvation Front (NAS) and other armed elements, in the greater Yei region of Central Equatoria state, predominantly impacting Yei River, Morobo and Lainya counties.

Last month itself, UNMISS received reports of some 12 such cases, affecting 134 individuals, six of whom are children. The abduction of children, in particular, exposes them to various risks including possible recruitment and use in armed conflict; sexual and gender-based violence, trafficking; and other forms of exploitation.

“Children as well as adults in captivity must be released immediately and unconditionally. Such incidents not only go against international human rights and humanitarian law but also have a devastating impact on communities, creating fear and uncertainty,” said Nicholas Haysom, Special Representative of the UN Secretary-General and Head of UNMISS.

“We urge the Government of South Sudan to conduct immediate investigations and remind involved parties of their human rights obligations. We also call for collective action by all stakeholders, including the Government, to strengthen measures that prevent recurring abductions and bring perpetrators to justice swiftly,” added the top UN official.

Abductions remain an ongoing threat to security and peacebuilding efforts. For its part, UNMISS is proactively engaging with relevant national, state, and local authorities on this issue.

--

**Contact: UNMISS Spokesperson at *unmiss-spokesperson@un.org*(link sends e-mail) (mailto:unmiss-spokesperson@un.org)**

Press Releases (/press-releases)

(/high-level-delegation-meets-stakeholders-jonglei-assess-need-flood-mitigation-measures)

(/unmiss-funds-civic-and-political-peacebuilding-space-mundri-east-county)

 (/high-level-delegation-meets-stakeholders-jonglei-assess-need-flood-mitigation-measures)

High-level delegation meets stakeholders in Jonglei to assess need for flood mitigation measures (/high-level-delegation-meets-stakeholders-jonglei-assess-need-flood-mitigation-measures)

 (/unmiss-funds-civic-and-political-peacebuilding-space-mundri-east-county)

UNMISS funds civic and political peacebuilding space in Mundri East County (/unmiss-funds-civic-and-political-peacebuilding-space-mundri-east-county)

Print (/en/print/unmiss-gravely-concerned-rising-abductions-

Email (mailto:?subject=UNMISS gravely concerned by rising

Twitter (https://twitter.com/share?

Facebook (https://www.facebook.com/sharer.php?

**UNMISS** | UNITED NATIONS MISSION IN SOUTH SUDAN

## BACKGROUND

The United Nations Mission in South Sudan (UNMISS) was initially established for a period of one year from 9 July 2011, under Security Council **Resolution 1996 (2011) (//unmiss.unmissions.org/un-security-council-resolution-1996-2011)**, with the intent to renew for further periods as needed.

Since then, UNMISS has been renewed consistently with the Security Council determining that the situation in South Sudan continues to pose a threat to international peace and security in the region. Currently, under **Resolution 2779 (2025) (//unmiss.unmissions.org/resolution-2779-2025-adopted-security-council-its-9913th-meeting-8-may-2025)**, the Council has extended the UNMISS mandate until 30 April 2026..

As it stands today, the Mission's mandate includes four pillars, namely, protection of civilians; creating conditions conducive to the delivery of humanitarian assistance; supporting the Implementation of the Revitalised Agreement and the peace process; and, monitoring, investigating, and reporting on violations of humanitarian and human rights law.

The Council has also determined that UNMISS should continue advancing a three-year strategic vision to prevent a return to civil war, build durable peace and support inclusive, accountable governance and free, fair and peaceful elections in accordance with the Revitalized Peace Agreement.

[See **Mandate (//unmiss.unmissions.org/mandate)** and **Facts and Figures (//unmiss.unmissions.org/facts-and-figures)** sections for more details]

### The Comprehensive Peace Agreement (CPA), referendum and independence of South Sudan

On 9 July 2011, South Sudan became the newest country in the world. The birth of the Republic of South Sudan culminated from a six-year peace process which began with the signing of the Comprehensive Peace Agreement (CPA) on 9 January 2005 between the Government of Sudan and the Sudan People's Liberation Movement (SPLM), ending more than 20 years of war.

The CPA called for a referendum to take place to determine the status of Southern Sudan. It was held in January 2011, with the overwhelming majority, 98.83% of participants, voting for independence.

Following the subsequent independence of South Sudan in July 2011, the Security Council established UNMISS.

## Subsequent conflict

On 15 December 2013, violence broke out in South Sudan's capital Juba and quickly spread to other locations in the country resulting in a nation-wide political and security crisis. Seven out of the country's 10 states were affected by the conflict, with Central Equatoria, Jonglei, Lakes, Unity and Upper Nile states being the hardest hit.

The relationship between the Government and UNMISS became increasingly tense, amid mounting anti-United Nations sentiment emanating from misperceptions about the Mission's role during the crisis. There were unfounded allegations that UNMISS was not impartial and was aiding and abetting anti-government forces. The ability of UNMISS to move freely was obstructed and demonstrations against the United Nations organized in several state capitals.

There were widespread human rights consequences, especially in areas of greatest military confrontation. UNMISS estimated that thousands of people had been killed during the hostilities. Both parties to the conflict were responsible for ethnically targeted attacks on civilians and failed to comply with international humanitarian and human rights law.

The humanitarian situation deteriorated sharply. Within the first month of the crisis, almost 500,000 persons were displaced within South Sudan and around 74,300 people had crossed into neighbouring countries. These numbers continued to rise, with total displacement by the end of February 2014 reaching 900,000 persons, including some 167,000 people crossing the country's borders. Civilians who had tipped into the "acute" or "emergency" categories of food insecurity had increased from 1.1 million to 3.2 million. Additionally, some 500,000 displaced people were in urgent need of food aid.

[For details, see **UN Secretary-General's report dated 6 March 2014 (//unmiss.unmissions.org/sites/default/files/secretary-generals_report_6_march_2014.pdf)**.]

## UNMISS reinforced and reprioritized

When conflict erupted, tens of thousands of civilians fled from areas where large numbers of killings were taking place and arrived at UNMISS compounds in Juba, Bor, Akobo, Bentiu, Malakal and Melut to seek refuge. The Mission opened its gates and its military engineers, working with humanitarian partners, quickly prepared sites in the compounds for the protection of civilians, despite having minimum facilities to accommodate them. Since then, as many as 85,000 civilians sought protection in eight UNMISS compounds across the country.

The massive influx of civilians into United Nations premises was unprecedented and placed a huge strain on UNMISS resources. In order to give the Mission adequate capacity to cope, the Security Council by its **Resolution 2132 (2013) (//unmiss.unmissions.org/sites/default/files/unscr_2132_2013.pdf)** of 24 December, approved the Secretary-General's recommendation to temporarily increase the overall UNMISS troop and police strength.

Reporting to the Security Council on **6 March 2014 (//unmiss.unmissions.org/sites/default/files/secretary-generals_report_6_march_2014.pdf)**, the Secretary-General emphasized that it was important to keep this surge capacity deployed for at least 12 months. The Secretary-General also called for UNMISS to temporarily reprioritize its activities and shift from a stand dedicated to peacebuilding, state-building and the extension of state authority, to one of strict impartiality in its relations with both parties.

Going forward, the main focus of the Mission, the Secretary-General suggested, should be on the protection of civilians, human rights and contributing to the creation of security conditions conducive to the delivery of humanitarian assistance, within its capability, in areas most affected by the conflict. The Mission's impartiality would be the sine qua non of all its actions throughout the country as long as the conflict persisted.

On 27 May 2014, the Security Council, by unanimously adopting **Resolution 2155 (2014) (//unmiss.unmissions.org/un-security-council-resolution-2155-2014), (//www.un.org/en/ga/search/view_doc.asp?symbol=S/RES/2155(2014))** reprioritized the UNMISS mandate towards the protection of civilians, human rights monitoring and support for the delivery of humanitarian assistance. The Council increased the Mission's troop and police strength. It also authorized the deployment within UNMISS of an Intergovernmental Authority on Development (IGAD) task force to support protection of civilians and the Monitoring and Verification Mechanism (MVM), established pursuant to the 23 January 2014 Cessation of Hostilities Agreement.

**Transition of UN Protection Sites into conventional camps for displaced people**

With the signing of the Revitalized Peace Agreement in 2018 and a transitional government of national unity in place, political violence has greatly reduced across South Sudan. The UN Protection Sites were established to protect civilians in imminent physical danger during intense conflict. But that threat no longer exists today. Therefore, many of these sites are gradually being redesignated as more conventional camps for internally displaced people, under the sovereign control of the Government of South Sudan. UNMISS has followed a long and careful process, planning alongside humanitarians, and in consultation with national and local government, the security services, and the displaced community themselves. The changing political and security situation combined with the ongoing successful redesignation of UN protection sites is enabling the Mission to reach more people in need and build the capacity of local police and the justice system to protect their own citizens. Humanitarian assistance to displaced people continues and nobody is being forced to leave.

Print (/en/print/background)

Email (mailto:?

Twitter (https://twitter.com/share?

Facebook (https://www.facebook.com/sharer.php?

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; MARY DOE; DAVID DOE; PETER DOE; and JACOB DOE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>Defendants. | Civil Action<br>No. 25-cv-13939-PBS |

**MEMORANDUM AND ORDER**

February 12, 2026

Saris, J.

## INTRODUCTION

South Sudan was designated for Temporary Protected Status ("TPS") in 2011, shortly after becoming the world's newest nation. After multiple extensions and redesignations, on November 6, 2025, Secretary of Homeland Security Kristi Noem announced that South Sudan's TPS designation would terminate in sixty days. Secretary Noem has decided to terminate the TPS designations of twelve countries in the past twelve months: Venezuela, Afghanistan,

Cameroon, Nepal, Nicaragua, Honduras, Syria, South Sudan, Myanmar, Haiti, Ethiopia, and Somalia. See App. A (summarizing litigation regarding each of these twelve terminations).

On December 22, 2025, a nonprofit called African Communities Together ("ACT") and four South Sudanese TPS holders filed a putative class action complaint against Secretary Noem, the U.S. Department of Homeland Security ("DHS"), U.S. Citizenship and Immigration Services ("USCIS"), and the United States (collectively, "Defendants"). Plaintiffs allege that the termination of South Sudan's TPS designation violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., and the equal protection component of the Fifth Amendment, see U.S. Const. amend. V. Now before the Court is Plaintiffs' motion to postpone the termination under 5 U.S.C. § 705.

After a hearing and review of the administrative record, the Court concludes that Plaintiffs are likely to succeed on their arguments that Secretary Noem violated the APA by arbitrarily adopting a pattern and practice of terminating each and every TPS designation, by giving pretextual reasons for the termination of South Sudan's TPS designation, and by failing to meaningfully consult with appropriate agencies. The Court further determines that Plaintiffs would suffer irreparable harm absent postponement of the termination and that the balance of equities weighs in

Plaintiffs' favor. Accordingly, the Court **ALLOWS** Plaintiffs' motion to postpone pursuant to 5 U.S.C. § 705 (Dkt. 7).

## BACKGROUND

### I. The TPS Statute

In 1990, Congress amended the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., to create the TPS program. See Immigration Act of 1990, Pub. L. No. 101-649, § 302, 104 Stat. 4978, 5030-36 (codified at 8 U.S.C. § 1254a). Under that program, noncitizens from designated countries may apply for work authorization and temporary protection against removal. See 8 U.S.C. § 1254a(a)(1).

The TPS statute authorizes the Secretary of Homeland Security to "designate any foreign state" for TPS only if she finds that at least one of three conditions applies. Id. § 1254a(b)(1). First, a foreign state may be designated if "an ongoing armed conflict . . . would pose a serious threat to the[] personal safety" of returning nationals. Id. § 1254a(b)(1)(A). Second, designation is permitted where a foreign state has requested designation after suffering an "environmental disaster" such as "an earthquake, flood, drought, [or] epidemic." Id. § 1254a(b)(1)(B). Third, the Secretary may designate a foreign state in which "there exist extraordinary and temporary conditions . . . that prevent" that state's nationals "from returning to the state in safety, unless the [Secretary] finds

that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." Id. § 1254a(b)(1)(C).

A TPS designation lasts for six to eighteen months. See id. § 1254a(b)(2). "At least 60 days before [the] end of" a foreign state's designation period, the Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation . . . continue to be met." Id. § 1254a(b)(3)(A). "If the [Secretary] does not determine" that the designated foreign state "no longer meets the conditions for designation," the designation period is automatically extended. Id. § 1254a(b)(3)(C). If, on the other hand, "the [Secretary] determines" that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation by publishing notice in the Federal Register of the determination," "including the basis for the determination." Id. § 1254a(b)(3)(B). The resulting TPS termination "shall not be effective earlier than 60 days after the date the notice is published." Id.

Judicial review of the Secretary's TPS determinations is statutorily proscribed. The TPS statute provides that "[t]here is no judicial review of any determination of the [Secretary] with

respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." Id. § 1254a(b)(5)(A).

## II. The Current Administration's TPS Terminations

On the first day of his second term in office, President Trump issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025). The executive order directs the Secretary of Homeland Security and other officials to "take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States." Id. at 8446. As relevant here, the executive order tasks government officials with "ensuring that designations of Temporary Protected Status are consistent with the provisions of [§ 1254a], and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." Id.

Since the issuance of that executive order, the government has taken steps to terminate the TPS designations of twelve countries: Venezuela, Afghanistan, Cameroon, Nepal, Nicaragua, Honduras, Syria, South Sudan, Myanmar, Haiti, Ethiopia, and Somalia. See App. A. Only five countries with TPS designations have not yet been slated for termination: El Salvador, Lebanon,

Sudan, Ukraine, and Yemen. See U.S. Citizenship & Immigr. Servs., Temporary Protected Status, https://www.uscis.gov/humanitarian/temporary-protected-status (last visited Feb. 12, 2026). At least four of these five designations are not yet eligible to be terminated.[1]

## III. The Termination of TPS for South Sudan

South Sudan was first designated for TPS in 2011. See Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63629, 63630 (Oct. 13, 2011). The then-Secretary of Homeland Security found that TPS protection was warranted due to both "ongoing armed conflict" and other "extraordinary and temporary conditions" such as food insecurity, human rights abuses, and impediments to humanitarian aid. Id. at 63631. South Sudan then retained TPS until the present through a series of extensions and redesignations. Most recently, in May 2025, DHS announced an automatic six-month extension of South Sudan's TPS designation, noting that Secretary Noem "was unable to make an informed determination" by the "statutory deadline due to the lack of an updated analysis of current country conditions in

[1] Yemen's TPS designation is listed as being in place until March 3, 2026. See U.S. Citizenship & Immigr. Servs., Temporary Protected Status Designated Country: Yemen, https://www.uscis.gov/humanitarian/temporary-protected-status/yemen/temporary-protected-status-designated-country-yemen (last visited Feb. 12, 2026). Because Secretary Noem has not announced a termination of that designation, it likely will be automatically extended.

South Sudan." Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19217, 19217 (May 6, 2025).

On November 6, 2025, DHS published a notice announcing that South Sudan's TPS designation would be terminated effective January 5, 2026. Termination of the Designation of South Sudan for Temporary Protected Status ("Termination"), 90 Fed. Reg. 50484, 50484 (Nov. 6, 2025). By DHS's estimate, the termination of South Sudan's TPS designation will affect 232 TPS holders and 73 applicants. See id. at 50486. The termination notice states that the May 2025 extension "occurred because Secretary Noem was provided with a non-current record from the Department of State that was signed November 6, 2024, which, together with other factors, prevented [her] from making an informed decision by the . . . statutory deadline." Id. at 50485. "[A]fter consulting with appropriate U.S. Government agencies" and "review[ing] current country conditions in South Sudan," however, the Secretary determined that South Sudan no longer met the conditions for TPS designation as of November 6, 2025. Id.

The Federal Register notice provides several explanations for this determination. First, the notice states that Secretary Noem determined that "South Sudan no longer meets the criteria for an ongoing armed conflict" under the TPS statute because although "inter/intra-communal violence" persists, "return to full-scale civil war . . . has been avoided" and "[r]ecent diplomatic

developments . . . indicate South Sudan's willingness to ensure the safety and reintegration of its returning nationals." Id.

Next, the notice lists several "improvements in South Sudan's civil safety outlook," infrastructure, and other developments. Id. While acknowledging that "certain extraordinary and temporary conditions remain" in South Sudan, the notice states that Secretary Noem determined that termination "is required because it is contrary to the national interest to permit South Sudanese nationals . . . to remain temporarily in the United States." Id. at 50486. In assessing the national interest, the notice points to "foreign policy concerns" -- such as "the transitional South Sudanese government's current compliance" with accepting returning nationals -- and "public safety and national security risks" posed domestically by South Sudanese nationals who are purportedly "subjects of administrative investigation for fraud, public safety and national security concerns." Id.

Finally, the notice cites Executive Order 14,159, stating that President Trump directed Secretary Noem to "take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States," including by limiting TPS designations. Id. The notice states that this directive from President Trump "bear[s] upon the national interest." Id.

## IV. **The Instant Lawsuit**

On December 22, 2025, Plaintiffs filed a putative class action complaint challenging the termination of TPS for South Sudan. Plaintiff ACT is a nonprofit membership organization that has "South Sudanese TPS recipients and/or applicants" among its members and that "fights for civil rights, opportunity, and a better life for African immigrants, their families, and their communities across the United States." Dkt. 1 ¶¶ 16, 18. Pseudonymous Plaintiffs Mary Doe, David Doe, Peter Doe, and Jacob Doe are South Sudanese nationals whose sole immigration status is TPS. Plaintiffs intend to seek certification of a class consisting of all recipients of TPS for South Sudan, all persons with pending applications for TPS for South Sudan, and the U.S. citizen dependents or immediate relatives of those two groups.

The complaint advances four APA claims and one constitutional claim.[2] Count One alleges that the termination of TPS for South Sudan was procedurally improper in violation of 5 U.S.C. § 706(2)(D) because Secretary Noem "failed to consult with appropriate agencies," failed to review country conditions, based the termination "on a predetermined domestic policy . . . to restrict access to TPS for non-white, non-European, African

[2] Defendants do not currently contest standing, and the Court is satisfied that Plaintiffs have adequately demonstrated standing at this stage of the litigation.

immigrants," and improperly considered the "national interest." Id. ¶¶ 202-04; see id. ¶¶ 196-208. Count Two alleges that the Secretary unlawfully departed from past agency practice without explanation by providing only sixty days' notice before the termination, considering the national interest, and failing to consider intervening country conditions since the most recent TPS extension. See id. ¶¶ 209-15. Count Three alleges that the termination was arbitrary and capricious and contrary to law under 5 U.S.C. § 706(2)(A) and (C) because the Secretary, inter alia, failed to consider country conditions, neglected to consult appropriate agencies, and acted based on "undue political influence" and "impermissible racial preferences." Id. ¶ 218(E)-(F); see id. ¶¶ 216-20. Count Four alleges that the termination was "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(B) due to "racial and/or national origin animus against African and other non-white or non-European immigrants." Id. ¶¶ 222-23; see id. ¶¶ 221-26. Count Five alleges an equal protection violation under the Fifth Amendment based on that purported animus. See id. ¶¶ 227-32.

On December 23, 2025, Plaintiffs filed an emergency motion to postpone the effective date of the termination pursuant to 5 U.S.C. § 705. Plaintiffs argue that postponement is appropriate because they are likely to succeed on their claims that (1) the termination is contrary to law under § 706(2)(A) because the Secretary made a

predetermined decision to terminate South Sudan's TPS without consulting appropriate agencies or considering current country conditions, and because the Secretary impermissibly considered the national interest, see Dkt. 7-1 at 13-19; (2) the termination is arbitrary and capricious under § 706(2)(A) because it departed from past agency practice in providing only sixty days' notice and considering the national interest, see id. at 19-20; and (3) the termination violated § 706(2)(B) and the Fifth Amendment by discriminating based on race and national origin, see id. at 20-23.

A hearing was held by the emergency judge on December 26, 2025, on Plaintiffs' request for an administrative stay of the termination until the Court could resolve Plaintiffs' § 705 motion. The emergency judge issued the requested relief, thereby staying the effective date of the termination "subject to further [o]rder of this Court or higher courts." Dkt. 37 at 4. As noted in the emergency judge's order, the administrative stay was "not a reflection of the merits" but rather was issued solely to "allow the [C]ourt time to consider the merits" of Plaintiffs' § 705 motion. Id. at 3.

After hearing, upon the Court's request, Defendants filed the certified administrative record on January 26, 2026. The parties then filed supplemental briefing on February 2, 2026. Plaintiffs' § 705 motion is now before the Court.

## LEGAL STANDARD

The APA provides that, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of" the court's review of the agency action. 5 U.S.C. § 705. In determining whether to postpone agency action under § 705, courts assess the factors that govern the issuance of a preliminary injunction. See, e.g., Nat'l TPS All. v. Noem, 150 F.4th 1000, 1015 (9th Cir. 2025); Colorado v. U.S. EPA, 989 F.3d 874, 883 (10th Cir. 2021); Cook County v. Wolf, 962 F.3d 208, 221 (7th Cir. 2020).

Accordingly, a party moving under § 705 must establish that (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of" postponement of the challenged agency action; (3) "the balance of equities tips in [its] favor"; and (4) postponement of the agency action "is in the public interest." Sosa v. Mass. Dep't of Corr., 80 F.4th 15, 25 (1st Cir. 2023) (quoting Dist. 4 Lodge of the Int'l Ass'n of Machinists Loc. Lodge 207 v. Raimondo, 40 F.4th 36, 39 (1st Cir. 2022)). The first factor "is the sine qua non" of the analysis. US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC, 121 F.4th 339, 347 (1st Cir. 2024). The third and fourth factors "merge when the

[g]overnment is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

## DISCUSSION

## I. Likelihood of Success on the Merits

In determining Plaintiffs' likelihood of success on the merits, the Court must first assess Defendants' jurisdictional arguments. The Court concludes, as explained below, that it has jurisdiction to review several of Plaintiffs' claims. The Court then finds that Plaintiffs are likely to succeed on their claims that Secretary Noem violated the TPS statute by failing to disclose the true basis for her termination determination and failing to consult with appropriate agencies.

### A. Jurisdiction

The threshold question is whether Plaintiffs' claims are reviewable. The Supreme Court has held that "the presumption favoring judicial review of administrative action" means that a statute "reasonably susceptible to divergent interpretation" does not bar review. Guerrero-Lasprilla v. Barr, 589 U.S. 221, 229 (2020) (quoting Kucana v. Holder, 558 U.S. 233, 251 (2010)). This presumption of reviewability is "'consistently applied' . . . to immigration statutes" and "can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." Id. (first quoting Kucana, 558 U.S. at 251; and then quoting Reno v. Cath. Soc. Servs., Inc., 509 U.S. 43, 64 (1993)).

Further, a "heightened showing" is required to bar judicial review of constitutional claims: Where a statute "purports to 'deny any judicial forum for a colorable constitutional claim,'" Congress's "inten[t] to preclude judicial review of constitutional claims . . . must be clear." Elgin v. Dep't of Treasury, 567 U.S. 1, 9 (2012) (quoting Webster v. Doe, 486 U.S. 592, 603 (1988)).

Defendants argue that Plaintiffs' claims are jurisdictionally barred by three statutory provisions. The Court addresses each of those provisions in turn.

*1. 8 U.S.C. § 1254a(b)(5)(A)*

Defendants first point to the TPS statute itself, which provides that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). Defendants argue that this provision bars review of all of Plaintiffs' claims because Plaintiffs challenge "the Secretary's determination to terminate South Sudan's TPS" designation. Dkt. 43 at 16. Defendants further contend that the Supreme Court "necessarily determined" the likelihood of success of this argument by staying orders postponing the effective date of the termination of TPS for Venezuela. Id. at 18.

To resolve this issue, the Court must first determine the types of claims that § 1254a(b)(5)(A) renders unreviewable and

then determine whether Plaintiffs' claims fall within the scope of this statutory bar. The Court then addresses the Supreme Court's orders in the Venezuela TPS litigation.

a. Scope of § 1254a(b)(5)(A)

To assess whether Congress intended to preclude judicial review of certain types of claims, the Court examines the "text, structure, and purpose" of the TPS statute. Elgin, 567 U.S. at 10. A "determination" under the TPS statute, with respect to the periodic review of existing TPS designations, is the Secretary's decision regarding "whether the conditions for [the TPS] designation" of a foreign state "continue to be met." 8 U.S.C. § 1254a(b)(3)(A); see also id. § 1254a(b)(3)(B) (requiring notice when the Secretary of Homeland Security "determines . . . that a foreign state . . . no longer continues to meet the conditions for designation" (emphasis added)). Those designation conditions are the ones set forth in § 1254(b)(1): armed conflict, environmental disaster, or extraordinary and temporary conditions. See id. § 1254(b)(1).

Therefore, in prohibiting "judicial review of any determination . . . with respect to . . . [a] termination . . . of a designation," id. § 1254a(b)(5)(A), the TPS statute forecloses all claims challenging the Secretary's determination that no qualifying armed conflict, environmental disaster, or extraordinary and temporary condition continues to exist (or that

the national interest precludes a designation based on extraordinary and temporary conditions). In other words, the substantive decision to designate a country for TPS, or to terminate such designation, is the Secretary's alone, and the Court cannot, for example, second-guess the weight she ascribes to conditions in the foreign state at issue.

The TPS statute does not, however, prohibit review of whether the Secretary (1) "consult[ed] with appropriate agencies" before terminating a designation; (2) "review[ed] the conditions in the foreign state" after consulting with those agencies; (3) "publish[ed] notice in the Federal Register" of the termination determination and "the basis" for it; and (4) engaged in interagency consultation and country-condition review "[a]t least 60 days before [the] end of the" current designation period and published notice "on a timely basis" after making the termination determination. Id. § 1254a(b)(3)(A)-(B). These procedural requirements are distinct from the substantive "determination" of whether conditions for TPS designation continue to be met. Id.

Defendants argue that the phrase "with respect to" in § 1254a(b)(5)(A) means that the judicial review provision covers all "matters relating to" a determination, not just the determination itself. Dkt. 43 at 16 (quoting Lamar, Archer & Cofrin, LLP v. Appling, 584 U.S. 709, 717 (2018)). But the provision prohibits review "of" a determination "with respect to

the designation, . . . termination[,] or extension" of a foreign state for TPS. 8 U.S.C. § 1254a(b)(5)(A). The phrase "with respect to" thus refers to the types of determinations implicated -- i.e., determinations relating to designations, terminations, and extensions of TPS, as described in other portions of § 1254a(b).

Further, while the TPS statute bars direct review of the Secretary's country-specific TPS determinations, it does not preclude review of "general collateral challenges to . . . practices and policies used by the agency" in reaching those determinations. McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 492 (1991). In McNary, the Supreme Court was confronted with a provision that precluded "judicial review of a determination respecting an application for adjustment of status" under an amnesty program for certain agricultural workers. 498 U.S. at 491 (quoting 8 U.S.C. § 1160(e)(1)). Similarly, in Reno, the Court interpreted a provision limiting "judicial review of a determination respecting an application for adjustment of [temporary resident] status." 509 U.S. at 54 (quoting 8 U.S.C. § 1255a(f)(1)). In each case, the Supreme Court held that the jurisdictional bar at issue "applie[d] only to review of denials of individual . . . applications." Id. at 56 (second alteration in original) (quoting McNary, 498 U.S. at 494). Critical to these holdings was the Court's reasoning that each statute's "reference to 'a determination' describes a single act rather than a group of

decisions or a practice or procedure employed in making decisions." Id. (quoting McNary, 498 U.S. at 492). So too here: Because the TPS statute precludes judicial review of a "determination," a court may not inquire into the substantive considerations of the Secretary in making country-specific TPS determinations but may entertain collateral challenges to agency "procedures and practices" in administering the TPS program. McNary, 498 U.S. at 494.

Finally, the TPS statute also does not preclude constitutional claims. "[W]here Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." Webster, 486 U.S. at 603. Congress knows how to demonstrate that intent. For example, another section of the INA "specifically precludes review of 'all questions of law and fact, including interpretation and application of constitutional and statutory provisions' except as provided in that section." CASA, Inc. v. Noem, 792 F. Supp. 3d 576, 594 (D. Md. 2025) (quoting 8 U.S.C. § 1252(b)(9)). Section 1254a(b)(5)(A), in contrast, contains no reference to constitutional challenges. Defendants therefore have not made the "heightened showing" required to persuade the Court that § 1254a(b)(5)(A) should be "construed to deny any judicial forum for a colorable constitutional claim." Webster, 486 U.S. at 603.

b. Application to Plaintiffs' Claims

Having demarcated the scope of the TPS statute's jurisdictional bar, the Court now turns to deciding which of Plaintiffs' claims survive that bar. Defendants argue persuasively that several of Plaintiffs' claims do not. For one, Plaintiffs' argument that Secretary Noem wrongly viewed "armed conflict short of 'full-scale civil war'" as insufficient to satisfy the "armed-conflict-based designation" condition is unreviewable. Dkt. 7-1 at 16-17. Similarly, the Court cannot review Plaintiffs' challenge to Secretary Noem's alleged failure to consider factors such as "acute food insecurity," "widespread flooding," and "barriers to humanitarian access" in determining whether extraordinary and temporary circumstances permit an extension of South Sudan's TPS designation. Id. at 18. And the Court cannot review Plaintiffs' claims that Secretary Noem impermissibly considered the domestic "national interest." Id. at 19. Each of these claims asks the Court to second-guess how Secretary Noem should weigh country conditions in determining whether armed conflict, environmental disaster, or extraordinary and temporary conditions continue to justify a TPS designation. Section 1254a(b)(5)(A) does not allow the Court to pick apart the substantive reasoning of the Secretary's country-specific TPS determinations in this fashion.

Several of Plaintiffs' claims are, however, reviewable. First, the Court may review Plaintiffs' claim that "the decision

to terminate TPS for South Sudan was a predetermined action" in violation of the APA. Id. at 13; see Dkt. 1 ¶¶ 203, 218(E), (G). Plaintiffs contend that Secretary Noem's true reason for terminating South Sudan's TPS designation was to achieve "the politically motivated objective of gutting access to TPS" and "the goal of systematically shrinking" the TPS program. Dkt. 7-1 at 13-14; see also Dkt. 50 at 8 (contending that "the termination of TPS for South Sudan was part of a larger initiative to terminate the TPS program altogether"). In support of the contention that Secretary Noem's asserted reasons for the termination were pretextual, Plaintiffs highlight the fact that Secretary Noem has announced the termination of TPS designations for twelve countries since taking office, as well as the dearth of interagency consultation in the administrative record. Plaintiffs also point to statements by Secretary Noem opposing TPS. See, e.g., Dkt. 7-1 at 14 (claiming that Secretary Noem asserted during her confirmation hearing that the TPS program had "been abused and manipulated" and that extensions would "no longer be allowed").

This argument amounts to a claim of pretext under Department of Commerce v. New York, 588 U.S. 752 (2019). That case stands for the proposition that where there is a "disconnect between" an agency action "and the explanation given," and where "the sole stated reason[s]" for the agency action were "contrived," a court may remand the action to the agency. Id. at 784-85; see id. at 783

(affirming remand due to "significant mismatch between the decision the [agency] made and the rationale [it] provided"). As the Supreme Court noted, this doctrine arises from the "settled proposition[]" that "in order to permit meaningful judicial review" under the APA, "an agency must 'disclose the basis' of its action." Id. at 780 (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

Plaintiffs' claim of pretext is reviewable to the extent it represents an allegation that Secretary Noem failed to publish the true basis for her termination determination in the Federal Register. As already noted, the TPS statute requires the Secretary to "publish[] notice in the Federal Register of the [termination] determination," "including the basis for the determination." 8 U.S.C. § 1254a(b)(3)(B). That basis must be a "genuine" basis for the determination; "[a]ccepting contrived reasons would defeat the purpose of" judicial review. Department of Commerce, 588 U.S. at 785. The Court also may review Plaintiffs' claim to the extent it challenges a general "practice or procedure" by DHS of terminating all TPS designations regardless of whether conditions for designation continue to be met. McNary, 498 U.S. at 492.

In addition to Plaintiffs' claim of pretext, the Court may review three other claims made by Plaintiffs. First, the Court may review Plaintiffs' argument that Secretary Noem did not consult with appropriate agencies. See Dkt. 7-1 at 15-16. Second, the Court

deems reviewable Plaintiffs' contention that Secretary Noem departed from past agency practice, without proper explanation, by providing a notice only "60 days prior to [the] effective date" of the termination of South Sudan's TPS. Id. at 19-20. These two assertions relate to procedural requirements that are collateral to the Secretary's substantive "determination" of whether to terminate a TPS designation -- i.e., the TPS statute's provisions requiring that the Secretary "consult[] with appropriate agencies" and that a termination's effective date be no later than "60 days after the date the [termination] notice is published" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A)-(B); see CASA, 792 F. Supp. 3d at 592 (holding that challenges based on "the timing requirements of the TPS statute" are reviewable). Third, because § 1254a(b)(5)(A) does not bar constitutional claims, the Court may review Plaintiffs' claim that the termination of South Sudan's TPS violated the "equal protection component" of the Fifth Amendment's Due Process Clause. Dkt. 7-1 at 20 (quoting Washington v. Davis, 426 U.S. 229, 239 (1976)).

c. Effect of Recent Supreme Court Orders

As Defendants point out, the Supreme Court issued two emergency orders in May and October 2025 regarding the termination of TPS for Venezuela. See Noem v. Nat'l TPS All., 145 S. Ct. 2728 (2025) (mem.); Noem v. Nat'l TPS All., 146 S. Ct. 23 (2025) (mem.). Defendants contend that these Supreme Court orders "necessarily

determined that the government was likely to succeed on the merits of its . . . argument," comparable to the one Defendants advance here, that § 1254a(b)(5)(A) bars review of all matters related to a TPS determination. Dkt. 43 at 18.

"Although [the Supreme Court's] interim orders are not conclusive as to the merits, they inform how a court should exercise its . . . discretion in like cases." Trump v. Boyle, 145 S. Ct. 2653, 2654 (2025). Where, as here, the Supreme Court orders provide little to no reasoning, this Court will look to the litigation history culminating in those orders to determine if the instant case differs from them "in any pertinent respect." Id.; see New York v. Trump, __ F. Supp. 3d __, __ (D. Mass. 2025) [2025 WL 3514301, at *10-11] (employing this analytical approach).

Every court to have addressed the issue, including the Ninth Circuit, has concluded that even the Supreme Court's second order -- which stayed the grant of partial summary judgment to plaintiffs challenging the termination of Venezuela's TPS designation, see Noem, 146 S. Ct. at 24 -- contains insufficient reasoning to guide lower courts' legal analyses. See Nat'l TPS All. v. Noem, __ F.4th __, __ (9th Cir. 2026) [2026 WL 226573, at *5]; Doe v. Noem, No. 25-cv-8686 (S.D.N.Y. Nov. 19, 2025), Dkt. 59 at 4:20-6:8, appeal filed, No. 25-2995 (2d Cir. Nov. 25, 2025); Doe v. Noem, No. 25-cv-15483, 2026 WL 184544, at *9 n.3 (N.D. Ill. Jan. 23, 2026); Miot v. Trump, __ F. Supp. 3d __, __ (D.D.C. 2026)

[2026 WL 266413, at *19-20], appeal filed, No. 26-5050 (D.C. Cir. Feb. 6, 2026); see also Nat'l TPS All. v. Noem, No. 26-199 (9th Cir. Jan. 9, 2026), Dkt. 11 at 5 (finding Supreme Court's stay orders informative as to equitable factors but not as to likelihood of success on the merits). Because it is difficult to read the tea leaves of the Supreme Court's orders and the associated litigation history, which are not necessarily at odds with this Court's construction of the TPS statute's judicial review bar, this Court joins the chorus.

*2. 8 U.S.C. § 1252(f)(1)*

Defendants next contend that 8 U.S.C. § 1252(f)(1) bars judicial review of Plaintiffs' motion. With exceptions not relevant here, that section strips district courts of "jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." 8 U.S.C. § 1252(f)(1).

The parties dispute whether the TPS statute is among "the provisions of part IV of this subchapter" referenced by § 1252(f)(1). Id. Defendants concede that "§ 1254a appears in part V of the relevant subchapter" in the U.S. Code but argue that the public-law version of § 1252(f)(1) does encompass § 1254a and trumps the U.S. Code's language. Dkt. 43 at 21. Plaintiffs respond that Congress did not intend § 1254a to be covered by § 1252(f)(1).

The Court need not resolve this dispute because even if the TPS statute is encompassed by § 1252(f)(1), Plaintiffs' motion does not seek to "enjoin or restrain the operation of the" TPS statute. 8 U.S.C. § 1252(f)(1). This language in § 1252(f)(1) precludes the issuance of only "a specific category of remedies," and it is "included . . . in a provision whose title -- 'Limit on injunctive relief' -- makes clear the narrowness of its scope." Biden v. Texas, 597 U.S. 785, 798 (2022). Although the Supreme Court has not specifically addressed whether § 1252(f)(1) extends to declaratory relief and vacatur under the APA, see id. at 801 n.4, binding precedent from the First Circuit dictates that "declaratory relief remains available under [§] 1252(f)(1)," Brito v. Garland, 22 F.4th 240, 252 (1st Cir. 2021); see Guerrero Orellana v. Moniz, __ F. Supp. 3d __, __ (D. Mass. 2025) [2025 WL 3033769, at *12], and this Court likewise concludes that "§ 1252(f)(1) does not apply to vacatur," Texas v. United States, 50 F.4th 498, 528 (5th Cir. 2022); cf. New York, __ F. Supp. 3d at __ [2025 WL 3514301, at *17] (noting distinction between injunctive relief and vacatur); infra section IV (same). Plaintiffs' requests for declaratory relief and vacatur, see Dkt. 1 at 70, therefore may proceed to the extent they are not barred by § 1254a(b)(5)(A). And because a postponement of agency action under § 705 "functions as a 'temporary form of vacatur,'" not as a preliminary injunction "that operate[s] in personam," Plaintiffs' requested relief in the

instant motion is not barred by § 1252(f)(1). Make the Rd. N.Y. v. Noem, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (per curiam) (quoting All. for Hippocratic Med. v. U.S. FDA, 78 F.4th 210, 254 (5th Cir. 2023)).

*3. 5 U.S.C. § 701(a)(2)*

Defendants level one final challenge to this Court's ability to entertain Plaintiffs' APA claims. In a footnote, Defendants posit that the APA's waiver of sovereign immunity does not apply to Plaintiffs' suit because TPS termination determinations are "committed to agency discretion by law." Dkt. 43 at 16 n.2 (quoting 5 U.S.C. § 701(a)(2)).[3]

This argument fails. The Supreme Court has "read the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018) (quoting Lincoln v. Vigil, 508 U.S. 182, 191 (1993)). The TPS statute does not present such rare circumstances; on the contrary, it "imposes . . . 'categorical

[3] In the same footnote, Defendants also suggest that the TPS statute is one which "grants consent to suit [but] expressly or impliedly forbids the relief which is sought." Dkt. 43 at 16 n.2 (quoting 5 U.S.C. § 702). But the TPS statute does not preclude all of Plaintiffs' APA claims, as already explained, see supra Section I.A.1, and the relief sought by Plaintiffs is permissible, see infra Section IV.

requirement[s]' that the Secretary" of Homeland Security consult with appropriate agencies, review country conditions, and publish the basis for her determination in the Federal Register. Id. at 24 (quoting Bennett v. Spear, 520 U.S. 154, 172 (1997)); see 8 U.S.C. § 1254a(b)(3). Even if the substantive weight ascribed by the Secretary to certain country conditions is discretionary, these procedural requirements are not. Section § 701(a)(2) thus does not change the scope of this Court's review. See Miot, __ F. Supp. 3d at __ [2026 WL 266413, at *18-19].

**B. Merits of Non-Barred Claims**

The Court addresses each of Plaintiffs' reviewable arguments in turn.

*1. Pretext*

Plaintiffs argue that Secretary Noem's decision to terminate TPS for South Sudan is part of a preordained pattern and practice of terminating all TPS designations, regardless of country conditions, based on "the politically motivated objective of gutting access to TPS" and "the goal of systematically shrinking" the TPS program. Dkt. 7-1 at 13-14. As previously noted, this claim also implicates the TPS statute's requirement that the Secretary publish "the basis for [her] determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(B).

At the outset, the Court notes that it "may not set aside an agency's policymaking decision solely because it might have been

influenced by political considerations or prompted by an Administration's priorities." Dep't of Com., 588 U.S. at 781. "Agency policymaking is not a 'rarified technocratic process, unaffected by political considerations or the presence of Presidential power.'" Id. (quoting Sierra Club v. Costle, 657 F.2d 298, 408 (D.C. Cir. 1981)). Nevertheless, "in order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." Id. at 780 (quoting Burlington Truck Lines, 371 U.S. at 168). Where there is "a significant mismatch between the decision the [agency] made and the rationale [it] provided," the "contrived" rationale is inadequate under the APA. Id. at 783, 785.

Relatedly, if the Secretary of Homeland Security fails to provide "the basis" -- not just any basis, but "the" true basis -- for her termination determination in the Federal Register, she acts contrary to the TPS statute. 8 U.S.C. § 1254a(b)(3)(B); see Nat'l TPS All., __ F.4th at __ (Mendoza, J., concurring) [2026 WL 226573, at *27] (noting that an agency must disclose its "actual basis" for acting). That procedural requirement is reviewable by this Court, see supra Section I.A.1.a, as is Plaintiffs' claim that Defendants engaged in a preordained practice of terminating all TPS designations as "part of a larger initiative to terminate the TPS program altogether," Dkt. 50 at 8; see McNary, 498 U.S. at 492.

Several lines of evidence show a likelihood of success on the claim that Secretary Noem "was determined to" terminate all TPS designations "from the time [s]he entered office" and failed to disclose that basis for her termination determination in the Federal Register. Dep't of Com., 588 U.S. at 782-83. First, the Court cannot ignore the fact that Secretary Noem has decided to terminate twelve TPS designations in as many months. See App. A. The sole extension granted by Secretary Noem during that span, by DHS's own admission, occurred only because Secretary Noem missed the "statutory deadline" for South Sudan -- not because she determined that conditions for TPS designation continued to exist. Termination, 90 Fed. Reg. at 50485. This pattern of TPS terminations demonstrates a likelihood of success in proving a "practice or procedure" by DHS of terminating all designations irrespective of country conditions. McNary, 498 U.S. at 492. It also distinguishes this case from the litigation regarding Venezuela's TPS designation, in which the Supreme Court ruled against the plaintiffs on its emergency docket. While Venezuela's designation was the first that Secretary Noem sought to terminate, South Sudan's was the eighth. And while Secretary Noem had sought to terminate six countries' TPS designations as of the date the

district court granted partial summary judgment in the Venezuela litigation, she has, by now, announced the termination of twelve.[4]

Furthermore, one salient statement in the Federal Register notice is belied by the record, bolstering Plaintiffs' claim that the explanation provided by Secretary Noem was "contrived." Dep't of Com., 588 U.S. at 785. The Federal Register notice states that South Sudanese TPS holders have "been subjects of administrative investigation for fraud, public safety[,] and national security concerns." Termination, 90 Fed. Reg. at 50486. The administrative record reveals, however, that when USCIS searched for records of fraud or public safety concerns among 228 South Sudanese TPS holders, it found none. See Dkt. 59-1 at 129.[5] Notably, Secretary Noem used the exact same language alleging fraud, public safety, and national security concerns when announcing the termination of TPS for at least four other countries. See Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20309, 20311 (May 13, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45398, 45401

[4] The Court recognizes that several courts have allowed TPS terminations to proceed. See generally App. A. Nevertheless, with each additional TPS designation that Secretary Noem decides to terminate, claims that such termination determinations are preordained become increasingly supported.

[5] The portion of the administrative record concerning USCIS's search for national security concerns among these TPS holders is redacted, see Dkt. 59-1 at 129, but Defendants do not contend that any such concerns were identified.

(Sept. 22, 2025); Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54733, 54737 (Nov. 28, 2025); Termination of the Designation of Somalia for Temporary Protected Status, 91 Fed. Reg. 1547, 1551 (Jan. 14, 2026). This pattern indicates a likely "practice or procedure" of using stock language in the Federal Register notices regardless of USCIS's actual findings. McNary, 498 U.S. at 492.

Similarly, the Federal Register notice includes several instances of cherry-picked positive data that are sharply at odds with the country conditions described in the administrative record. For example, the notice states that a United Nations mission is helping "build[] the capacity of South Sudan's local police and justice system." Termination, 90 Fed. Reg. at 50485. But the notice does not discuss that the same United Nations mission, which was established in 2011, reported in 2025 that it was "gravely concerned by escalating violence," "civilian displacement," "rising abductions," and other "threat[s] to international peace and security in the region." Dkt. 59-9 at 93-94, 96. While the Court lacks jurisdiction to assess whether Secretary Noem adequately weighed country conditions in South Sudan, the disconnect between the Federal Register notice and her own administrative record is further evidence of pretext.

Secretary Noem's failure to consult with other agencies -- which is discussed in more detail below, see infra Section

I.B.2 -- also weighs toward a finding of pretext. Defendants cite only one communication as evidence of interagency consultation. On July 21, 2025, a DHS employee emailed a State Department employee the following:

> The following TPS designations are coming up for review:
> - Syria: Aug. 1 decision deadline
> - South Sudan: September 3 decision deadline
> - Burma: September 26 decision deadline
> - Ethiopia: October 13 decision deadline

Dkt. 59-3 at 133. The State Department employee replied as follows:

> I confirm that State has no foreign policy concerns with ending these TPS designations on or before those dates. As you are aware, sanctions on Syria have recently been lifted, and we have partnered with South Sudan on immigration-related issues.

Id. This minimal evidence of consultation bolsters Plaintiffs' claim that the default Defendants were predetermined to terminate South Sudan's TPS designation.

Finally, Secretary Noem has vocally opposed the TPS program writ large. For example, as Plaintiffs point out, Secretary Noem stated during her confirmation hearing that TPS "has been abused and manipulated by the Biden Administration" and that the TPS "program was intended to be temporary." Dkt. 1 ¶ 114. The Court is "not required to exhibit a naiveté from which ordinary citizens are free." Dep't of Com., 588 U.S. at 785 (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977)). It is self-evident that Secretary Noem was predisposed to terminate TPS designations from the outset of her tenure. Secretary Noem cannot

be faulted for having a policy preference; after all, a "change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 59 (Rehnquist, J., concurring). Still, her public statements reinforce the argument that the decision to terminate South Sudan's TPS designation was preordained and that the Federal Register notice's assertion that the termination resulted from South Sudan no longer meeting the statutory conditions for designation was not the real reason. It is highly likely that no country will pass muster, no matter how dire its conditions.

Plaintiffs thus are likely to succeed on their argument that Secretary Noem failed to disclose the true "basis for [her] determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(B).

*2. Consultation*

The Court next addresses Plaintiffs' separate claim of insufficient interagency consultation. The TPS statute requires the Secretary to "consult[] with appropriate agencies" before reviewing country conditions and determining whether to terminate a TPS designation. 8 U.S.C. § 1254a(b)(3)(A). "Consultation," at the time of the enactment of the TPS statute, meant the "[d]eliberation of persons on some subject," Consultation, Black's Law Dictionary (6th ed. 1990), that is to say, "[t]he act of

weighing and examining the reasons for and against a contemplated act or course of conduct," Deliberation, Black's Law Dictionary (6th ed. 1990). See also Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 117 (1st Cir. 2002) (defining consultation as "[t]he act of asking the advice or opinion of someone" (alteration in original) (quoting Consultation, Black's Law Dictionary (7th ed. 1999)).

In support of their argument that Secretary Noem satisfied this consultation requirement, Defendants point only to the July 2025 email exchange with the State Department discussed above. No communications between DHS and State Department officials about country conditions are included in the administrative record. Under any reasonable interpretation of the word "consultation," the single email chain cited by Defendants plainly is inadequate.[6]

It is true that the administrative record contains a country-conditions report from USCIS and a redacted memorandum from the USCIS Director to Secretary Noem. See Dkt. 59-1 at 141-90; see also Dkt. 59-1 at 123-126 (internal DHS correspondence). But Defendants do not contend that conversations within DHS's "own subcomponents could fulfill" the TPS statute's consultation requirement. Doe, 2026 WL 184544, at *14 n.4. It is significant that the Secretary of State traditionally provided DHS with a

[6] Notably, another district court found this same email chain to be insufficient evidence of interagency consultation with respect to Secretary Noem's termination of TPS for Myanmar. See Doe, 2026 WL 184544, at *13-14.

formal "letter with a recommendation" regarding TPS determinations. Dkt. 8-6 at 24. There is no such correspondence in the administrative record.

The lack of any evidence of consultation with the State Department about conditions for designation also differentiates this case from the Venezuela TPS litigation. There, DHS received a "one-and-a-half page letter" from the Secretary of State before terminating Venezuela's TPS designation. Nat'l TPS All. v. Noem, 798 F. Supp. 3d 1108, 1151 (N.D. Cal. 2025), aff'd, __ F.4th __ (9th Cir. 2026) [2026 WL 226573]. In staying the district court's grant of partial summary judgment to the plaintiffs in that case, the Supreme Court may well have viewed this evidence of consultation as adequate under the TPS statute. The Supreme Court's order thus does not preclude finding that insufficient interagency consultation occurred here, where no such letter from the Secretary of State was received.[7]

[7] Similarly, although the Ninth Circuit recently stayed a grant of partial summary judgment to plaintiffs challenging the termination of TPS for Nepal, Nicaragua, and Honduras, see Nat'l TPS All., No. 26-199, Dkt. 11 at 5, the district court in that case found inadequate consultation even though DHS staff solicited country conditions reports from the State Department, see Nat'l TPS All. v. Noem, No. 25-cv-05687, 2025 WL 4058572, at *5 (N.D. Cal. Dec. 31, 2025). No such consultation between DHS and the State Department occurred here.

In sum, Plaintiffs are likely to succeed on their claim that Secretary Noem acted contrary to law by failing to consult with appropriate agencies. See 5 U.S.C. § 706(2)(A).

*3. Notice*

Next, Plaintiffs contend that Secretary Noem deviated from prior agency practice without proper explanation by providing only sixty days' notice before terminating South Sudan's TPS designation. They point out that before President Trump's current term, the twelve most recent TPS terminations -- spanning two decades -- came with at least six months' notice. Defendants respond that providing sixty days' notice is per se permissible because the TPS statute expressly provides that DHS may make its termination determination "60 days before [the] end" of the current designation period. 8 U.S.C. § 1254a(b)(3)(A).

The Court need not determine Plaintiffs' likelihood of success on this argument because the Court has already concluded that Plaintiffs are likely to succeed on their claims that Secretary Noem failed to disclose the true basis for her termination determination and to consult with appropriate agencies.

*4. Equal Protection*

Finally, Plaintiffs assert that Secretary Noem's termination determination was rooted in race-based and national origin-based animus in violation of the "equal protection component" of the

Fifth Amendment's Due Process Clause. Dkt. 7-1 at 20 (quoting Washington, 426 U.S. at 239). Plaintiffs point to "charged code words" used by Secretary Noem, President Trump, and others in the current administration, claiming that these statements "lay bare [Defendants'] animus" against "non-white, non-European noncitizens." Dkt. 7-1 at 22; see, e.g., Dkt. 1 ¶ 144 (alleging that Secretary Noem referred to unlawful immigration "as an 'invasion happening on purpose . . . to remake the foundation of this country'" (alteration in original)); id. ¶ 147 (alleging that President Trump stated that immigrants from Africa and Asia "are poisoning the blood of our country"); id. ¶ 150 (alleging that "Secretary Noem has referred to non-white immigrants as 'dirt bags'"); id. ¶ 155 (alleging that DHS tweeted a word, "[r]emigrate," which "has ties to white nationalism"); id. ¶ 159 (alleging that President Trump "referred to countries designated for TPS as 'shithole' countries").

Courts have reached differing conclusions in resolving similar constitutional challenges to TPS terminations. Compare, e.g., Doe, No. 25-cv-8686, Dkt. 59 at 28:20-29:6 (finding no likelihood of success on constitutional claim), with, e.g., Miot, __ F. Supp. 3d at __ [2026 WL 266413, at *34] (finding likelihood of success on constitutional claim). Because Plaintiffs have shown a likelihood of success on other claims, the Court does not address Plaintiffs' equal protection claim now and will assess the merits

of that claim on a more ample record. See Doe, 2026 WL 184544, at *24.

## II. Irreparable Harm

In addition to showing a likelihood of success on the merits, Plaintiffs must also demonstrate that they are "likely to suffer irreparable harm in the absence of" postponement of Secretary Noem's termination determination. Sosa, 80 F.4th at 25 (quoting Dist. 4 Lodge, 40 F.4th at 39). On this score, Plaintiffs easily meet their burden.

The administrative record reflects that South Sudan remains dangerous and unstable in various ways. As noted by a country-conditions report prepared by USCIS in June 2025, South Sudan "was embroiled in a civil war" between December 2013 and September 2018, when a tenuous peace agreement was reached. Dkt. 59-1 at 154. The report states that the peace agreement "has effectively collapsed" in the past year, "plung[ing] the country into a political crisis" and leading to an "escalat[ion]" in "armed violence." Id. at 155; see also id. ("South Sudan is on the brink of a renewed civil war . . . ."). This "violence has worsened an already dire humanitarian situation in South Sudan," including "chronic food insecurity," "economic crisis," and mass displacement due to "the ongoing civil war in neighboring Sudan." Id. at 155-56. Meanwhile, South Sudan "has been grappling with a cholera outbreak" and other diseases. Id. at 168. The State Department maintains a "Level 4:

Do Not Travel" advisory for South Sudan, stating, among other things, that "carjackings, shootings, ambushes, assaults, robberies, and kidnappings are common throughout" the country. Dkt. 59-3 at 115. The many articles and reports included in the administrative record echo the same refrain: South Sudan is in a state of crisis. See generally Dkts. 59-3 to -9.

Defendants largely do not contest the dangerousness of conditions in South Sudan. They do point out, however, that the State Department's travel advisory assesses threats only to U.S. citizens, not to South Sudan's own returning nationals. Even if this is true, most of the country conditions evident in the administrative record -- including armed violence, food scarcity, widespread disease, and political and economic crisis -- undisputedly affect South Sudan's own nationals. See, e.g., Dkt. 59-1 at 165 (reporting that over three-quarters of South Sudan's population are "in need of humanitarian assistance").

Defendants further contend that harm to current TPS holders is mitigated because their removal is a "mere possibility." Dkt. 43 at 36. But many TPS holders -- including the four named Plaintiffs -- have TPS as their sole form of status. And the "loss of liberty" during removal proceedings would itself "constitute irreparable harm." Guerrero Orellana v. Moniz, 802 F. Supp. 3d 297, 312 (D. Mass. 2025), appeal filed, No. 25-2152 (1st Cir. Dec. 2, 2025). Moreover, even in instances where removal does not occur,

Plaintiffs note (and Defendants do not dispute) that a temporary gap in immigration status would engender other repercussions, such as loss of work authorization and ineligibility for certain types of immigration relief.

## III. Balance of Equities and Public Interest

The final two § 705 factors -- balance of the equities and the public interest -- "merge when the [g]overnment is the opposing party." Nken, 556 U.S. at 435. In analyzing these factors, courts "explore the relative harms" to the parties and gauge "the interests of the public at large." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 580 (2017) (quoting Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers)). The Court finds that these factors, too, favor Plaintiffs.

Defendants claim a general public interest in allowing the government to enforce statutes. But there is "no public interest in the perpetuation of unlawful agency action." Somerville Pub. Schs. v. McMahon, 139 F.4th 63, 76 (1st Cir. 2025) (quoting League of Women Voters of the U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016)). If Secretary Noem obeys the mandatory procedural requirements of the TPS statute, including by consulting with appropriate agencies and disclosing the true basis for her termination determination, she can eliminate South Sudan's TPS designation.

Defendants also invoke a governmental interest in initiating removal proceedings against individuals who Defendants claim could impede the "national interest" of the United States. Dkt. 43 at 37. But, as previously noted, the administrative record reflects that the government found no evidence of fraud or public safety concerns caused by South Sudanese TPS holders. Further, the TPS statute permits DHS to "withdraw" TPS protections from any individual TPS holder if DHS finds that the individual was ineligible for TPS, including due to certain convictions or national security risks. 8 U.S.C. § 1254a(c)(3); see id. §§ 1254a(c)(2)(B), 1158(b)(2)(A)(iv).

The Court concludes that the many irreparable harms that South Sudanese TPS holders imminently face upon termination of South Sudan's TPS designation outweigh the largely unsubstantiated concerns raised by Defendants. Because all factors relevant to the § 705 analysis favor Plaintiffs, the Court will grant Plaintiffs' motion to postpone.

## IV. Scope of Relief

Defendants request that postponement of agency action under § 705 "should be limited to . . . Plaintiffs" if granted. Dkt. 43 at 37. But, as already noted, relief pursuant to § 705 does not "operate in personam," but rather "functions as a 'temporary form of vacatur.'" Make the Rd. N.Y., 2025 WL 3563313, at *16 (per curiam) (quoting All. for Hippocratic Med., 78 F.4th at 254); see

also Doe, 2026 WL 184544, at *26 ("[The] language [of § 705] is naturally read to authorize courts to postpone or stay the agency action itself, rather than enjoining its enforcement as to particular plaintiffs."). Unlike injunctive relief, vacatur need not be (and typically is not) party-specific. See New York, __ F. Supp. 3d at __ [2025 WL 3514301, at *17]. Because Secretary Noem acted contrary to the TPS statute, postponement of her entire action -- i.e., the termination of TPS for South Sudan -- is warranted.

**ORDER**

For the foregoing reasons, Plaintiffs' motion to postpone the effective date of Defendants' termination of South Sudan's TPS designation (Dkt. 7) is **ALLOWED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge

**APPENDIX A**

| **Country** | **Status of Litigation** |
|---|---|
| Venezuela | DHS published notice on February 3, 2025, of a purported vacatur of a prior extension of Venezuela's TPS designation, see 90 Fed. Reg. 8805 (Feb. 3, 2025), and published notice on February 5, 2025, of the termination of TPS for Venezuela, see 90 Fed. Reg. 9040 (Feb. 5, 2025). A district court granted plaintiffs' motion to postpone those actions, see Nat'l TPS All. v. Noem, 773 F. Supp. 3d 807, 868 (N.D. Cal. 2025), but the Supreme Court stayed that relief pending appeal, see Noem v. Nat'l TPS All., 145 S. Ct. 2728, 2729 (2025) (mem.). The district court subsequently granted partial summary judgment to plaintiffs and vacated the termination of TPS for Venezuela, see Nat'l TPS All. v. Noem, 798 F. Supp. 3d 1108, 1164 (N.D. Cal. 2025), which the Supreme Court again stayed, see Noem v. Nat'l TPS All., 146 S. Ct. 23, 24 (2025) (mem.). The Ninth Circuit recently affirmed the district court's grant of partial summary judgment, subject to the ongoing Supreme Court stay. See Nat'l TPS All. v. Noem, __ F.4th __, __ (9th Cir. 2026) [2026 WL 226573, at *18]. Venezuela's TPS designation thus is not currently in effect. |
| Afghanistan | DHS published notice on May 13, 2025, of the termination of TPS for Afghanistan. See 90 Fed. Reg. 20309 (May 13, 2025). A district court denied plaintiffs' motion to postpone that action, see CASA, Inc. v. Noem, 792 F. Supp. 3d 576, 612 (D. Md. 2025), and the Fourth Circuit likewise declined to postpone it on an emergency basis, see CASA, Inc. v. Noem, No. 25-1792, 2025 WL 2028397, at *1 (4th Cir. July 21, 2025). Afghanistan's TPS designation thus is not currently in effect. |
| Cameroon | DHS published notice on June 4, 2025, of the termination of TPS for Cameroon. See 90 Fed. Reg. 23697 (June 4, 2025). A district court denied plaintiffs' motion to postpone that action, see CASA, Inc. v. Noem, 792 F. Supp. 3d 576, 612 (D. Md. |

| | |
|---|---|
| | 2025), and the Fourth Circuit likewise declined to postpone it on an emergency basis, see CASA, Inc. v. Noem, No. 25-1792, 2025 WL 2028397, at *1 (4th Cir. July 21, 2025). Cameroon's TPS designation thus is not currently in effect. |
| Nepal | DHS published notice on June 6, 2025, of the termination of TPS for Nepal. See 90 Fed. Reg. 24151 (June 6, 2025). A district court granted plaintiffs' motion to postpone that action, see Nat'l TPS All. v. Noem, 798 F. Supp. 3d 1008, 1040 (N.D. Cal. 2025), but the Ninth Circuit stayed that relief pending appeal, see Nat'l TPS All. v. Noem, No. 25-4901 (9th Cir. Aug. 20, 2025), Dkt. 19 at 1. The district court subsequently granted partial summary judgment to plaintiffs and vacated the termination of TPS for Nepal, see Nat'l TPS All. v. Noem, No. 25-cv-05687, 2025 WL 4058572, at *29 (N.D. Cal. Dec. 31, 2025), which the Ninth Circuit again stayed, see Nat'l TPS All. v. Noem, No. 26-199 (9th Cir. Jan. 9, 2026), Dkt. 11 at 5. Nepal's TPS designation thus is not currently in effect. |
| Nicaragua | DHS published notice on July 8, 2025, of the termination of TPS for Nicaragua. See 90 Fed. Reg. 30086 (July 8, 2025). A district court granted plaintiffs' motion to postpone that action, see Nat'l TPS All. v. Noem, 798 F. Supp. 3d 1008, 1040 (N.D. Cal. 2025), but the Ninth Circuit stayed that relief pending appeal, see Nat'l TPS All. v. Noem, No. 25-4901 (9th Cir. Aug. 20, 2025), Dkt. 19 at 1. The district court subsequently granted partial summary judgment to plaintiffs and vacated the termination of TPS for Nicaragua, see Nat'l TPS All. v. Noem, No. 25-cv-05687, 2025 WL 4058572, at *29 (N.D. Cal. Dec. 31, 2025), which the Ninth Circuit again stayed, see Nat'l TPS All. v. Noem, No. 26-199 (9th Cir. Jan. 9, 2026), Dkt. 11 at 5. Nicaragua's TPS designation thus is not currently in effect. |
| Honduras | DHS published notice on July 8, 2025, of the termination of TPS for Honduras. See 90 Fed. Reg. 30089 (July 8, 2025). A district court granted plaintiffs' motion to postpone that action, see |

| | |
|---|---|
| | Nat'l TPS All. v. Noem, 798 F. Supp. 3d 1008, 1040 (N.D. Cal. 2025), but the Ninth Circuit stayed that relief pending appeal, see Nat'l TPS All. v. Noem, No. 25-4901 (9th Cir. Aug. 20, 2025), Dkt. 19 at 1. The district court subsequently granted partial summary judgment to plaintiffs and vacated the termination of TPS for Honduras, see Nat'l TPS All. v. Noem, No. 25-cv-05687, 2025 WL 4058572, at *29 (N.D. Cal. Dec. 31, 2025), which the Ninth Circuit again stayed, see Nat'l TPS All. v. Noem, No. 26-199 (9th Cir. Jan. 9, 2026), Dkt. 11 at 5. Honduras's TPS designation thus is not currently in effect. |
| Syria | DHS published notice on September 22, 2025, of the termination of TPS for Syria. See 90 Fed. Reg. 45398 (Sep. 22, 2025). A district court granted plaintiffs' motion to postpone that action. See Doe v. Noem, No. 25-cv-8686 (S.D.N.Y. Nov. 19, 2025), Dkt. 54 at 1, appeal filed, No. 25-2995 (2d Cir. Nov. 25, 2025). Syria's TPS designation thus is currently in effect. |
| South Sudan | DHS published notice on November 6, 2025, of the termination of TPS for South Sudan, see 90 Fed. Reg. 50484 (Nov. 6, 2025), after South Sudan's TPS designation had automatically extended for six months earlier in the year, see 90 Fed. Reg. 19217, 19217 (May 6, 2025). This Court grants Plaintiffs' motion to postpone that action. South Sudan's TPS designation thus is currently in effect. |
| Myanmar | DHS published notice on November 25, 2025, of the termination of TPS for Myanmar. See 90 Fed. Reg. 53378 (Nov. 25, 2025). A district court granted plaintiffs' motion to postpone that action. See Doe v. Noem, No. 25-cv-15483, 2026 WL 184544, at *26 (N.D. Ill. Jan. 23, 2026). Myanmar's TPS designation thus is currently in effect. |
| Haiti | DHS published notice on November 28, 2025, of the termination of TPS for Haiti. See 90 Fed. Reg. 54733 (Nov. 28, 2025). A district court granted plaintiffs' motion to postpone that action. See Miot v. Trump, __ F. Supp. 3d __, __ (D.D.C. 2026) [2026 |

| | |
|---|---|
| | WL 266413, at *39], appeal filed, No. 26-5050 (D.C. Cir. Feb. 6, 2026). Haiti's TPS designation thus is currently in effect. |
| Ethiopia | DHS published notice on December 15, 2025, of the termination of TPS for Ethiopia. See 90 Fed. Reg. 58028 (Dec. 15, 2025). A district court administratively stayed that action pending a resolution of plaintiffs' motion to postpone. See Afr. Cmtys. Together v. Noem, No. 26-cv-10278 (D. Mass. Jan. 30, 2026), Dkt. 36. Ethiopia's TPS designation thus is currently in effect. |
| Somalia | DHS published notice on January 14, 2026, of the termination of TPS for Somalia, effective March 17, 2026. See 91 Fed. Reg. 1547 (Jan. 14, 2026). No lawsuit challenging that action has yet been filed. Somalia's TPS designation thus is currently in effect. |

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; MARY DOE; DAVID DOE; PETER DOE; and JACOB DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | **AMENDED COMPLAINT**<br><br>Civil Action No. 1:25-cv-13939-PBS<br><br>Pursuant to L.R. 5.1(c), Plaintiffs request **emergency relief** against agency action that was scheduled to take effect at **12:00 a.m. on January 6, 2026**. |

## INTRODUCTION

1. South Sudan is currently facing a humanitarian crisis, and ongoing armed conflict continues to threaten the safety of its nationals, as the country teeters on the brink of another civil war.

2. Congress enacted Temporary Protected Status ("TPS") to protect eligible individuals from removal to countries designated unsafe on account of dire conditions like armed conflict, natural disaster, or other extraordinary circumstances. *See* 8 U.S.C. § 1254a. TPS provides eligible beneficiaries with the right to live and work legally in the United States during a period when it is unsafe for them to return to their country of origin.

3. The United States government designated South Sudan for TPS in 2011, following South Sudan's independence from Sudan after over two decades of civil war. The initial designation turned both on the existence of armed conflict and on other extraordinary

circumstances. Since then, the United States has repeatedly and consistently redesignated or extended South Sudan on each of those grounds. The redesignations have recognized the ongoing, devastating, and widespread armed conflict in the country—which has included gender-based and sexual violence, arbitrary arrests and confinement, torture and physical violence, and the killing of civilians. Every redesignation has also recognized other extraordinary circumstances, such as food insecurity, destructive droughts and flooding, population displacement, barriers to accessing humanitarian relief, and disease outbreaks.

4. Approximately 232 South Sudanese nationals are currently TPS beneficiaries and, as a result, find refuge in the United States. Approximately 73 South Sudanese nationals have pending applications for that same protection.

5. Through a November 6, 2025, notice in the Federal Register, U.S. Department of Homeland Security ("DHS") Secretary Kristi Noem announced the January 5, 2026, termination of TPS for South Sudan ("the Termination"). As a result of the Termination, South Sudanese TPS holders in the U.S. will lose their protected status as of midnight on January 6, 2026, and face unconscionable harm. People with pending applications and the U.S.-based dependents and immediate relatives of recipients and applicants will also be harmed.

6. The individual plaintiffs are four South Sudanese nationals with TPS, who have lived in the United States for years and have deep ties to this country and their communities here. They are each members of African Communities Together ("ACT"). ACT is an associational Plaintiff that represents the interests of South Sudanese TPS recipients and applicants in the U.S., as well as their U.S.-based families.

7. Plaintiffs bring this action to challenge Defendants' Termination as unlawful. Defendants' actions put the individual Plaintiffs and other TPS recipients at imminent risk of

losing critical humanitarian protection, robs people with pending applications of the opportunity for that protection, harms members of Plaintiff ACT, and harms the U.S.-based dependents and immediate relatives of recipients and applicants.

8. Should TPS for South Sudan terminate imminently and unlawfully, the individual Plaintiffs and other South Sudanese TPS holders will face an impossible choice: to uproot their lives yet again, in search of safety in a third country; to remain in the United States without TPS, at risk of deportation, related immigration confinement, and loss of work authorization and eligibility for a driver's license; or to relocate to South Sudan, a country where their safety and even their lives would assuredly risk be in peril, as the U.S. Department State has affirmed in its Travel Advisory for South Sudan.

9. The Termination is one of a series of purposeful and pretextual terminations by Secretary Noem of TPS for several non-European countries whose nationals are majority non-white. To date, the Trump Administration has sought to terminate TPS for all other countries whose designations have been up for periodic review, including: Ethiopia, Cameroon, Haiti, Afghanistan, Nepal, Burma, Syria, Nicaragua, Honduras, and Venezuela. The decisions to terminate TPS for these countries and for South Sudan are part of the Trump Administration's ongoing effort to eliminate access to the Congressionally authorized TPS program. The apparent goal of that effort is to significantly reduce the number of non-white and non-European immigrants in the United States.

10. Defendants' decision to terminate TPS for South Sudan violates the TPS statute and the Administrative Procedure Act ("APA") because it was made without consulting appropriate agencies; without due consideration of available and objective evidence of South Sudan's dire conditions; in disregard of established DHS practices; and in improper reliance on

impermissible factors, as well as being politically influenced. Each of these procedural deficiencies violates the APA.

11. Defendants' unexplained decision to have the Termination take effect 60 days after its announcement independently violates the APA, because it is a stark departure from the established past practice of providing an orderly transition period of at least six months or more.

12. The insufficiency of the 60-day wind-down period is compounded by other severe and recent policy changes that impede access to other immigration benefits. One such change is a blanket pause on all asylum processing in the U.S., announced on December 2, 2025. That blanket pause makes accessing asylum ahead of the Termination virtually impossible.

13. Accessing any other immigration status ahead of the Termination also seems virtually impossible because of: (1) the Administration's blanket pause, announced on December 2, 2025, on the processing of immigration benefits applications from people in the U.S. who are the nationals of any countries subject to entry bans that the Administration instituted effective June 9, 2025; (2) the extension of the entry bans to nationals of South Sudan and 19 other majority Black countries, including 17 other African countries, announced on December 16, 2025, and effective January 1, 2026; and (3) a December 18, 2025, social media announcement by the Director of USCIS, expanding the processing pause on immigration benefits applications to applicants in the U.S. who are South Sudanese nationals.

14. The Termination of South Sudan's TPS designation also violates the Constitution in multiple respects. First, the Termination violates the Equal Protection Clause because it was motivated, at least in part, by racial, ethnic, and national origin-based animus. The dehumanizing rhetoric that Secretary Noem, President Trump, and officials in his Administration have consistently used to describe and justify their TPS decisions demonstrates their underlying animus

against immigrants who are not white or descended from Europeans, including South Sudanese immigrants. That animus and related rhetoric have been particularly stark for the nationals of majority Black countries. Second, the Termination violates the Due Process Clause. TPS holders have substantial liberty and property rights in their TPS status, which confers both protection from removal and work authorization. And the TPS statute itself establishes procedural safeguards that are constitutionally necessary to protect those interests. By issuing the Termination in violation of those procedures, the Secretary violated the due process rights of South Sudanese TPS holders and applicants, who now face the summary loss of their liberty and property interests.

15. In the alternative, and under Federal Rule of Civil Procedure 8(d)(2)–(3), Plaintiffs allege that the DHS Secretary lacked statutory authority to terminate South Sudan's TPS designation under 8 U.S.C. § 1254a. Congress made clear repeatedly and unambiguously throughout the TPS statute that the "Attorney General"—and only the "Attorney General"—possesses the authority to terminate TPS status. And contrary to the government's assertions, Congress never transferred that authority to the DHS Secretary or any other official. For any or all of these reasons, this Court should set aside the agency's unlawful decision to terminate TPS for South Sudan nationals.

## THE PARTIES

### Plaintiffs

16. **Plaintiff African Communities Together ("ACT")** is a non-profit, membership-based organization that fights for civil rights, opportunity, and a better life for African immigrants, their families, and their communities across the United States. It was founded in 2013 and is incorporated in New York.

17. ACT has thousands of members nationwide. Its membership is diverse and includes people around the U.S. who are the nationals or descendants of myriad African nations, as well as their U.S.-based family members. ACT's membership has diverse citizenship and immigration statuses and includes TPS holders and/or applicants from South Sudan and other African countries, including Sudan and Ethiopia.

18. ACT's members who are South Sudanese TPS recipients and/or applicants live around the United States, including in Massachusetts.

19. ACT brings this action on behalf of itself and its members, including the individual Plaintiffs.

20. **Plaintiff Mary Doe** is a Black woman who is a South Sudanese national and a TPS holder. Mary has lived in the U.S. for years, and TPS is currently her sole form of immigration status. She is a member of ACT and works and lives in the U.S., in the same town as her elder sister and her sister's five children, who range in age from 11 to 21. Her sister and sister's children are all U.S. citizens. Mary is very close with them, and they rely on her to help with her sister's business, which enables her sister to spend more time caring for her children.

21. In their community and surrounding ones, Mary earns her living as an outreach worker for low-income women who are pregnant or who otherwise have children under three years old. She provides education and support to these women to promote their wellbeing and their children's wellbeing. She currently has many clients, all of whom are U.S. citizens or green card holders. She enjoys her work and finds it rewarding to serve her community.

22. Mary's values are informed by her Christian faith. She is a member of a local church, whose functions she attends regularly.

23. Mary's TPS status allows her eligibility for her driver's license, which is essential for her career and daily life.

24. **Plaintiff David Doe** is a Black man who is a South Sudanese national and a TPS holder. David has lived in the U.S. for years, and TPS is his sole form of immigration status currently.

25. David is a member of ACT. He lives and works in the U.S., as an addiction case manager. In that capacity, he supports vulnerable community members in their efforts to achieve recovery and sobriety that enables them, their families, and their communities to begin to heal from the ravages of drug and alcohol addiction. He has found his work so gratifying that he is working to become a licensed addiction counselor.

26. David relies on TPS for eligibility for his driver's license, which is essential for the work he does and for assorted aspects of his daily life.

27. **Plaintiff Peter Doe** is a Black man who is a South Sudanese national and a TPS holder. David has lived in the U.S. for years, and TPS is his sole form of immigration status currently. Peter is a member of ACT and lives in the U.S. The place he calls home in the U.S. is where his cousin lives, who is more like a brother to him. Peter loves their community, including its diversity.

28. **Plaintiff Jacob Doe** is a Black man who is a South Sudanese national, a TPS holder, and a member of ACT.

29. Jacob has lived in the U.S. for years, with a host family. Everyone in the host family is a U.S. citizen and is affiliated with a local church. Jacob and his host family have built a friendship and a bond with each other that are important to Jacob, because they mitigate his separation from his own family since coming to the United States.

30. Jacob and his host family volunteer together and attend church together. Jacob is deeply involved in the community through church programs. He volunteers by teaching the youth about Christ and helping out when the church feeds the homeless and the hungry. Every Saturday he volunteers by coaching children sports to get them outside and away from their phones and to teach them important lessons about the value of teamwork.

31. While in the U.S., Jacob has obtained contract work, drilling and repairing water wells. Through this work, he has been essential to providing water to community members, including rural communities. He has responded to urgent calls, including natural disasters that rendered drinking water inaccessible, as well as to routine calls for drilling and repairing water wells. Throughout these experiences, he has enjoyed being a dependable member of the teams that do this work and that rely on their grit to keep doing it.

32. Jacob longs to save up enough money to attend college in the U.S., if possible, and to gain employment that can help him support his family, who are struggling to survive outside the U.S. Their access to the most basic necessities is very limited and irregular, including for his mother, who is ill; and they have relied on whatever financial support that Jacob is able to provide them.

33. Through TPS, Mary, David, Peter, and Jacob have immigration status, access to related federal benefits (like work authorization), access to related state benefits (like driver's licenses), protection against deportation charges and related confinement within the U.S., and protection against forced removal to South Sudan—where they and many others face grave and deadly dangers because of ongoing armed conflict and other extraordinary circumstances there.

**Defendants**

34. **Defendant Markwayne Mullin** is the Secretary of the U.S. Department of Homeland Security. As the highest-ranking officer for DHS, Secretary Mullin has statutory

authority over all TPS extension, termination, and designation decisions.[1] He is sued in his official capacity.

35. **Defendant U.S. Department of Homeland Security** is a Cabinet-level department in the U.S. federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP"). DHS, together with its component agencies, is responsible for administering and enforcing the TPS program. Its highest-ranking officer is its Secretary, and references herein to "the Secretary" correspond to the DHS Secretary.

36. **Defendant U.S. Citizenship and Immigration Services** is the sub-agency within DHS charged with adjudicating applications for immigration benefits, including TPS.

37. **Defendant United States of America** includes all other government agencies and departments responsible for changes in TPS policies and the implementation and administration of those policies.

**JURISDICTION AND VENUE**

38. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States, including the Fifth Amendment to the Constitution and the APA, and the case presents a justiciable case or controversy within the meaning of Article III of the U.S. Constitution.

39. The Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, the APA, 5 U.S.C. § 701 *et seq.*, and its common law equitable powers.

---

[1] *See* 8 U.S.C. § 1254a(b); *see also* 6 U.S.C. § 557 (transferring certain functions from the Attorney General).

40. The APA waives the Government's sovereign immunity from claims alleging unlawful agency action and "seeking relief other than money damages." 5 U.S.C. § 702. In addition, sovereign immunity does not bar claims against federal officials for non-monetary injunctive relief to prevent violations of federal law.[2]

41. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States or officers of the United States acting in their official capacity, and because at least one Plaintiff and putative class representative resides in this judicial district.

## THE STATUTORY SCHEME FOR TPS AND RELATED AGENCY PRACTICES

42. Congress created TPS as a response to unconstrained executive discretion in immigration humanitarian relief programs. Prior to 1990, the executive used "extended voluntary departure" to confer blanket nationality-based humanitarian relief, through a process that lacked "any specific … criteria."[3]

43. Congress designed TPS to ensure that future nationality-based protections would be based on "identifiable conditions" rather than "the vagaries of our domestic politics." 101 Cong. Rec. H25811, 25838 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (debating the immediate precursor to the TPS statute). Congress also sought to replace the "ad hoc, haphazard . . . procedures" that existed before and provide beneficiaries with certainty about "what [their] rights are, how [an agency] determines what countries merit [protected] status," and "how long [beneficiaries] will be able to stay." *Id.* at 25837 (statement of Rep. Bill Richardson).

---

[2] *Larson v. Domestic & Foreign Com.* Corp., 337 U.S. 682, 697–99 & nn.18–19 (1949); *Shields v. Utah Idaho Cent. R.R. Co.*, 305 U.S. 177, 183–84 (1938).

[3] *See* Lynda J. Oswald, Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters, 85 Mich. L. Rev. 152, 157–60, 178 n.153 (1986) (quoting Letter from Att'y Gen. William F. Smith to Rep. Lawrence J. Smith. (July 19, 1983)). The facts in paragraphs 42–193 are alleged as of the date of Plaintiffs' original complaint, and have not been modified to reflect intervening developments in this litigation, including the filing of the administrative record.

44. Since 1990, the TPS statute has given the executive branch authority to provide humanitarian relief to nationals of designated countries who are already present in the United States. *See* 8 U.S.C. § 1254a. The statute provides that the Secretary of DHS may designate a country for TPS where (A) "there is an ongoing armed conflict within the state" and returning nationals "to that state . . . would pose a serious threat to their personal safety"; (B) [there is a natural disaster] or (C) "there exist extraordinary and temporary conditions in the foreign state that prevent . . . nationals of the state from returning to the state in safety, unless the Attorney General finds that permitting the [noncitizens] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(A)–(C).

45. Significantly, Congress included the "national interest of the United States" provision only in subsection (C), for designations based on "extraordinary and temporary conditions"; it does not apply to designations under subsections (A) (armed conflict) or (B) (natural disasters).

46. The statute first requires the Secretary to consult with "appropriate agencies." 8 U.S.C. § 1254a(b)(1). After that, the Secretary "may designate" a country based on armed conflict, environmental disaster, or other extraordinary conditions. *Id.* A designation lasts between six and eighteen months, effective either upon notice in the Federal Register or "such later date as the [Secretary] may specify." *Id.* §1254a(b)(2).

47. As long as the Secretary consults appropriate agencies and determines certain country conditions exist, she may designate a country for TPS.

48. By contrast, Congress limited the Secretary's discretion to periodically review TPS designations. *See* U.S. Gov't Accountability Off., GAO-20-134, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020)

("GAO Report") at 15–18, 27 (differentiating between the discretion afforded before and after an initial designation).

49. The statutory requirements for periodic review of a designation are clear: "At least 60 days before [the] end of the . . . period of designation, . . . the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state . . . for which a designation is in effect . . . and shall determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

50. The periodic review process typically begins months before the 60-day deadline. *See* GAO Report at 20–21. As part of the process, both USCIS and the U.S. Department of State ("State Department") usually have prepared country conditions memoranda and recommendations for the Secretary. *See id.* 15–16; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023) (describing the TPS review process).[4]

51. Customarily, USCIS manages and coordinates the TPS periodic review process for the Secretary, soliciting a country conditions report from the Refugee, Asylum, and International Operations ("RAIO") unit within USCIS and soliciting a country conditions report and recommendation from the State Department.[5] After considering the materials provided, USCIS

[4] The district court's decision was reversed on appeal in a 2-1 ruling on jurisdictional grounds, but a majority of active judges voted to rehear the case en banc, so the panel decision was vacated. *See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

[5] *See* GAO Report at 15–21; *see also, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 299–300 (E.D.N.Y. 2019).

prepares for the Secretary a detailed recommendation, based on country conditions, and called a "Director Memo."[6]

52. Once the Secretary makes her decision, the statute requires that she "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." 8 U.S.C. § 1254a(b)(3)(A).

53. Unless the Secretary timely determines and publishes notice of her decision that the country "no longer continues to meet the conditions for designation," the designation "is extended" automatically for 6 months or "in [her] discretion . . . a period of 12 or 18 months." 8 U.S.C. § 1254a(b)(3)(C). The statute thus "essentially provides extension as a default."[7]

54. In contrast, if the Secretary timely "determine[s]" (after consulting appropriate agencies and reviewing objective evidence of country conditions) that a country "no longer continues to meet the conditions for designation under" § 1254a(b)(1), she "shall terminate the designation by publishing notice in the Federal Register." 8 U.S.C. § 1254a(b)(3)(B). Termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* The statute provides no grounds for the termination of TPS other than a determination that a country no longer meets the conditions for designation.

55. The Secretary has discretion to further postpone the effective date of a termination "in order to provide for an orderly transition." 8 U.S.C. § 1254a(d)(3). For the twelve most recent terminations of TPS that preceded the Trump Administration's second term in office, the agency

---

[6] *See, e.g.*, *Saget*, 375 F. Supp. 3d at 299–300.

[7] *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 851 (N.D. Cal.), *aff'd*, 150 F.4th 1000 (9th Cir. 2025) ("*NTPSA I* PI Decision").

provided at least a six-month period for an orderly transition—and more commonly a twelve- or eighteen-month period.[8] The practice of furnishing orderly transitions of at least 6 months has been ongoing for over thirty years, and the Trump Administration applied it during its first term in office. Only four TPS designations have been terminated without any such period, and each of those terminations occurred more than twenty years ago and involved a designation that had been in place for three years or less.[9]

56. To be eligible for TPS, individuals from a designated country must meet stringent requirements, including: (1) continuous physical presence in the United States from the most recent date of designation; (2) continuous residence in the United States from a (potentially earlier) date designated by the Secretary; (3) satisfaction of the criteria for admissibility as a noncitizen or, for certain grounds of inadmissibility, a waiver of those grounds; (4) a lack of disqualifying criminal history (including misdemeanors in some cases); and (5) the submission of an application, extensive documentation, and fees. *See* 8 U.S.C. § 1254a(c)(1); *see also* 8 C.F.R. §§ 244.2, 244.4, 244.9.

57. Further, an individual is ineligible for TPS if "there are reasonable grounds for regarding [them] as a danger to the security of the United States." *See* 8 U.S.C. § 1254a(c)(2)(B)(ii) (incorporating 8 U.S.C. § 1158(b)(2)(A)).

58. Congress ensured that people who are granted TPS would enjoy the freedom to live and work in the United States without fear of deportation. Under the statute's clear directives, anyone who receives and maintains TPS "shall [be] authorize[d]" to work in the United States;

---

[8] *See Nat'l TPS Alliance v. Noem*, No. 3:25-cv-05687-TLT, Dkt. No. 28 (C.D. Cal. 2025) (chart submitted into evidence, documenting the transition periods for all TPS terminations from 1992 to 2018, almost all of which lasted between 6 to 18 months).

[9] *Id.*

"shall not be detained" by the Secretary of Homeland Security on the basis of immigration status; and "shall not [be] remove[d]" from the United States. 8 U.S.C. §§ 1254a(a)(1), (d)(4). The statute affords protection to qualifying individuals regardless of whether they meet the requirements for asylum or other immigration relief. *See id.* § 1254a(b)(1).

59. Individuals who apply for TPS and are *prima facie* eligible for it may receive work authorization and protection from deportation while the application is pending. *See* 8 U.S.C. § 1254a(a)(4)(B); 8 C.F.R. § 244.10(a), (e).

**SOUTH SUDAN'S INITIAL TPS DESIGNATION AND REPEATED EXTENSIONS AND REDESIGNATIONS, SPANNING 2011–2025**

60. South Sudan is a country in eastern Africa whose nationals are predominantly Black. The country gained independence from Sudan in 2011 after a 22-year war, which was one of the longest and most severe armed conflicts ever recorded.[10]

61. Despite gaining its official independence, severe and widespread armed conflict persisted in South Sudan. In 2013, ongoing regional and ethnic armed conflicts escalated into the South Sudanese Civil War, which formally lasted seven years.

62. The conflict was marked by hundreds of thousands of deaths, millions of internally and externally displaced peoples, widespread starvation, and economic devastation. This conflict and its devastation are well-documented, including by the U.S. State Department.[11]

63. For seven years of its fourteen-year statehood, South Sudan has experienced full-scale war. For the other seven years, humanitarian crises and widespread armed conflict have

---

[10] *See generally* Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629 (Oct. 31, 2011); Center for Preventive Action, *Civil War in Sudan*, COUNCIL FOR FOREIGN RELATIONS (Nov. 6, 2025), https://www.cfr.org/global-conflict-tracker/conflict/power-struggle-sudan.

[11] Lauren Ploch Blanchard, Cong. Rsch. Serv., IF10218.19, *South Sudan*, (May 9, 2025) (collecting State Department commentary), https://www.congress.gov/crs-product/IF10218.

resulted in rampant armed violence, consistent and gross human rights abuses, and other extreme threats to peoples' lives and safety.[12]

64. The Secretary of Homeland Security first designated South Sudan for TPS in November 2011, based both on armed conflict, 8 U.S.C. § 1254a(b)(1)(A), and on other extraordinary circumstances, 8 U.S.C. § 1254a(b)(1)(C). The designation identified relevant conditions warranting the country's designation for TPS on both grounds, including: escalating intercommunal armed conflict, targeted attacks on civilians, mass displacement related to the armed conflict, mass food insecurity, and lack of access to drinking water.[13] In 2013, the Secretary extended and redesignated South Sudan for another eighteen-month period, based on the continuation of conditions that existed at the initial designation, including ongoing armed conflict and other extraordinary circumstances.[14]

65. On eight occasions, successive Secretaries of Homeland Security repeatedly extended and/or redesignated South Sudan for TPS, each time citing ongoing armed conflict, human rights abuses, and humanitarian catastrophe.[15] Each extension and redesignation

---

[12] *See generally* Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629 (Oct. 13, 2011); Extension and Redesignation of South Sudan for Temporary Protected Status, 78 Fed. Reg. 1,866 (Jan. 9, 2013); Extension and Redesignation of South Sudan for Temporary Protected Status, 79 Fed. Reg. 52,019 (Sept. 2, 2014); Extension and Redesignation of South Sudan for Temporary Protected Status, 81 Fed. Reg. 4,051 (Jan. 25, 2016); Extension of South Sudan for Temporary Protected Status, 82 Fed. Reg. 44,205 (Sept. 21, 2017); Extension of the Designation of South Sudan for Temporary Protected Status, 84 Fed. Reg. 13,688 (Apr. 5, 2019); Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344 (Nov. 2, 2020); Extension and Redesignation of South Sudan for Temporary Protected Status, 87 Fed. Reg. 12,190 (Mar. 3, 2022).

[13] Designation of Republic of South Sudan for Temporary Protected Status, 76 Fed. Reg. 63,629, 63,630–31 (Oct. 13, 2011).

[14] Extension and Redesignation of South Sudan for Temporary Protected Status, 78 Fed. Reg. 1,866, 1,868–69 (Jan. 9, 2013).

[15] *See generally* Extension and Redesignation of South Sudan for Temporary Protected Status, 78 Fed. Reg. 1,866 (Jan. 9, 2013); Extension and Redesignation of South Sudan for Temporary Protected Status, 79 Fed. Reg. 52,019 (Sept. 2, 2014); Extension and Redesignation of South

underscored that these conditions prevented the safe return of South Sudanese nationals from the diaspora.[16]

66. In its sixth extension, in November of 2020, after the official end of the civil war, the Secretary noted that "[d]espite a decrease in large-scale fighting and limited progress on the country's political transition, ongoing armed conflict persists in several areas in South Sudan among both signatories and non-signatories to the peace agreement."[17] The Secretary further noted pervasive sexual and gender-based violence; the conscription of children into armed groups; the arbitrary detention, torture, and extrajudicial killing of civilians; the mass displacement of civilians; widespread food insecurity, exacerbated both by droughts and flooding; and deep economic crisis.[18]

67. In September 2023, DHS reviewed South Sudan's TPS and redesignated the country through May 2025, under both the armed conflict and extraordinary and temporary conditions subsections of the statute.[19]

68. As to armed conflict, DHS found that "[i]n spite of the 2018 peace agreement that established the current transitional government [] South Sudan faces 'often violent political contestations,' and the lack of stable government has facilitated ongoing violence that is 'nearly

---

Sudan for Temporary Protected Status, 81 Fed. Reg. 4,051 (Jan. 25, 2016); Extension of South Sudan for Temporary Protected Status, 82 Fed. Reg. 44,205 (Sept. 21, 2017); Extension of the Designation of South Sudan for Temporary Protected Status, 84 Fed. Reg. 13,688 (Apr. 5, 2019); Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344 (Nov. 2, 2020); Extension and Redesignation of South Sudan for Temporary Protected Status, 87 Fed. Reg. 12,190 (Mar. 3, 2022). Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971 (Sep. 6, 2023).

[16] *Id.*

[17] Extension of the Designation of South Sudan for Temporary Protected Status, 85 Fed. Reg. 69,344, 69,346 (Nov. 2, 2020).

[18] *Id.* at 69,346–47.

[19] Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971 (Sept. 6, 2023).

always characterized by gross human rights violations that [have] targeted civilians and caused mass displacements' in parts of the country."[20] The 2023 redesignation recognized that conflict among armed actors had continued and that armed groups were prepared to return to war, even though the country was not currently undergoing a full-blown civil war.[21] It further noted related circumstances, including: arbitrary arrests, detentions, and killing of civilians; sexual and gender-based violence; physical abuse; forced recruitment, including of children, into armed forces; and looting and destruction of civilian property.[22]

69. As to other extraordinary circumstances, DHS noted the impacts of widespread flooding, disease outbreaks, food insecurity, and barriers to accessing humanitarian relief.[23]

70. In May 2025, DHS announced that South Sudan's TPS designation had automatically extended for an additional six months, stating there was insufficient information regarding current country conditions and the "national interest" to issue a determination.[24]

**DEFENDANTS' TERMINATION OF SOUTH SUDAN'S TPS DESIGNATION**

71. On November 6, 2025, Defendants issued a notice in the Federal Register terminating South Sudan's TPS designation, beyond January 5, 2026. The Termination reflects a variety of procedural and statutory irregularities driven by DHS's institution of new guidance providing that TPS periodic review should "[f]ocus on conditions described in the original designation," *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-2 at 1693—while disregarding intervening conditions.

---

[20] *Id*. at 60,974.
[21] *Id*.
[22] *Id*.
[23] *Id*. at 60,974–75.
[24] Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19,217, 19,222 (May 6, 2025).

***Failure to Consult Appropriate Agencies***

72. On information and belief, prior to the Termination, and consistent with DHS's new guidance for periodic reviews, Defendant Noem did not meaningfully consult with appropriate federal agencies, as otherwise required by the TPS statute. *See* 8 U.S.C. § 1254a(b)(3)(A). To date, Defendants have not publicly specified, in the Termination notice or elsewhere, any particular consultation they conducted or whether they followed even the general practice of soliciting a country conditions report from USCIS.[25] However, discovery obtained in *NTPSA II* reveals that, in the course of periodic reviews of the TPS designations for South Sudan and Afghanistan, occurring in or around February 2025, the consultation the Defendants did undertake was intended to place a heavy thumb on the scales in favor of termination: "The DMs [Director Memos] **should include additional information that would support different decision outcomes**. For example, are there improvements that have been made in the country? What about information about fraud/abuse of the program? . . . There are some stats pending, but [it is not clear] where that will be added." *See NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-16 at 3 (emphases added). This does not appear to be an isolated example: Defendant Noem has issued previous terminations under similar conditions, without appropriately conducting the required consultation.[26] As revealed in discovery during the *NTPSA II* litigation, in or around March 2025 DHS stopped

---

[25] *But cf.* GAO Report at 20–26.

[26] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*") (Dkt. No. 97) (discovery order indicating that Secretary Noem issued the terminations for Nicaragua, Honduras, and Nepal's TPS designations without reviewing country conditions reports from the relevant agencies); *see also supra* ¶¶ 48–52 ("The Statutory Scheme of TPS and Related Agency Practices") (noting the requirement for interagency consultation.).

receiving country conditions information from the State Department as part of the TPS periodic review process.[27]

***Failure to Consider Objective and Available Evidence of Country Conditions***

73. The TPS statute requires Defendant Noem to consider objective and available evidence of country conditions during her periodic review of the TPS designation for South Sudan. *See* 8 U.S.C. § 1254a(b)(3)(A). She did not do so.

74. Instead, she cherry-picked "improvements." *See* 90 Fed. Reg. at 50,485; *NTPSA II*, No. 3:25-cv-05687-TLT (N.D. Cal.), Dkt. 176-16 at 3. The Secretary's failure to *fully* consider current conditions in South Sudan relevant to TPS redesignation was based on the new DHS guidance, which marks an arbitrary and unexplained return to a methodology for periodic reviews found to be unlawful during the prior Trump Administration.[28] The Termination does not acknowledge or explain Defendant Noem's reliance on the new and legally suspect DHS guidance.

***Failure to Consider Evidence of Ongoing Armed Conflict and Its Ramifications***

75. In her Termination, Defendant Noem failed to consider the available, objective evidence of ongoing armed conflict in South Sudan, including evidence of numerous considerations the Department previously found relevant to periodic review of the armed-conflict basis for South Sudan's TPS designation.

76. Secretary Noem's entire explanation for the Termination of South Sudan's designation based on ongoing armed conflict is contained in two sentences: one stating that full-

---

[27] *See* Exs. in Supp. of Pls' Mot. for SJ, Dkt. 176-22 at 1504_003; Dkt. 176-27 at 1524; Dkt. 176-28 at 2342, *Nat'l TPS All. v. Noem*, Case No. 3:25-cv-05687-TLT (N.D. Cal. July 7, 2025) ("*NTPSA II*").

[28] *See Ramos v. Nielsen* 336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

scale war is no longer present, and one stating that the transitional government has "indicate[d]" a willingness to accept and ensure the safety of returning nationals.[29]

77. However, a plethora of available and objective evidence establishes that, throughout 2025, armed conflict and related violence escalated and further endangered the already tenuous 2018 peace agreement that had arisen out of the civil war. Armed conflict between warring political and communal factions has escalated to levels not previously experienced since the 2018 peace agreement,[30] and experts are warning of an imminent return to full-scale war.[31] Ugandan forces have deployed to South Sudan's capital city; war in neighboring Sudan is spilling across South Sudan's porous border; and political sectarianism is increasing.[32]

78. In April 2025, the State Department recognized that "South Sudan is on the brink of openly renewed conflict and political upheaval, with tensions escalating following a Nuer militia's capture of an army base in Nasir in March."[33]

79. Since April, the situation has only worsened. In October 2025, a U.N. Commissioner on Human Rights in South Sudan stated: "South Sudan's political transition is falling apart[.][] The ceasefire is not holding, political detentions have become a tool of repression,

---

[29] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025).

[30] Office of the U.N. High Comm'r for Human Rights, Press Release, *South Sudan: U.N. Commission Urges General Assembly to Bolster Dialogue and Justice Efforts, to Avert Return to Full Scale War*, (Oct. 29, 2025), https://www.ohchr.org/en/press-releases/2025/10/south-sudan-un-commission-urges-general-assembly-bolster-dialogue-and?sub-site=HRC.

[31] Human Rights Council, Commission on Human Rights in South Sudan, *Plundering a Nation: how rampant corruption unleashed a human rights crisis in South Sudan*, ¶ 1, U.N. Doc. A/HRC/60/CRP.5 (Sept. 16, 2025).

[32] Center for Preventive Action, *Instability in South Sudan*, COUNCIL FOR FOREIGN RELATIONS (Mar. 21, 2025), https://www.cfr.org/global-conflict-tracker/conflict/civil-war-south-sudan.

[33] U.S. Dep't of State, Overseas Security Advisory Council, *South Sudan Country Security Report*, (Apr. 30, 2025), https://www.osac.gov/Content/Report/60d44686-9142-4338-937d-1c78087363c9.

the peace agreement's key provisions are being systematically violated, and the government forces are using aerial bombardments in civilian areas. All indicators point to a slide back toward another deadly war."[34]

80. The South Sudanese army's "indiscriminate airstrikes in populated areas" have resulted "in civilian casualties, the displacement of the civilian population, and the destruction of medical facilities, schools, and homes."[35] Nearly 400,000 civilians have been newly displaced by the armed conflict, and two million more remain displaced inside South Sudan.[36]

81. The U.N. has noted that "[k]illed, displaced and starved, civilians are bearing the brunt of the human rights crisis, while violence by SSPDF [South Sudan People's Defence Forces] in populated civilian areas signals a return to full-scale war."[37] Civilians in South Sudan are regularly killed, displaced, or face other risks because of the ongoing armed conflict.[38]

82. Among those other risks is "one of the highest rates of gender-based violence (GBV) in the region, with 2.7 million people at risk."[39] "The bodies of women and girls continu[e] to be subjected to extreme forms of sexual violations by armed groups and militias. National authorities are complicit in these crimes, and in forced recruitment and other grave violations

---

[34] Office of the U.N. High Comm'r (Oct. 29, 2025), *supra* n. 30.
[35] Office of the U.N. High Comm'r for Human Rights, Press Release, *South Sudan: Türk alarmed by deteriorating human rights situation amid rising violence and political tensions* (Sep. 26, 2025), https://www.ohchr.org/en/press-releases/2025/09/south-sudan-turk-alarmed-deteriorating-human-rights-situation-amid-rising.
[36] *Id.*
[37] Human Rights Council, *supra* n. 31.
[38] *Id.*
[39] U.N. Population Fund, *Knowledge, Attitudes and Practices Survey on Gender-based Violence in Upper Nile, Jonglei and Unity states, South Sudan*, 6 (Jan. 2025), https://reliefweb.int/report/south-sudan/knowledge-attitudes-and-practices-survey-gender-based-violence-south-sudan-final-report-january-2025?_gl=1*aj340a*_ga*MTg5MzA1NzMxNS4xNzY2MDU5NTU1*_ga_E60ZNX2F68*czE3NjYwNTk1NTUkbzEkZzEkdDE3NjYwNTk4NjIkajYwJGwwJGgw.

against children."[40] The "state policy of extrajudicial killings" further "inflames conflicts in areas where intra-communal violence is already rife,"[41] and intra-communal strife alone has been exacting "a deadly toll on civilians with a 33 per cent year-on-year increase."[42]

83. Indeed, the U.S. State Department continues to maintain a Level 4 "Do Not Travel" advisory for South Sudan due to "crime, kidnapping, and *armed conflict*" and has stated that "*[a]rmed conflict* is ongoing and includes fighting between various political and ethnic groups. Weapons are readily available to the population."[43]

84. The Termination does not address any of this available, objective evidence of ongoing armed conflict, all of which directly correlates to considerations the prior DHS Secretary deemed relevant to the periodic review of the armed-conflict basis for South Sudan's TPS designation. The Termination does not explain Defendant Noem's departure from applying considerations her agency previously deemed material.

85. In the Department of Homeland Security's 2023 periodic review of TPS for South Sudan, the Secretary of Homeland Security considered conflict between state and nonstate actors; "collective punishment of civilians" by government forces, "often based on ethnicity"; "simmering ethnic conflict" resulting in displacement and human rights abuses; and resulting "dire consequences" for women and children, including gender-based violence and "grave violations against children."[44]

---

[40] Office of the U.N. High Comm'r (Oct. 29, 2025), *supra* n. 30.
[41] *Id.*
[42] Office of the U.N. High Comm'r (Sep. 16, 2025), *supra* n. 35.
[43] *South Sudan Travel Advisory*, U.S. DEP'T OF STATE (NOV. 13, 2025), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/SouthSudan.html (emphases added).
[44] Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971, 60,974 (Sept. 6, 2023).

86. In her Termination, Defendant Noem acknowledged that "there is inter/intra-communal violence linked to border disputes, cross-border violence, cyclical and retaliatory attacks, and ethnic polarization"[45] but inexplicably glossed over this armed conflict solely because "return to full-scale civil war, to date has been avoided."[46]

87. The Termination fails to explain Defendant Noem's departure from the Department's explicit prior finding that armed conflict short of "full-scale civil war" is still relevant to redesignation of TPS for South Sudan when it involves widespread, gross human rights abuses, including violence against civilians, gender-based violence, grave violations against children, and mass displacements[47]: factors that objective, available evidence shows still apply[48] and that the Termination did not address.[49]

88. Instead, the Termination relied improperly on the transitional government's resumed acceptance of deportees from the U.S. to infer "South Sudan's willingness to ensure the safety and reintegration of its returning nationals."[50] That inference is flatly contradicted by objective evidence of how the current South Sudanese government is a substantial source of grave harm to its nationals,[51] which the Termination did not address.[52] The inference also departs from the prior DHS Secretary's consideration in 2023 of South Sudanese governmental violence against its nationals as relevant to the periodic review of the armed-conflict basis for South Sudan's TPS

---

[45] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, 50,485 (Nov. 6, 2025).
[46] *Id.*
[47] Extension and Redesignation of South Sudan for Temporary Protected Status, 88 Fed. Reg. 60,971, 60,974 (Sept. 6, 2023).
[48] *See supra* ¶¶ 77–83.
[49] 90 Fed. Reg. at 50,485.
[50] *Id.*
[51] *See supra* ¶¶ 79–83.
[52] *See supra* note 49

designation.[53] The Termination does not explain why Defendant Noem departed from her agency's prior consideration of that factor.

***Failure to Consider Evidence of Extraordinary and Temporary Conditions***

89. In her Termination, Defendant Noem failed to consider available, objective evidence of ongoing, extraordinary, and temporary conditions in South Sudan, including evidence of numerous factors the Department previously found relevant to periodic review of the extraordinary-circumstances basis for South Sudan's TPS designation.

90. The prior periodic review, in 2023, considered acute food insecurity; environmental and health concerns, including widespread flooding and disease outbreaks; and barriers to humanitarian access.[54] Available and objective evidence demonstrates that all of these conditions still exist.

91. The United Nations Office for the Coordination of Humanitarian Affairs ("UNOCHA") estimates 927,000 people have been harmed by recent flooding across South Sudan, with 335,000 people displaced by floods alone.[55] The overall number of internally displaced people within South Sudan is nearing 2 million.[56]

92. Floods more than double the frequency of cholera outbreaks in South Sudan, by imperiling access to clean water and impeding humanitarian access to affected areas.[57] Since the

---

[53] *See supra* note 47.

[54] 88 Fed. Reg. 60,971, 60,975.

[55] U.N. Office for the Coordination of Humanitarian Affairs (OCHA), *South Sudan: Floods Snapshot* (Oct. 17, 2025), https://www.unocha.org/publications/report/south-sudan/south-sudan-floods-snapshot-17-october-2025.

[56] European Comm'n, European Civil Protection and Humanitarian Aid Operations, *South Sudan* (Nov. 25, 2025), https://civil-protection-humanitarian-aid.ec.europa.eu/where/africa/south-sudan_en.

[57] U.N. News, *South Sudan's longest cholera outbreak enters critical stage* (July 8, 2025), https://news.un.org/en/story/2025/07/1165348.

cholera outbreak was declared in October 2024, over 80,000 cholera cases and 1,400 cholera deaths have been documented.[58] U.N. agencies and others have declared that the cholera outbreak "'is not merely a public health crisis, but a multi-sectoral emergency exacerbated by flooding, displacement, and limited access to basic services.'"[59]

93. Over 7.5 million people in South Sudan face acute food insecurity.[60] The Reconstituted Joint Monitoring and Evaluation Commission ("RJMEC") for South Sudan reported in September 2025 that "[a]cute food insecurity and malnutrition continued to be driven by the severe impacts of persistent conflict, expanding flood extent, economic deterioration, and a high returnee and refugee burden on household access to local food sources and life-saving humanitarian food assistance."[61]

94. The crisis of food insecurity in South Sudan is exacerbated by substantial barriers to access to humanitarian relief within the country. The RJMEC, which monitors incidents regarding aid distribution, found that U.N. aid distribution was disrupted at least seventy times in September 2025 alone, and that at least 56 of those times involved "violence against humanitarian staff" or "active hostilities disrupting the delivery of critical humanitarian services."[62] The RJMEC

---

[58] *Id.*
[59] *Id.*
[60] U.N. Peacekeeping, *Stakes rise for South Sudan: What's happening, and why it matters* (Nov. 11, 2025), https://peacekeeping.un.org/en/stakes-rise-south-sudan-whats-happening-and-why-it-matters.
[61] H.E. Amb. Maj. Gen. George Aggrey Owinow, *Quarterly Report on the State of Implementations of the Revitalised Agreement on the Resolution of the Conflict in the Republic of South Sudan for the period of July 1st to September 30th, 2025*, RECONSTITUTED JOINT MONITORING AND EVALUATION COMMISSION (RJMEC) SOUTH SUDAN, Report No. 028/25, (Oct. 23, 2025), https://www.jmecsouthsudan.org/index.php/reports/rjmec-quarterly-reports/270-rjmec-quarterly-report-on-the-status-of-implementation-of-the-r-arcss-from-1st-july-to-30th-september-2025/file
[62] *Id.* at ¶ 58.

noted "[t]here is a need to urgently restore humanitarian access, particularly in conflict-affected areas, to avert a possible full-scale food and nutrition catastrophe."[63]

95. Humanitarian challenges in South Sudan are deepened by crises in neighboring Sudan. Since the civil war in Sudan started in 2023, 1.2 million people have fled into South Sudan.[64] "South Sudan is facing its most perilous moment since independence in 2011. The war in Sudan, coupled with political instability, flooding, and food shortages at home, has pushed 9.3 million people into humanitarian need."[65]

96. Instead of considering any of this objective and available evidence of worsening conditions, the Termination appears to have considered only modest positive developments: two infrastructure grants from the World Bank; a $9 million grant for an internet project still in the development phase; a refugee-flow statistic from nearly four years ago; and the presence of a United Nations Mission that has existed since 2011.[66]

97. The Termination did not explain why or how any of these developments has obviated the need to consider the factors that the prior periodic review considered, which available and objective evidence demonstrates still exist and therefore warranted consideration within Defendant Noem's periodic review.

***Consideration of U.S. "National Interest," Which Is Contrary to the TPS Statute and Departs from Past Agency Practice Without Explanation***

98. Defendant Noem relies on the claim that the continued temporary presence of South Sudanese TPS beneficiaries is contrary to the "national interest" of the United States and cites

[63] *Id.*
[64] Nathan Carey, *"We escaped hell, but we arrived in another one"*, Norwegian Refugee Council (Nov. 5, 2025), https://www.nrc.no/perspectives/2025/we-escaped-hell-but-we-arrived-in-another-one.
[65] *Id.*
[66] Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50,484, n. 13, 14, 15 (Nov. 6, 2025).

various purported examples. One such example asserts that "a portion of the South Sudan Temporary Protected Status population has been subjects of administrative investigation for fraud, public safety and national security concerns."[67]

99. It is impossible to know what Defendant Noem is referring to here. There is no citation; no individuals or alleged conduct is identified; nor are the circumstances of the claimed 'administrative investigation' discernible. In fact, this allegation appears to be boilerplate language lifted directly from the termination notices for Syria, Afghanistan, and Haiti.[68]

100. Under the statute, TPS protections are unavailable *ab initio* to individuals with disqualifying criminal history (including misdemeanors in some cases), or who are found to be inadmissible on grounds relating to national security, foreign policy, or on many other bases.[69] It is improper to conclude, as the Secretary does here, that the conduct of any single South Sudanese who might be ineligible under these grounds disqualifies the entire South Sudanese population in the United States from TPS.

101. Furthermore, the consideration of the domestic "national interest" is procedurally improper during a periodic review, because the statute instructs the Secretary to look only at "the conditions in the foreign state (or part of such foreign state) for which a designation is in effect . . . [and] whether the conditions for such designation . . . continue to be met," 8 U.S.C. § 1254a(b)(3)(A). Consideration of United States national interests is also procedurally improper in

[67] *Id.* at 40,486.
[68] *See* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,398, 45,401 (Sept. 22, 20250; Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760, 28,763 (Jul. 1, 2025).
[69] 8 U.S.C. § 1254a(c)(1)(A); 8 U.S.C. § 1254a(c)(2)(B); 8 U.S.C. § 1182; 8 U.S.C. 1158(b)(2)(A).

the context of a TPS designation based on ongoing armed conflict, *see* 8 U.S.C. § 1254a(b)(1)(A), and had not been invoked as a basis for *any* terminations prior to 2025.

***Unreasoned Departure from the Past Agency Practice of Orderly Transition Periods***

102. The Termination was published a mere 60 days prior to the effective date, [70] the minimum required under the statute. This is a significant departure from established policy and practice of affording more orderly transition period of 6 month or longer.[71]

**THE FIRST TRUMP ADMINISTRATION'S EFFORTS TO ELIMINATE ACCESS TO TPS**

103. The South Sudan Termination is a resumption of the first Trump Administration's attempts to end TPS designations for non-European countries whose nationals are majority non-white. Between 2017 and 2018, DHS announced terminations of TPS designations for Sudan, Haiti, Nicaragua, El Salvador, Honduras, and Nepal. *See Ramos v. Nielsen*, 709 F. Supp. 3d 871, 877–78 (N.D. Cal. 2023). If the terminations had taken effect, they would have ended TPS protection for approximately 400,000 people, comprising approximately 98 percent of all TPS holders at the time.[72] In each case, the Secretary announced either a 12- or 18-month orderly transition period, which would have delayed the effective date of termination.

104. Documents obtained in litigation and congressional investigations subsequently revealed that the 2017 and 2018 termination decisions were not based on an objective review of country conditions as required by statute—and as had been the past practice over multiple administrations, both Democratic and Republican—but rather were part of a "predetermined

---

[70] Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19,217, 19,218 (May 6, 2025).
[71] *See supra* note 8.
[72] Marcela Valdes, *Their Lawsuit Prevented 400,000 Deportations. Now It's Biden's Call*, N.Y, TIMES (Apr. 7, 2021), https://www.nytimes.com/2021/04/07/magazine/immigration-el-salvador.html.

presidential agenda to end TPS." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1094–99 (N.D. Cal. 2018) (vacated and remanded on different grounds; quoting then-DHS Secretary Duke's assurance to the White House that terminating Nicaragua's TPS would "send a clear signal that TPS in general is coming to a close").[73]

105. Moreover, every district court to consider animus as a motivating factor in these terminations found that they were part of a policy "to decrease the presence of non-white immigrants in the United States."[74]

106. DHS Secretaries faced unrelenting pressure from the White House to reach its "desired result of terminating TPS" and responded by ordering pre-textual terminations of TPS designations for nearly everyone who held the status. *Ramos*, 336 F. Supp. 3d at 1101.

107. The courts that reviewed these decisions consistently found that DHS had radically changed the way it approached TPS decisions and justified the terminations by considering a much narrower range of country conditions than had been considered in the past. *See Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019); *Ramos*, 336 F. Supp. 3d at 1097–98; *Centro Presente*

---

[73] *See also* Minority Staff of S. Comm. on Foreign Rels., 116th Cong., *Playing Politics with Humanitarian Protections: How Political Aims Trumped U.S. National Security and the Safety of TPS Recipients* 41 (U.S. Gov't Publ'g Off. Wash. 2019) (finding that termination decision was influenced by considerations related to upcoming elections and disregarded risks to national security and safety of returnees).

[74] *Saget v. Trump*, 375 F. Supp. 3d 280, 368–72 (E.D.N.Y. 2019) (also finding that "evidence of White House . . . animus toward non-white immigrants, including Haitians specifically, raises at the very least serious questions going to the merits of Plaintiffs' equal protection claim" challenging the termination of TPS for Haiti); *see also Ramos*, 336 F. Supp. 3d at 1100 (noting "evidence that President Trump harbors an animus against non-white, non-European [noncitizens] which influenced his (and thereby the Secretary's) decision to end . . . TPS designation[s]"); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("find[ing] that the combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision" to terminate TPS for Haiti, El Salvador and Honduras).

*v. DHS*, 332 F. Supp. 3d 393, 412–14 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 321 (D. Md. 2018).

108. To justify these terminations and undermine the TPS program, political appointees during the first Trump Administration sought to paint TPS holders as criminals and manufactured evidence to support that claim.

109. The U.S. District Court for the Eastern District of New York found that the Acting Secretary of Homeland Security, Elaine Duke, decided to terminate TPS for Haiti for the sake of "agenda adherence" to the "America first" platform, without regard to her consideration of country conditions under the TPS statute. *Saget*, 375 F. Supp. 3d at 343, 347–48, 359–62. Additionally, subordinates of then-DHS Secretary John Kelly covertly sought data on the number of Haitian TPS holders who committed crimes and relied on public assistance. *Id*. at 307–09. Secretary Kelly and other DHS and USCIS personnel tried to use these data to demonstrate that extending TPS to Haitians would not be in the "national interest," despite the fact that virtually any criminal record would be enough to disqualify an individual applicant for TPS eligibility. *See id*. at 352; *cf*. 8 U.S.C. § 1254a (b)(1)(C), (c)(2)(B). Another federal district court found that "[t]he information sought by the Secretary [Kelly] coincides with racial stereotypes – i.e., that non-whites commit crimes and are on the public dole." *Ramos*, 336 F. Supp. 3d at 1105.

110. After analyzing "a wealth of record evidence" regarding the terminations of TPS for El Salvador, Haiti, Nicaragua, and Sudan, a federal district court found that "DHS made a deliberate choice to base the TPS decision solely on whether the originating conditions or conditions directly related thereto persisted, regardless of other current conditions no matter how bad . . . The evidence . . . suggests this change may have been made in order to implement and justify a pre-ordained result." *Id*. at 1092, 1097–98; *see also Centro Presente*, 332 F. Supp. 3d at

416 (denying motion to dismiss and explaining "there is no justification, explicit or otherwise, for Defendants' switch to focusing on whether the conditions that caused the initial designation had abated rather than a fuller evaluation of whether the country would be able to safely accept returnees").

111. The U.S. District Court for the Eastern District of New York came to the same conclusion after a four-day bench trial regarding Haiti's TPS termination, finding that the termination "was preordained and pretextual" and "was made in part due to political influence," violating the TPS statute's requirement that decisions be based on country conditions. *Saget*, 375 F. Supp. 3d at 346.

112. Indeed, then-Acting Secretary Duke's writings revealed that "she, in her role at DHS, was largely carrying out or conforming with a predetermined presidential agenda to end TPS." *Ramos*, 336 F. Supp. 3d at 1099. Specifically, she expressed that her TPS decision-making was based on "an America first view," a term that invoked President Trump's preference for immigration from majority-white European countries. *Id.* at 1099–1100, 1104.

113. As a result of injunctions issued in these cases and subsequent stipulated orders, the terminations sought by the first Trump Administration for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan did not go into effect. *See, e.g.*, *Ramos*, 709 F. Supp. 3d at 878–79. DHS issued new extensions for Haiti and Sudan on May 21, 2021, and April 19, 2022, respectively, effectively overturning their TPS terminations.[75] *See id.* And in 2023, DHS rescinded the TPS terminations for Honduras, Nicaragua, Nepal, and El Salvador and instead extended TPS designations for those countries. *See id.* In doing so, DHS extensively criticized the flawed

[75] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863 (Aug. 3, 2021); Designation of Sudan for Temporary Protected Status, 87 Fed. Reg. 23,202 (Apr. 19, 2022).

country-conditions analyses in the termination decisions issued under the first Trump Administration.[76]

## THE SECOND TRUMP ADMINISTRATION'S PROMISE TO END ACCESS TO TPS

### *Secretary Noem, President Trump, and Vice President Vance Commit to Terminating TPS*

114. Even before she became Secretary of DHS, Defendant Noem publicly committed to ending TPS for reasons unrelated to relevant country conditions. During her confirmation hearing, she claimed that TPS "has been abused and manipulated by the Biden Administration," and suggested that the "extensions" of TPS were impermissible because "[t]he program was intended to be temporary."[77]

115. Defendant Noem repeatedly asserted that TPS was a program to benefit people who had entered the country illegally or who commit crimes in the United States. In announcing her decision to end TPS for Venezuela, for instance, she said she would not allow Venezuelan TPS holders to "stay here and violate our laws."[78] In her press statement announcing the partial vacatur of TPS for Haiti, Defendant Noem emphasized that "TPS is a type of immigration status available

---

[76] *See* Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304, 40,307 (June 21, 2023) ("[T]he conditions in Honduras that gave rise to its TPS designation in 1999 persisted in 2018 and continue to this day."); Extension of the Temporary Protected Status Designation for Nicaragua, 88 Fed. Reg. 40294, 40,297 (June 21, 2013) (same for Nicaragua); Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023) (same for Nepal).

[77] *Homeland Security Secretary Nominee Gov. Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 15, 2025), https://www.c-span.org/program/senate-committee/homeland-securitysecretary-nominee-governor-kristi-noem-testifies-at-confirmation-hearing/654484 (at approximately 1:50:54); *see also* NBC News (@NBCNews), *Meet the Press full broadcast* – Feb. 2, YouTube (Feb. 2, 2025), https://www.youtube.com/watch?v=FpeMXrvxHco (at approximately 16:25).

[78] *DHS Sec. Noem Announces End to Temporary Protected Status for Venezuelan Migrants*, Fox & Friends (Jan. 29, 2025), https://www.foxnews.com/video/6367942790112?msockid=30416397acd261bf24f1707bad6860

to nationals of certain designated countries that allows aliens,[79] *even if they entered the country illegally*, the ability to reside *temporarily* in the U.S."[80] Defendant Noem further cited Haiti as an "example" of the "exploit[ation]" of the system because "Haiti has been designated for TPS since 2010"; and because "more Haitian nationals, even those who entered the U.S. illegally" have benefited from "each extension."[81]

116. President Trump, Vice President Vance, and Trump surrogates have likewise expressed their disagreement with TPS and characterized designations as illegal, or, in the Vice President Vance's words, "a magic amnesty wand."[82]

117. Before taking office, both the President and the Vice-President made clear their intent to target TPS designations for termination.[83] President Trump, while campaigning, said that

---

[79] The term "alien" is used throughout the Immigration and Nationality Act to describe non-citizens, but it and the related term "illegal alien" are considered by some to be a derogatory term used particularly to vilify and dehumanize non-white immigrants without lawful status (or people perceived as such). *See, e.g.*, Kai Wei, et al., *The Role of Language in Anti-Immigrant Prejudice: What Can We Learn from Immigrants' Historical Experiences?*, 8(3) SOC. SCIS. J. 1, 10–11 (2019), https://www.mdpi.com/20760760/8/3/93#B63-socsci-08-00093. Notably the current Trump Administration concertedly specified that it would use these terms, as a matter of policy, and departing from the contrary policy of the Biden Administration. *See, e.g.*, Todd Lyons, Acting Director, U.S. Immigr. & Customs Enforcement, *Updated Terminology for Communications Materials and Internal and External Communications* (Mar. 31, 2025), https://www.ice.gov/doclib/foia/policy/memo_CommsTerminology_03.31.2025.pdf.

[80] Press Release, *U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's TPS* (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status (emphases in original).

[81] *Id.* (Here, Secretary Noem presumably meant each "redesignation," because an extension does not allow additional Haitian nationals to benefit from TPS).

[82] Gabe Whisnant, *JD Vance Confronted on Putting Constituents 'at Risk' With Haitian Claims*, NEWSWEEK (Sept. 16, 2024), https://www.newsweek.com/jd-vance-cnn-confronted-ohio-haitian-immigrant-claims-1954036.

[83] *See* Chris Cameron, *Vance Vows an End to Programs for Legal Immigrants*, N.Y. TIMES (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/us/politics/vance-trump-legal-immigrants.html; Miriam Jordan & Hamed Aleaziz, *Trump Immigration Targets: Ukrainians, Venezuelans, Haitians*, N.Y. TIMES (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/trump-immigrants-temporary-protected-status.html.

he would "[a]bsolutely … revoke" TPS from Haitians, saying, "You have to remove the people; you cannot destroy our country . . . In my opinion, it's not legal."[84]

118. He decried TPS as a "little trick," asserting that Haitian migrants "are illegal immigrants" who were "destroying the town" of Springfield, Ohio.[85]

119. For his part, Vice President Vance, said that "[w]e're going to stop doing mass grants of Temporary Protected Status. Of course, you're going to have people fleeing from tyranny, but that happens on a case-by-case basis, not by waving the magic government wand."[86] Because TPS is a statute enacted by Congress to be a mass grant for all eligible individuals (unlike asylum and other forms of fear-based immigration relief grounded in individualized assessments), this statement can only be understood as an attack on TPS itself. Vice President Vance expressed this view repeatedly while campaigning.[87]

---

[84] Damita Menezes & Ali Bradley, *Trump on Springfield Haitian Migrants: 'They Have to Be Removed*, NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ (starting at approximately 12:00); *see also* Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[85] Charisma Madarang, *Trump Says Legal Haitian Migrants Are Illegal 'As Far As I'm Concernced'*, ROLLINGSTONE (Oct. 9, 2024), https://www.rollingstone.com/politics/politics-news/trump-claims-legal-haitian-migrants-illegal-1235129621.

[86] Timothy Nerozzi, *Trump ends Temporary Protected Status for more than 300,000 Venezuelans in US*, WASH. EXAM'R (Feb. 3, 2025), https://www.washingtonexaminer.com/policy/immigration/3308462/trump-ends-temporaryprotected-status-venezuelans/.

[87] *See, e.g.*, CNN-News 18 (@cnnnews18), CNN's Dana Bash And JD Vance Clash Over Claims About Haitian Immigrants, YouTube (Sept. 16, 2024), http://youtube.com/watch?v=djpTr5r0zMQ (at approximately 5:10, disputing anchor's characterization of TPS holders as being in the United States legally and calling TPS designations a "magic amnesty wand."); *Senator JD Vance Campaigns in Raleigh, North Carolina*, C-SPAN (Sept. 18, 2024), https://www.c-span.org/program/campaign-2024/senator-jdvance-campaigns-in-raleigh-north-carolina/649012 (at approximately 41:00, "The media loves to say that the Haitian migrants, hundreds of thousands of them, by the way . . . they are here legally . . . . if Kamala Harris waves the wand illegally and says these people are now here legally. I'm still going to call them an illegal alien.").

120. According to the New York Times, Stephen Miller, President Trump's Deputy Chief of Staff and chief architect of his immigration policy platform, and other top advisers flagged the revocation of TPS designations as a priority for the incoming administration, again without consideration of country conditions or the merit of any individual designation.[88]

**DEFENDANTS' RENEWED EFFORTS TO END TPS**

121. Neither the adverse decisions of federal courts nor DHS's 2023 analysis of conditions in South Sudan have deterred the second Trump Administration from pursuing its plan to effectively end access to TPS consistent with campaign promises. To date, the Administration has attempted to terminate every TPS designation that has come up for review, announcing terminations for South Sudan, Ethiopia, Cameroon, Haiti, Syria, Afghanistan, Nepal, Burma, Nicaragua, Honduras, and Venezuela. The termination decisions—including the termination of TPS for South Sudan—reflect preordained outcomes driven by the very sort of partisan politics the statute is intended to exclude from consideration.

122. On his first day in office, President Trump issued an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14159 § 16(b), 90 Fed. Reg. 8,443, 8,446 (Jan. 20, 2025) ("Invasion EO"). The supposed "invasion" involved purportedly "unprecedented" levels of irregular entry into the United States. *Id.* § 1. The executive order describes immigrants, including lawfully present TPS holders, as invaders committing "vile and heinous acts against innocent Americans." *Id.*

[88] *See* Charlie Savage *et al.*, *Sweeping Raids, Giant Camps and Mass Deportations: Inside Trump's 2025 Immigration Plans*, N.Y. TIMES (Nov. 11, 2023), https://www.nytimes.com/2023/11/11/us/politics/trump-2025-immigration-agenda.html ("People who were granted temporary protected status because they are from certain countries deemed unsafe, allowing them to lawfully live and work in the United States, would have that status revoked.").

123. The Executive Order directs the Secretary of Homeland Security to "promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States," including by reviewing "designations of Temporary Protected Status." Invasion EO § 16(b). Although TPS holders are, by definition, lawfully present in the United States, the Executive Order demanded that TPS designations be "appropriately limited in scope" to restrict the "continued presence of illegal aliens in the United States." *Id.*

124. Immediately after Defendant Noem was confirmed as Secretary of Homeland Security, Defendants began to implement the Executive Order's mandate, and several of Secretary Noem's termination decisions rely explicitly on this order. In fact, when publicizing the Venezuela TPS vacatur described below, Defendant Noem explained that the vacatur reflected President Trump's "desire" to make sure TPS was "used properly," adding that "when the President gives a directive, the Department of Homeland Security will follow it."[89]

125. Within days of taking office, Defendant Noem began improperly terminating TPS designations, following the same procedurally improper playbook that was eventually used to terminate South Sudan.

***Failure to Consult Appropriate Agencies and to Consider Country Conditions Within Periodic Reviews Conducted in 2025***

126. Defendant Noem failed to consult with other agencies as required by the TPS statute and disregarded objective and available evidence of country conditions in multiple terminations. Instead, she relied on pretextual justifications for the terminations. Just days after entering office,

---

[89] Secretary Kristi Noem (@Sec_Noem), X (Jan. 29, 2025, 6:57 PM), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (statement appears in posted video clip from CNN interview).

Secretary Noem reversed Venezuela's TPS extension, an unprecedented action that a federal court later found to be a pretext to cover her "desire to totally undo" the redesignation signed by then-Secretary Alejandro Mayorkas.[90] This decision granting preliminary relief was stayed by the Supreme Court in a nonprecedential decision with no analysis. *See Noem v. Nat'l TPS All.*, 145 S. Ct. 2728 (2025). The Ninth Circuit later upheld the district court's preliminary relief decision in a detailed opinion, *Nat'l TPS All. v. Noem*, 150 F.4th 1000 (9th Cir. 2025), terminating the Supreme Court's stay, 145 S. Ct. at 2729. Meanwhile, the district court issued a decision on summary judgment in the same case, holding that plaintiffs had established that the agency's vacatur and termination decisions were unlawful and/or arbitrary and capricious.[91] That merits decision and the vacatur were then stayed by the Supreme Court in another nonprecedential decision with no analysis. *Noem v. Nat'l TPS All.*, No. 25A326, 2025 WL 2812732, at *1 (U.S. Oct. 3, 2025).

127. Quickly after issuing the Venezuela termination, Defendant Noem then "vacated a decision by the previous administration to extend Haiti's [TPS] by 18 months" as "part of President Trump's promise to rescind policies that were magnets for illegal immigration and inconsistent with the law."[92] The same district court held that Defendants' decision "was preordained" and made without "any meaning[ful] analysis and review [of country conditions],"[93] and a separate district court also found the action unlawful and set it aside. *See Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 273 (E.D.N.Y 2025).

---

[90] *NTPSA I* PI Decision at 855.
[91] *Nat'l TPS All. v. Noem*, No. 25-CV-01766-EMC, 2025 WL 2578045 (N.D. Cal. Sep. 5, 2025) ("*NTPSA I* SJ Decision").
[92] Press Release, U.S. Dep't of Homeland Sec., Secretary Noem Rescinds Previous Administration's Extension of Haiti's Temporary Protected Status (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-rescinds-extension-haitis-temporary-protected-status [hereinafter "Haiti Termination Press Release"].
[93] *NTPSA I* SJ Decision at *34.

128. On May 12, 2025, DHS terminated Afghanistan's TPS designation despite an ongoing State Department warning against any travel to the country "due to civil unrest, crime, terrorism, risk of wrongful detention, kidnapping, and limited health facilities,"[94] Secretary Noem claimed that conditions had "notabl[y] improve[d]." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. 20,309, 20,310 (May 13, 2025).

129. In her terminations for Cameroon, Nepal, and Honduras, Defendant Noem claimed that notable country conditions improvements justified ending the designations, but she ignored entire categories of conditions that DHS had previously considered.[95]

130. Discovery produced in litigation challenging Defendants' termination of TPS for Nepal, Honduras and Nicaragua [96] confirms that USCIS drafted decision memoranda recommending termination for Honduras and Nicaragua before drafters had reviewed USCIS country conditions reports. For Nepal and Nicaragua, USCIS drafted decision memoranda without ever receiving any recommendation or contemporaneous conditions report from the State Department. This process violated the statutory directives to engage in interagency consultation and further evidence Defendants' ends-oriented approach.

---

[94] *Travel Advisory Afghanistan*, U.S. Dep't of State, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/afghanistan-advisory.html.

[95] *Compare* Extension of the Temporary Protected Status Designation for Nepal, 88 Fed. Reg. 40,317 (June 21, 2023), *with* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,151; Compare Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023), *with* Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. at 23,697; Extension of the Temporary Protected Status Designation for Honduras, 88 Fed. Reg. 40,304 (June 21, 2023); *see also* Honduras Termination Notice (not addressing political violence or crime).

[96] *See Nat'l TPS All. v. Noem*, No. 25-cv-05687-TLT (N.D. Cal. Aug. 21, 2025) ("*NTPSA II*").

131. Each of these terminations and the failure to consult appropriate agencies demonstrates that the Trump Administration's aim of dismantling TPS has been implemented through decision-making that was predetermined, pretextual, and procedurally deficient.

***Impermissible Consideration of "National Interest" at the Periodic Review Stage***

132. Defendant Noem also impermissibly based multiple TPS termination decisions primarily on U.S. national interest grounds, which cannot be considered at the periodic review stage of the TPS process.[97] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042 ("[E]ven assuming the relevant conditions in Venezuela remain both 'extraordinary' and 'temporary,' termination of the 2023 Venezuela TPS designation is required because it is contrary to the national interest to permit the Venezuelan nationals . . . to remain temporarily in the United States.").

133. Defendant Noem based her termination of Haiti on U.S. "national interest." Haiti, like Venezuela was designated for TPS on the grounds of extraordinary and temporary conditions. The Secretary rested her termination decision on her finding that extension of TPS status was not in the U.S. "national interest." This is procedurally inappropriate, and the facts used to justify the decision—the total societal collapse Haitian citizens are facing—weigh *in favor of* extending TPS status. *Id.* at 28,763.

134. In her terminations for Afghanistan, Haiti, and Syria, Defendant Noem used verbatim language for each country, claiming that "DHS records indicate that there are . . .

[97] Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040, 9,042; Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10,511, 10,513–14 (Feb. 24, 2025); Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697, 23,698 (June 4, 2025); Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57).

nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security."[98]

135. These terminations were the first to rely on a purported U.S. "national interest" to terminate a TPS designation. Until 2025, when the second Trump administration took power, no TPS designation for any country in the 35-year history of the TPS statute had ever been terminated based on "national interest." But in President Trump's second term alone, four countries' TPS designations have been terminated based exclusively or primarily on Secretary Noem's assessment of "national interest." 90 Fed. Reg. 9040 (Venezuela); 90 Fed. Reg. 20309 (Afghanistan); 90 Fed. Reg. 23697 (Cameroon); 90 Fed. Reg. 28760 (Haiti). These terminations were the first to rely on a purported U.S. "national interest" to terminate a TPS designation. There is a reason for this: U.S. "national interest" is not a factor that can be considered at the periodic review stage, nor for TPS designations for countries facing armed conflict.[99] There is a reason for this: U.S. "national interest" is not a factor that can be considered at the periodic review stage, nor for TPS designations for countries facing armed conflict.[100]

---

[98] *See* Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025); Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 45,398, 45,401 (Sept. 22, 20250; Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760, 28,763 (Jul. 1, 2025).

[99] *See* 8 U.S.C. § 1254a(b)(1) (including "national interest" as a relevant consideration only under subsection (C)); 8 U.S.C. § 1254a(b)(3) (providing that the outcome of the periodic review of a designation depends solely on "whether the conditions for such designation under this subsection continue to be met"); Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57) (reviewing the TPS statute and finding that "periodic review, including review for termination, is limited to consideration of country conditions, and not to proclamations of the national interest divorced from those country conditions").

[100] *See* 8 U.S.C. § 1254a(b)(1) (including "national interest" as a relevant consideration only under subsection (C)); 8 U.S.C. § 1254a(b)(3) (providing that the outcome of the periodic review of a designation depends solely on "whether the conditions for such designation under this subsection continue to be met"); Oral Order at 19–20, *Doe v. Noem, 1:25-cv-08686*, (S.D.N.Y. Oct. 20, 2025) (Dkt. No. 57) (reviewing the TPS statute and finding that "periodic review, including review for

***Impermissible Breaks from Past Practice***

136. Six of the nine terminated countries had been designated since at least 2015. Rather than adhere to DHS's longstanding practice of providing at least a six-month orderly transition period when ending a TPS designation of substantial length, the Secretary denied that there was any such practice. *See* Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. at 24,153–54 n.24. While acknowledging "that certain previous TPS terminations allowed for an extended transition," she noted that "certain other TPS designations were terminated without allowing for an extended transition period." *Id.* That is incomplete and inaccurate. DHS maintained a clear practice over the prior twenty years of providing at least a six-month orderly transition period for any TPS termination, and even before that had provided at least a six-month transition for any country designated for TPS for more than three years.

137. In the past month, the Trump Administration has taken further action to systematically dismantle TPS. On November 25, 2025, Defendant Noem issued a termination for Burma. On November 28, 2025, the Administration issued a termination notice for Haiti. On December 12, 2025, the Administration announced the forthcoming termination for Ethiopia.

138. The Administration has also signaled repeatedly its intent to terminate TPS for Somalis in Minnesota, despite the absence of any basis in the TPS statute or DHS practice to target TPS beneficiaries for termination on the basis of where they reside in the United States.[101]

---

termination, is limited to consideration of country conditions, and not to proclamations of the national interest divorced from those country conditions").

[101] 8 U.S. Code § 1254a (notably missing any commentary on terminations that are limited to a specific city or state, while detailing the process for terminations); Donald J. Trump (@realDonaldTrump), Truth Social, (Nov. 21, 2025, 5:37 PM EST), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.

***Decision-Making Based on Animus***

139. The Trump Administration's ongoing policy of dismantling the TPS program, carried out through the pretextual terminations discussed above, is based on race, national origin, and ethnicity-based animus in violation of Fifth Amendment to the U.S. Constitution. While federal courts have yet to rule on the merits of the equal protection claims included in the previous litigation challenging the terminations discussed above, many interim rulings have recognized a likelihood of success on the merits of the claim that the Trump Administration's terminations are based on unconstitutional animus.[102] This same animus motivated the termination of TPS for South Sudan.

**DEFENDANTS' TERMINATION WAS MOTIVATED BY DISCRIMINATORY ANIMUS TOWARDS NON-WHITE, NON-EUROPEAN IMMIGRANTS GENERALLY AND BLACK AND AFRICAN IMMIGRANTS, SPECIFICALLY**

140. President Trump, Defendant Noem, and other members of the Trump Administration have built their political platforms and public-facing personas on unabashed animus toward non-white people, particularly non-white immigrants, and, among them, particularly Black and African immigrants. This animus substantially motivated the Trump Administration's plan to end TPS designations and is evidenced by numerous statements made by

---

[102] Mem. Op., *CASA, Inc. v. Noem*, 2025 WL 1907378 (D. Md. July 10, 2025)(Docket No. 122), at 11 (noting "[a]t this early stage, the Court finds that CASA has adequately pleaded facts in several of these categories of direct and circumstantial evidence that, when read as a whole and in the most favorable light to CASA, permit a reasonable inferenced of a policy or practice of race discrimination in TPS determinations.); Mem. Order Granting Pl's Mot. to Postpone, *NTPSA I*, at [59], (Dkt. No. 93)(stating "[b]ased on the extensive record provided by Plaintiffs, the Court finds that Plaintiffs have raised a substantial claim of unconstitutional animus."); Order Granting Pl. Mot'n to Postpone, *NTPSA II*, at 29, (Dkt. No. 73) (stating "[i]n totality, Plaintiffs have produced sufficient evidence demonstrating racial and discriminatory animus in support of their Fifth Amendment claim. Color is neither a poison nor a crime. Therefore, Plaintiffs have provided sufficient evidence to establish that Plaintiffs will likely succeed on the merits of their Fifth Amendment claim.").

Defendant Noem, President Trump, and other Administration officials. A limited sample of those statements follows.

***Defendants Have Repeated White Nationalist and Racist Rhetoric***

141. Defendants and their Administration have repeated rhetoric used within white nationalist, anti-immigrant ideology.

142. The so-called "Replacement Theory" of white nationalism, for example, is a unifying theme of the Trump Administration's. This conspiracy theory turns on the idea that non-white immigrants will "replace" the white race, and in doing so undermine the country's perceived white foundation, history, and culture.[103]

143. Echoing the white nationalist Replacement Theory, President Trump and his administration have long expressed animus against non-white immigrants in general and non-white TPS-holders in particular.

144. Secretary Noem has endorsed the core premise of Replacement Theory and has described irregular immigration across the southern border as an "invasion happening on purpose… to remake the foundation of this country."[104]

145. Deputy Chief of Staff for Policy and Homeland Security Advisor to the President Stephen Miller has long "promoted white nationalist literature," and "pushed racist immigration stories" to the media.[105] The Southern Policy Law Center reviewed 900 emails sent by Miller to media outlets going back to 2015, and found repeated themes of white genocide and a focus on

---

[103] *See The 'Great Replacement' Theory, Explained*, National Immigration Forum, https://forumtogether.org/article/the-great-replacement-theory-explained/.
[104] *South Dakota Gov. Kristi Noem Calls on Nikki Haley to Exit 2024 Race*, CBS NEWS (Mar. 5, 2024), https://www.cbsnews.com/video/kristi-noem-calls-on-nikki-haley-to-exit-2024-race/ (at approximately 4:57).
[105] Michael Edison Hayden, *Stephen Miller's Affinity for White Nationalism Revealed in Leaked Emails*, SOUTHERN POVERTY LAW CENTER (Nov. 12, 2019).

interracial crime.[106] Miller also lauded historical immigration laws that imposed quotas based on racist assumptions.[107]

146. President Trump himself has repeatedly "retweeted" posts from avowed white nationalists, such as @WhiteGenocideTM, and publicly dined with prominent, self-declared white supremacists, implicitly endorsing their racist views and amplifying their racist message.[108]

147. While campaigning in 2023 and 2024, President Trump explicitly adopted those racist views, and said that non-white, non-European immigrants "*from Africa*" and Asia are "poisoning the blood of our country."[109]

148. In October 2024, during an interview with conservative radio host Hugh Hewitt, President Trump further emphasized his belief about the genetic inferiority of non-white, non-European immigrants. Speaking about "allowing people to come to an open border," he said, "many of them murdered far more than one person, and they're now happily living in the United

---

[106] *Id.*

[107] Adam Serwer, *Trump's White-Nationalist Vanguard*, THE ATLANTIC (Nov. 19, 2019), https://www.theatlantic.com/ideas/archive/2019/11/stephen-miller-alarming-emails/602242/ ("A cache of Miller's emails . . . Show Miller praising racist immigration reactions from a century ago, while bitterly lamenting the law that repealed them.").

[108] Benjy Sarlin, *Donald Trump Retweets Apparent Neo-Nazi Supporter*, NBC NEWS (Jan. 22, 2016), https://www.nbcnews.com/politics/2016-election/donald-trump-tweets-apparent-neo-nazi-supporter-n502136; Eric Lichtblau, *OPINION: Trump amplifies racist lies, giving neo-Nazis 'real power.' Where are GOP leaders?* USA TODAY (Sep. 23, 2024), https://www.usatoday.com/story/opinion/2024/09/23/trump-far-right-haitian-immigrants-springfield/75301951007/.

[109] *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country"*, C-SPAN (Dec. 16, 2023), https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439 (at approximately 00:15) (emphases added); Raheem J. Kassam (@RaheemKassam), *Raheem Kassam Interviews Donald Trump*, YouTube (Sep. 2023), https://www.youtube.com/watch?v=v283kLQbe1M&t=89s (at approximately 1:34 to 1:45).

States. You know now a murderer, I believe this, it's in their genes. And we got a lot of bad genes in our country right now."[110]

149. By contrast, President Trump told a predominantly white crowd at a Minnesota campaign rally, that they have "good genes."[111]

150. President Trump has referred to non-white, non-European immigrants as "animals,"[112] and compared them to snakes that will bite and kill anyone foolish enough to shelter them.[113] When discussing undocumented immigrants during a March 2024 rally, he stated, "I don't know if you call them people. In some cases they're not people, in my opinion, but I'm not allowed to say that[.]"[114] Secretary Noem has referred to non-white immigrants as "dirt bags."[115]

---

[110] Jack Traylor et al., *Trump Suggests Immigrants Have 'Bad Genes' in Latest Disparagement of Migrants*, NBC NEWS (Oct. 7, 2024), https://www.nbcnews.com/politics/donald-trump/trumpsuggests-immigrants-bad-genes-latest-disparagement-migrants-rcna174271 .
[111] *Id.*
[112] Miriam Valverde, *In Context: Donald Trump's comments about immigrations, 'animals,'* POLITIFACT (May 17, 2018), https://www.politifact.com/article/2018/may/17/context-donald-trumps-comments-about-immigrants-an/ (relying on MS-13 to claim that undocumented immigrants "aren't people. These are animals.").
[113] *See, e.g.*, Dara Lind, *"The Snake": Donald Trump Brings Back His Favorite Anti-Immigrant Fable at CPAC*, VOX (Feb. 23, 2018), www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac; *see also* Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. TIMESS (May 16, 2018), www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html; *see also* John Bennett, *"Dumping Ground": Trump Echoes Conservative "Project 2025" at First Rally as Felon*, ROLL CALL (June 10, 2024), https://rollcall.com/2024/06/10/dumping-ground-trump-echoes-conservative-project-2025-at-first-rally-as-a-felon/ ("[W]e're taking in people that are a disaster for our country. So it's all happening at our border. . . . And we're not going to let it happen, we're not going to let them ruin our country, we're not going to let them destroy our country. . . . The whole country is being turned into an absolute dumping ground[.]").
[114] Ariana Figueroa, *Trump Promises Mass Deportations of Undocumented People. How Would That Work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/
[115] Secretary Kristi Noem (@Sec_Noem), X (Jan. 28, 2025, 7:35 AM EST), https://x.com/Sec_Noem/status/1884264039158800547 ("Getting the dirt bags off the streets."); CBS Mornings (@CBSMornings), *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, YouTube (Jan. 29, 2025),

151. In his speech at the Republican National Convention in July 2024, President Trump, repeating the white nationalist talking points discussed above, stated: "[t]he greatest invasion in history is taking place right here in our country. They are coming in from every corner of the earth, not just from South America, but from Africa, Asia, Middle East…"[116]

152. On September 23, 2025, President Trump used his platform at the U.N. General Assembly to critique the United Nations' humanitarian aid for migrants as "funding an assault on Western countries and their borders," and warning of "the death of Western Europe."[117]

153. As recently as November 27, 2025, Trump declared his intent to "permanently pause migration from all Third World Countries,"[118] and claimed that "most" of the 53 million "foreign" people in the United States "are on welfare, from failed nations, or from prisons, mental institutions, gangs, or drug cartels."[119]

154. Over the past few months, the Trump Administration—including the Department of Homeland Security and Department of Labor—have ramped up their symbolic embrace of white nationalist ideology and the animus it carries with it.

---

https://www.youtube.com/watch?v=tODarHnNiNs ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The CBS reporter who accompanied Secretary Noem during the New York City raids she referenced has reported that nearly half of those arrested had no criminal history.

[116] *Read the Transcript of Donald J. Trump's Convention Speech*, N.Y. TIMES (July 19, 2024), https://www.nytimes.com/2024/07/19/us/politics/trump-rnc-speech-transcript.html.

[117] *Trump Speaks at U.N.*, REV, https://www.rev.com/transcripts/trump-speaks-at-un.

[118] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, 11:26 PM), https://truthsocial.com/@realDonaldTrump/posts/115625427648743414.

[119] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 27, 2025, 11:27 PM), https://truthsocial.com/@realDonaldTrump/posts/115625429081411360.

155. On October 14, 2025, DHS posted a one-word tweet: "Remigrate."[120] This word "refer[s] to the mass deportation of non-white immigrants," "has ties to white nationalism," and "has been seen as a euphemism for ethnic cleansing."[121]

156. President Trump has repeatedly embraced this white nationalist call. Earlier in 2025, he stated: "America was invaded and occupied. I am reversing the Invasion. It's called Remigration."[122] President Trump "directed" the "entire Administration to put every resource possible behind this effort, and reverse the tide of Mass Destruction Migration that has turned once Idyllic Towns into scenes of Third World Dystopia. Our Federal Government will continue to be focused on the REMIGRATION of Aliens."[123]

157. Also in 2025, President Trump called for "the Largest Mass Deportation Operation in History,"[124] saying "[i]t's called "REMIGRATION" and, it will, MAKE AMERICA GREAT AGAIN!"[125] (quotation marks in original). President Trump has repeatedly called for this "single largest Mass Deportation Program in History,"[126] all while specifically encouraging the immigration of white people, from places like South Africa and Europe.

---

[120] Homeland Security (@DHSgov), X (Oct. 14, 2025, 3:06 PM), https://x.com/DHSgov/status/1978175527329358094.

[121] Connor Greene, *Trump's Department of Homeland Security Embraces a Word with Ties to White Nationalism*, TIME (Oct. 16, 2025), https://time.com/7326233/trump-remigrate- homeland-security/; *see also* Chelsea Bailey, *DHS Issued a Call to 'Remigrate.' Here's the History of the Term Often Associated with Far-Right Groups*, CNN US (Oct. 19, 2025), https://www.cnn.com/2025/10/19/us/remigrate-dhs-explained.

[122] Donald J. Trump (@realDonaldTrump), Truth Social (June 12, 2025, 6:45 PM), https://truthsocial.com/@realDonaldTrump/posts/114672816056718064.

[123] Donald J. Trump (@realDonaldTrump), Truth Social (June 15, 2025, 8:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

[124] Donald J. Trump (@realDonaldTrump), Truth Social (July 5, 2025, 12:50 PM), https://truthsocial.com/@realDonaldTrump/posts/114801653749329102.

[125] *Id.*

[126] Donald J. Trump (@realDonaldTrump), Truth Social (June 15, 2025, 8:43 PM), https://truthsocial.com/@realDonaldTrump/posts/114690267066155731.

158. In the Fall of 2025, DHS posted a series of anti-immigrant posters that demonstrate discriminatory animus through their text and/or images. *See Figures A, B*. The Department of Labor has posted similarly charged symbolic language. *See Figures C, D, E, F*. Through Project Firewall, depicted in Figures C–F, the Department of Labor coordinates with DHS to constrain the availability of employment-based visas and immigration status.




*Figure A*[127]




*Figure B*[128]

---

[127] Graphic posted by U.S. Dep't of Homeland Security (@homelandgov.bskysocial), Bluesky (Oct. 18, 2025, 1:56 PM), https://bsky.app/profile/homelandgov.bsky.social/post/3m3iec6j2xs2m.

[128] Graphic posted by U.S. Dep't of Homeland Security (@homelandgov.bskysocial), Bluesky (Nov. 7, 2025, 11:48 AM), https://bsky.app/profile/homelandgov.bsky.social/post/3m52jswz7d22e, Bluesky (Nov. 7, 2025, 11:48 AM), https://bsky.app/profile/homelandgov.bsky.social/post/3m52jswz7d22e .




*Figure C*[129]




*Figure D*[130]

[129] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 18, 2025, at 6:08 PM), https://bsky.app/profile/dol.gov/post/3m3isfbppcs2f.@dol.gov).

[130] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 17, 2025, at 6:24 PM), https://bsky.app/profile/dol.gov/post/3m3gcseptrs22 (post "pinned" to the top of the Department of Labor's Bluesky profile as of Dec. 9, 2025).




*Figure E*[131]




*Figure F*[132]

***Defendants' Animus Toward Black, African, and Other Non-White Immigrants***

159. During his First Administration, President Trump repeatedly denigrated immigrants from countries designated for TPS. Most infamously, he referred to countries designated for TPS as "shithole" countries in a conversation with legislators about TPS, saying "Why do we need more Haitians?" He asked officials to "take them out" of the immigration proposal. He expressed a preference, instead, for immigrants from countries "such as Norway."[133]

---

[131] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 21, 2025, 6:14 PM), https://bsky.app/profile/dol.gov/post/3m3qe5ocyn22p.

[132] Graphic posted by U.S. Dep't of Labor (@dol.gov.bskysocial), Bluesky (Oct. 23, 2025, 10:06PM), https://bsky.app/profile/dol.gov/post/3m3vrz4sanc2h.

[133] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, WASH. POST. (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html.

160. During the 2024 election campaign, President Trump doubled down on those remarks, reiterating comparisons between "nice countries, you know like Denmark, Switzerland . . . [and] Norway"—all of which are countries whose nationals are majority white—and non-European countries whose nationals are majority non-white, which he described as "unbelievable places and countries, countries that are a disaster."[134]

161. On December 9, 2025, President Trump tripled down on his prior remarks at an event in Pennsylvania, in which "he boasted about pausing immigration applications from what he called 'third-world countries' including 'hellholes like Afghanistan, Haiti, Somalia and many other countries.'"[135]

162. In response, someone in the audience yelled out "shithole!", to which President Trump responded by saying:

> "Remember, I said that to the senators. They came in, the Democrats, they wanted to be bipartisan, so they came in and they said, 'This is totally off the record, nothing mentioned here, we want to be honest,' because our country was going to hell."
>
> "And we had a meeting, and I say, 'Why is it we only take people from s---hole countries,' right? Why can't we have some people from Norway, Sweden? Just a few? Let's have a few from [] Denmark. Do you mind sending us a few people? Send us some nice people. Do you mind? But we always take people from Somalia, places that are a disaster, right? Filthy, dirty, disgusting, ridden with crime."[136]

---

[134] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("These are people coming in from prisons and jails. They're coming in from just unbelievable places and countries, countries that are a disaster.").

[135] Lalee Ibssa and Karen Travers, *Trump ramps up anti-immigrant rhetoric, embraces 's---hole countries' phrase*, ABC NEWS (Dec. 10, 2025), https://abcnews.go.com/Politics/trump-ramps-anti-immigrant-rhetoric-embraces-phrase-hole/story?id=128279166.

[136] *Id.; see also Speech: Donald Trump Holds a Political Rally in Mount Pocono, Pennsylvania – Dec. 9, 2025*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-mount-pocono-pennsylvania=december-9-2025/.

163. The vitriol against Somalis was on ample display only one week prior, on December 2, 2025, during a Cabinet meeting, in which President Trump stated:

> I don't want them in our country, I'll be honest with you, OK? Somebody would say, oh, that's not politically correct. I don't care. I don't want them in our country. Their country is no good for a reason. Their country stinks and we don't want them in our country. I can say that about other countries too. We don't want them -- the hell -- we have to rebuild our country. You know, our country is at a tipping point. We could go bad; we're at a tipping point. I don't know if people mind me saying that, but I'm saying it. We could go one way or the other and we're going to go the wrong way if we keep taking in garbage into our country.[137]

164. Only days before that Cabinet meeting, President Trump posted the following on social media: "I am, as President of the United States, hereby terminating, effective immediately,

[137] *Remarks: Donald Trump Holds a Cabinet Meeting at the White House - December 2, 2025*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-cabinet-meeting-december-2-2025/. On December 2, 2025, the same day as this Cabinet meeting, USCIS instituted a new policy pausing all asylum processing in the U.S. and pausing the processing of immigration benefits applications from people in the U.S. who come from any of the 19 countries whose nationals are subject to entry bans that the President instituted effective June 9, 2025. The nationals of these countries are majority non-white, including those of 8 countries who are majority Black. *See* Policy Mem., U.S. Citizenship & Immigr. Serv., Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf (citing Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, Fed. Reg. 22491 (June 4, 2025), https://www.govinfo.gov/content/pkg/FR-2025-06-10/pdf/2025-10669.pdf). Days later, on December 16, 2025, President Trump announced an expansion of the entry bans, to take effect January 1, 2026. The newest entry bans extend to an additional 22 countries, the nationals of which are majority non-white. The nationals of 20 of those countries are majority Black. Of those 20 countries, 18 are African, including South Sudan. Presidential Proclamation, *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*, (Dec. 16, 2025), https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/. On December 18, 2025, the Director of USCIS announced on social media that the processing pause on immigration applications would extend to applicants who are nationals of countries, including South Sudan, that President Trump had newly designated for entry bans only two days prior. *See* Camilo Montoya-Galvez, *Trump administration pauses immigration cases for people from another 20 countries*, CBS News, (Dec. 18, 2025), https://www.cbsnews.com/news/trump-administration-pauses-immigration-cases-another-20-countries/.

the Temporary Protected Status (TPS Program) for Somalis in Minnesota. Somali gangs are terrorizing the people of that great State, and BILLIONS of Dollars are missing. Send them back to where they came from. It's OVER! President DJT."[138] Notably, the TPS statute does not authorize the President to effect an immediate termination of TPS, let alone for a subset of beneficiaries within a given U.S. city, over social media.

165. President Trump's disregard for immigrants from majority Black countries, including African countries, is nothing new. On the campaign trail to his current presidency, then-candidate Trump often remarked disparagingly about African immigrants, including people from South Sudan's neighboring country, the Democratic Republic of the Congo.

166. In September 2024, candidate Trump told a crowd in Uniondale, New York: "[t]hey are vicious, violent criminals that are being let into our country. They're people that their countries, who are very smart—they don't want them. That's why all over the world; a lot of people coming out of jails in the Congo, in Africa … They're coming from the Congo, they're coming from Africa, they're coming from the Middle East, they're coming from all over the world."[139]

167. In August 2024, candidate Trump claimed:

> "We have criminals from all over the world pouring into our country right now. Your jobs will never be obsolete… She [then-Vice President Kamala Harris] has allowed millions of people—open border—to flow into our country totally unchecked, totally unvetted. This isn't just from South America — people think it's just South America — this is Africa, Asia, the Middle East. A lot of people coming from the Congo in Africa, the Congo, rough, rough, rough, and they're prisoners, they're prisoners, and we say 'where do you come from?' 'Africa' 'Where in Africa?' 'Prison' 'What did

[138] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 21, 2025, 8:37 PM), https://truthsocial.com/@realDonaldTrump/posts/115590786862216464.
[139] Donald J. Trump (Shared by @TeamTrump), Truth Social (Sep. 18, 2024, 8:17 PM), https://truthsocial.com/@TeamTrump/posts/112996067996354335.

> you do?' 'We don't want to say.' They turn out to be murderers, these are rough, these are rough people…"[140]

168. In April 2024, at a speech to law enforcement officials in Grand Rapids, Michigan, candidate Trump claimed that immigrants have "wrecked our country," and that other countries were "sending prisoners, murderers, drug dealers, mental patients, and terrorists… from Congo, from Yemen, from Somalia, from Syria."[141]

169. In June of 2024 candidate Trump said again, "[T]hey come from Africa. They come from Asia. They come from South America. They come from the Middle East. What's happening to our country is unbelievable. They're poisoning our country."[142]

170. In October 2023, President Trump repeatedly boasted of his successes in excluding Black immigrants, stating for example: "I banned refugees from Somalia, very dangerous places, and from all of the most dangerous places all over the world… [s]ome very rough people, some very, very rough people come out of these areas."[143]

171. In 2022, President Trump claimed that immigrants were "storming" the country, including from "all of Africa."[144]

---

[140] Donald J. Trump (Shared by @TeamTrump), Truth Social (Aug. 20, 2024, 3:46 PM), https://truthsocial.com/@TeamTrump/posts/112996067996354335.

[141] *Speech: Donald Trump Addresses Law Enforcement Officials in Grand Rapids - April 2, 2024*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-law-enforcement-officials-grand-rapids-michigan-april-2-2024/.

[142] *Speech: Donald Trump Attends a Club 47 Birthday Fundraiser in Florida - June 15, 2024*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-club-47-birthday-fundraiser-west-palm-beach-florida-june-14-2024/#108.

[143] *Speech: Donald Trump Holds a Campaign Event in Clive, Iowa - October 16, 2023*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-event-clive-iowa-october-16-2023/#101.

[144] *Speech: Donald Trump Holds a Political Rally in Robstown, Texas - October 22, 2022*, ROLL CALL, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-political-rally-robstown-texas-october-22-2022/#20.

***Favorable Treatment of White Immigrants***

172. In stark contrast, the Trump Administration has shown a strong bias in favor of immigrant populations it perceives to be white. On February 7, 2025, President Trump signed Executive Order No. 14204, *Addressing Egregious Actions of the Republic of South Africa*, which directs Secretary Noem (among others) to: "[T]ake appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."[145]

173. President Trump previously posted on Truth Social that "any Farmer (with family!) from South Africa, seeking to flee that country to reasons of safety, will be invited into the United States of America with a rapid pathway to Citizenship. This process will begin immediately!"[146]

174. In October 2025, President Trump announced that the refugee cap for the coming year would be reduced from 125,000 last year, to just 7,500 people for 2026—the majority of whom will be white South Africans.[147]

**EXTRAORDINARY AND IRREPARABLE HARMS IF TPS FOR SOUTH SUDAN IS TERMINATED IMMINENTLY AND UNLAWFULLY**

175. Defendants' decision to terminate TPS imminently and unlawfully for South Sudan would strip TPS status from more than 230 South Sudanese TPS recipients, including the individual Plaintiffs and other members of Plaintiff ACT; at least 73 South Sudanese nationals with pending applications for TPS; and the U.S. citizen and lawful permanent resident dependents

[145] Exec. Order No. 14204, 90 Fed. Reg. 9497, 9497 (Feb. 12, 2025).
[146] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 7, 2025, at 9:05 AM), https://truthsocial.com/@realDonaldTrump/posts/112894686703859511.
[147] Rebecca Santana, *Trump Limits Annual U.S. Refugees to 7,500. It'll be mostly white South Africans,* PBS NEWS (Oct. 30, 2025), https://www.pbs.org/newshour/nation/trump-limits-annual-refugees-to-u-s-to-7500-itll-be-mostly-white-south-africans.

and immediate relatives of recipients and applicants. Some of these people, such as the individual Plaintiffs, have lived in the United States for years and are otherwise deeply embedded in their communities. Should Defendants' unlawful and imminent Termination take effect beyond January 5, 2026, the harms caused to them and many others would be myriad and severe.

176. For the TPS recipients, including all of the individual Plaintiffs, those harms can include: losing TPS as a sole source of immigration status; losing eligibility for related federal benefits (such as work authorization); losing eligibility for related state benefits (such as driver's licenses); facing the risk of deportation charges and of related immigration confinement; facing related, forced separation from loved ones and community in the U.S.; and facing forced removal to South Sudan and the risks of harm there, including deadly harm, on account of ongoing armed conflict and its ramifications, as well as other, compounded humanitarian crises, spanning severe flooding, a deadly cholera outbreak, mass internal displacement, acute food insecurity, and barriers to accessing humanitarian aid.

177. For the TPS applicants, the harms include no longer having any basis for consideration of their pending application for TPS, losing related protection against deportation, and losing access to TPS.

178. For the individual Plaintiffs and all other TPS recipients, TPS applicants, and their U.S.-based family members, the harms include the stress and torment of possible forced separation from loved ones and the fear that the applicants and recipients could face grave harm, including death, if forcibly removed to South Sudan.

179. All of these harms are compounded by the fact that the Administration only provided a 60-day wind-down period for South Sudanese TPS recipients, which is insufficient for them, applicants, and their U.S.-based family members to respond or plan fairly.

180. The unfairness of the 60-day wind-down is exacerbated by other severe policy changes that the Administration has implemented, including:

A) A December 2, 2025, set of policy changes that the Administration announced that (1) pauses all asylum processing within the U.S., and (2) pauses the processing of immigration benefits applications for applicants who come from countries whose nationals are subject to the entry bans instituted effective June 9, 2025;

B) A December 16, 2025, Presidential Proclamation that extends the entry bans to nationals of South Sudan, effective January 1, 2026; and

C) A December 18, 2025, expansion of the processing pause on immigration benefits applications to applicants in the U.S. who are South Sudanese nationals.[148]

181. The blanket pause on asylum processing that is currently in place renders impossible any access to asylum for South Sudanese TPS holders and/or applicants, ahead of the January 5, 2026, termination date for TPS for South Sudan.

182. The blanket pause on the processing of other immigration benefits for applicants in the U.S. who are South Sudanese nationals renders impossible for South Sudanese TPS holders and/or applicants any access to another immigration status in the U.S., ahead of the January 5, 2026, termination date for TPS for South Sudan.

183. Defendants' actions also threaten deportation and related immigration confinement for TPS holders and applicants who are not presently eligible for alternative paths to legal status, even though TPS was established expressly to serve this population—individuals who cannot

---

[148] Camilo Montoya-Galvez, *Trump administration pauses immigration cases for people from another 20 countries*, CBS NEWS, (Dec. 18, 2025), https://www.cbsnews.com/news/trump-administration-pauses-immigration-cases-another -20-countries/.

safely return to South Sudan but may not fit the specific legal requirements of asylum and related forms of humanitarian protection.

184. And the loss of TPS in some instances can also limit the possibility of acquiring an alternative legal status for which an individual would otherwise be eligible but for which maintenance of or current legal status is a prerequisite.[149]

185. TPS holders, including all of the individual Plaintiffs, who lose their status may also face a years-long statutory bar to re-entry whether they depart on their own or are deported.[150] And the recent institution of a new entry ban against South Sudanese nationals, effective January 1, 2026, could separately frustrate or render impossible the ability of the individual Plaintiffs and every other South Sudanese TPS holder or applicant to be able to come back into the U.S. on another immigration status.

186. TPS holders who may be entitled to a fear-based form of immigration relief— such as withholding of removal or protection pursuant to the Convention Against Torture—face the prospect of deportation to unsafe countries. The current Trump Administration has sought to remove people to third countries "without adequate notice and a 'meaningful opportunity' to present a claim under the Convention," even if they may be subject to a fear-based form of relief. *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2153, 2155 (2025) (Sotomayor, J. dissenting). While this issue is being litigated, the Supreme Court has allowed such third-country removals to move forward, including to South Sudan. *Id.*

[149] *See Temporary Protected Status: An Overview*, AMERICAN IMMIGRATION COUNCIL, (Nov. 25, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/temporary-protected-status-tps-overview/ (noting some TPS recipients may be eligible to adjust status).
[150] 8 U.S.C. § 1182(a)(9)(A)(ii), (B)(i)(II).

187. TPS holders also face the prospect of losing employment authorization. This can result in their summary dismissal from their jobs, jeopardizing their and their families' financial stability. Without stable employment, some TPS holders risk losing their homes or other material assets, leading to further economic harm.

188. Many TPS holders also face the imminent loss of their driver's licenses (or state identification cards) and, with them, their mobility and freedom of movement, because in many states driver's licenses and state-issued identification are limited to those with legal immigration status.[151] In addition, because the Defendant Noem's termination goes into effect so quickly, TPS holders, including all of the individual Plaintiffs, have been afforded almost no time to make alternative arrangements for themselves and their families.

189. Compounding the destabilizing harms of loss of legal status, employment authorization, and driver's licenses and state identification cards are the severe risks of family separation, loss of healthcare, psychological harm, and stigma.

190. The risk of deportation renders TPS holders and applicants vulnerable to separation from U.S. citizen dependents, immediate relatives, and other family and loved ones. There are many South Sudanese TPS holders and applicants in mixed-status families—with children, spouses, partners, elderly parents, and other family members who are U.S. citizens, lawful permanent residents, or who hold other forms of lawful status. These TPS holders and applicants face the risk of having to choose between being forced to leave their family members behind, without any ability to reunite with them in the U.S., given the newest entry bans taking effect agains South Sudanese nationals effective January 1, 2026, or bringing their U.S. citizen children

[151] *See, e.g.*, *REAL ID Checklist*, California DMV, https://www.dmv.ca.gov/portal/driverlicenses-identification-cards/real-id/real-id-checklist/ (listing documents showing immigration status as requirements for REAL ID driver's licenses).

(or other family members) to a country that is unsafe and in dire straits, where the children have never lived and, in many cases, have never even visited.

191. TPS holders and their families will be deprived of employer-sponsored health insurance and in some cases public health care. Despite having paid into Social Security, TPS holders also face the loss of this crucial benefit.

192. Meanwhile, the fear of deportation inflicts severe psychological harm on TPS holders and their loved ones. South Sudanese TPS holders, including the individual Plaintiffs, have been experiencing tremendous emotional and psychological harm since the announcement of the Termination, giving rise to the risk of heightened anxiety, trauma, insomnia, and depression. The psychological harms resulting from Defendants' actions will only intensify as the effective date approaches.

193. South Sudanese TPS holders and applicants have also suffered the additional dignitary harm of being subject to an agency action motivated by racial, ethnic, or national-origin discrimination.

## CLASS ACTION ALLEGATIONS

194. This case seeks class-action status pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of the following, proposed classes of people who face harm because of the termination of TPS for South Sudan, scheduled to take effect beyond January 5, 2025:

A) All current recipients of TPS for South Sudan (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan) who are present in the U.S.;

B) All people, present in the U.S., who have pending applications for TPS that reflect their prima facie eligibility for it (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan);

C) The U.S. citizen dependents or immediate relatives of U.S.-based recipients of TPS for South Sudan (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan); and

D) The U.S. citizen dependents or immediate relatives of U.S.-based people with pending applications for TPS that reflect their prima facie eligibility for it (either nationals of South Sudan or individuals without any nationality who last habitually resided in South Sudan).

195. The proposed classes are each sufficiently numerous so as to make joinder impracticable. Based on Defendants' own accounting in the Federal Register notice, the recipient class consists of 232 TPS holders and the applicant class consists of 73 applicants. There are common questions of law and fact affecting the members of each proposed class, including: (a) whether Defendants' decision to terminate of South Sudanese TPS was preordained and/or pretextual, without regard to country conditions and prior to consulting with other appropriate agencies in violation of the TPS statute; (b) whether the TPS statute authorizes the Secretary to consider "national interest" as a sole justification to terminate TPS; (c) whether Defendants' decision to terminate TPS was impermissibly motivated by animus based on race, ethnicity, or national origin; and (d) whether Defendants' failure to provide more than the minimum 60-day notice before terminating South Sudan's TPS designation violates the APA.

# CAUSES OF ACTION

## COUNT ONE
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(D)**
**(All Plaintiffs Against All Defendants)**
***(Failure to Follow Procedures Required by Law)***

196. All the foregoing allegations are repeated and realleged as though fully set forth herein.

197. The Administrative Procedure Act (APA), 5 U.S.C. 701 et seq., ensures that federal agencies are accountable to the public by providing a "right of review" to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. 702. Judicial review is generally limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

198. Secretary Noem's Termination constitutes "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. 704, because the Defendants' Termination results in the TPS holders' loss of TPS "automatically and without further notice or right of appeal."[152]

199. Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

200. The TPS statute requires the Secretary to "consul[t] with appropriate agencies of the Government", "review the conditions in the foreign state… for which a designation is in effect under this subsection," and "determine whether the conditions for designation" continue to be met. 8 U.S.C. § 1254a(b)(3)(A).

[152] 8 C.F.R. § 244.19.

201. Secretary Noem's Termination was procedurally improper in numerous ways, each of which constitutes a violation of the APA.

202. Secretary Noem failed to consult with appropriate agencies as required by the periodic review procedures. Secretary Noem additionally failed to review the conditions in South Sudan as required by the periodic review procedures.

203. Secretary Noem failed to base her Termination on "whether the conditions for designation" continue to be met and based it instead on a predetermined domestic policy of the Trump administration to restrict access to TPS for non-white, non-European, African immigrants.

204. Secretary Noem's Termination relied on "national interest" considerations divorced from the conditions inside South Sudan, which are procedurally improper during a periodic review.

205. Secretary Noem's Termination of South Sudan's designation based on ongoing armed conflict under 8 U.S.C. § 1254a(b)(1)(A) was procedurally improper because it was based on her consideration of "national interest" as a factor, in violation of the TPS statute.

206. The specific national interest factors Secretary Noem considered (ensuring South Sudan's compliance with lawful deportations, for example) had no nexus to the continued temporary, *lawful* presence of fewer than four hundred South Sudanese nationals in the United States, as required under the statute.

207. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

208. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT TWO**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A)**
**(All Plaintiffs Against All Defendants)**
***(Departing from Prior Policy Sub Silentio, Without Good Reason)***

209. All the foregoing allegations are repeated and realleged as though fully set forth herein.

210. To engage in procedurally appropriate decision-making, an agency must "display awareness that it is changing position."[153] Agencies "may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books."[154] And the APA requires a "more detailed justification . . . for disregarding facts and circumstances that underlay . . . the prior policy."[155]

211. Defendants' Termination of the TPS designation for South Sudan with only 60-days' notice was arbitrary, capricious, and contrary to law in violation of the APA because it was an unacknowledged and unreasoned departure from decades of decision-making practices and procedures.

212. Separately and independently, Defendants' Termination of the TPS designation for South Sudan violated the APA because it was an unacknowledged and unreasoned departure from decades of decision-making practices and procedures in which domestic U.S. "national interest" divorced from consideration of objective and available evidence of relevant conditions in the designated country were not invoked as a basis for terminating a TPS designation.

213. Separately and independently, Defendants' Termination of the TPS designation for South Sudan violated the APA because it was an unacknowledged and unreasoned departure from

---

[153] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).
[154] *Id.*
[155] *Id.*, at 516.

decades of decision-making practices and procedures in which the Secretary's country conditions consideration during periodic review included an assessment of intervening conditions since the most recent designation, redesignation, or extension.

214. Plaintiffs will suffer irreparable injury resulting from the unlawful departure from the prior policy.

215. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT THREE**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(A) & (C)**
**(All Plaintiffs Against All Defendants)**
***(Arbitrary and Capricious, Abuse of Discretion, Contrary to Law)***

216. All the foregoing allegations are repeated and realleged as though fully set forth herein.

217. Under the APA, the Court must hold unlawful and set aside an agency action, finding, or conclusion found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A) & (C).

218. Defendants' Termination was arbitrary and capricious, not in accordance with the law, and in excess of statutory authority and limitations for the following reasons, each of which constitutes an independent violation of the APA:

A) Defendants did not consider objective, available evidence of relevant country conditions—including ongoing armed conflict, imminent risk of full-scale civil war, and myriad extraordinary and temporary conditions, including severe

flooding, a deadly cholera outbreak, significant internal population displacement, acute food insecurity, and barriers to accessing humanitarian aid;

B) Defendants failed to consult appropriate agencies in the course of their periodic review, including by disregarding relevant and available country conditions findings by the U.S. Department of State;

C) In the Termination of the armed-conflict-based designation, Defendants improperly disregarded and directly contradicted the Department's recent, explicit determination that an conditions short of an official or full-blown civil war are still relevant for periodic review of an armed conflict designation under 8 U.S.C. 1254a(b)(1)(A);

D) Defendants' Termination of the extraordinary and temporary conditions designation failed to address the specific conditions in South Sudan that the Department had otherwise previously deemed relevant to its periodic review;

E) Defendants' Termination was infected by undue political influence;

F) Defendants' Termination was motivated by impermissible racial preferences rather than any rational justification; and

G) Defendants' Termination was predicated on the legally incorrect belief that TPS designations, including the designations of South Sudan, are themselves illegal, and the belief that TPS holders are present in the United States illegally.

219. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination;

220. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT FOUR**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(B)**
**(All Plaintiffs Against All Defendants)**
***(Contrary to Constitutional Right, Power, Privilege, or Immunity)***

221. All the foregoing allegations are repeated and realleged as though fully set forth herein.

222. Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

223. Defendants' Termination was impermissibly motivated by racial and/or national origin animus against African and other non-white or non-European immigrants, and their pattern of TPS cancellations described herein cannot be explained other than by reference to race and/or national origin.

224. As such, Defendants' Termination violates Plaintiffs' rights to Equal Protection under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." *Id.*

225. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

226. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful and set aside as violative of the APA.

**COUNT FIVE**
**Fifth Amendment**
**U.S. Constitution, Am. 5**
**(All Plaintiffs Against All Defendants)**
***(Equal Protection Under the Law)***

227. All the foregoing allegations are repeated and incorporated as though fully set forth herein.

228. The Fifth Amendment contains an implicit guarantee of equal protection that prohibits any official action that motivated in part by a racially discriminatory intent or purpose. Classifications based on race or national origin receive exacting scrutiny, and even facially neutral policies and practices will be held unconstitutional when they reflect a pattern unexplainable on grounds other than race or national origin.[156]

229. Defendants' decision to terminate South Sudan's TPS designation impermissibly and intentionally discriminates against Plaintiffs because of their race and/or national origin.

230. Defendants' Termination was motivated by racial and/or national origin animus against African and other non-white or non-European immigrants, and their pattern of TPS cancellations described herein cannot be explained other than by reference to race and/or national origin.

231. Plaintiffs will suffer irreparable injury resulting from the unlawful Termination.

232. Defendants' Termination of South Sudan's TPS designation must therefore be postponed on an emergency basis ahead of its effective date and otherwise be held unlawful as violative of the Fifth Amendment's guarantee of equal protection.

---

[156] *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

**COUNT SIX**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(B)**
**(All Plaintiffs Against All Defendants)**
**[*Contrary to Constitutional Right, Power, Privilege, or Immunity*]**

233. All the foregoing allegations are repeated and incorporated as though fully set forth herein.

234. Under the APA, the Court shall hold unlawful and set aside an agency action, finding, or conclusion found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

235. Due process protections extend to "all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

236. To state a procedural due process claim "a plaintiff must 'identify a protected liberty or property interest' and show the defendants deprived him of that interest 'without constitutionally adequate process.'" *Wright v. Moniz*, 737 F. Supp. 3d 48, 61 (D. Mass. 2024) (Saris, J.) (quoting *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006)).

237. TPS holders and applicants have significant liberty and property interests, protected by the Due Process Clause, in obtaining and maintaining TPS status and in the attendant benefits that come with that status.

238. Specifically, TPS holders and applicants have liberty interests in the work authorization and removal protections that TPS status confers. *See, e.g.*, *Saget*, 375 F. Supp. 3d at 333 ("Protecting liberty interests such as those associated with TPS is vital to the proper functioning of the rule of law[.]"); *Destino v. FCI Berlin, Warden*, 2025 WL 4010424, at *11 (D.N.H. Dec. 24, 2025) (finding that plaintiff had "weighty" liberty interests in "working in the United States" and "living alongside his fiancée and infant child"); *Tenemasa-Lema v. Hyde*, 810

F. Supp. 3d 244, 258 (D. Mass. 2025) (The "disruption of established family ties further compounds [a plaintiff's] deprivation of liberty.") (Murphy, J.); *Bridges v. Wixon*, 326 U.S. 135, 155 (1945) (deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom"); *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) ("The right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process." (quoting *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982))).

239. TPS holders and applicants also have property interests in the work authorization and removal protections that TPS status confers. *See, e.g.*, *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1013 (W.D. Wash. 2023) ("a prima facie eligible TPS applicant has a property interest in temporary employment authorization subject to due process protections"); *see also Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1122 (N.D. Cal. 2018); *Rodas v. Chertoff*, 399 F. Supp. 2d 697, 702 (E.D. Va. 2005).

240. TPS holders and applicants also have protected interests in the related state benefits conferred through TPS status, such as driver's licenses. *See, e.g.*, *Bell v. Burson*, 402 U.S. 535, 539 (1971) (A driver's license is a protected interest that, once issued, cannot be revoked or suspended "without that procedural due process required by the Fourteenth Amendment." (citations omitted)); *Mackey v. Montrym*, 443 U.S. 1, 11 (1979) (A person's interest in continuing to hold a valid driver's license "is a substantial one."); *Belezos v. Bd. of Selectmen of Hingham*, 2019 WL 2870733, at *6 (D. Mass. July 3, 2019) ("In general, the 'Due Process Clause applies to the deprivation of a driver's license by the State.'" (quoting *Dixon v. Love*, 431 U.S. 105, 112 (1977))); *Raper v. Lucey*, 488 F.2d 748, 752 (1st Cir. 1973) ("freedom to make use of one's own property, here a motor vehicle, as a means of getting about from place to place, whether in pursuit

of business or pleasure, is a 'liberty' which under the Fourteenth Amendment cannot be denied or curtailed by a state without due process of law" (citation omitted)).

241. Once the government grants TPS to an individual, benefits such as protection from removal and employment authorization are mandatory. *See* 8 U.S.C. § 1254a(a)(1)(A)–(B) (providing that, once the Attorney General grants an individual TPS, the Attorney General "shall not remove the alien from the United States" and "shall authorize the alien to engage in employment in the United States"). The use of the compulsory term "shall" makes clear that the Attorney General has no discretion about providing removal and work authorization for those granted TPS. *Compare, e.g.*, *id.* (the Attorney General "*may* grant the alien temporary protected status" (emphasis added)).

242. Similarly, once an individual applies for TPS and makes a prima facie showing of eligibility, the government must grant that person protection from removal and temporary employment authorization. *See* 8 U.S.C. § 1254a(a)(4)(A) ("In the case of an alien who can establish a prima facie case of eligibility . . . the Attorney General shall provide for the benefits of [protection from removal and work authorization]."); *see also Mansor*, 685 F. Supp. 3d at 1013–14.

243. The Termination deprived South Sudanese TPS holders and applicants of liberty and property interests without constitutionally adequate safeguards.

244. Congress included procedural safeguards in the TPS statute in order to protect the liberty and property interests of TPS holders and thus conform with the requirements of the Due Process Clause. *See, e.g.*, *Adame v. Holder*, 762 F.3d 667, 672 (7th Cir. 2014) ("[S]tatutorily required procedures assure compliance with constitutional due process requirements, and . . . a

petitioner may have a legal claim when she can show statutory procedural shortfalls[.]") (citing *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011)).

245. Those procedures reflect the application of the "three-part balancing test articulated in *Mathews*[]," *D.V.D. v. U.S. Dep't of Homeland Sec.*, 821 F. Supp. 3d 102, 148 (D. Mass. 2026), namely "(1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail,'" *Hernandez-Lara v. Lyons*, 10 F.4th 19, 28 (1st Cir. 2021) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

246. For example, 8 U.S.C. § 1254a provides that TPS status may be terminated only "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b)(3)(A)-(B).

247. But prior to the Termination, the Secretary did not meaningfully consult with appropriate federal agencies, as otherwise required by the TPS statute. *See* 8 U.S.C. § 1254a(b)(3)(A); *supra* ¶¶ 64–65, 124–130.

248. Similarly, the decision to terminate TPS designations must be based on a "review [of] the conditions in the foreign state," and the statute requires publication of the actual "basis for the determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A)–(B).

249. But here, the Secretary's decision-making was predetermined, pretextual, and procedurally deficient. *See supra* ¶¶ 95–98, 112–130, 136–173; *see also supra* ¶¶ 102–108.

250. Accordingly, Defendants' Termination violates Plaintiffs' liberty and property rights guaranteed by the Due Process Clause under the Fifth Amendment of the U.S. Constitution and was therefore an act "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

251. Defendants' Termination of South Sudan's TPS designation must therefore be held unlawful and set aside.

**COUNT SEVEN**
**Fifth Amendment**
**U.S. Constitution, Am. 5 (All Plaintiffs Against All Defendants)**
**[*Due Process Clause*]**

252. All the foregoing allegations are repeated and incorporated as though fully set forth herein.

253. The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

254. Plaintiffs have significant liberty and property interests, protected by the Due Process Clause, in a non-arbitrary decision as to the continuation of TPS for South Sudan.

255. Defendants' termination of TPS arbitrarily deprives Plaintiffs of the process to which they are entitled, as shown by, for example, the Administration's departure from and apparent disregard of the process for termination of TPS set forth in 8 U.S.C. § 1254a.

256. Plaintiffs will suffer irreparable injury resulting from the termination of the TPS designations without due process of law.

257. Defendants' Termination of South Sudan's TPS designation must therefore be held unlawful, set aside, or otherwise vacated.

**COUNT EIGHT**
**Administrative Procedure Act**
**5 U.S.C. § 706(2)(C)**
**(All Plaintiffs Against All Defendants)**
**[*Agency Action in Excess of Statutory Authority*]**

258. As authorized by Federal Rule of Civil Procedure 8(d)(2)–(3), Plaintiffs plead in the alternative and incorporate the foregoing allegations to the extent they are consistent with the allegations that follow.

259. Federal agencies are creatures of statute; they may act only in accordance with authority that Congress bestows. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022); *see also La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

260. The APA directs that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" issued "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

261. The DHS Secretary's Termination of South Sudan's TPS status was unlawful and must be set aside because it exceeded the Secretary's statutory authority. Congress expressly authorized one—and only one—executive official to terminate TPS designations: the Attorney General.

262. Specifically, the TPS statute provides that a foreign-state designation "shall remain in effect until the effective date of the termination of the designation under paragraph (3)(B)." 8 U.S.C. § 1254a(b)(2)(B); *see also Nat'l TPS Alliance v. Noem*, 166 F.4th 739, 762–63 & n.12 (9th Cir. 2026) (paragraph (3)(B) supplies the sole process for ending a TPS designation). And paragraph (3)(B) names who may act: "[i]f the *Attorney General* determines under subparagraph (A) that a foreign state . . . no longer continues to meet the conditions for designation . . . the *Attorney General* shall terminate the designation[.]" 8 U.S.C. § 1254a(b)(3)(B) (emphases added).

263. In 1991, the Department of Justice ("DOJ") and the former Immigration and Naturalization Service ("INS") adopted regulations governing TPS. *See* Temporary Protected Status, 56 Fed. Reg. 618 (Jan. 7, 1991) (codified at 8 C.F.R. part 244) ("This interim rule implements a new section, 244A of the Immigration and Nationality Act, established by

section 302."). Those regulations delegated significant operational aspects of TPS to INS, including the authority to initially find individual aliens eligible and award protected status, *see id.* at 619 (codified as 8 C.F.R. § 244.2), and the authority to receive and process applications for protected status, *see id.* at 620 (codified as 8 C.F.R. §§ 244.6, 244.7).

264. The regulations, however, did not authorize any subordinate official to exercise the Attorney General's authority to designate or terminate foreign states pursuant to 8 U.S.C. § 1254a. On the contrary, they defined an eligible state to mean a "foreign country or part thereof as designated *by the Attorney General* pursuant to section 244A(b) of the Act." *See id.* at 619 (codified as 8 C.F.R. § 244.1) (emphasis added).

265. In practice, the Attorney General made all country designations, extensions, and terminations under the Act. *See, e.g.*, Extension of Designation of Somalia; Under Temporary Protected Status Program, 60 Fed. Reg. 39005 (July 31, 1995); Termination of Designation of Angola Under the Temporary Protected Status Program, 68 Fed. Reg. 3896 (Jan. 27, 2003).

266. In 2002, Congress passed the Homeland Security Act, which created DHS. Homeland Security Act of 2002, Pub L. No. 107-296, 116 Stat. 2135.

267. The Homeland Security Act charged the DHS Secretary "with the administration and enforcement of this chapter [*i.e.*, the INA] and all other laws relating to the immigration and naturalization of aliens *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the* President, *Attorney General*, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers[.]" 8 U.S.C. § 1103 (emphases added).

268. At the time, the termination of TPS status was a "power[]," "function[]," or "dut[y]" "conferred upon the . . . Attorney General," and so was expressly reserved to that office.

269. The Act also created the Bureau of Citizenship and Immigration Services as a branch of DHS and "transferred from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services" specific functions of INS. *See* 6 U.S.C. § 271. Among the functions transferred were "all . . . adjudications performed by the Immigration and Naturalization Service immediately before" the effective date of the act. *Id.* § 271(b)(5).

270. TPS terminations were not "performed by [INS] immediately before" the Homeland Security Act's "effective date," and so that function was not transferred to DHS by operation of 6 U.S.C. § 271.

271. In addition, the Act required the President to submit an executive reorganization plan to Congress detailing "[t]he transfer of agencies, personnel, assets, and obligations to the Department" of Homeland Security. 6 U.S.C. § 542(a)(1).

272. In accordance with that provision, the President issued an executive reorganization plan, which purported to "[t]ransfer the . . . functions of the Immigration and Naturalization Service"—including delegated functions "performed by" INS "immediately before" the transfer—to DHS. *See* 6 U.S.C. § 542 note. But the reorganization plan made no mention of TPS; nor did it address those powers expressly vested in the *Attorney General* under the INA. *See id*.

273. DHS has pointed to 6 U.S.C. § 557 as a source of TPS authority. *See* 6 U.S.C. § 557 ("With respect to any function transferred by or under this chapter (including under a reorganization plan that becomes effective under section 542 of this title) and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be

deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.”).

274. But that provision does not independently transfer any authority. It just simplified the process of amending the code by altering certain statutory “references” to “any function” that was actually “transferred by or under” the Homeland Security Act. *See* 6 U.S.C. § 557. TPS termination authority was not so “transferred.”

275. Beginning in spring 2003, and through to the present, the DHS Secretary began to issue foreign-state designations pursuant to the Attorney General’s authority under 8 U.S.C. § 1254a. *See* Extension of the Designation of Honduras Under Temporary Protected Status Program, 68 Fed. Reg. 23744 (May 5, 2003).

276. In the first TPS designation following the implementation of the Homeland Security Act of 2002, the DHS Secretary addressed “what authority . . . the Secretary of the Department of Homeland Security ha[s] to extend the designation of Honduras under the TPS program.” *Id.* (capitalization altered). The DHS Secretary took the position that: “On March 1, 2003, the Immigration and Naturalization Service (INS) transferred from the Department of Justice to the Department of Homeland Security (DHS) pursuant to the Homeland Security Act of 2002, Public Law 107–296. The responsibilities for administering the TPS program were transferred to the Bureau of Citizenship and Immigration Services (BCIS).” *Id.* The DHS Secretary cited no other source of authority for exercising the Attorney General’s power to issue, extend, or terminate TPS designations.

277. Because no statute authorizes the DHS Secretary to exercise TPS termination authority, the DHS Secretary exceeded her statutory authority by purporting to terminate South Sudan’s TPS status.

278. The Termination constitutes "final agency action for which there is no other adequate remedy in a court," pursuant to 5 U.S.C. § 704, because the Defendants' Termination results in the TPS holders' loss of TPS automatically and without further notice or right of appeal.

279. The Termination must be set aside because it was issued "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

280. Declare that the termination of TPS for South Sudan was unlawful under the APA and unconstitutional under the Due Process Clause of the Fifth Amendment;

281. Declare that the decision to provide only 60 days' notice before the termination of TPS for South Sudan take effect was unlawful under the APA;

282. Immediately postpone or stay the termination of TPS for South Sudan from taking effect or being put into effect beyond January 5, 2026;

283. Set aside or otherwise vacate the termination of TPS for South Sudan as beyond Defendants' authority and/or unlawful under the APA;

284. Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, from enforcing the termination of TPS for South Sudan;

285. Order Defendants to take all steps necessary to ensure that the TPS designation for South Sudan remains in full force and effect unless and until it lawfully expires lawfully or is terminated lawfully;

286. Award Plaintiffs' attorneys' fees and costs under 28 U.S.C. § 2412 and any other applicable statute or regulation; and

287. Award such other and further relief that the Court may deem just, equitable, and proper.

Dated: July 13, 2026

Respectfully Submitted,


*/s/ Paul Killebrew*
Mark H. Lynch (*pro hac vice*)
Stephen Petkis (*pro hac vice*)
Daniel G. Randolph (*pro hac vice* admission pending)
Paul Killebrew (*pro hac vice*)
Ayana M. Lindsey (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
MLynch@cov.com
SPetkis@cov.com
DRandolph@cov.com
PKillebrew@cov.com
ALindsey@cov.com

*/s/ Nargis Aslami*
Nargis Aslami (BBO No. 714848)
Melissa Keaney (*pro hac vice* admission pending)
Collin Poirot (*pro hac vice*)
Abbey Rutherford (*pro hac vice*)
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 897-2622
Nargis@muslimadvocates.org
Melissa@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/ Erik Crew*
Erik Crew (*pro hac vice*)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org


*Counsel for Plaintiffs African Communities Together, Mary Doe, David Doe, Peter Doe, Jacob Doe, and the Proposed Class*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER; MARY DOE; DAVID DOE; PETER DOE; and JACOB DOE, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and UNITED STATES OF AMERICA,<br><br>*Defendants*. | Civil Action No. 1:25-cv-13939-PBS |

**NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs in the above-captioned case hereby appeal to the United States Court of Appeals for the First Circuit from the district court's (Saris, J.) Memorandum and Order, ECF No. 122 (docketed on August 7, 2026).

Dated: August 7, 2026

Respectfully Submitted,

*/s/ Daniel G. Randolph*

Mark H. Lynch (*pro hac vice*)
Stephen Petkis (*pro hac vice*)
Daniel G. Randolph (*pro hac vice*)
Paul Killebrew (*pro hac vice*)
Ayana M. Lindsey (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000
MLynch@cov.com

SPetkis@cov.com
DRandolph@cov.com
PKillebrew@cov.com
ALindsey@cov.com

*/s/ Nargis Aslami*
Nargis Aslami (BBO No. 714848)
Melissa Keaney (*pro hac vice*)
Collin Poirot (*pro hac vice*)
Abbey Rutherford (*pro hac vice*)
MUSLIM ADVOCATES
1032 15th Street N.W. #362
Washington, D.C. 20005
(202) 897-2622
Nargis@muslimadvocates.org
Melissa@muslimadvocates.org
Collin@muslimadvocates.org
Abbey@muslimadvocates.org

*/s/ Eric Crew*
Erik Crew (*pro hac vice*)
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
(949) 603-7411
ecrew@haitianbridge.org

*Counsel for Plaintiffs African Communities Together, Mary Doe, David Doe, Peter Doe, Jacob Doe, and the Proposed Class*

**CERTIFICATE OF SERVICE**

I certify that this Notice of Appeal, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Daniel Randolph*
Daniel Randolph

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AFRICAN COMMUNITIES TOGETHER, et al.,
Plaintiffs,

v.

KRISTI L. NOEM, in her official capacity as Secretary of Homeland Security, et al.,
Defendants.

Civil Action No. 1:25-cv-13939-PBS

BEFORE THE HONORABLE PATTI B. SARIS, DISTRICT JUDGE

HEARING BY VIDEOCONFERENCE

Wednesday, July 29, 2026
2:33 p.m.

John J. Moakley United States Courthouse
Courtroom No. 19
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiffs:

COVINGTON & BURLING LLP
BY: DANIEL GERARD RANDOLPH
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
drandolph@cov.com

MUSLIM ADVOCATES
BY: ABBEY ROSE KOENNING-RUTHERFORD
PO Box 34440
Washington, DC 20043
(202) 897-2622
abbey@muslimadvocates.org

On behalf of the Defendant:

UNITED STATES ATTORNEY'S OFFICE
BY: MICHAEL FITZGERALD
One Courthouse Way
Suite 9200
Boston, MA 02210
(617) 748-3266
michael.fitzgerald2@usdoj.gov

**P R O C E E D I N G S**

(In open court at 2:33 p.m.)

THE DEPUTY CLERK: The Court calls Civil Action 25-13939, African Communities Together, et al., v. Noem, et al.

Could counsel and the court reporter please identify themselves.

MR. RANDOLPH: Good afternoon, Your Honor. Daniel Randolph from Covington & Burling. I'm here on behalf of plaintiffs. And I'm here with my co-counsel Abbey Koenning-Rutherford from Muslim Advocates, also on behalf of plaintiffs.

MR. FITZGERALD: Good afternoon, Your Honor. Michael Fitzgerald for the defendants.

THE COURT REPORTER: Good afternoon. Robert Paschal, court reporter.

THE COURT: All right. Thank you.

So we're here today primarily on the motion to amend the complaint. I want to make sure everyone agrees I have jurisdiction to do this because the case is still pending on appeal with respect to different claims. Maybe someone -- plaintiffs and defendant can tell me what the status of the appeal is.

MR. RANDOLPH: Sure, Your Honor. I'm happy to start and welcome the defendants' views on this as well.

The First Circuit still has not ruled on the government's motion for a stay and for a reversal. The parties were largely --

THE COURT: So back up. That's of the original order, way back when, right?

MR. RANDOLPH: Yes, Your Honor.

THE COURT: That's the one where it was directly affected by the case the Supreme Court ruled on, right?

MR. RANDOLPH: Yes, Your Honor.

THE COURT: So everyone expects that will be vacated, right?

MR. RANDOLPH: Yes, Your Honor. And the parties are in agreement that the -- that that appeal should result in a reversal. There was a -- there was a dispute as to the length of the mandate that should issue when that reversal is issued, but we are expecting a reversal any day now.

At this point, though, that reversal has not happened, and so this Court's administrative stay, as we understand it, has not yet gone into effect because the mandate has not issued.

THE COURT: So let me be clear: If I ruled on the motion to amend in an expedited way, there would be a way, as far as one way or another, it may happen before or after the First Circuit actually rules, right?

MR. RANDOLPH: Yes. Yes, Your Honor. And just, if

I might, if I might after plaintiff's position on the jurisdictional issue, so our position is that this Court has jurisdiction over the motion to amend the complaint and over the postponement motion. We understand that Your Honor takes a different view as to the jurisdictional issue as to the postponement motion.

THE COURT: I'm not going to do that. I'm not going to postpone because I don't have jurisdiction back or yet that particular issue is pending before the First Circuit. At most, what I've done so far is an administrative stay till I could read things, and I've now read things. So that's why we're having today's hearing and --

MR. RANDOLPH: Thanks, Your Honor. If I might just offer, though, a suggestion, which is that, in our view, these claims, particularly an ultra vires claim, which has never been addressed by any court, really warrant reply briefing. And we think it's remarkable that the government has opposed a reply both in this case and in the Ethiopia case.

We have strong responses to all of the government's arguments that they raised in their opposition paper yesterday, but the government is taking the position that we should not even have the opportunity to address those arguments in writing and --

THE COURT: I have not seen -- was that filed today? I haven't seen that.

MR. RANDOLPH: Your Honor, yes. This morning, we filed a motion for leave to file reply in support of our motion for leave to amend, and the government opposed that motion. Yes, Your Honor.

THE COURT: I've been in court all day. I'm about -- after a monthlong trial, about to go to the jury tomorrow, so I maybe missed what you filed today. So you're asking for additional briefing till when?

MR. RANDOLPH: Yes, Your Honor, and I'm happy to sort of --

THE COURT: But let me just -- let's answer my question first.

MR. RANDOLPH: Yes.

THE COURT: You believe I have jurisdiction even to entertain the motion to amend?

MR. RANDOLPH: Yes. And just to be clear, we asked for a reply brief that would be due on August 3rd in support of the motion for leave to amend, yes.

THE COURT: So from the defense point -- from the government's point of view, do you think I have jurisdiction to even entertain a motion to amend --

MR. FITZGERALD: I do, Your Honor.

THE COURT: -- while it's pending on appeal?

MR. FITZGERALD: I do, Your Honor. I think the appeal just divested this Court of jurisdiction over that issue, not the motion to amend.

And, I mean, we don't have to get into it, but I'm a little thrown off by plaintiffs' counsel's comment. The government, as I told plaintiffs' counsel, the government only opposed the filing of a reply brief given the, like, short timing before the hearing. I had asked if the reply brief was going to be filed, that it be, you know, filed by 2:30 yesterday so we would have sufficient time to review and analyze it.

It's not as though, you know, I wanted to prevent them from filing any briefing whatsoever; it was just to give people the time to review it for this hearing.

MR. RANDOLPH: Excuse me. Just with respect to -- my understanding of counsel's position was that the government opposed and, in addition, requested that if the Court was inclined to allow us to file a reply, that it would be filed in advance of the hearing.

And I think under the circumstances where the government had two full weeks to prepare its opposition brief, you know, requiring plaintiffs to submit a reply in a few hours is plainly, you know, an unreasonable request.

THE COURT: I believe that, at this point anyway, I want to hear argument because I have your briefing through

the motion for a postponement, which is already in the record, and your motion to amend is already in the record.

I know what the arguments are. I'm not sure what the rebuttal is. I don't know. I'm not likely to hold another hearing. But we know what the issues are. We've already had a motion to amend brief and a motion for postponement brief. So I'm hoping you had enough -- you vetted that enough to present to me what the issues are, that the government wrote a fulsome opposition, so I'm ready to hear oral argument today.

MR. RANDOLPH: Yes, Your Honor. And we're ready to answer Your Honor's questions. We're also happy to provide and I can go point by point and respond to each of the government's arguments that were raised in their paper yesterday.

THE COURT: Good. I'm glad.

MR. RANDOLPH: And I'm also -- I just want to share that I think that, in addition to presenting argument today in response to the government's arguments, it would benefit the Court to see in writing the authorities that we rely on, particularly with respect to the ultra vires claim.

I just want to underscore this has never been -- this has never been litigated in any court previously. The government cites a long list of cases that have just assumed in the background that the DHS secretary has the authority

here to issue these terminations.

THE COURT: All right. Well, why don't we get into the argument a little bit here, the -- by which I'm referring to the motion to amend. And I -- there are two primary grounds, as I read it. One is procedural due process, and one is ultra vires, which means that only the attorney general has the authority to do this, as I understand.

I actually went into the actual code books, which I have right in front of me, not even the computers. I go into the hard text. I understand the statutory scheme. And so why don't I give plaintiff -- why don't you support your motion to amend.

But I did have one threshold question: Is -- are you raising this issue all over the United States with respect to all of these cases?

MR. RANDOLPH: So, Your Honor, my -- so I represent -- I have appeared on behalf of plaintiffs in two cases: this case, which is the South Sudan case, in addition to the Ethiopia case that's before Magistrate Judge Murphy. I don't personally represent other plaintiffs; however, Muslim Advocates, our co-counsel, in addition represents the Somalia TPS litigants; and, also, our co-counsel, Haitian Bridge Alliance represents the Somalia TPS litigants.

And I wonder whether my co-counsel, Ms. Koenning-Rutherford, could speak to the status of the

Somalia case; but, yes, we have raised these new claims --
THE COURT: These new claims are popping up all over the United States. Is that --
MR. RANDOLPH: Well, Your Honor -- yes. Other counsel have raised these claims now, I believe, in the -- also in the Burma TPS case, in the Yemen TPS case, and most recently in the Ninth Circuit TPS case as well.
THE COURT: All right. And no -- and to your knowledge, no court has ruled yet?
MR. RANDOLPH: To my -- yes, Your Honor. We haven't received any rulings on these, on this issue yet, on either of the new claims yet. Yes.
THE COURT: Does the government agree that this is sort of -- hasn't been ruled on yet?
MR. FITZGERALD: I mean, we disagree. We think the Supreme Court addressed the issue in the *Mullin v. Doe* case, but with respect --
THE COURT: No, no. I understand that position; but, I mean, on this motion to amend and add these two claims, has any court ruled on it yet?
MR. FITZGERALD: No, not to my knowledge, Your Honor.
THE COURT: Okay. Thank you for clarifying.
Okay. I think we're ready to get through with the housekeeping and have you just jump into the merits.

MR. RANDOLPH: Great. So, Your Honor, I'll just provide an overview of our response to the government's arguments, and then, of course, please interrupt me. And then I can also go point by point through each of those arguments.

So starting with the statutory authority claim, we know from a mountain of Supreme Court and First Circuit authority that when you're bringing a statutory authority claim, you start with the text. And most of the time, you end with the text too, and that's even more the case in the *Loper Bright* era. We don't give -- we certainly don't give *Chevron* deference to interpretations of statutes anymore that are offered by agencies.

And so what that means is that this analysis really should begin and it should end with the statutory provisions. The government has a burden to identify the statutory authority for the actions that it takes. And if you take a look at the government's opposition brief, it's heavy on rhetoric, and it's heavy on, frankly, citations to a lot of authorities that don't really matter much.

THE COURT: Well, so let's go straight to the statute.

MR. RANDOLPH: Yes, Your Honor. So the government relies on three provisions. First is 1103(a), and in our view -- this is 8 USC 1103(a). And in our view, on its face,

1103(a) fatally undermines the government's position because it includes -- it generally confers powers related to the administration of the immigration laws upon the DHS secretary, but it includes an exception that all of those immigration-related powers for the attorney general and other officials, the President, the Secretary of State, and other specific officials at the State Department, are reserved to those officials.

In other words, the powers that, by statute, are vested in those particular officials that are carved out of the general vesting provision remain with those officials, and the attorney general is included in that provision.

In fact, the attorney general was added to that provision in the context of the amendments that were brought about by the Homeland Security Act. So that's starting with 1103(a), which I think, if you just take that provision on its own, there's no way that that could possibly provide the statutory authority that the government is asserting here.

THE COURT: What do you do with the government's argument that, if it's true that temporary protected status is reserved only for the attorney general, then there was no authority to grant -- to designate in the first place?

MR. RANDOLPH: Three --

THE COURT: In other words, the designation was by the Secretary.

MR. RANDOLPH: Yes, Your Honor. We have three responses to that. And, again, we'd be happy to elaborate on all of these in a reply brief.

The first response is that this Court has jurisdiction to address a challenge to just one final agency action. Plaintiffs brought this lawsuit to challenge one final agency action, and that was termination for South Sudan. And plaintiffs have standing to bring -- to bring that particular claim. And any future challenge to the initial designation would have to be brought by a different set of plaintiffs in the context of a different lawsuit.

And it is far from clear whether any such plaintiffs would ever bring any such a lawsuit, and it's also unclear whether such a lawsuit would even be just a civil or given, timely particularly the fact that the designation for South Sudan was issued in 2011, which is well beyond the six-year statute of limitations that would apply for an APA claim.

So that's response number one, Your Honor, is just that is a determination that is beyond scope for this lawsuit. This Court doesn't have jurisdiction to reach the validity of --

THE COURT: But the logic of it would mean that the original designation was no longer valid.

MR. RANDOLPH: Well, and I think that gets to our

second response to this, Your Honor, which is, if the executive branch were to decide, you know, tomorrow that it agreed with plaintiffs and that, actually, this initial designation was ultra vires and, therefore, invalid, the executive branch could not just flip a switch overnight and decide that the program no longer applied to plaintiffs and other TPS holders here.

And that's because of the Supreme Court's decision in *Regents*, where the Supreme Court addressed the DACA program. That was an extremely analogous case where the Department of Homeland Security had created a discretionary government program that the executive branch later went on to decide was illegal and contrary to the INA based on Fifth Circuit precedent.

And the Supreme Court made crystal clear in the *Regents* case that, in that scenario, the government cannot just, you know, overnight unwind the program. It has to make a new agency action that's a rescission, and it has to comply with the APA's requirements to consider reasonable alternatives and to account for reliance interests in the program.

So even if, even if the original designation were later determined to be unlawful, the government would have to comply with all of the requirements laid out in *Regents*. There's no meaningful distinction between this scenario and

that one, assuming that the initial designation is invalid.

And then third, Your Honor -- those were our first two responses as to why this is not self-defeating. Our third response is our procedural due process claim, but I want to be clear that it's only our third response. And so if this Court were to disagree with us that the procedural due process claim is not viable or were to decide not to reach that claim, that would not undermine our arguments as to the ultra vires claim.

THE COURT: I take it there's no case law on point?

MR. RANDOLPH: Well -- well, Your Honor, the closest case law that we would identify is the *Regents* case, the Supreme Court --

THE COURT: But there's no case law interpreting the statute?

MR. RANDOLPH: There is -- there is -- there is absolutely no case that has addressed this issue. No party that we're aware of has raised this argument before any court previously. The government has --

THE COURT: The thing is, like, there's been 19 cases in the United States of America, and it's gone all the way up to the Supreme Court, which did not have this direct issue in front of it. I mean, that's clear. It didn't. But it kept referring to the Secretary of Homeland Security. So it's -- I think would be a great surprise to

everybody, this argument as to why it wasn't raised earlier.

MR. RANDOLPH: Your Honor, we agree that it would be a surprise; but at the same time, there are countless examples of agencies adopting, you know, interpretations of statutes issuing regulations that are on the books for decades before a court comes along and considers an argument raised by a party and then disagrees with the agency's interpretation and says, ultimately, it's the court's job to say what the statute means.

And that's the message that *Loper Bright* makes clearer than ever.

THE COURT: Why didn't you raise it originally? I mean, it's sort of not in the interest -- I don't know if this is you personally. I don't remember if you were the original -- I think you weren't. Who was it?

Was it you, Ms. Rutherford? I can't remember who was the first person who raised it, but --

MR. RANDOLPH: Yeah, Your Honor.

THE COURT: -- it's not in the interest of justice to have this all raised in such a piecemeal fashion.

MR. RANDOLPH: So, Your Honor, just to be very candid about that -- and we understand there might be concerns about sort of gamesmanship. But to be very candid, you know, we brought these claims. And I was not appearing at the time, but my firm represented the plaintiffs and the

same group of counsel did. And I was, you know -- I was involved, you know, more sort of in the background.

But we brought these claims on an extremely expedited basis. It was an emergency posture, and we identified at that time the best claims that we thought we had to challenge the termination here.

And it was only in the process of examining the statutory scheme and digging in and looking at all of these provisions and also considering the -- you know, the *Mullin* decision itself that we identified this claim and realized, frankly, that this is the best reading of the statute and that actually courts have just -- courts and the government, they've been getting this wrong for a long time.

And that's why, you know, we have this -- that doesn't change, though, what the statute says. It doesn't change the availability of this claim.

THE COURT: I mean, when in, right after 9/11, if I remember correctly, the big switchover -- I think it's been understood since when? 2003, maybe, that a Secretary of Homeland Security -- I mean, no one's ever tried to change it or attorney generals, who are notoriously -- you know, they're not giving up power fast, never claim, "No, this is my job." So it's a little hard to suddenly make this argument.

MR. RANDOLPH: I think, Your Honor, if -- another

point, though, that I do find remarkable here is the government is relying very heavily at this point on 1103(g), which was another -- which was another of the three provisions that the government is hanging its hat on here.

And we are not aware of a single case that has relied on 1103(g) as the basis for DHS having TPS authority. We're not -- we're not aware of the government ever having cited 1103(g) before in any prior, you know -- you know, regulations or Federal Register notices or in court.

Courts have, instead, relied on 1103(a); and then they've also relied on this housekeeping provision, 557, which is -- you know, it's meaningless in terms of an actual transfer of substantive authority. All it says is, if authority has been transferred, well, then references relating to that transfer of authority will be -- will be changed from the AG to the DHS secretary.

But if there's not an underlying or independent transfer of authority, then that housekeeping provision doesn't do anything.

THE COURT: Thank you. And do you want to address procedural due process first, or should we go to the government first?

Do you want to address this first, Mr. Fitzgerald, and then we'll jump to procedural due process?

MR. FITZGERALD: I'm happy to proceed however you

prefer, Your Honor.

THE COURT: Well, why don't we do the ultra vires right now since that's sort of in play, and then we'll go back to procedural due process.

MR. FITZGERALD: Okay. Thank you, Your Honor. Happy to address this claim first.

I think I have to start with plaintiffs' -- plaintiffs' counsel's contention that the government rests on authorities that, quote, "don't matter much." I have to start with *Mullin v. Doe*, the Supreme Court's most recent pronouncement on this.

I mean, plaintiffs themselves have argued that the Supreme Court's holding in that case with regard to the judicial review bar applies specifically and solely to how the Secretary of Homeland Security exercises TPS authority and did not, by contrast, interpret the judicial review bar vis-à-vis the attorney general.

So -- but even accepting that as true, it would just go to show that the reasoning necessary to that holding was the conclusion that the Secretary exercises TPS authority. If the Supreme Court's holding applies specifically to how the Secretary exercises TPS authority and doesn't address the attorney general at all, then a necessary antecedent to that holding is the determination that the Secretary is the one who exercises TPS authority.

And it's not as though the Supreme Court treated the issue as uncontested and, therefore, assumed without deciding that the Secretary has TPS authority. The Court stated that, quote, "Responsibility for TPS decisions rests with the Secretary of Homeland Security," end quote.

And not only did it state that, it specifically cited as support 6 USC 552(d) and 557, which, not for nothing, is the same --

THE COURT: Could you say that a little bit more slowly? Which sections?

MR. FITZGERALD: Sure. I'm sorry, Your Honor. The Supreme Court cited as support for its -- the -- its statement that responsibility for TPS rests with the Secretary 6 USC, Sections 552(d) and 557.

557 is particularly, I think, telling, to me, because it is the same statute that plaintiffs themselves cite in their own proposed amended complaint as the authority for their own assertion that the Secretary is the one who exercises TPS authority.

And so for them to now suggest that, oh, this has all been some unthinking, you know, rote acceptance that nobody has ever deigned to even consider, I mean, plaintiffs' original complaint, the currently operative complaint, says it's the Secretary that exercises TPS authority, cites the statute, that statute, for support.

And not only that, their currently proposed amended complaint, the one they're asking the Court for leave to file that includes this ultra vires claim, itself still says that the Secretary exercises TPS authority and cites 6 USC Section 557 as support.

And so I don't say that as a means of saying, "Oh, look, gotcha. You guys forgot to update the whole complaint; and, therefore, you know, this claim, you know, necessarily fails." But it's pretty good support that, even plaintiffs, that everybody's good faith understanding and reading of the statute -- and this amended complaint was not filed, you know -- you know, on the same short notice that plaintiff says the original complaint was filed. It was filed after plaintiffs, you know, reviewed *Mullin v. Doe*, presumably reviewed the statutory scheme again. Everybody has this understanding.

And I know plaintiffs now state that they disagree with this proposition, but that is a disagreement with the Supreme Court's reasoning. It's not an argument that the Supreme Court --

THE COURT: But was it -- I know it wasn't specifically raised in the opinion, any argument of ultra vires. Was it raised in oral argument at all, to your knowledge?

MR. FITZGERALD: No. And I'm not trying to suggest

that --

THE COURT: Wasn't there some question about ultra vires? Wouldn't you agree that if it was the Secretary of Agriculture, it would be ultra vires or something like that?

MR. FITZGERALD: So I think that's a fair point, Your Honor. With respect to -- the Supreme Court's decision, again, is that this ultra vires claim is still a nonconstitutional claim. And if the Supreme Court's holding was clear about anything, it was that the judicial review bar applies to a nonconstitutional claim. It doesn't carve out ultra vires claims.

THE COURT: What was the answer? You know, would it be -- could we review it if it was so plainly ultra vires? Do you know what I'm talking about?

MR. FITZGERALD: In the Supreme Court's --

THE COURT: In the oral argument. Do I -- am I dreaming that? I think that -- I followed this case, so it wasn't -- you would say not raised at all, even in oral argument?

MR. FITZGERALD: No, I mean, I do think that versions of ultra vires claims were raised. I think the notion that, say, if somebody other than the Secretary exercised the TPS authority, at that point, that just wouldn't be a determination under the judicial review bar

because, under our view, it would be the Secretary; under their view, it would be the attorney general. But if it was somebody that was not one of those --

THE COURT: Totally random?

MR. FITZGERALD: -- individuals, then I don't -- then, you know, I think we'd probably both agree the judicial review bar doesn't apply.

But I do think it's a good point to raise because when the Supreme Court, in its discussion with respect to kind of plaintiffs, what they called sort of farfetched hypotheticals about, well, what if the Secretary flipped a coin to decide a TPS termination, what if the Secretary designated for 50 years, things that are so, obviously, beyond the bounds of what the TPS statute authorizes, the Supreme Court mentioned all of those hypotheticals to make the point that, well, that wouldn't be a basis to narrow the judicial review bar.

So I do think the Supreme Court was specifically anticipating or thinking about these ultra vires-type claims, claims that, well, that is so beyond the bounds of what the statutes authorizes, and nonetheless held that the TPS statute bars review of all nonconstitutional claims.

And so at a very minimum, I mean, this is a nonconstitutional claim. And so I think that, you know, beyond all the reasons I've already discussed, the judicial

review bar would still apply.

I do want to certainly address the merits, which we think --

THE COURT: So that's interesting. So you're saying I shouldn't even get into the statutory construction, because the judicial review bar applies?

MR. FITZGERALD: That's correct, Your Honor. We -- the judicial review bar, as interpreted by the Supreme Court, applies to all nonconstitutional claims. This is a nonconstitutional claim.

I don't -- I think the Supreme Court also separately -- I mean, it did state that TPS authority resides with the Secretary of Homeland Security. Its statutory citations on that point, no matter how much plaintiffs might disagree with them, you know, I think conclusively demonstrate this was not a drive-by, unthinking, offhanded statement.

The Supreme Court citation to supporting authorities for that proposition makes clear that it understood that transfer of authority issue and accepted that the transfer of authority from the attorney general to the Secretary -- so this was not a situation where it just said, "Oh, the parties agree about this, so we don't need to think about it or we can assume without deciding it." The Supreme Court cited authority for it, and so I think the Court could

resolve the issue that way.

With respect to the merits, I do want to clarify one thing. Plaintiffs' counsel said that the government is relying on 110- -- 1103(g) for the transfer of authority. We do cite -- we do think that's important, but just as a clarification, that's not the specific subsection that would support the transfer of authority.

We're still relying on 1103(a) for the transfer of authority. It's just that we think Section 1103 needs to be read as a whole, and at subsection (g) that makes clear that the reserved functions, the functions that are retained by the attorney general, those relate specifically to functions of EOIR, not -- which didn't have authorities --

THE COURT: Is there any case or regulation that says that, or is this you're just construing that section as a whole?

MR. FITZGERALD: So 1103(g) itself says the attorney general retains authorities.

THE COURT: Sure. Sure. I agree with that. But it is an awkward -- 1103(a) is awkwardly worded because it says, basically -- basically everything was the attorney general before. So -- and it says transfers everything over, except those reserved for the attorney general. So it's a little hard to figure out what's left. And you're saying only 1103(g) is left?

MR. FITZGERALD: Right.

THE COURT: Nothing else is left for the attorney general?

MR. FITZGERALD: I think that's the way to make sense of what would otherwise be not only an awkward but kind of a self-defeating transfer of a provision that doesn't transfer --

THE COURT: Accomplish much, because everything used to be -- I remember -- how old am I? I remember when everything was the attorney general's, so -- okay.

MR. FITZGERALD: And so if it wasn't for 1103(g), then I do think it would be hard to make sense of 1103(a). So I just wanted to clarify that. It's not that we're, like, resting, like, finding transfer of authority in 1103(g). I would describe it more as 1103 as a whole.

THE COURT: Once again -- you may have answered this question already -- there's no case that's really addressed this issue --

MR. FITZGERALD: For TPS?

THE COURT: -- other than *Mullin* itself? I mean --

MR. FITZGERALD: I mean, I would -- I would disagree with that, Your Honor. The district court cases that we cite that do -- in our brief -- do address the issue. I'm not trying to suggest that it was a contested issue, but these are district court decisions that cite, like, this

transfer of authority that the government cites.

THE COURT: Fair enough. But I'm talking about -- I mean, this case -- this issue was not raised before the Supreme Court expressly because they -- and the Supreme Court didn't have to rule on it. So -- and these other cases was -- were there any other cases that expressly dealt with this issue about who had the authority, the Secretary or the attorney general?

MR. FITZGERALD: Not to my knowledge.

THE COURT: We couldn't find one.

MR. FITZGERALD: I don't think so, Your Honor, and -- but I just want -- I would want to emphasize that not where it was a disputed issue.

THE COURT: Fair enough. Fair enough.

MR. FITZGERALD: And I do -- because the relevant standard here on the motion to amend, Your Honor, is futility, I do think it's incredibly important to emphasize that, at least in defendants' view, that this truly would be a claim that leads to nowhere or at least, you know, nowhere that would lead to a substantive benefit for plaintiffs.

If the Secretary does not have legal authority to terminate a TPS designation, the Secretary did not have legal authority to designate South Sudan in the first instance. I don't understand plaintiffs to even be disagreeing with that as a proposition.

THE COURT: Yes. I thought that was a powerful point, actually --

MR. FITZGERALD: There --

THE COURT: -- when I read the statutory scheme.

Can I ask you, on the futility thing --

MR. FITZGERALD: Sure.

THE COURT: -- say I agreed with you, that this claim is futile and I denied the motion to amend; I would imagine that's immediately appealable. I'm trying to figure out how this is not going to be litigated piecemeal --

MR. FITZGERALD: Sure. So --

THE COURT: -- so, like, it will bounce back and forth between me and the Circuit, kind of thing.

MR. FITZGERALD: It's a fair point, Your Honor. I don't -- so here's how I think it would play out. Sitting here now, I don't think the denial of a motion to amend -- I'm not sure if that would be immediately appealable.

I think that if Your Honor were to rule on the motion to, say -- rule on the motion to amend and then, depending on the outcome of that, soon thereafter rule on the motion for postponement, either a grant or deny, that would be immediately appealable.

THE COURT: I'm just -- jurisdictionally, we're awkward because, I mean, my stay, the administrative stay, doesn't even count because it's in front of the First Circuit

at this point. So I'm just trying to rule on it in an expeditious way and understand -- give the plaintiffs a chance to reply.

MR. FITZGERALD: Sure.

THE COURT: There will also be -- you know, written -- you're replying now, but some sort of written submission. And then I don't know how this all plays out. I -- it's awkward because it's technically still pending in front of the First Circuit.

MR. FITZGERALD: I -- so I think once the First Circuit remands, issues the mandate, returns jurisdiction over that issue to the Court, then this Court's administrative stay will go into effect.

That -- then the Court would be able to decide plaintiffs -- I think plaintiffs have to refile their renewed motion for 705 since the Court already denied that. But once plaintiffs filed that, defendants respond, and the Court rules on that, then either the Court will grant it, and then the postponement will be -- or the termination will still -- will be postponed by virtue of that. And so it's just -- the administrative stay will end, but we'll have a postponement, and then the government could appeal that.

Or the Court would deny the motion to postpone. At that time, the administrative stay would terminate. The termination would go in effect; and plaintiffs could, if they

so chose, appeal that order.

THE COURT: Much -- that's complicated. Let's go on to procedural due process.

MR. FITZGERALD: Sure.

MR. RANDOLPH: Your Honor? Apologies for jumping in, but would it be all right if I was heard just on the path forward for addressing the motion for leave and the -- sort of the subject that was just being discussed, which I think went beyond the scope of the ultra vires claim?

THE COURT: It did, but I asked him, so -- I asked him how he -- because at some point soon, I will rule on the futility issue or whether or not it's futile, and so I'm trying to --

MR. RANDOLPH: Well, Your Honor, just -- yes, Your Honor. Just to offer another path forward there --

THE COURT: Yeah.

MR. RANDOLPH: -- this Court could -- this Court could simply grant the motion for leave to amend but not address the merits. And we can cite you a number of cases, including from this district, where district courts have said, you know, addressing the merits in the context of futility in a motion for leave context is less than ideal for various reasons. And so I'm just not going to get into the merits right now, and we think that that would be preferable for a number of reasons.

First of all, we were just days away from the cutoff from being able to amend as of right if you account for the stay period and the extension that we received on the response to defendants' motion to dismiss. We were very close to being able to amend as of right. And, in fact, in the Ethiopia case, we were able to amend as of right. And so I think that counsels in favor --

THE COURT: Who has that case? Is that Judge Burroughs or Judge Murphy?

MR. RANDOLPH: It's Judge Murphy.

THE COURT: Okay.

MR. RANDOLPH: Yeah. It's Judge Murphy. And so in that case, we've just been able to amend as of right, and that's now in a motion to dismiss posture.

And, Your Honor, as to the appealability issue, we think that's a much better vehicle both for making sure that we have the briefing necessary to really get into the merits of these issues, but also to make sure that plaintiffs actually do have an avenue to appeal if this Court does rule against us on the statutory issue because, to my colleague's point just a minute ago, we would be happy to provide more authority on this and address this as well, but in our understanding, the denial of a motion for leave to amend would potentially not be appealable directly.

So we would want to look into that further, but I

think it's another -- another reason why this Court should -- why this Court should not resolve the merits of this claim in the context of a motion for leave.

And, you know, on top of all of that, the amount of briefing that we've been able to put in on -- just in the motion for leave is quite limited and narrow.

Just one other point on this: If the Court were to deny the motion for leave to amend, I'm not sure what basis we would have to assert a renewed postponement motion, because our renewed postponement motion is based on the claims.

And so if this Court had denied us leave to even add those claims to the complaint, then I don't know -- again, I don't want to say anything definitive at this point, but I'm scratching my head trying to understand how we could bring a renewed postponement motion if this Court had, in fact, said that we could not, you know, add the new claims to the complaint.

And, finally, just to add one more --

THE COURT: One way or another, I have to decide whether there's likely -- if I'm reversed, which I'm -- is certain, as night follows day, that I will be reversed on the opinion that I did a while ago, because it's the exact same case as the Haiti case. I don't think there were any issues, right?

MR. RANDOLPH: Yes, Your Honor, and plaintiffs agree to a reversal as to that appeal. Yes.

THE COURT: Right. So once again -- so there will be no basis to stay -- I have to find likelihood of success. I haven't even addressed those issues. I just stayed it so I could read the briefs. I just got the government's briefs Monday night. So -- it's Wednesday. So I --

MR. RANDOLPH: Yeah.

THE COURT: I can only move so fast. I'm in trial. I'm doing what I can here, but -- anyway, I think we should move on to the procedural due process.

MR. FITZGERALD: Could I -- I mean, I'm totally fine to move on if Your Honor doesn't --

THE COURT: What is it you want to say?

MR. FITZGERALD: Just the responses to the plaintiffs' points on the, like, would this ultimately be futile because there would be no authority to designate in the first place, just addressing their two responses to that.

THE COURT: Sure.

MR. FITZGERALD: So plaintiffs' first response, as I understand it, was that -- for the, I guess, initial TPS designation to be invalid, someone would need to first file a lawsuit challenging that designation. I don't think that can be right. If the Secretary didn't have authority to designate South Sudan for TPS, then South Sudan's TPS

designation is invalid.

There wouldn't be a need for somebody to challenge the designation; and, certainly, you know, the government isn't going to sue itself to vindicate that point.

I think it would be, you know, like, if a court entered a preliminary injunction and then a permanent injunction and then it turned out the court lacked jurisdiction to decide the case and so the permanent injunction was vacated, you wouldn't say okay. Well, let's revert back to the preliminary injunction unless and until the defendant objects to that one too.

If the court lacked jurisdiction to enter the permanent injunction, then it lacked jurisdiction to enter the preliminary injunction too. And I think the same essential logic would apply here too.

If the Secretary lacked jurisdiction over TPS, then the Secretary lacked jurisdiction over TPS. There doesn't need to be a separate independent lawsuit challenging the designation. It would just be, as a matter of law, the Secretary --

THE COURT: I think a lot of people would be upset if they heard the designation was invalid.

MR. FITZGERALD: I think that's exactly right.

The second point plaintiff raises is, okay, well, let's say the government, you know, didn't wait for a

lawsuit, just agreed with us, turned around and said there is no designated -- according to plaintiffs, we didn't have authority, so there is no designation, you know, their argument there would be *Regents*.

But, you know, they cite *Regents* for the proposition that, essentially, that when the cited basis for an agency program turns out to be invalid, the APA requires the government to explore alternatives to outright termination.

Very respectfully, that's not what *Regents* says at all. *Regents* says that it may be arbitrary and capricious for an agency to terminate an entire program based on a rationale -- that applies only to part of it without --

THE COURT: Can I say something? Your audio just went out. Can you just say it again?

MR. FITZGERALD: I'm sorry, Your Honor. Can you hear me now?

THE COURT: Yeah. It -- just momentarily. It may have just been a glitch in the software.

MR. FITZGERALD: I think my bandwidth is a little bit low. I apologize, Your Honor.

THE COURT: Just what you just said, say again.

MR. FITZGERALD: Just that *Regents* describes a very specific category of error that first arose in *State Farm*. And so that category of error is when an agency terminates an

entire program based on a rational that only applies to part of it without even considering whether it would retain aspects of the program unaffected by the agency's termination rationale.

So, for instance, in *Regents*, the Secretary terminated the DACA program. And the DACA program had two components, main components. One was the provision of benefits to recipients, like Medicaid, Social Security; and the other was forbearance of removal, not removing somebody.

And the Secretary, if I recalled correctly, determined that it was unlawful to provide benefits. It said we didn't have any authority to provide these benefits to DACA recipients, and so I'm terminating DACA as a whole.

And the Supreme Court says, well, that was arbitrary and capricious because, you know, you say you don't have authority to terminate or to provide benefits; that doesn't speak to your authority for forbearance of removal at all. You could have retained the forbearance aspect of it, and you didn't even consider whether to retain the forbearance aspect; therefore, so it was arbitrary and capricious not to consider retaining that component, which is unaffected by your whole rationale for terminating the program.

Here that would not apply. It's not as though the Secretary terminated South Sudan's designation on a basis

that only applied to part of the designation but not another, and so it could have considered whether it retained part of it.

The *Regents* category of error is just inapt, but I think of it more fundamentally. *Regents* is describing an APA claim. It would -- the Supreme Court held that it was arbitrary and capricious for the Secretary not to -- essentially, it was an unreasoned explanation not to consider, you know, retaining that aspect of DACA.

But here everybody agrees that plaintiffs wouldn't be able to bring an APA claim, you know, this type of nonconstitutional APA claim to challenge the Secretary's termination of a designation or, really, determination with respect to a designation or a termination or extension.

And so, you know, *Regents* is not only inapplicable, but it's genuinely no answer for, you know, the government's point that the initial designation here for South Sudan wouldn't be valid at all. You couldn't challenge the -- then a designation on a *Regents*-type basis for all the reasons discussed.

And then their third answer -- I mean, it does, as plaintiffs' counsel noted, dovetail significantly with the procedural due process claim. And so I can hold off on addressing that until --

THE COURT: Okay. Why don't we move to procedural

due process, *Mathews v. Eldridge*.

MR. RANDOLPH: Yes, Your Honor. Sorry. Sort of as -- there were two issues that I was hoping to be heard on in rebuttal that actually relate to both issues that I think are very important to clear up.

So first was my colleague mentioned -- seems to be confused about how we pleaded our amended complaint. If I could just direct the Court's attention specifically to our amended complaint and how we framed it, there's a specific paragraph at the very beginning of our statutory authority claim where we specifically invoked Rule 8 and Rule 8's allowance for pleading in the alternative. And Rule 8 specifically allows pleadings that are inconsistent, including allegations that are inconsistent with one another.

The government says in its brief they've gone beyond pleading in the alternative. They're internally inconsistent. But the rule itself allows for inconsistent pleading. And that's exactly what we did in our amended complaint, and we did that for a very specific reason.

We, obviously, think the best reading of the statute is that the attorney general has this authority. But we included -- we retained the initial allegations that supported the original claims because we wanted to ensure that we would not disturb this Court's -- that we would not disturb the appellate jurisdiction that the First Circuit has

with respect to the postponement order as to the original claims. So we --

THE COURT: I'm not totally understanding that. The original -- look, I said what I believed, but the Supreme Court -- the majority of the Supreme Court disagreed with it, so the original complaint's gone.

MR. RANDOLPH: So, Your Honor, our view -- again, our attempt was to preserve those claims so that we did not disturb the basis for the pending First Circuit appeal. So it was just a concern about appellate jurisdiction. We didn't want to make amendments to the claims that were sort of the foundation for the First Circuit appeal, which is the -- which is Your Honor's, you know, prior postponement order that we do agree should be reversed and remanded.

But I just wanted to explain. We were aware of the inconsistency in our amended complaint. It wasn't that we overlooked something. We did this very intentionally in an effort to try to preserve this Court's ability to address these new claims.

Just one other -- one other point I wanted to raise, which is that as -- there's a Supreme Court case from 1925, *Webster v. Fall*. And it says -- it says very clearly that questions which merely lurk in the record neither brought to the attention of the Court nor ruled upon are not to be considered as having been so decided as to constitute

precedence.

So this is a Supreme Court authority. The government entirely ignores this in their briefing. They entirely --

THE COURT: Who was that in 1925? Was that Justice Taft or something? Who was that?

MR. RANDOLPH: Your Honor, I would have to look. I would have to look into it.

THE COURT: It's irrelevant.

MR. RANDOLPH: I will say it's not just that case. It's a whole line of cases from the Supreme Court, and we've cited multiple of them in our brief. The government doesn't acknowledge this at all. And I think that it's remarkable because the government is accusing plaintiffs of not adhering loyally to Supreme Court precedent.

We have multiple pages in our briefing addressing *Webster v. Fall* and the Supreme Court's authorities that address this exact scenario, and the government has completely ignored it. And I just think that's remarkable.

Your Honor, I apologize. I'm happy to turn to the procedural due process claim.

THE COURT: Yeah. Because let me just say, procedural due process -- there are some TPS procedural due process cases that we saw when we did some research here. It was always in the context of individual rights. You know, if

you are a designee, do you get work authority or something like that?

So I just -- you're, essentially, asking for procedural due process protections for the whole program. Is that it?

MR. RANDOLPH: So, Your Honor, first of all, as to the cases that have addressed TPS, due process in the TPS context, you are correct that some of them addressed procedural due process with respect to individual adjudications, but others acknowledge that there were due process interests, even with respect to group challenges.

We agree that no court has previously held that there are these procedural due process interests, but they have -- but courts have acknowledged and sort of recognized these interests sort of in the background of their discussions. And so we think that that certainly gives credibility to these -- to these claims.

I do want to clarify something very important here, which is the government accuses us of just repackaging the statutory claims as procedural due process claims. And that's just absolutely inaccurate and not the case.

We are not saying that all of the claims that we could have brought as statutory claims can be -- can be brought under now a constitutional label. We would acknowledge that some of the statutory claims that we brought

before this Court several months ago, for example, the APA claim that there was a departure from past practice and also the APA claim that the Secretary impermissibly considered the national interests, those we acknowledge would not be cognizable as procedural due process claims.

But this Court has held -- and when I say "this Court," I mean Your Honor -- has held multiple times that statutes and regulations that are implemented to ensure that constitutional procedural safeguards are afforded to litigants, including in the immigration context, that when there is a violation of those regulations, that independently violates the procedural due process clause.

And so that's exactly what our claim is here. Congress --

THE COURT: It's just sort of -- I agreed with you the first time around that the Secretary did not adequately or meaningfully consult with the Secretary of State. It was, like, you know, one line in an email or something. But the Supreme Court said I can't review that.

MR. RANDOLPH: Well, Your Honor, respectfully, the Supreme Court considered statutory claims that were brought under the APA. Once again, the Supreme Court did not consider a constitutional procedural due process claim. And the Supreme Court's holding in *Mullin* says that the review bar -- well, the Supreme Court explicitly reserved as to

whether the review bar applies to constitutional claims. And so certainly there's no argument that *Mullin* --

THE COURT: What would you do? I'm just trying to think. Most of the procedural due process cases I've had in my career have been an individual who claims that he was deprived of a statutory right arbitrarily or without reasonable basis or no substantial evidence, and then you have -- you're entitled to notice and a hearing.

So what would you do here? I mean, I can't do every TPS designee.

MR. RANDOLPH: Yes, Your Honor. That's right. And we would agree that most procedural due process cases arise in the individualized context, but not all. For example, the first travel ban litigation under the first Trump administration --

THE COURT: *Trump v. Hawaii*; is that it?

MR. RANDOLPH: Yes. Your Honor, it went through the District of Washington and then to the Ninth Circuit on procedural due process, on a procedural due process claim. And that was a challenge to an executive order that, obviously, was a determination that affected a very large number of people in one fell swoop.

And so our -- our claim is very similar, is that this determination -- excuse me -- the termination of the TPS designation, even though it has an effect on a large number

of people, it affects each of those people's protected property and liberty interests and, therefore, triggers procedural due process.

And in terms of --

THE COURT: But if they don't have those property or liberty interests anymore, the Secretary declined to designate them, what would a hearing even look like?

MR. RANDOLPH: Well, Your Honor, we're not saying that each of these members -- we're certainly not saying that each of these individual members should receive individualized notice or an individualized hearing for every designation. That's not at all what we're saying.

We're saying that the relevant notice for procedural due process purposes and under the constitution is a notice in the Federal Register that is actually providing the true basis for the designation. And the reason why --

THE COURT: I agreed with you last time, and it was rejected. I thought -- I said it was a pretext, right? I mean, and -- because he -- and they said you can't look at that.

MR. RANDOLPH: Well, Your Honor, we would just -- we would just say that our claim is based on a different -- it's a fundamentally different claim, and it's based on a different set of case law.

I mean, it's settled in due process case law that

notice is one of the fundamental components of, you know, procedural due process. And so it's based on a different line of cases. It's not based on -- you know, I think the government also mischaracterizes our claim here. We do assert that this is an independent violation of the due process clause.

It's not simply that this is a violation of the statute. It's also a violation of the -- of the due process clause, and it is for different reasons.

And it also might be the case that the Court concludes that, you know, some of the particular procedural safeguards we've identified, you know, do not rise to the level of a due process violation while others do.

So, for example, the Court might conclude that the consultation requirement is not required under the due process clause but that the notice requirement is required under the due process clause, again, going Back to *Mullin* and all those foundational due process cases that recognize the importance of notice.

And in that case, there would still be a procedural due process violation, and even one violation would be sufficient to support relief here.

THE COURT: Thank you.

The government?

MR. FITZGERALD: Thank you, Your Honor.

I don't want to rehash all the briefing. I think the points that you've raised are exactly right. I mean, the two critical ones being, one, the *Mathews v. Eldridge* framework procedural due process applies in the context of individual adjudications.

If plaintiffs aren't looking for -- as far as plaintiffs' counsel just stayed, if they're not looking for individualized notice and hearing, then *Mathews v. Eldridge* really does not have anything to do with it. That's what would be at play in a procedural due process claim.

Here they're arguing that the process they are entitled to are the statutory procedural requirements. They are validly challenging the Secretary's alleged failure to meaningfully consult with appropriate agencies and the Secretary's alleged failure to publish the true basis for her decision in the Federal Register.

So the second point, as Your Honor alluded to as well, is the Supreme Court has already held that the TPS statute bars these types of process-based claims in substance. And to say that, well, we think these statutory violations are also due process violations and, therefore, we can proceed notwithstanding the judicial review bar, I just think that would be the epitome of elevating form over substance.

I think maybe the -- an analogous scenario arises

in the Section 1983 context. So as Your Honor well knows, Section 1983 affords a cause of action for alleged violations of federal law, not state law. And so it would not provide a cause of action to challenge a state governmental actor's noncompliance with state statutory procedures.

Sometimes, to get around that, plaintiffs argue that a defendant's noncompliance with state statutory procedures also violated their federal due process rights under the Fourteenth Amendment. And so they go into federal court saying they can state a Section 1983 claim.

And in those situations, courts often say, no, you can't get around Section 1983's limitations so easily. A violation of statutory procedures without more is not a federal due process claim.

And I think, essentially, that same principle applies here. Plaintiffs are arguing that the statutory procedures were not followed and that rose to the level of a due process violation, but the TPS judicial review bar cannot be evaded that easily truly by just calling these due process claims. They are in substance the same issues that plaintiffs challenged earlier and Your Honor agreed with.

But they are claims that the Secretary did not meaningfully consult and that the Secretary's, you know, basis in the Federal Register was pretextual and preordained. The Supreme Court has said those decisions are not

reviewable. I think it would be extraordinary if it turned out that, oh, yes, they actually are in full based on labeling these claims a procedural due process challenge.

We also don't think that there's a procedural due process-protected interest in the first place. I mean, this kind of gets at what Your Honor was talking about with the framework applying to individual adjudications as opposed to a legislative program writ large.

But plaintiffs have no -- you know, I think all would concede that the TPS designation, say, of South Sudan, is, at most, a benefit. And in the government's view, the TPS statute does not entitle TPS recipients to the extension of that benefit in a set of specified circumstances. It's up to the Secretary of Homeland Security.

And so there is not -- plaintiffs point to, you know, the interest in, say, not being -- being able to stay in the United States, work in the United States, not being removed. But even accepting that as a liberty interest against removal, that interest would -- the process that would need to be afforded before depriving somebody of that interest, that would be afforded in individual removal proceedings. That's where --

THE COURT: You told me about this last time. Essentially, if I agree with you that it's futile and I get it remanded from the First Circuit and I don't continue a

stay, these people -- I know plaintiffs are so really diligent about trying to protect -- they get their own individual rights, right? I mean, they get to -- they get a hearing and -- whether there's humanitarian basis for keeping them in the country; isn't that right?

MR. FITZGERALD: If they were to contest the removal, certainly, yes, they would have to get -- removal proceedings would have to be initiated. They would have to have notice of that, an opportunity to be heard, contest to --

THE COURT: They're not all going to be swept up in a detention facility right away, right?

MR. FITZGERALD: I mean, that's --

THE COURT: There's a removal order.

MR. FITZGERALD: There would have to be removal proceedings initiated, is my understanding. This is out of my depth. But, I mean, certainly, my understanding is that in order to be removed, your interest in not being removed, the process afforded to -- before depriving you of that right would be afforded in an individualized removal hearing.

THE COURT: Because that would be required under procedural due process, I would say.

MR. FITZGERALD: I think that's exactly right. I think -- I mean, I think that is the way to think about it, in that your due process liberty interest in not being

removed from the United States unlawfully, you would be -- you would have to be afforded notice in a hearing before that happens, and that would occur in context of removal proceedings.

It's just an awkward fit in trying to overlay that *Mathews v. Eldridge* individual due process rights on top of a legislative scheme like TPS. There's not, like, an individual entitlement to South Sudan continuing to be -- you know, certainly not to be designated in the first place, but also not to be extended.

And so I think just procedural due process is not the right framework, which, you know, candidly, I think is why it makes sense why plaintiffs' initial challenge to this was a statutory challenge, that the Secretary didn't follow the statutory procedures.

And, you know, some -- and I think the Seventh Circuit decision they cite is also fairly helpful on this score, in that it's the Judge Easterbrook decision that explains, well, you know, you can challenge a statutory -- or a noncompliance with statutory procedures. That's a statutory claim.

And if, you know, you're claiming that the statutory procedures are not enough, then you might have a separate due process claim. But if all you're claiming is they didn't comply with the procedures that were afforded in

the statute, that is a statutory claim. And the due process claim covers entirely a different ground.

THE COURT: So this is where -- I think what we should do here now. I do think that the plaintiffs have a right to respond, but I'm on my own time frame with my own trial and personal schedule. So why don't you file any reply by noon on Friday. And then I will get an opinion out, if possible. I got another giant case today filed, so we're being inundated a bit here. But I'm going to try and do it within a week because I think -- I'd like to have whatever happens happen soon.

So -- but I do believe that the plaintiffs have a right to reply. And did the government want a right for a sur-reply or just leave it there?

MR. FITZGERALD: I -- you know, I would never turn down a chance for a sur-reply, unless it would kind of extend the decision-making time for this. If the Court is ready to promptly rule right after the plaintiffs file their reply, then I would forego the sur-reply. But if the Court wants and would appreciate a sur-reply, then, you know, I'm more than happen to do that.

THE COURT: Well, it's a little awkward for me. I don't know what to say. They'll file something by noon on Friday. And if you want to a file a sur-reply, let me know on Friday.

MR. FITZGERALD: Okay. Thank you, Your Honor.

MR. RANDOLPH: Your Honor, may I just ask about the postponement motion? Will plaintiffs have an opportunity to renew their postponement motion?

THE COURT: What postponement?

MR. RANDOLPH: I understand Your Honor's -- I apologize. I understand Your Honor's inclined against it at the moment, but we would appreciate the opportunity to brief that postponement motion.

THE COURT: I don't know what you're talking about.

MR. RANDOLPH: Well, Your Honor, we've --

THE COURT: I already denied it, because the First Circuit has it on appeal, right?

MR. RANDOLPH: Yes, Your Honor. So my question is when the -- assuming the First Circuit reverses and remands, which could happen at any day now, and this Court gets jurisdiction back, will -- can plaintiffs at that point -- may they renew their postponement since it was initially denied without prejudice?

THE COURT: Of course you can always renew it. But I have to say I'm very sympathetic to what you want to do because you want to help these people, but there are difficult issues here.

MR. RANDOLPH: Your Honor, with respect, we feel like we just haven't had --

THE COURT: I would have to find there's a likelihood of success.

MR. RANDOLPH: Yes, Your Honor. We understand that. And I think we feel -- we just think these are important claims and they need to have their day in court.

And I think the government is really attempting and they're doing this -- you know, multiple district courts will weigh in here in the coming, you know, days and weeks on these claims. But the government is really attempting in all of these cases to rush out decisions, to sort of sweep things under the rug, frankly.

And we think that -- we think that these claims deserve to be properly briefed and considered by this Court and other courts. So we appreciate the opportunity to reply in support of --

THE COURT: Of course you can reply, and of course they can sur-reply. And I can do what is humanly necessary -- possible for me given the weight of my caseload right now. I'll do what I can --

MR. RANDOLPH: Yes, Your Honor.

THE COURT: -- as quickly as I can humanly do it. But that having been said, you know, I'm not going to -- you know, it's in the interest of justice to move this along. And --

MR. RANDOLPH: Your Honor --

THE COURT: -- you can file whatever you want to file, but I'm right now at just an administrative stay. I'm not at likelihood of success yet, so -- if at all. So I just need to read your reply.

And if the government wants a sur-reply, you'll tell me on Friday and tell me when you can get it in.

But let me just say that I'm going to be starting -- well, I've already started to do research into it. I've already started that process, as you can tell. I've got the books right here, looking at the statute. So -- in the old-fashioned way. But what I want is for both of you to let me know if other courts weigh in on it on the interim.

MR. RANDOLPH: Yes, Your Honor. And, sorry, one final point. First of all, we deeply respect Your Honor's attention to this and understand these are difficult claims that have not been raised before and they need time.

But I also just want to emphasize that, at this point, this Court's administrative stay is not even in effect. And so I understand that there is some, you know, time sensitivity here, but there's also -- at this point, the government is attempting to sort of manufacture an emergency right now in order to rush out a decision. And, particularly given all of the other things on Your Honor's plate, there isn't actually a burning need here for a decision, particularly on plaintiffs' motion for leave to amend.

The Court could -- the Court could simply grant that without addressing the merits at all and then allow plaintiffs to raise their postponement motion --

THE COURT: Well, the merits have been raised, so I -- this isn't the first time I've had a -- deny the motion to amend because it's futile. I would have to say on every single motion to amend, I get, no, it's futile if it's substantive. So it's common, not uncommon, for this to be raised, at least here in Boston.

MR. RANDOLPH: Yes, Your Honor. I understand.

THE COURT: Honestly, it's usually your firm raising that issue with respect to motions to amend. So -- not you personally, but defense --

MR. RANDOLPH: Yes, Your Honor.

THE COURT: So I will look at this. I will give it my full attention. I'm taking it very seriously. But I will do it consistent with my caseload. I will look at the reply brief and if the government wants a sur-reply. But I'll be moving it along. It won't be some indefinite stay. So, as you point out, my administrative stay isn't even effective yet because it's all in the First Circuit. So there it is.

Thank you very much, because we did -- we have a fast turnaround on this, and you both were willing to do that right away. So I appreciate it. Now I'm going to go back to my jury charge.

So thank you very much.

MR. RANDOLPH: Thank you so much, Your Honor.

THE COURT: All right. Bye-bye.

(Court in recess at 3:43 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 10th day of August, 2026.

/s/ Robert W. Paschal

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter